UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, ) | Case No. SA-98-CA-0629-FB |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| **HOLD BILLING SERVICES, et al.**, ) | |
| ) | |
| Defendants. ) | |

### FEDERAL TRADE COMMISSION'S REPLY TO BSG'S OPPOSITION TO MOTION FOR ORDER TO SHOW CAUSE

In its Opposition, BSG[1] does not dispute that it billed consumers for millions of unauthorized charges, collecting more than $70 million. Rather, BSG raises several unsupported and unsustainable arguments without presenting any evidence to dispute the facts in the FTC's contempt motion. First, BSG proposes an interpretation of the Permanent Injunction that disregards its plain language. Second, BSG mischaracterizes the law that binds non-parties to an injunction. Third, BSG wrongly asserts that proof of scienter is required to bind its non-party entities. Fourth, BSG fails to rebut the overwhelming evidence that it violated Paragraphs II, III, and V of the Permanent Injunction. Moreover, because BSG fails to raise any genuine issue of material fact, the Court need not conduct an evidentiary hearing to hold it in contempt.

---

[1] As described in the FTC's initial motion and adopted in BSG's Opposition, "BSG" includes foreign parent company Billing Services Group Ltd.; domestic parent company and party to the Permanent Injunction, Billing Services Group North America, Inc. ("BSGNA," also referred to in BSG's Opposition by its prior name, "HBS"); and BSGNA's subsidiaries: BSG Clearing, ESBI, BCI, ACI, and party to the injunction HBS Billing Services Group. *See* Dkt. No. 55-40 (Wolfe Att. E-32), at BSGRESPXVI00002747 (BSG Organizational Chart).

### I.     BSG Disregards the Plain Language of the Order, Contrary to Law.

BSG devotes nearly two pages of its Opposition to a summary of case law making the uncontroversial point that orders must be clear and unambiguous.  Dkt. No. 69, Opposition ("Opp.") 8-9.  It does not, however, actually argue that any particular term or provision in the Permanent Injunction is unenforceably vague.  Instead, BSG urges the Court to look beyond the plain language of the Permanent Injunction to interpret it via its purported "context" and "purpose."  Opp. 10, 13-16.  In doing so, BSG ignores the well-settled law that where the language of an order is clear, courts will not look past its terms.  *See United States v. Armour & Co.*, 402 U.S. 673, 682 (1971) ("the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it"); *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 77 (1st Cir. 2002) (courts must limit their inquiry to an order's text); *Combs v. Ryan's Coal Co.*, 785 F.2d 970, 978 (11th Cir. 1986) (appropriate inquiry focuses on the language of the order).

Contrary to this well-settled authority, BSG argues that the Court should read the Permanent Injunction in the "context" of the underlying proceedings to cover only the specific conduct addressed in the FTC's complaint.  Opp. 3, 10, 13, 15-16.  Applying this rationale, BSG would interpret Part V.A of the Permanent Injunction to prohibit only billing of customers who filled out deceptive sweepstakes entries, Part III to prohibit only billings for "charges agreed to by a consumer who is not the line subscriber," and Part II to prohibit only post-billing representations.[2]  Opp. 10, 13, 15-16.  In fact, the plain language of the Permanent Injunction is

---

[2]  BSG's Opposition purports to present BSG's subjective understanding of the Permanent Injunction's terms.  However, even if BSG's subjective understanding were relevant, which it is not, BSG presents no evidence that its officers, directors, managers, or employees actually interpreted the Permanent Injunction as it suggests.  *Ochoa-Barrios v. Mukasey*, 269 F. App'x 497, 497-98 (5th Cir. 2008) (attorney's statements in a brief or motion are not evidence).

not so limited:  Part V expressly prohibits all billings and collections on behalf of a vendor "that does not disclose clearly and conspicuously" six specific types of information before sign-up; Part III prohibits "billing … or collecting" for charges that were not "expressly authorized by the Line Subscriber"; and Part II prohibits "*any* misrepresentation" that a line subscriber authorized or must pay for a charge, regardless of when or how the misrepresentation is made.  Dkt. No. 39, Permanent Injunction ("Permanent Injunction") 2-6 (emphasis added).

Such "fencing-in" provisions enjoining conduct beyond the precise allegations set out in a complaint are both appropriate and, as this case demonstrates, necessary to create "decrees that are not so narrow as to invite easy evasion."[3]  *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949); *see also FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) ("[T]he Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past") (quoting *FTC v. Ruberoid Co*., 343 U.S. 470, 473 (1952)); *Alterman Foods, Inc. v. FTC*, 497 F.2d 993, 997 (5th Cir. 1974) (same); *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1499 (1st Cir. 1989); *FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1335 (M.D. Fla. 2010); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1017-18 (N.D. Ind. 2000).

Additionally, BSG argues that Paragraph III's prohibition on unauthorized billing cannot

---

[3]  As a corollary, the mere fact that an injunction covers conduct beyond that alleged in the complaint does not render it impermissibly vague.  *Nat'l Comm'n on Egg Nutrition v. FTC*, 570 F.2d 157, 164 (7th Cir. 1977).  Nor is an order vague simply because the defendant can concoct an argument about its meaning, particularly where that argument is incompatible with the order's plain language.  *FTC v Leshin*, 618 F.3d 1221, 1235 (11th Cir. 2010) (if one party's interpretation is unreasonable in light of the stipulated order's plain language, then the order is not ambiguous); *Goya Foods*, 290 F.3d at 77 (rejecting defendants' contention that "cobbling together a plausible legal argument about the effectiveness of an order renders the order unclear or ambiguous for contempt purposes"); *United States v. Prof'l Air Traffic Controllers Org. (PATCO)*, 678 F.2d 1, 3 (1st Cir. 1982) (argument about the meaning of a clearly worded order "strikes more of legalistic afterthought than of vagueness and ambiguity").

mean what it says because, if it did, BSG could not comply with it. Opp. 14-15. But this is no more than a disguised assertion of an "inability to comply" defense. *See Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 401 (5th Cir. 1987) (*citing United States v. Rylander*, 460 U.S. 752, 757 (1983) (inability to comply is a defense to contempt)); *see also FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1241 (9th Cir.) ("the party asserting the impossibility defense must show 'categorically and in detail' why he is unable to comply"). This defense fails for three reasons.

First, the Fifth Circuit rightfully takes a dim view of defendants who stipulate to an order, as BSGNA and HBS stipulated to the Permanent Injunction, and later argue they are unable to comply with it. *See United States v. Sorrells*, 877 F.2d 346, 349-50 (5th Cir. 1989) (where defendant stipulated to an order to produce documents, court would not accept his later contention that he did not possess those documents).

Second, defendants have a duty to make all reasonable efforts to comply with an order's terms. *United States v. Ryan*, 402 U.S. 530, 534 (1971); *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976). Defendants who fail to discharge this duty cannot successfully assert an inability to comply defense; in essence, defendants may not claim inability to comply if they have not even made a reasonable effort to comply. *See Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998); *CFTC v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992); *see also Smith v. Smith*, Case No. 99-50212, 1999 WL 766991, at *2 (5th Cir. Sept. 2, 1999); *Rizzo*, 539 F.2d at 465. Here, as described in Section IV below and in the FTC's contempt filing, BSG does not and cannot demonstrate that it made "all reasonable efforts" not to bill or collect unauthorized charges. Indeed, even in the face of thousands of complaints, BSG

made no such efforts. It instead utterly failed to check the services' marketing or usage, and billed for the services after LECs refused to do so. Dkt. No. 55-3, FTC's Fact Appendix ("Fact Appx."), ¶¶ 27, 40-58, 69-77, 81-92, 94-106. In essence, BSG gave its vendors free rein, ignoring the order and the enormous harm BSG was causing consumers.

Third, if BSG truly believed it could not comply with the order as written, or that the order's language was unclear, its proper recourse was to seek modification. *McComb*, 336 U.S. at 192 (because defendants did not seek modification, but instead "undertook to make their own determination of what the decree meant … they acted at their peril"); *Negron-Almeda v. Santiago*, 528 F.3d 15, 24 (1st Cir. 2008) ("to the extent that there was any room for doubt that the 2004 order meant exactly what it said, it was the burden of the doubters … to ask the district court in a timely fashion to clarify the scope of the order"); *Glover v. Johnson*, 934 F.2d 703, 709 (6th Cir. 1991) ("It suffices to say that the 1981 final order was a negotiated settlement between the parties. … defendants' failure to request the court to clarify, explain, or modify the language in the decade since the order was served precludes raising an ambiguity argument at this time").

## II.   BSG Minimizes and Mischaracterizes the Law Binding Non-Parties to Injunctions.

BSG minimizes and mischaracterizes the law that binds non-parties who stand in close relationships with parties to an order – including by ignoring the seminal case, *Regal Knitwear Co. v. NLRB*, 324 U.S. 9 (1945). Significantly, BSG does not dispute that its domestic parent, BSGNA, is simply a renamed party defendant or that BSGNA controls its subsidiaries BSG Clearing, ESBI, ACI, BCI, and HBS (which is itself a renamed party to the Permanent Injunction). Fact Appx., ¶¶ 4-12, 18. Having failed to dispute BSGNA's control of its subsidiaries, BSG unsurprisingly ignores the Supreme Court's oft-cited directive that injunctions

bind "those identified with [parties] in interest, in 'privity' with them, represented by them or subject to their control." *Regal Knitwear*, 324 U.S. at 14 (emphasis added); *see also Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (quoting *Regal Knitwear*); *Waffenschmidt v. MacKay*, 763 F.2d 711, 717 (5th Cir. 1985) (same).

BSG references the non-party liability doctrines that arose from *Regal Knitwear* only in the final footnote on the last page of its brief, where it admits that "non-parties may be held in contempt if they are 'legally identified with the enjoined party.'"[4]  Opp. 19 n.12.  However, BSG tries to limit the doctrine to "successors and assigns." *Id.*  But in fact, the very case BSG cites explicitly states that the doctrine is not limited to successors:  "One line of cases holds that an injunction will bind nonparty successors in interest to an enjoined party … Another line of cases holds that a nonparty may be bound by an injunction if the nonparty is *otherwise 'legally identified'* with the enjoined party." *Nat'l Spiritual Assembly of the Baha'is of the United States of America Under the Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of the Baha'is of the United States of America, Inc.*, 628 F.3d 837, 849 (7th Cir. 2010) (emphasis added).

BSG then seeks to limit such liability to situations where the non-party controlled the underlying litigation in which the injunction was entered.  Opp. 19 n.12.  But courts consider a non-party's control over the underlying litigation only where the non-party is no longer closely identified with the party when the violation occurs. *See Baha'is*, 628 F.3d at 850, 855 (former employees of dissolved party accused of violating injunction) (discussing *Alemite Manufacturing Corp. v. Staff*, 42 F.2d 832 (2d Cir. 1930) and *G&C Merriam Co. v. Webster Dictionary Co.*, 639

---

[4] By recognizing the existence of these doctrines, BSG disproves its earlier statement that the FTC "must show that the BSG Group non-parties aided or abetted" the parties.  Opp. 17.  Regardless, as described in the FTC's contempt motion and in Section III below, the non-party BSG entities are liable *both* as aiders and abettors *and* because they are closely identified in interest with the parties.

F.2d 29 (1st Cir. 1980) (both involving former employees of party)). Where, as here, the non-party at issue is "identified with [the party] in interest" or "subject to their control" at the time of the violation, the Court need go no further to find that the non-party is bound by the order. *Regal Knitwear*, 324 U.S. at 14; *see Merriam*, 639 F.2d at 37 (stating that *Merriam* addressed a situation not covered by *Regal Knitwear*). Thus, in *Teas v. Twentieth-Century Fox Film Corp.*, 413 F.2d 1263, 1269 (5th Cir. 1969), the Fifth Circuit held that an order against a corporate parent "inures to the detriment of all persons within the scope of [the parent's] corporate control." There, the Fifth Circuit bound both a parent and its wholly owned subsidiary because they shared officers, directors, and employees; they operated from the same location; and the subsidiary existed only to serve the parent's purposes. *Teas*, 413 F.2d at 1269 n.7.[5] As described in the FTC's contempt motion and supporting documents, the same situation exists between domestic parent company (and party to the order) BSGNA and its subsidiaries – a fact BSG makes no effort to rebut.

Finally, having failed to rebut the control relationship and close identity of interests between BSGNA and its subsidiaries, BSG then fails to rebut foreign parent company BSG Ltd.'s liability. In its attempt to do so, BSG flagrantly mischaracterizes Fifth Circuit law regarding the responsibility of a corporate parent for order violations. It argues that *Wirtz v. Ocala Gas Co.*, 336 F.2d 236 (5th Cir. 1964), held only that "the president of a corporation was

---

[5] As the *Teas* court implicitly recognized, to hold otherwise would lead to absurd results. Indeed, it would permit a bound party (BSGNA) to evade an order simply by creating or acquiring a subsidiary (BSG's billing arms) post-order and then using that subsidiary to violate the order. Such evasion would undercut Rule 65(d), which exists precisely to prevent defendants from nullifying court orders through corporate sleight-of-hand. *See Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 179 (1973); *Regal Knitwear*, 324 U.S. at 14-15; *Walling v. James V. Reuter, Inc.*, 321 U.S. 671, 674 (1944); *see also Computer Searching Serv. Corp. v. Ryan*, 439 F.2d 6, 8-9 (2d Cir. 1971) (if an enjoined party simply transferred its violative activities to its "controlled subsidiary," the subsidiary would be liable under Rule 65(d)).

liable for contempt, not its parent corporation," and that "an injunction does not reach related companies." Opp. 19 n.12. In fact, *Wirtz* expressly held the parent company liable: "We hold further that Mr. H.M. Lewis, President of all corporations here concerned, having full knowledge of the decree, *and West Florida Gas, [the non-party parent corporation] likewise having full knowledge of the decree*, and having actually participated in the alleged violation thereof … are answerable for contempt" because both were "responsible for the conduct" of the bound subsidiary's affairs. 336 F.2d at 242 (emphasis added). As in *Wirtz* and as described in the FTC's motion, BSG Ltd. is responsible, and thus liable, for the violations of its party-subsidiary BSGNA.

### III.   BSG Wrongly Seeks to Apply a Heightened Scienter Requirement to Non-Party Corporations Who Aid and Abet a Corporate Affiliate.

BSG also seeks to require the FTC to prove that its non-party corporate affiliates willfully violated the order. *See* Opp. 18. Specifically, BSG claims that non-party aiding and abetting liability requires a showing of "conscious intent" to violate the Court's order.[6] *Id.* But this argument is inapplicable to non-parties identified with a party or subject to a party's control. *Software Freedom Conservancy, Inc. v. Westinghouse Digital Elecs., LLC*, 812 F. Supp. 2d 483, 488 (S.D.N.Y. 2011). Non-parties who are identified with a party or subject to a party's control need only have knowledge of the order, not knowledge that they were violating the order. *Wirtz*, 336 F.2d at 242 (non-defendant parent corporation liable for participating in the order violations while "having full knowledge of the decree"). Furthermore, even when considering only the

---

[6] BSG's citation for the "conscious intent" standard, *Amacker v. Renaissance Asset Mgmt. LLC*, 657 F.3d 252, 254-55 (5th Cir. 2011), *see* Opp. 18, in fact deals with a statute that created a private right of action against one who "willfully aids [or] abets" a violation of the Commodity Exchange Act. As *Amacker* does not even address contempt liability, it cannot serve as the basis to import new requirements into the test for civil contempt.

aiding-and-abetting liability of non-parties, courts do not universally require proof that they knew their actions violated the order. *See Goya Foods*, 290 F.3d at 75 (non-parties who had actual knowledge of an order held in contempt for aiding and abetting even though they "honestly believed" the orders had lapsed because they "assume the risk of mistaken judgments.").

Those courts that have required heightened scienter for aiding-and-abetting liability have done so only in the context of *independent* third parties, not intertwined corporate affiliates. *See Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1354 (Fed. Cir. 1998). For example, each of the three cases BSG cites concerns an independent third party that was misinformed or mistaken about the order's terms. *See Flowdata*, 154 F.3d at 1354; *Whitcraft v. Brown*, 570 F.3d 268, 273 (5th Cir. 2009); *Waffenschmidt*, 763 F.2d at 726. In *Flowdata*, the defendant's majority stockholder and attorney assured the non-party individual that his pump designs were not covered by the subsequently issued injunction. 154 F.3d at 1354. In *Whitcraft*, the non-party individual was unaware that a painting she owned was subject to a freeze on the bound party's assets, as the defendant told her only that the SEC had closed his accounts. 570 F.3d at 273. In *Waffenschmidt*, the defendant assured the non-party bank that the assets he sought to liquidate were not covered by the order. 763 F.2d at 726. The courts in those cases therefore did no more than apply *Regal Knitwear's* directive that the relationship between the party and the non-party guide the liability analysis under Rule 65(d). *Flowdata*, 154 F.3d at 1351 ("the effect of an injunction on non-parties depends on an appraisal of their relations and behavior with the enjoined party" (internal quotation marks omitted) (quoting *Regal Knitwear*, 324 U.S. at 15)).

Here, as described in the FTC's initial motion and as BSG does not dispute, the lack of separation between the BSG entities make them quite different from the independent third parties described in *Flowdata*, *Whitcraft*, and *Waffenschmidt*, and more like the corporate affiliates in *Wirtz* and *Teas*.  The BSG entities do not operate at arms' length; in fact, they are essentially indistinguishable from one another.  Fact Appx., ¶¶ 13-17, 63-64, 67.  BSG therefore cannot claim that its party components misled its non-party components about the Permanent Injunction.  Indeed, its party and non-party components undisputedly act as one entity, with the same personnel and thus the same knowledge of the Permanent Injunction's terms regardless of which name they choose to use for particular transactions.  *Id.*  As BSG's party and non-party components are indistinguishable from one another, BSG cannot require the FTC to prove a heightened scienter against any of them.[7]

Even if the FTC were required to prove that BSG's non-party components knew about the violations, the FTC has amply demonstrated that each BSG entity had full knowledge of the Permanent Injunction and of BSG's failures to comply with it.  First, all of the BSG entities signed documents acknowledging the Permanent Injunction upon consummation of their 2003 merger, and BSG does not dispute this knowledge.  Fact Appx., ¶ 10.  Second, the FTC presented overwhelming, undisputed evidence that BSG was aware of, or at least willfully blind to, its violations of the Permanent Injunction.  *See, e.g., Global-Tech Appliances, Inc. v. SEB S.A.* and cases cited, __ U.S. __, 131 S. Ct. 2060, 2068-69 (2011) ("Many criminal statutes require proof that a defendant acted knowingly or willfully, and courts applying the doctrine of willful

---

[7] It is well-settled that BSG's party components are liable for contempt regardless of their scienter.  *See, e.g.*, *McComb*, 336 U.S. at 191 ("The absence of willfulness does not relieve from civil contempt. … Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act.").

blindness hold that defendants cannot escape the reach of these statutes by deliberately shielding themselves" from the illegal activities). BSG received thousands of complaints from line subscribers who had never heard of the crammed services, let alone seen clear and conspicuous disclosures of the services' terms, before being billed for them. Fact Appx., ¶¶ 52, 88, 94-95. BSG knew the services' principals were longtime crammers and that their offerings constantly generated complaints of unauthorized billings. Fact Appx., ¶¶ 28-55, 62, 65-66, 84-85, 94-96. BSG knew that various LECs had repeatedly refused, suspended, or terminated billing for the services due to extensive cramming, and that one LEC deemed further billing "irresponsible." Fact Appx., ¶¶ 46, 55-57, 60, 66, 72-78, 97-98, 103. BSG also received consumers' complaints stating they had never seen the "Letters of Authorization" supposedly generated by the vendors' marketing. Fact Appx., ¶ 88. Yet despite this knowledge, BSG took no steps to investigate the services' actual marketing, to ensure that consumers were actually using the services, or to verify with even one consumer that the charges were authorized. Instead, BSG closed its eyes to the cramming for nearly five years, causing more than a million consumers to receive bills for charges the consumers never authorized. Fact Appx., ¶¶ 112-116. BSG's own statements and actions thus demonstrate that it knew – or at least deliberately shielded itself from knowing – that it was violating the Permanent Injunction.

**IV. BSG Does Not Dispute Overwhelming Evidence That It Violated Paragraphs II, III, and V of the Permanent Injunction.**

Without introducing any evidence, BSG makes several unpersuasive arguments that it did not violate Paragraphs II, III and V of the Permanent Injunction.

A.  BSG's unavailing argument that it did not violate Paragraph V

Paragraph V prohibits "[b]illing or causing to be billed, or collecting or attempting to collect payment, directly or indirectly, from a Line Subscriber for any Telephone-Billed Transaction on behalf of any Vendor that does not disclose clearly and conspicuously to the Line Subscriber [specified information] before such Line Subscriber authorizes charges for the Vendor's goods or services[.]"  BSG first argues that it did not violate this provision because it told its vendors to make the required disclosures.  Opp. 10 ("the requirement of clear and conspicuous disclosures means that HBS must require a service provider to inform consumers about the key characteristics of its service offerings").

This argument fails because it openly flouts the plain language of the order, which places the onus on BSG not simply to inform its vendors to make disclosures, but *not to bill or collect* on behalf of vendors who fail to make them.  As the undisputed evidence shows, BSG utterly failed to comply, by billing and collecting millions of charges where even the existence of the so-called services was not clearly and conspicuously disclosed.  BSG failed to take even elementary steps to ensure it did not violate Paragraph V.  Indeed, it only nominally requested and never received the "website creative or landing pages used during each end user's sign up process."  Fact Appx., ¶¶ 48-50, 52, 90.  Nor did BSG follow up on the vendors' failure to provide them, instead simply acquiescing when the vendors told BSG they did not keep such records.  Fact Appx., ¶ 91.  Given BSG's utter failure to investigate the disclosures made to the consumers it billed, even in the face of an avalanche of complaints, it is not surprising that BSG billed thousands of consumers in violation of Paragraph V.

BSG then argues that it did not violate Paragraph V because the marketing pages for the crammed services contained most of the required terms in fine print.[8] Opp. 11-12. But BSG disregards the order's mandate that the required terms be "clearly and conspicuously" disclosed. Clear and conspicuous disclosure is determined by the "overall, net impression made by the advertisement in determining what messages may reasonably be ascribed to it." *In re Kraft, Inc.*, 140 F.T.C. 40, 60 (1991); *see also Removatron,* 884 F.2d at 1497 (representations are not to be viewed "apart from their context") (quoting *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976)); *FTC v. Patriot Alcohol Testers, Inc.*, 798 F. Supp. 851, 855 (D. Mass. 1992). The net impression of the marketing employed here – including enticements for unrelated free services, misleading headlines, pre-populated data fields, tiny and incomplete "disclosures," and the absence of any notification to consumers that they would be billed for services – is the antithesis of clear and conspicuous disclosure.[9] *See FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 993-4 (N.D. Cal. 2010) (finding that similar pass-through marketing used to sell a LEC-billed service was deceptive), *aff'd* __ F. App'x __, 2012 WL 1065543 (9th Cir. Mar. 30, 2012). Indeed, if the

---

[8] BSG argues that the vendors' refund policy was sufficiently disclosed in the statement "you may cancel at any time, with no cost to you." Opp. 12 n.7. However, this "disclosure" was buried like the others detailed in this section. Moreover, this was not the actual refund policy. The vendors informed BSG before billing began that their policy was to refund only charges that consumers could verify on their past phone bills, even for accounts containing "wrong information" about the consumers. Fact App'x ¶ 67; Dkt. No. 55-24 (Wolfe Att. E-16), at BSG00054484 p.23, 00054485 p.25 ("credit is applied to the verified bill dates that the customer provides"). Thus, the vendors' actual refund policy was never disclosed.

[9] Congress recently recognized the inherent deceptiveness of any Internet marketing wherein an initial merchant passes a consumer's billing information to an unrelated merchant in offers designed to make consumers think the offers were part of the initial transaction. Restoring Online Shoppers' Confidence Act, 15 U.S.C. § 8401, *et. seq.,* at § 8402(b); P.L. 111-345 (Dec. 29, 2010) ("It shall be unlawful for an initial merchant to disclose . . . billing information that is used to charge a customer of the initial merchant, to any post-transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third party seller.").

terms of these services had been clearly and conspicuously disclosed, BSG would not have received tens of thousands of complaints from consumers who said they had never heard of the services and did not order them.[10]

### B. BSG's unavailing argument that it did not violate Paragraph III

Paragraph III of the order forbids BSG from billing or collecting from a line subscriber "unless the charge for such Telephone-Billed Transaction was expressly authorized by the Line Subscriber." BSG does not even attempt to dispute that it billed and collected unauthorized charges in the face of constant consumer complaints, or that essentially no one used the services. Fact Appx., ¶¶ 48-52, 54, 69-71, 82, 88, 94-95, 106-110, 112. Rather, BSG makes factually unsupported arguments that it did all it could to prevent such unauthorized billing through its pre-billing due diligence ("review [of] marketing materials submitted by potential vendors") and through its "confirmation" requirement that purports to ensure "that the line subscriber is the person authorizing the charge." Opp. 14-15. These arguments are unavailing because the undisputed facts show that neither BSG's due diligence nor its "confirmation" system came close to constituting "all reasonable efforts" to comply with the Permanent Injunction. *See* Section I,

---

[10] BSG attempts to analogize the deceptive marketing employed here to offers for travel insurance or car rentals that might appear to consumers making travel arrangements online. Opp. 11. BSG makes this argument without evidence of such travel marketing. However, even considering only the hypothetical descriptions BSG provides of this marketing, it differs in three essential respects from the deceptive marketing for the services at issue here. First, in the travel marketing context, consumers visit the initial landing page specifically to make a travel purchase; in contrast, consumers reached the "offers" at issue from sites offering *free* services or events, such as a cute-baby photo contest, and thus did not expect to purchase anything. Second, the hypothetical travel sites offer products related to the consumer's initial purchase; the services for which BSG billed were unrelated to the offer that drew consumers in, making offers for such services unexpected and easy to overlook. Third, no lawful travel site buries its follow-on offers with misleading headlines and tiny text.

*supra*; *see also Chairs*, 143 F.3d at 1436; *Wellington Precious Metals,* 950 F.2d at 1529; *Smith*, 1999 WL 766991, at *2; *Rizzo*, 539 F.2d at 465.

BSG's reliance on its self-proclaimed "due diligence" ignores that it billed for the crammed services despite knowing about the vendor's history of cramming, and that it continued to bill even after various LECs refused to do so. Fact Appx., ¶¶ 46, 55-57, 62, 72-78, 97-101, 103. Moreover, BSG does not dispute that it never questioned the vendors' failure to send the actual marketing for the services, even though BSG supposedly "required" production of this material during its monthly investigations of excessive complaints. Fact Appx., ¶¶ 48-50, 90. Nor did BSG ever investigate the services' abysmal usage rates, despite knowing that such data is key to determining whether charges were authorized.[11] Fact Appx., ¶¶ 69-71, 82, 106-110. BSG instead continued to approve more services for the same vendor in the face of a flood of consumer complaints about its charges. Fact Appx., ¶¶ 49-54, 84-85, 88, 94-95, 104. This "due diligence" hardly constitutes "all reasonable efforts" to comply with the Permanent Injunction.

BSG's touting of its "confirmation" requirements fares even worse. Contrary to BSG's unsupported claims that it checks "non-public information" submitted with charges before billing them, BSG frequently billed for the services without regard to such information. Specifically, BSG repeatedly noted that the supposed "Letters of Authorization" lacked either a field or a response for information – such as mother's maiden name or last four digits of a Social Security number – that purportedly verified consumers' identities. Fact Appx., ¶¶ 87, 89. But BSG never did anything to ensure that this information was actually collected or checked. Instead, it

---

[11] BSG complains that the only evidence of usage it "knew about" was the vendors' extraordinary pre-billing admission that only 20% of those billed would use the billed services Opp. 15 n.9. BSG does not address why the vendor's estimate that 80% of the "customers" would not use the services did not immediately prompt BSG to refuse to bill for the services.

allowed the vendors to "replace the BSG authentication" process and submit billings as "preauthenticated." Fact Appx., ¶ 105; Dkt. No. 68-6 (Wolfe Att. E-12), at BSG00040060-8. In sum, BSG turned its confirmation procedures over to the very vendors whose charges it was supposed to be confirming.

### C. BSG's unavailing argument that it did not violate Paragraph II

Paragraph II prohibits "any express or implied misrepresentations of material fact" made "in connection with the advertising, offering, promotion or sale of any Telephone-Billed Transaction, or with the billing or collection for a Telephone-Billed Transaction[.]" As discussed in Section I above, BSG incorrectly argues that Paragraph II is limited to post-billing representations. In fact, the Permanent Injunction contains no such limitation. Accordingly, BSG's billing was a misrepresentation that a charge was due and payable, *see Inc21.com Corp.*, 745 F. Supp. 2d at 1001 ("the representation at issue was the inclusion of fraudulent charges on the telephone bills of tens of thousands of unsuspecting consumers"), as was BSG's undisputed use of the phony Letters of Authorization to represent to consumers post-billing that they authorized the charges. Fact Appx., ¶¶ 86-88, 92-93.

## V. The Court Need Not Hold an Evidentiary Hearing.

BSG incorrectly analogizes its Opposition to a motion to dismiss, based on a single unreported case from the Southern District of New York that actually considered a complaint seeking injunctive relief, not a motion for contempt. Opp. 7, citing *Espada v. N.Y. Bd. of Elections*, 2007 WL 2588477, at *1 (S.D.N.Y. Sept. 4, 2007). In fact, the proper analogy is to a motion for summary judgment; various courts have held that evidentiary hearings on contempt motions are required only where there is an issue of material fact. *See Goya Foods*, 290 F.3d at

77; *Thomas, Head & Greisen Emps. Trust v. Buster*, 95 F.3d 1449, 1457 (9th Cir. 1996), *cert. denied*, 510 U.S. 1116, 117 S.Ct. 1247, 137 L.Ed.2d 328 (1997); *CFTC v. Premex, Inc.*, 655 F.2d 779, 782 n.2 (7th Cir. 1981).  As stated by the Seventh Circuit:

> [B]ecause the contempt proceeding is concerned solely with whether or not the respondent's conduct violates a prior court order, the parties cannot expect to litigate to the same extent that they might in a new and independent civil action. *See generally Ferrell v. Pierce*, 785 F.2d 1372, 1382 (7th Cir. 1986) (per curiam) (district court "has a great deal more latitude in enforcing its own decrees in a contempt proceeding, although it must allow party charged with contempt an opportunity to contest the issue); *see also Alexander v. Chicago Park Dist.*, 927 F.2d 1014, 1025 (7th Cir. 1991) (no evidentiary hearing necessary where relevant facts are not in dispute), *cert. denied*, 503 U.S. 905, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992)[.]

*D. Patrick, Inc v. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir. 1993); *see also Morales-Feliciano v. Parole Bd. of Puerto Rico*, 887 F.2d 1, 6-7 (1st Cir. 1989) (when there are no disputed factual matters, nor a request for a hearing, none is required).

BSG has not introduced evidence to dispute any of the facts in the FTC's motion.[12]  The motion is therefore ripe to be decided, either without a hearing or with a hearing limited to the interpretive issues BSG raised.  *See Premex*, 655 F.2d at 782 n.2 ("refusal to grant a full evidentiary hearing did not constitute a due process denial where the documentary evidence presented by the CFTC was more than sufficient to establish the contemptuous conduct.  In addition, defendants received the CFTC's motion and supporting papers in ample time to prepare for a show cause hearing. They also failed to demand such a hearing at that time and did not present any arguments which created any material issue of fact."); *see also Goya Foods*, 290 F.3d at 77 ("Goya introduced documentary evidence that established what the appellants knew,

---

[12] The Local Rule requires that "any party opposing a motion shall file a response and supporting documents as are then available." Local Court Rule CV-7(E)(1) (effective April 26, 2012).  Its predecessor also required that the opponent "shall file a response and supporting documents as are then available[.]"  Former Local Court Rule CV-7(d).

when they knew it, and the nature of the various actions that they took. The appellants failed to contradict this evidence. The record, therefore, disclosed no genuine issue of material fact as to the appellants' roles. Given that void, an evidentiary hearing would have been a waste of time"); *United States v. Ayers*, 166 F.3d 991, 995 (9th Cir. 1999) (where "the affidavits offered in support of a finding of contempt are *uncontroverted,* we have held that a district court's decision not to hold a full-blown evidentiary hearing does not violate due process.") (quoting *Peterson v. Highland Music*, *Inc.*, 140 F.3d 1313, 1324 (9th Cir. 1998)); *Thomas, Head & Greisen*, 95 F.3d at 1457 (no abuse of discretion to enter finding of contempt when, in response to overwhelming evidence submitted with a motion for order to show cause, alleged contemnors presented no admissible evidence that they could not comply); *Mercer v. Mitchell*, 908 F.2d 763, 769 n.11 (11th Cir. 1990) ("[W]hen there are no disputed factual matters that require an evidentiary hearing, the court might properly dispense with the hearing prior to finding the defendant in contempt and sanctioning him.").

## VI.     Conclusion

BSG has failed to rebut the overwhelming evidence of its contempt of Paragraphs II, III, and V of the Permanent Injunction. Accordingly, the FTC moves the Court to find BSG in contempt and order a compensatory sanction of $52,631,224.46.

Dated: May 15, 2012	Respectfully Submitted,

                           Federal Trade Commission
                           600 Pennsylvania Ave., N.W., Suite M-8102 B
                           Washington, D.C. 20580

By:     */s/ Douglas V. Wolfe*
Douglas V. Wolfe (DC Bar #437476)
Sarah Waldrop (MD Bar – numbers not issued)
Attorneys for Federal Trade Commission
Admitted *Pro Hac Vice*
Telephone:  (202) 326-3113 (Wolfe)/3444 (Waldrop)
Fax:  (202) 326-2558
Email: dwolfe@ftc.gov, swaldrop@ftc.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of May, 2012, I electronically filed the foregoing Reply to BSG's Opposition to Motion to Show Cause with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

John Roberti
Mayer Brown LLP
1999 K St. NW
Washington, DC 20006

Ricardo G. Cedillo
Derick J. Rodgers
Mark W. Kiehne
Davis, Cedillo & Mendoza, Inc.
McCombs Plaza
755 E. Mulberry Ave.
Suite 500
San Antonio, TX 78212-3149


By:      */s/ Douglas V. Wolfe*
         Douglas V. Wolfe (DC Bar #437476)
         Sarah Waldrop (MD Bar – numbers not issued)
         Attorneys for Federal Trade Commission
         Admitted *Pro Hac Vice*
         Telephone:  (202) 326-3113 (Wolfe)/3444 (Waldrop)
         Fax:  (202) 326-2558
         Email: dwolfe@ftc.gov, swaldrop@ftc.gov