UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** )<br> )<br> Plaintiff, )<br> )<br>vs. )<br> )<br>**HOLD BILLING SERVICES, Ltd.,** *et al.* )<br> )<br> Defendants. )<br> ) | NO. 5:98-CV-0629-FB |

## REPLY IN SUPPORT OF MOTION TO MODIFY OR INTERPRET 1999 ORDER

Since the 1999 Order was entered over fourteen years ago, the FTC's position regarding the role of clearinghouses to prevent cramming has evolved. The 1999 Order's blunt prohibition against cramming evolved into the "knew or should have known" standard embodied in the 2001 Order. Then, the 2008 Order specifically outlined how a clearinghouse should know whether cramming is occurring. The 2008 Order is the most recent, well-articulated set of guidelines crafted by the FTC and Respondents[1] to prevent unauthorized charges from appearing on consumers' telephone bills.

Despite this evolution, the FTC attempts to distract the Court with distinctions about service provider product types. However, Respondents are clearinghouses – not service providers. A clearinghouse processes all transactions the same way regardless of whether the transaction is for a long distance call, a collect call, or a voicemail service. The process is complex and dynamic; hence, the need for clearinghouses. Generally speaking, the service provider sends the transaction information to the clearinghouse; the clearinghouse formats and

---

[1]The 2008 Order was issued to ACI Billing Services, Inc. ("ACI"), Billing Concepts, Inc. ("BCI"), and BSG Clearing Solutions North America, LLC ("BSG Clearing") and their "respective parents, divisions, subsidiaries…" Doc. 99, Ex. 3. As discussed in the Motion to Modify or Interpret, Respondents disagree with the FTC's "single enterprise" theory as applied to the 1999 Order, but if the BSG-affiliated companies are a "single enterprise," then the FTC's most recent edict on clearinghouse conduct (the 2008 Order) must apply to that "single enterprise."

1

sends the transaction information to the appropriate LEC; and, the LEC places the charge for the transaction on the consumer's telephone bill. After the consumer pays the LEC for its bill, the LEC pays the clearinghouse, and the clearinghouse pays the service provider. That exact process is the same for all LEC clearinghouse services, regardless of the clearinghouse, the LEC, the service provider, or the type of product or service being billed.

The FTC argues that the 2008 Order cannot apply in this case because the Landeen Entity charges were for enhanced services; and, the 2008 Order applies only to third-party charges for telephone calls. This hyper-technical view of the Order tries to capitalize on a distinction without a difference. Not surprisingly, the method by which a clearinghouse prevents cramming is the same regardless of service provider product type. As outlined in the 2008 Order, a clearinghouse is privy to three critical data points that enable the clearinghouse to monitor a service provider's performance: customer service, LEC, and regulatory inquiries. By way of this tri-fold monitoring of service provider performance, Respondents ensure that they do not knowingly submit charge records for unauthorized transactions.

Regardless of the 2008 Order's literal applicability, the FTC is still unfairly overreaching in its efforts to apply the 1999 Order to Respondents. In making its argument that the 1999 Order applies here because it enjoins unauthorized charges for enhanced services, the FTC completely ignores the 2001 Order, which specifically addressed clearing charges for enhanced services. The 2001 Order was issued directly to Respondents,[2] and it enjoined the ***knowing*** clearing of any unauthorized charge.[3]

Because the FTC's position regarding clearinghouse responsibilities to prevent cramming has evolved over the last fourteen years, this Court has authority to modify the 1999 Order.

---

[2] Specifically, the 2001 Order applies to ESBI, BCI, and their divisions and subsidiaries. Doc. 99, Ex. 2.
[3] It should be noted that Respondents are no longer processing records for enhanced service providers.

Additionally, the Court should clarify that the 1999 Order does not bind the Non-Parties because the FTC has failed to show that they can be enjoined under the 1999 Order.[4]

### 1. **Modification Is Warranted Given The Evolution of The FTC Standards Governing Clearinghouse Conduct, Which Are Not Product Specific.**

The 2008 Order is the most recent and well-developed articulation of the FTC's directive as to what clearinghouses need to do to detect and prevent cramming. Even if the 2008 Order does not literally apply to enhanced services,[5] it is most certainly evidence of what clearinghouses should be doing to detect and prevent cramming, irrespective of the product or service that is being billed. Respondents are employing the best and most effective measures to prevent cramming as articulated by the FTC in 2008 such that the 1999 Order should be modified to comport with the evolution of the industry's efforts to combat cramming.

This evolution is not product specific, and the FTC's focus on the underlying service is misplaced.[6] In order for a clearinghouse to prevent cramming, it must monitor performance.

---

[4] As shown in the Motion to Modify or Interpret, the majority of the Respondents – i.e., BSG Ltd., BSG Clearing, ACI, BCI, and Enhanced Services Billing, Inc. ("ESBI") – are not (and were never) parties to this lawsuit or the 1999 Order. These entities are collectively referred to as the "Non-Parties."

[5] The 2008 Order applies to BSG Clearing Solutions North America, LLC and its subsidiaries including ESBI. The language used is broad, undefined terms such as "common carrier transmission," which is susceptible to multiple interpretations. Indeed, the 2008 Order regulates billing for "Telecommunication Services," which is defined as a "***common carrier transmission***, such as collect calls, third-party billed calls, and PIC's Services." In attempting to define "common carrier" for purposes of the Telecommunications Act, courts have defined the term as a service whereby consumers can "***communicate or transmit intelligence of their own design and choosing***." *FCC v. Midwest Video Corp.*, 440 U.S. 689, 700-701 (U.S. 1979). The FCC's definition of "enhanced services" also supports an interpretation that that the 2008 Order applies to billing for so-called "enhanced services." Regulations promulgated by the FCC define an "enhanced service" as a service "offered over common carrier transmission facilities ... which employ[s] computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information; provide the subscriber additional, different, or restructured information; or involve subscriber interaction with stored information." 47 C. F.R. § 64.702(a). This definition clearly recognizes that, included in the transmissions which are provided by a common carrier, are certain "enhanced services" so long as the subscriber "transmits information." *Id.* Consistent with the definition articulated by the Supreme Court in *Midwest Video* and the FCC's definition of "enhanced services," one reasonable interpretation is that it the term includes ***all*** services – including "enhanced" – that allow purchasers to "transmit intelligence of their own design and choosing." *See* 440 U.S. 700-701.

[6] In its conversations within the telecommunications industry, the FTC does not make a distinction between billing for "enhanced services" and billing for any other type of services. At a 2011 panel discussion on cramming hosted by the FTC, the FTC made no such distinction. *See* Ex. 1, May 11, 2011 Transcript of panel discussion, p. 6. (David Vladeck, Director of the FTC's Bureau of Consumer Protection, stated "So, we're hosting this forum today to examine the persistent and harmful practice of phone bill cramming, the placement of unauthorized charges on a consumers' or business' telephone bill."). At the discussion, Mr. Vladeck further stated that the "goods and services for which crammers have billed consumers range from telecommunications services, like long distance and collect

(cont'd)

The only way it can effectively do so is through the monitoring of customer service, LEC, and regulatory inquiries. These are the basic tenets of cramming prevention for clearinghouses, which are precisely the components embodied by the 2008 Order. This is for a reason: These three components are the best and only consistent variables that a clearinghouse can use to evaluate service provider performance and to prevent cramming.

The FTC admits that both the 1999 Order and the 2008 Order were intended to prohibit cramming. Doc. 106, p. 6, n.6. But while the 1999 Order is merely a blunt prohibition against cramming, the 2008 Order actually defines what a clearinghouse can and should do to detect and prevent cramming. Thus, to further the FTC's intent to prohibit cramming, the 1999 Order should be modified to conform to the 2008 Order.[7]

The FTC argues that Respondents are required to comply with both the 1999 and the 2008 Order because "both orders prohibit unauthorized billing." Doc. 106, p. 6. The issue,

---

calls, to goods and services unrelated to the telephone, such as web hosting, directory listings, club memberships." *Id*. Later, Russell Deitch, attorney with the FTC, described cramming broadly by commenting that "[o]ne way of looking at cramming is causing unauthorized charges for a variety of goods or services to appear on consumers' telephone bills." *Id*. at 16. This non-product-specific view is reflected in *FTC v. Landmark Clearing, Inc., et al.*, (Case 4:11-cv-00826-MHS-ALM) wherein the Amended Stipulated Permanent Injunction and Final Order enjoined defendants involved in the banking industry from processing payments for any clients they knew or should have known to be engaged in or likely to be engaged in any acts prohibited by Section 5 of the FTC Act. *See* Ex. 2, Amended Stipulated Permanent Injunction and Final Order, p. 9. No distinction was made for the various types of products or services offered by the clients. *Id*. at 10. In *Landmark Clearing,* the FTC sets forth a screening process very similar to that prescribed by the 2008 Order regardless of what type of product or service is being offered. *Id*. at 9-10. The FTC did not distinguish between product types during its 2011 forum on cramming but rather focused on how to prevent cramming, irrespective of product type. The FTC's present focus on product type in its Opposition appears animated entirely by the FTC's desire to salvage the viability of its overreaching Motion to Show Cause.

[7] Consistent with the FTC's intent, Respondents developed specific policies and procedures as instructed by the 2008 Order. The framework identified in the 2008 Order was adopted by Respondents "across the board" and was applied to all third-party service providers, regardless of the product being sold. While Respondents have made minor adjustments in the calibration needed to accurately and effectively monitor its clients for cramming, the 2008 Order's structure was applied universally because Respondents' LEC clearinghouse operations are the same irrespective of product type. The processes and information that a clearinghouse is privy to are precisely the same whether it is processing enhanced or non-enhanced transactions. Moreover, the parties to the 2008 Order did not intend to limit its cramming detection and prevention measures to the particular products at issue in the *Nationwide* case – i.e., collect call and long distance services. The FTC argues the parities' intent and the FTC's evolution on cramming cannot be considered because the scope of the 1999 Order is determined from its "four corners." Doc. 106, p. 3. An interpretation of a consent decree from its four corners, however, is limited to a decree that is unambiguous in its application. *Eaton v. Courtaulds of North America, Inc.*, 578 F.2d 87 (5th Cir. 1978). When a consent decree is ambiguous, any ambiguities should be read as "redound[ing] to the benefit of the person charged with contempt." *NBA Prop.'s, Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir.1990).

however, is not whether cramming is prohibited by both Orders, but whether the simultaneous application of the Orders places Respondents in a "Catch 22." Respondents can lawfully clear charges under the 2008 Order's safe harbor provision while being subject to a finding of contempt under the 1999 Order for the very same clearinghouse activities. *See, e.g., U.S. v. South Carolina*, 840 F.Supp.2d 898, 916 (D. S.C. 2011) (holding state immigration law conflicted with Federal law which provided a "safe harbor" provision because creating "the potential scenario where a person acting lawfully under the federal harboring statute could be prosecuted by state officials for conduct expressly excepted from federal criminal law"). Clearly, an order that provides safe harbor against liability for particular conduct – i.e., providing clearinghouse services for charge records that were not knowingly crammed – conflicts with an order that does not contain a similar safe harbor provision for the same conduct.[8]

### 2. The FTC Cannot Ignore The 2001 Order.

The FTC hinges the bulk of its Opposition on the theory that the 1999 Order applies to "enhanced services" whereas the 2008 Order is "facially inapplicable" because it applies only to basic telephone services.[9] In making this argument, the FTC completely ignores the 2001 Order.

---

[8]This is not a situation where Respondents are subject to different standards for "different types of behavior" as the FTC claims. Doc. 106, p. 6. Indeed, the allegations against Respondents in the Motion for Show Cause are virtually identical to the allegations in the *Nationwide* case. Both cases involve allegations of cramming in the LEC billing context; and, both cases turn on the issue of whether a clearinghouse can be liable for a third-party service provider's alleged conduct. Thus, modification is warranted to reflect the significantly changed (and evolving) circumstances applicable to clearinghouse conduct, as embodied by the 1999, the 2001, and the 2008 Orders. *See American Home Products Corp.* 103 F.T.C. 528 (1984) (modifying order to bring petitioner's order into general parity with similar FTC orders as a matter of public interest). Moreover, the FTC's reliance on its regulation of Google is misplaced. Indeed, the fact that the FTC has issued different orders to Google is irrelevant to whether modification here is warranted because those cases involved completely different conduct and allegations against Google. *Compare In the Matter of Google, Inc.*, *2011 WL 1321658* (alleging that Google used and shared Gmail users' personal information for purposes other than providing them with free web-based mail, contrary to express terms of Google's Gmail privacy policy) *with In re Matter of Motorola Mobility LLC and Google, Inc., 2013 WL 124100* (alleging that Google, in violation of section 5 of the FTC Act, breached its commitments to standard-setting organizations to license its standard essential patents on fair, reasonable and non-discriminatory terms). Here, the allegations in the Motion to Show Cause and the *Nationwide* case are virtually identical.

[9]The FTC also argues that modification is not warranted because Respondents have allegedly violated the 2008 Order. Whether the FTC can show an alleged violation of the 2008 Order is completely irrelevant to whether a change in circumstances warrants modification of the 1999 Order. In addition, the Court has already rejected the notion that Respondents should be denied the opportunity to present evidence in response to the FTC's allegations.

(cont'd)

Yet, the 2001 Order expressly applies to "enhanced services."[10] Thus, according to the FTC's own theory of the case, the 2001 Order must supersede the 1999 Order.

More importantly, although ESBI and BCI are Non-Parties to the 1999 Order, the 2001 Order was issued directly to them. Doc. 99, Ex. 2.[11] ESBI and BCI are the very clearinghouses whose actions are – according to the FTC – at issue in the FTC's contempt motion. Doc. 106, p. 13, n.11. It is illogical to suggest that ESBI and BCI are bound by the 1999 Order where they were never parties to this case or the 1999 Order and where they entered into their own separate agreements and orders with the FTC (specifically, the 2001 and 2008 Orders).

The FTC ignores the 2001 Order because its application would increase the FTC's burden in proving that the Respondents should be held liable for the alleged conduct of the Landeen Entities (none of which have been sued by the FTC or indicted by the DOJ). The 2001 Order substantially altered the position the FTC took in the 1999 Order. As opposed to the Order issued in 1999, which simply proscribed any unauthorized charge regardless of the clearinghouse's intentions or awareness, the 2001 Order imposed a "knew or should have known" standard for determining whether a clearinghouse may be liable for processing service provider records for allegedly unauthorized charges.[12]

For these same reasons, the FTC would like to avoid application of the 2008 Order. But the 2008 Order defined precisely how a clearinghouse might refrain from **knowingly** clearing an unauthorized charge. So long as a clearinghouse is monitoring customer service, LEC, and regulatory inquiries and taking appropriate action based on this performance review, then it has

---

Doc. 92, p. 2 (Respondents shall have "an opportunity to raise any legitimate legal or factual issues that are relevant to the question of civil contempt or damages").

[10] The 2001 Order enjoined the knowing submission of charge records for an unauthorized "Telephone-Billed Good or Service," which was defined as an "enhanced service." The Order excluded common carrier telecommunications services. Doc. 99, Ex. 2, pp. 5-6.

[11] BCI is also a party to the 2008 Order, along with its parents, divisions, and subsidiaries. Doc. 99, Ex. 3.

[12] Applying the "knew or should have known" standard would mean that the FTC would be required to prove that Respondents should have uncovered the alleged fraud of Ms. Landeen in "real time" where the Federal Bureau of Investigation and the Department of Justice were unable to do so with a full view of her conduct in hindsight.

6

no reason to believe or know that it is forwarding billing records for charges that are unauthorized. Accordingly, the 1999 Order should be modified to conform to the 2008 Order.[13]

3. **The 1999 Order Should Be Modified To Conform To The Standards Set Forth In 2008, Especially Where The Conduct At Issue Occurred *After* 2008.**

Courts routinely grant requests for modification in contempt proceedings when a change in circumstances warrants such relief.[14] The FTC fails to cite a *single case* that supports its argument that a party should be precluded from seeking modification due to a change in circumstances simply because the request is made in the context of a contempt proceeding. Doc. 106, pp. 9-10. The FTC's cases simply stand for the uncontroverted proposition that a contempt proceeding is not the proper forum to relitigate the original controversy.[15] Here, Respondents do *not* seek to relitigate the 1999 Order. Respondents seek modification because the 1999 Order is *now* against public policy based upon circumstances that *did not exist* fourteen years ago.

Respondents do not seek an "impermissible retroactive modification" of the 1999 Order as the FTC alleges. Respondents acknowledge that the standards established in the 2008 Order cannot be applied to conduct occurring *before* the issuance of that Order. Respondents request that the 1999 Order be modified to embody the FTC-established industry standard set forth in the

---

[13] Alternatively, at a minimum, the Court should require the FTC to proceed under the 2001 Order's "knew or should have known" standard.

[14] *See, e.g., New York State Ass'n for Retarded Children Inc. v. Carey*, 706 F.2d 956 (2nd Cir. 1983); *RoadTechs, Inc. v. MJ Highway Technology, Ltd.*, 83 F. Supp. 2d 677 (E.D. Va. 2000); *Gomes v. Moran*, 605 F.2d 27, 30 (1st Cir. 1979) (modification of consent decree between prison inmates and officials in contempt action); *FTC v. Trudeau*, 708 F. Supp. 2d 711 (N.D. Ill. 2010); *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 437 (1976); *F.T.C. v. Fin. Res. Unlimited, Inc.*, 03 C 8864, 2006 WL 1157612 (N.D. Ill. Apr. 25, 2006) .

[15] The cases cited by the FTC actually support Respondents' request for modification due to a change in circumstances occurring after the 1999 Order. In *United States v. Rylander*, 460 U.S. 752, 756 (1983),the Court held that, while a defendant could not attack an original consent order in a civil contempt proceeding by claiming circumstances existing **"at the time the order was issued"** made compliance impossible, "a defendant may assert a ***present*** inability to comply with the order in question." *Id.* (emphasis in original). In *Regal Knitwear v. National Labor Relations Board*, 324 U.S. 9, 15 (1945), the Supreme Court made clear that a court should provide clarification regarding its orders, particularly to a non-party, to avoid **"entrapment"** or **"unwitting contempts."***Id.* Finally, while *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192(1949) states that respondents proceed at their own peril if they do not seek to clarify what is permissible under an order before they proceed, *McComb* is inapposite because it dealt with a failure to seek clarification regarding circumstances that existed **at the time the respondents entered into the consent decree.** In other words, the *McComb* respondents attempted to argue that the original injunction was too broad; they did not rely upon a change in circumstances that occurred after its entry. Clearly, a respondent in a contempt proceeding can raise defenses based upon a change in circumstance which occurs *after* the consent order is issued.

2008 Order *prospectively* to assess Respondents' clearinghouse conduct. Indeed, the vast majority of the alleged improper conduct of the Landeen Entities occurred *after* issuance of the 2008 Order. Doc. 55-3, ¶¶ 84-85, 87-89, 91, 93, 97, 100, 102-104, 106-110.

### 4. The 1999 Order Does Not Bind The Non-Parties.

The FTC accuses Respondents of mischaracterizing *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9 (U.S. 1945) and says that, under *Regal*, the FTC need only show that BSGNA controlled the Non-Parties in order to bind them by the 1999 Order. However, the reference in *Regal* to "control" is in *dicta* from the Court's opinion, not law. *Id*. at 14. *Regal* emphasizes that Rule 65(d)(2) governs the issue of whether the Non-Parties are bound; and, under Rule 65(d)(2), "control" over a non-party subsidiary is not enough.[16]

Assuming for the sake of argument that "control" were enough under Rule 65 (which it is not), the FTC cannot show the level of control needed to impose liability on distinct corporate affiliates. The Fifth Circuit is strict in upholding corporate separateness;[17] and, the showing of control required to disregard corporate separateness "is not mere majority or complete stock control but such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal." *Krivo Indus. Supply Co. v. National Distillers & Chemical Corp.*, 483 F.2d 1098, 1106 (5th Cir. 1973). The Fifth Circuit requires a showing of the parent ***totally dominating*** its

---

[16]The case law interpreting Rule 65 has developed two categories of "privity" for purposes of binding a non-party, and neither category turns on the "control" one company has over another. Control is merely one factor to consider. The FTC focuses on the "legal identification" category, which requires some evidence that the non-party was created to avoid the injunction in order to bind it. Doc. 99, Motion to Modify, pp. 17-19 (discussing *Nat'l Spiritual Assembly of the Baha'is of U.S. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of Baha 'is of U.S., Inc.*, 628 F.3d 837, 848–849 (7th Cir. 2010)).

[17]*See Gibraltar Sav. v. LD Brinkman Corp.*, 860 F.2d 1275, 1287 (5th Cir. 1988) ("Many [wholly-owned subsidiaries] are in fact controlled and operated in close concert with the interests of the owners, and do not have a distinct factual existence: separate employees, offices, or properties; consolidated financial reporting and tax returns; and the like. Such conduct is perfectly natural and proper and provides no basis for ignoring legal independence."). And, under the doctrine of corporate separateness, BSGNA's ability to control a Non-Party is not enough to impose liability under the 1999 Order. *See U.S. v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir. 1985) ("Our cases are clear that one-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil.") (citing *Nelson v. International Paint Co.*, 734 F.2d 1084, 1092).

8

subsidiary. *See Edwards Co. v. Monogram Industries, Inc.,* 700 F.2d 994, 1004 (5th Cir. 1983) (*Edwards I*); *U.S. v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir. 1985) (citing *Nelson v. International Paint Co.*, 734 F.2d 1084, 1091-1093 (5th Cir. 1984) (applying Texas law)). The examples of "control" that the FTC offers in its Opposition collectively fall far short of the complete domination needed before the FTC's control theory could prevail.

The FTC points to a loan agreement signed by BSGNA which included language that BSGNA would cause its subsidiaries to obey laws and "cause each of its Subsidiaries to," among other things, "comply in all material respects with all applicable laws, rules, regulations, orders, and decrees of any Governmental Authority or arbitrator." Doc. 106, p. 11. This "evidence" does not establish the ***complete domination*** needed in the Fifth Circuit to establish control and fulfill one of the factors under Rule 65 before binding the Non-Parties to the 1999 Order. *See Gibraltar Sav. v. LD Brinkman Corp.*, 860 F.2d 1275, 1286 (5th Cir. 1988) (holding company and its principal shareholder were not "alter egos" of subsidiaries who obtained loans, and thus were not contractually liable to lender, absent evidence of lack of separateness); *Edwards Co., Inc. v. Monogram Industries, Inc.*, 730 F.2d 977, 985 (5th Cir. 1984) (en banc) (citing *Edwards I*, 700 F.2d at 1003) (parent owning 100 percent of stock of subsidiary, with interlocking officers and directors, filing a joint tax return, and loaning money to each other does not defeat their separate existences).[18]

The FTC also tries to prove control by arguing that Mr. Phipps – BSG Ltd.'s current CEO – was a member of the Board of Directors for one of the named parties. Doc. 106, p. 13. But

---

[18] In support of its argument that the loan agreements prove control, the FTC cites to 18 U.S.C. § 1344, which imposes criminal liability on "whoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of fraudulent pretenses, representations, or promises." This citation and ensuing argument completely misses the point both legally and factually. This statute has no bearing on BSGNA's alleged control over the Non-Parties for purposes of determining whether they are bound to the 1999 Order under Rule 65(d)(2). At most, the language in the loan agreements would require BSGNA to make sure BCI complies with the 2001 Order to which it is a named party, and that ACI, BCI, and ESBI comply with the 2008 Order to which they are named parties. The FTC does not argue that BSGNA failed in this charge.

again, this evidence does not establish the ***complete domination*** needed for the FTC to prove control because the mere fact that two corporations share one or more directors or officers does not give rise to disregarding the corporate entities, viewing the entities as mere alter egos, or even considering the entities as legally identified or in privity with each other. *Bell Oil & Gas v. Allied Chemical Corp.,* 431 S.W.2d 336, 339 (Tex. 1968) (the presence of interlocking officers and directors of parents and subsidiaries does not suffice for disregarding their separate existences); *Berger v. Columbia Broadcasting Sys.*, 453 F.2d 991, 995 (5th Cir. 1972), *cert. denied*, 409 U.S. 848 (1972); *Jon-T Chemicals,* 768 F.2d at 691 ("we maintain the fiction that an officer or director of both corporations can change hats and represent the two corporations separately, despite their common ownership"); *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex. 1975) ("stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders"); *Nat'l Spiritual Assembly of the Baha,* 628 F.3d at 849.

In support of its "control" argument the FTC cites two cases, both of which serve as extreme examples of control so ***completely dominating*** that the subsidiaries never really existed at all. In *Teas v. Twentieth-Century Fox Film Corp.*, 413 F.2d 1263, 1269 n.7 (5th Cir. 1969), the court found that a subsidiary of Twentieth Century, Fox Realty, served no function other than to serve Twentieth Century's purposes. Based on this finding, the court found Fox Realty could be restrained. Importantly, the court ***did not*** find that Fox Realty and Twentieth Century were in privity or alter egos of one another. *Id*.

Fox Realty was dissimilar to ACI, BCI, and ESBI in at least one key aspect. First, Fox Realty was never its own functional company. *Id*. In this case, ACI, BCI, and ESBI were all independent, functioning companies before they were acquired by BSGNA. These Non-Parties were not mere pieces of paper lying in a file cabinet somewhere like Fox Realty was. Therefore,

*Teas* does not support the FTC's position that BSGNA controlled the Non-Parties. *Teas* teaches that, if the Non-Parties were separate, fully functioning companies before and after they were acquired, as is the case here, then they should not be bound by the 1999 Order.[19]

For the foregoing reasons, Respondents respectfully request that the 1999 Order be modified to comply with the framework articulated in the 2008 Order and that the 1999 Order also be interpreted to *not* apply to Non-Parties.

Respectfully submitted,

By: __/s/ *Dina M. Cox*_____
Dina M. Cox
Indiana State Bar No. 18590-49
*Admitted Pro Hac Vice*
**LEWIS WAGNER, LLP**
501 Indiana Avenue, Ste. 200
Indianapolis, Indiana 46202
Telephone: (317) 237-0500
Facsimile: (317) 237-6390

And

By: /s/ Ricardo G. Cedillo
Ricardo G. Cedillo, Lead Counsel
State Bar No. 04043600
Email: rcedillo@lawdcm.com
Derick J. Rodgers
State Bar No. 24002857
Email: drodgers@lawdcm.com
**DAVIS, CEDILLO & MENDOZA, INC.**
755 E. Mulberry Ave., Ste. 500
San Antonio, Texas 78212
Telephone: 210.822.6666
Telecopier: 210.822.1151

---

[19] The FTC also cites to *Zale Corp. & Corrigan-Republic, Inc. v. F.T.C.*, 473 F.2d 1317 (5th Cir. 1973) to support its control arguments. But, *Zale* is inapposite because there the court held that restraint of a parent based on the acts of its subsidiaries was appropriate because of certain factors that are not present in this case. Here, the FTC does not allege that the source of any alleged violation of the 1999 Order was BSGNA. The FTC alleges that the Non-Parties were the source of alleged violations.

## CERTIFICATE OF SERVICE

I certify that on May 13, 2013, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system which will send electronic notification to all counsel of record.

By: /s/ Derick J. Rodgers
Derick J. Rodgers