# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, | ) |
| | ) |
| Plaintiff, | ) |
| | )    **Case No. SA-98-cv-0629-FB** |
| vs. | ) |
| | ) |
| **HOLD BILLING SERVICES, et. al**. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## FEDERAL TRADE COMMISSION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**Contents**

FINDINGS OF FACT

I.   LEC Billing and the History of Cramming ........................................................... 1

II.  Entry of the Permanent Injunction ................................................................... 1

III. Formation of the BSG Enterprise ..................................................................... 2

IV.  BSG Operates as One Enterprise ...................................................................... 4

   A.  BSG Has Consolidated Operations ................................................................ 4

   B.  BSG's Employees Perform the Same Functions Regardless of Which Wholly Owned Subsidiary Is Involved in a Particular Transaction or Activity ................................... 6

   C.  BSGNA Controls Its Subsidiaries ................................................................. 7

V.   BSG's Billing Practices .................................................................................. 8

   A.  BSG Caused Consumers to Be Billed for Services They Did Not Authorize or Want ....... 8

      1.  BSG Had a Prior Relationship with Cindy Landeen That Raised Red Flags for Unauthorized Billing .................................................................................. 8

      2.  MyIproducts Generated Thousands of Complaints for Unauthorized Billing and Was Terminated by Verizon for Cramming ............................................................ 9

      3.  BSG Accepted Six More Billing Applications Despite Verizon's Termination of MyIproducts and Refusal to Bill for Two of the Services ..................................... 15

      4.  BSG Approved Yet Another Billing Application in 2009 ............................... 19

      5.  Billing for the New Services Generated Thousands of Unauthorized Billing Complaints 20

      6.  BSG Continued Billing for the Services Even After AT&T Forced BSG to Acknowledge That Thousands Were Billed Without Authorization ....................... 22

      7.  Execution of Search Warrants Finally Stops the Cramming Operation .......... 26

   B.  Consumers Did Not Use the Services for Which BSG Billed ............................ 26

      1.  BSG Learned the Vast Majority of Consumers Billed Would Not Use the Services Prior to Billing for Them ................................................................................. 26

    2.    Consumers Did Not Use Services for Which BSG Submitted Bills ............................. 27

VI.    BSG's Monitoring and Testing Did Not Prevent Unauthorized Billing ........................... 29

    A.    BSG's Monitoring and Recording of "Customer Service" Calls from Consumers Showed Unauthorized Billing ........................................................................................................ 29

    B.    The LOAs BSG Requested Do Not Establish Authorization ........................................... 34

VII.    Consumer Injury ....................................................................................................................... 39

CONCLUSIONS OF LAW

I.    Jurisdiction ..................................................................................................................................... 40

II.    The 1999 Permanent Injunction Binds BSGNA and its Subsidiaries ................................. 40

III.    The 1999 Permanent Injunction Binds BSG, Ltd. ............................................................. 42

IV.    Violations of the 1999 Order ............................................................................................... 43

    A.    Contempt Defendants Violated Paragraphs III and V.B.1 of the Permanent Injunction ... 43

    B.    Contempt Defendants Violated Paragraph V.A of the Permanent Injunction ................... 44

    C.    Contempt Defendants Violated Paragraph II.A.3 of the Permanent Injunction ............... 45

V.    The 2001 and 2008 Orders Are Irrelevant ........................................................................ 46

VI.    Compensatory Sanctions Are Appropriate ....................................................................... 47

# FINDINGS OF FACT

## I. LEC Billing and the History of Cramming

1. In the late 1990s, consumer complaints surfaced about a practice that became known as "cramming": the placement of unauthorized charges by third parties on consumers' Local Exchange Carrier ("LEC") telephone bills. (PX-379 at i, 2-4).[1]

2. LECs are telephone companies, such as AT&T and Verizon, through which consumers receive local telephone service. *Id*. at 8-9.

3. Billing aggregators serve as intermediaries between the vendors and the LECs. *Id*. Aggregators contract with the LECs for billing and collection and contract with vendors to submit vendors' billing applications to the LECs. *Id*. If a vendor is granted billing privileges, billing aggregators pass the charges from the vendor to the LEC for placement on its customers' bills. *Id*. at 9. After receiving the LEC bills, consumers pay the vendor's charge as part of their total phone bill payment. *Id*.

## II. Entry of the Permanent Injunction

4. This Court entered the Permanent Injunction on September 22, 1999. DE 39. The Permanent Injunction named, among other parties, Hold Billing Services, Ltd. ("Hold"), a Texas limited partnership; HBS, Inc., a Texas corporation; and Avery Communications, Inc. ("Avery"), a Texas corporation. *See* DE 39 (Permanent Injunction).

5. At the time, Avery held HBS, Inc., as a wholly owned subsidiary, and HBS, Inc. was the sole general partner of Hold. *See* DE 1 ¶¶ 5-7 (Complaint).

---

[1] All "PX-#" citations are to the Federal Trade Commission's proposed exhibits, sent on discs via Federal Express to the U.S. District Clerk's Office and to opposing counsel.

### III.     Formation of the BSG Enterprise

6.     After entry of the Permanent Injunction, Hold was converted into a Texas corporation and renamed HBS Billing Services Company ("HBS").  (PX-245 at 15).  HBS reported this change in the Compliance Report it submitted to the FTC on May 22, 2000, as required by the Permanent Injunction, stating that the change would not "affect its compliance obligations arising out of the Order" and "does not effect [sic] the continuity of the legal entity under Texas law."  *Id.*

7.     Also after entry of the Permanent Injunction, HBS, Inc. merged into Delaware corporation Thurston Communications Corporation ("Thurston Corp."), which remained a wholly owned subsidiary of Avery.  *Id.* at 15-16.  Thurston Corp. reported this change to the FTC in its May 22, 2000 Compliance Report, stating that it "had no corporate structure changes that would affect its compliance obligations arising out of the Order."  *Id.*

8.     Avery reported in the May 2000 Compliance Report that it was "still the sole owner of the entities known as HBS Billing Services, Ltd. and HBS, Inc., although such entities now operate under different names."  *Id.* at 16.

9.     In 2001, Avery, through its wholly owned subsidiary, ACI Billing Services, Inc. ("ACI"), acquired certain assets of OAN, a clearinghouse.  (PX-246 at F-24, PX-247 at 1).

10.     In 2003, Avery, Thurston Corp., and HBS acquired Billing Concepts, Inc. ("BCI") and Enhanced Billing Services, Inc. ("ESBI") from Platinum Equity, LLC.  (PX-247, PX-248).

11.     Billing Services Group, LLC ("BSG, LLC") was formed for the purposes of consummating the acquisition and owning the stock of Thurston.  (PX-249 at III.B.5-000308, 386).

12.     As part of the transaction, Avery contributed all of the stock of Thurston Corp. (its subsidiary) to BSG, LLC, making Thurston Corp. (f/k/a HBS, Inc.) a wholly owned

subsidiary of BSG, LLC.  (PX-250 at III.B.5 – 000014, 000023-24; PX-249 at III.B.5. – 000308).

13.     As part of the transaction, Thurston Corp. contributed its wholly owned subsidiaries, HBS and ACI, to BCI Acquisition, a newly formed entity.  (PX-249 at III.B.5-000308).  In exchange, BSG, LLC delivered all the capital stock of BCI Acquisition to Thurston, making BCI Acquisition a wholly owned subsidiary of Thurston.  *Id.*

14.     As a result of the acquisition:  (1) Thurston Corp. (f/k/a HBS, Inc.) became a wholly-owned subsidiary of BSG, LLC; (2) BCI Acquisition became a wholly owned subsidiary of Thurston Corp.; and (3) ACI, BCI, ESBI, and HBS (f/k/a Hold) became wholly owned subsidiaries of BCI Acquisition.  (PX-249 at III.B.5 – 000308-09).

15.     The Contribution Agreement, which Avery; BSG, LLC; Thurston Corp., and BCI Acquisition, among others, entered into disclosed the 1999 Permanent Injunction.  (PX-250 at III.B.5-000034, ¶ 3.15(c); PX-251).

16.     In June 2005, the BSG companies became publicly traded on the AIM market of the London Stock Exchange.  (PX-252 at 1-2).

17.     In conjunction with its admission to AIM, BSG created Billing Services Group Limited ("BSG Ltd."), a Bermuda limited partnership, which was "formed to succeed to the business of" BSG, LLC, and its subsidiaries.  (PX-254 at 22; PX-255 at 26).

18.     In December 2005, Thurston Corp. (known as HBS, Inc., at the time of the permanent Injunction) again changed its name to Billing Services Group North America, Inc. ("BSGNA"), and BCI Acquisition changed its name to BSG Clearing Solutions North America, LLC ("BSG Clearing") (PX-253 at 14).   BSG Ltd. then sold its overseas wireless billing subsidiaries, leaving BSGNA as its sole subsidiary.  (PX-253, PX-325).

19.     Accordingly, the current corporate structure is:



## IV.    BSG Operates as One Enterprise

### A.    *BSG Has Consolidated Operations*

20.     A single board of directors acts on behalf of all the BSG companies.  (PX-254 at 9, 11).
The Executive Director of the Board also serves as the CEO.  (PX-254 at 4, PX-255 at 4).
The entities file consolidated financial statements with each annual report.  *See e.g.*, PX-254
at 18-48; PX-255 at 18-48).

21.     BSG conducts all of its business, including that of its billing subsidiaries, from its offices
in San Antonio, Texas, where all of its employees are located.  (PX-256, PX-268 at
BSG00086937).

22.     In practice, BSG does not differentiate between its billing subsidiaries:  HBS, ESBI, ACI,
and BCI.  Standard contracts between the billing subsidiaries and BSG's customers provide
that the contracts may be freely assigned among BSG's subsidiaries.  (PX-281 at

BSG_Resp.-II-p.00000022; PX-295 at BSG_Resp.-II-p.00000131, PX-296 at BSG_Resp.-II-p.00000150; PX-300 at BSG_Resp.-II-p.00000245, PX-302 at BSG_Resp.-II-p.00000306; PX-304 at BSG_Resp.-II-p.00000342, PX-306 at BSG_Resp.-II-p.00000374; PX-308 at BSG_Resp.-II-p.00000402; PX-311 at BSG_Resp.-II-p.00000442).  Then-CEO Greg Carter signed these billing contracts for BSG regardless of which subsidiary's name was on them. (PX-281 (ESBI), PX-300 (ESBI), PX-302 (ESBI), PX-304 (BCI), PX-306 (BCI), PX-308 (ACI), PX-311 (ACI)).

23.     A single billing and collection contract with a LEC (like Verizon or Embarq) applies to the billings for all of BSG's subsidiaries.  (PX-266, PX-267)

24.     BSGNA files a single, consolidated tax return on behalf of itself and all of its wholly owned subsidiaries.  (PX-268 at BSG00086896-934).

25.     BSG Ltd.'s sole subsidiary is BSGNA.  *See* ¶ 18, *supra*.

26.     BSG Ltd. authorized the funding that supports BSGNA's billing activities.  (PX-265 at 20, § 5.1(a); PX-258 at 29, ¶ 124); *see also* PX-253 at (specifying that proceeds from an earlier revolving credit facility shall be used for "borrower's working capital requirements and other general corporate purposes"); PX-259 at 1 (defining borrower as BSGNA).

27.     BSG Ltd.'s board of directors are responsible for the company's "system of internal control," including assessing the effectiveness of such controls for BSGNA, BCI, ESBI, ACI, and HBS.  (PX-254 at 12; PX-255 at 15; PX-268 at 3).

28.     BSG's board of directors sets and monitors strategy, reviews trading performance, guides business development, examines acquisition possibilities, and approves reports to shareholders.  (PX-254 at 11, PX-255 at 14).  BSG Ltd.'s board also approves the annual budget.  *Id.*

29.     The board also commissioned audits that included BSG's billing operations, and
established an audit committee that made recommendations on the scope of the audits. (PX-254 at 11, PX-255 at 14, PX-268 at BSG00086935-83, PX-269, PX-270, PX-326). BSG
Ltd.'s bylaws allow it to pass a resolution to wind up its affairs and distribute its assets
among its shareholders. (PX-258 at 39).

**B.      BSG's Employees Perform the Same Functions Regardless of Which Wholly
Owned Subsidiary Is Involved in a Particular Transaction or Activity**

30.     Adolf Rodriguez responded to complaints of unauthorized billing from State Attorneys
General, other government agencies, and the Better Business Bureau on behalf of ESBI,
OAN/ACI, and HBS. (PXs 1-27 (responding to complaints about MyIproducts, 800
Vmailbox, and Digital Vmail on behalf of ESBI)); (PXs 28-34 (responding to complaints
about Instant 411 and InfoCall on behalf of OAN/ACI)); (PXs 35-39 (responding to
complaints about Streaming Flix, Uvolve, and EsafeID on behalf of HBS)).

31.     The same BSG employees implemented accounts for its vendors, regardless of which
wholly owned subsidiary was involved. For example, in the fall of 2008 BSG approved six
products – 800 Vmailbox, Digital Vmail, eSafeID, eProtectID, Instant411, and InfoCall.
(PXs 114, 115, 116, 117, 118, 119). ESBI handled the billing for 800 Vmailbox and Digital
Vmail; HBS handled the billing for eSafeID and eProtectID; and ACI handled the billing for
Instant411 and InfoCall. Denise Desilva, the Director of Client Implementation, conducted
the company's due diligence on all six of these products, regardless of whether ESBI, ACI,
or HBS was involved. (PXs 94, 98, 99, 100, 101, 102, 103, 104, 106, 107, 108, 109, 110,
114, 115, 116, 117, 118, 119, 137); *see also* PX-95, PX-111 (due diligence on Need the Info,
a service BSG ultimately did not approve); PX 139, PX-141 (due diligence on Streaming

Flix). The forms sent to the vendor and information sought about these products was identical, regardless of whether ESBI, ACI, or HBS was involved. *Id.*

32.     BSG employee Sherry Martinez handled marketing questions for these six products, regardless of whether ESBI, ACI, or HBS was involved. (PXs 84, 85, 86, 87, 88, 89, 90, 91).

33.     BSG employees Vivian Obledo and Melissa Mitchell monitored the billing practices for these six products (as well as earlier and later-approved products) regardless of whether ESBI, ACI, or HBS was involved. (PXs 134, 135, 136, 142, 143, 148, 153, 154, 157,161, 163, 166, 169); *see also* PX-224, PX-225 (e-mails sent to Denise DeSilva containing the product profiles for 800 Vmailbox and eProtectID).

34.     When consumer complaints exceeded regulatory, LEC, or BSG's customer "inquiry" threshold, *see, e.g.*, ¶¶ 64-65, letters were sent to the vendor, notifying them of this breach. *Id.* In many instances, these breach notifications were sent to the vendor as a single package, despite the fact that the products involved were billed through a combination of ESBI, ACI, and HBS. (PXs 148, 157, 161, 163, 166, 169).

### C.     *BSGNA Controls Its Subsidiaries*

35.     When the BSG companies entered loan and guaranty agreements in 2011, Phipps, then CFO, signed the loan for BSGNA and the guaranty agreements on behalf of each of BSGNA's subsidiaries. (PX-257, PX-265). Phipps also signed the tax-sharing agreement as CFO of BSGNA and of each billing subsidiary. (PX-268 at BSG00086902).

36.     In loan documents executed in 2011, BSGNA acted as the borrower and its subsidiaries acted as guarantors. (PX-257, PX-265). In those documents, BSGNA promised to perform various tasks as follows: "Borrower shall, and shall cause each of its Subsidiaries to" . . . "maintain insurance," "discuss its business operations with its officers, employees,

and…accountants, in each instance at [BSGNA]'s expense," and "comply in all material respects with all applicable laws, rules, regulations, orders, and decrees of any Governmental Authority or arbitrator." (PX-265 at 28-29).

## V.      BSG's Billing Practices

37.       "Enhanced" services are those products or services unrelated to the completion of a call, such as web hosting, directory listings, and e-mail services. (PX-380, Comment of Billing Concepts, Inc., *In re: Empowering Consumers to Prevent and Detect Billing for Unauthorized Charges (Cramming)*, FCC CG Docket 11-116 (filed Oct. 24, 2011), at 3) ("BSG FCC Comment").

38.       At the time relevant to the FTC's contempt motion, BSG "enable[d] third-party service providers [vendors] to include their charges on the telephone bills of LECs." (PX-380, BSG FCC Comment, at 1).

### A.      *BSG Caused Consumers to Be Billed for Services They Did Not Authorize or Want*

#### 1.      BSG Had a Prior Relationship with Cindy Landeen That Raised Red Flags for Unauthorized Billing

39.       Cindy Landeen was an officer of a company known as Innovative Calling Technologies, also known as Phonebillit, Inc., a voicemail service that billed through ESBI in the early 2000s. (PX-330, PX-331).

40.       In 2002, ESBI monitored consumers' calls to Phonebillit complaining of unauthorized charges, notifying Landeen that her company was receiving excessive cramming complaints, and was suspended by PAC Bell. (PX-333 at III.B.13.d – 001890).

41.       In 2003, ESBI notified Landeen that BellSouth reviewed a sales recording from a Phonebillit sale and found that the telemarketer's pitch differed from the script submitted to

BellSouth for approval. (PX-332). Because of the discrepancy, BellSouth suspended new

billing for Phonebillit pending approval of a new script. *See id.*

42.     In March 2005, ESBI notified Landeen that Phonebillit exceeded Qwest's 15% credit

threshold (percentage of dollars credited versus dollars billed) for three straight months, with

ratios of 42.9%, 27.4%, and 21.8%. (PX-334 III.B.13.d – 001933-34).

### 2.     MyIproducts Generated Thousands of Complaints for Unauthorized Billing and Was Terminated by Verizon for Cramming

43.     In late 2005, Cindy Landeen returned to LEC billing through BSG with associate

Timothy Durham and an entity called Durham Technology, LLC. (PX-41 at BSG00036085,

PX-302).

44.     On its billing agreement with ESBI, Durham Technology listed its address as 111

Monument Circle, Suite 4800, Indianapolis, Indiana, the same address used by Phonebillit.

(*Compare* PX-302 at BSG_Resp.-II-p.00000296 *with* PX-330).

45.     BSG approved and started billing for MyIproducts in December 2005. (PX 45).

46.     MyIproducts Imail purported to offer a voicemail service where messages could be

accessed via phone or the Internet. (PX-224 at BSG00054491).

47.     Soon after MyIproducts began operating, consumers complained to Landeen's company

Alternate Billing Corp ("ABC") about MyIproducts' billing. (PXs 47, 48, 49, 219, 220).

ABC handled the customer service calls for MyIproducts, and BSG frequently monitored

those calls. *Id.*

48.     Call summaries indicate that consumers called only to determine why they were being

charged, contest the charges as unauthorized, request cancellation or refund, or some

combination thereof. *Id.*

49.     BSG's monitoring focused on whether Landeen's call center provided complaining

consumers a refund for charges rather than whether MyIproducts was billing consumers without authorization.  (PXs 44, 46, 47, 49).

50.  In early 2006, internal BSG correspondence discussed concerns about MyIproducts' failure to issue billing credits to consumers who denied all knowledge of the billings or said they never ordered the service and noted that these "credit policies are driving the Regulatory [complaints] and more than likely LEC complaints are probably on the way . . . ."  (PX-44).

51.  In March 2006, BSG employee Denise DeSilva questioned Landeen's failure to issue credits for charges the consumers claimed were unauthorized just because the consumer's information matched the information ABC had on file.  Specifically, DeSilva asked, "How can you ensure that the person that is billed for the service is the one that hit the enter key?" (PX-46).

52.  In May and June, BSG warned Landeen that ABC was failing to credit consumers for MyIproducts charges that consumers said were unauthorized.  (PX-341, PX-342).

53.  In June 2006, BSG informed Landeen that 154 Verizon customers made cramming complaints about MyIproducts, a figure that exceeded Verizon's cramming complaint threshold of 1% of monthly billings or 150 complaints, whichever is less.  (PX-51); *see also* PXs 64, 65, 70 (establishing same cramming complaint threshold).

54.  Also in June 2006, BSG, on behalf of Verizon, requested an action plan to address the cause of the complaints, the remedial actions that would be taken to reduce complaints, the date MyIproducts would be compliant with Verizon's cramming complaint threshold, and the plan to maintain acceptable levels of complaints in the future.  (PX-51).

55.  In July 2006, BSG again notified Landeen that it had monitored her call center and that her company was failing to issue credits.  (PX-343).

56.     Also in July 2006, BSG employee Melissa Covarrubias notified Landeen of another 103 Verizon cramming complaints.  Covarrubias also informed Landeen that her company had failed to reduce complaints, that MyIproducts was "over the threshold for two months in a row," and that Verizon would suspend billing for MyIproducts if they were unable to comply with Verizon's cramming complaint threshold.  (PX-52).

57.     By mid-July 2006, BSG sent yet another letter to Landeen, stating that BSG received notice from Verizon that its billing subsidiary, ESBI, "ha[d] received excessive escalated complaints for the period of May 2006" and that it had determined that MyIproducts accounted for 17 percent of the complaints.  (PX-221 at BSG00055525).  The letter went on to state, "BSG is concerned by this recent development and in conjunction with the fact that the MyiProducts Imail product is on a developmental action plan with Verizon for excessive cramming complaints for the same time period it is most important that the level of complaints be dramatically reduced."  *Id.*

58.     BSG scheduled a meeting with Cindy Landeen, Tim Durham, and attorney Gary Sallee in San Antonio because MyIproducts was on the "verge of getting suspended in the Verizon region."  (PX-53).

59.     BSG also used customer service inquiry ratios to monitor its vendors' billing.  This ratio compares the number of customer inquiries received by BSG or transferred to the vendor's call center to the number of records processed for the previous month.  PX-54, PX-80.

60.     BSG sets a customer service inquiry threshold which, if breached, requires the vendor to provide BSG with additional information, including a written explanation of how the vendor will decrease these inquiries; Letters of Authorization ("LOAs"), which purport to be

documents demonstrating consumers' assent to be billed; and/or marketing used during the consumer sign-up process. (PX-54, PX-59, PX-60).

61.    At the end of August 2006, BSG notified Landeen that for the last 3 months, MyIproducts had exceeded BSG's threshold for allowable customer service inquiries, writing that MyIproducts' inquiry rate was "higher than our target of 10% inquiry" and requested a written plan for reducing the inquiries. (PX-54) (showing monthly billing inquiry rates of 28.71%, 24.32%, and 16.84% respectively).

62.    Earlier that month, Southwestern Bell informed BSG that MyIproducts had crammed a phone line belonging to Southwestern Bell's vice president. (PX-55).

63.    In September and October 2006, BSG monitored calls made by consumers to Landeen's customer service center about MyIproducts. (PX-56, PX-58). Again, summaries of these calls indicate that consumers called only to determine why they were being charged, contest the charges as unauthorized, request cancellation or refund, or some combination thereof. *Id.*

64.    Also in September 2006, BSG informed MyIproducts that its customer service inquiry ratio was 15.63% for August, a figure which exceeded BSG's 10% target ratio. (PX-57 at BSG00035983).

65.    At the end of 2006, MyIproducts again exceeded BSG's customer service inquiry threshold (which BSG had raised to 12.5%), with 2,794 consumer inquiries for a ratio of 12.68% in September and 5,623 such calls for a ratio of 19.92% in November. (PXs 59, 60). On both of these occasions, BSG requested a sample of 30 Letters of Authorization ("LOAs"). BSG also stated that, "since Internet marketing is also utilized, BSG requires the website creative or landing pages that were used during each end user's sign-up process," *i.e.*, pages consumers had allegedly navigated to on the Internet to sign up for MyIproducts

Imail.  *Id.*

66.     However, BSG never obtained the website creative or landing pages.

67.     Consumer complaints about MyIproducts continued into 2007.  In January, BSG notified Landeen that Durham Technology had again exceeded BSG's 12.5% inquiry threshold in December 2006, with 4,843 calls from consumers for a ratio of 13.52%.  (PX-61).  Again, BSG requested LOAs and landing pages.  *Id.*

68.     In February 2007, BSG notified ABC that Verizon received 67 cramming complaints about MyIproducts in November 2006, where consumers "contacted Verizon to deny all knowledge of the product and/or signing up for the service."  (PX-63).

69.     Also in February, BSG notified Landeen that Durham Technology exceeded the threshold with 6,081 calls for a ratio of 18.1% during January.  (PX-344 at 1B051_ITEM 32-CINDY'S PAPERS_COPIES GIVEN BACK TO ME at 000020).  Again, BSG requested LOAs and landing pages from Landeen.  *Id.*

70.     At the end of February, BSG notified Landeen that Verizon received 73 cramming complaints against MyIproducts in January, where consumers "contacted Verizon to deny all knowledge of the product and/or signing up for the service."  (PX-64).  In March 2007, BSG notified Landeen of 91 such cramming complaints by Verizon customers.  (PX-65).

71.     In April, May, and June 2007, BSG again notified Landeen that MyIproducts had surpassed BSG's 12.5% threshold for billing inquiries, with 8,398 complaints in April (19.7%), 7,798 complaints in May (16.19%), and 7,616 complaints in June (17.89%).  (PX-66 at BSG00024088, PX-69 at 24058-59, PX 70 at BSG00024052-53).

72.     In June 2007, Landeen submitted yet another "action plan" to address cramming complaints made to Verizon about MyIproducts.  (PX-71).  Rather than outlining additional

steps ABC would take to ensure that consumers would not be billed without their authorization, the plan alleged that consumers filled out LOAs and agreed to the charges and focused on making sure that future calls would be directed to ABC's call center rather than Verizon. *Id.*

73.     In September 2007, consumers' complaints of unauthorized billing continued to breach BSG's threshold, with 9,363 calls (15.87%) from complaining consumers in that month. (PX-74 at BSG00070794-95).

74.     Finally, that same month, Verizon notified BSG that it was terminating MyIproducts' ability to bill Verizon's customers "as they have not and will not bring [the] cramming complaint level" down to meet Verizon's thresholds. (PX-72, PX-223). Further, Verizon stated that "[i]t would be irresponsible for Verizon to allow this service provider to continue billing." (PX-73).

75.     In response, BSG's LEC relations manager, Sally Welge, attempted to get Verizon to reconsider by sending a reinstatement plan provided by Landeen. (PX 75 at BSG00056621-27). Landeen's plan attached an email from Christian Henderson, who was involved in the marketing of MyIproducts, promising to end a free coupon promotion, but stating that it could only end within 60-90 days "due to the number of publishers and websites currently running the campaign." *Id.* at BSG00056627.

76.     BSG's proposal for MyIproducts' reinstatement would have allowed BSG to continue billing the 8,503 Verizon customers who had been billed for more than 6 months, and recast the termination as a suspension of new sales "until such time as the inquiries are under threshold." (PX-76 at BSG00056692).

77.     Verizon denied BSG's effort to reinstate MyIproducts because "in our ongoing

discussions about internet marketing, co-registration marketing, and the like, these are exactly the programs that continue to generate cramming related complaints." (PX-77). That, plus a 5-month analysis of MyIproducts' threshold breaches, "bolstered" Verizon's decision to terminate MyIproducts' ability to bill Verizon customers. *Id.* at BSG00056672.

78.    BSG continued to bill other LECs' customers for MyIproducts despite Verizon's termination of its billing privileges. *See* PXs-122, PX-128, PX-324 at BSGRESPVII00000001-2).

79.    In February 2008, AT&T requested an action plan from MyIproducts to address cramming complaints in the BellSouth region. (PX-79).

80.    On September 29, 2008, BSG notified Cindy Landeen that AT&T (whose customers BSG was still billing) suspended MyIproducts from billing any newly signed-up AT&T customers in the Southeast region. (PX-140).

81.    In March 2010, AT&T terminated BSG's ability to bill its customers for MyIproducts. (PX-230).

### 3.    BSG Accepted Six More Billing Applications Despite Verizon's Termination of MyIproducts and Refusal to Bill for Two of the Services

82.    BSG sales representative Beth Kimball "went to see Cindy Landeen [on February 13, 2008] because we've been talking about adding two or 3 new companies/products for several months now." (PX-78). Kimball informed BSG CEO Greg Carter that she was drafting the billing agreements. *Id*.

83.    On March 5, 2008, Kimball told BSG CEO Carter that the potential agreements with Landeen "probably won't be under the Durham name, by the way." (PX-78 at BSG00062963). In mid-March, 2008, Cindy Landeen wrote to BSG's Kimball that the "three companies to start" were eSafeID, Instant411, and Digital Vmail, and Christian

-15-

Henderson would sign the contracts to bill through three different BSG subsidiaries.  (PX-81).

84.     Carter approved Kimball's request to waive the implementation fee for the new contracts and give them the same call-transfer fee that Durham Technology had in its contract to bill consumers for MyIproducts.  (PX-78 at BSG00062963).

85.     Landeen sent BSG contracts, signed by Durham and Henderson, to bill for seven new services, including the three she discussed with Kimball.  *See* ¶¶ 89-91.

86.     Two contracts were for voicemail service providers, **800 Vmailbox**, **Digital Vmail**, with Christian Henderson signing the agreements to bill through ESBI.  (PX-281, PX-300).

87.     Two contracts were for ID theft protection service providers**, eSafeID** and **eProtectID**, with Henderson and Durham, respectively, signing agreements with BCI.  (PX-304, PX-306).

88.     In addition to an application for **NeedtheInfo**, Landeen submitted directory assistance services **Instant411** (Henderson) and **InfoCall** (Durham) to bill through ACI.  (PX-308, PX-311, PX-328 at BSG00102763, BSG00102765-90).

89.     BSG CEO Greg Carter counter-signed the billing agreements with the following titles: CEO of ESBI (PX-281, PX-300), CEO of BCI (PX-304, PX-306), and CEO of ACI (PX-308, 311, PX-328 at BSG00102765).

90.     At the same time the proposed vendors signed the billing agreements, they also submitted information about their proposed LEC-billed services on a BSG-supplied "iForm."  (PXs 271, 272, 273, 274, 275, 278).  These applications contained blatantly false statements, including Tim Durham's answer to Question 9:  "Have you ever submitted billings under a different business, company or marketing name?  No."  (PX-271 at BSG_Resp.-I-p.00000022, PX-273 at BSG_Resp.-I-p.00000062).

91.	The seven vendors' relationship to one another and to the individuals involved in MyIproducts (Landeen, Durham, and Henderson) was apparent from the start, and certainly well before BSG started billing for them. For example, BSG corresponded with Cindy Landeen for the due diligence on these services. (*See e.g.*, PXs 84, 85, 86, 87, 88, 90, 91, 95, 95, 98, 101, 102, 103, 111). In addition, the paperwork submitted for billing approval for these services indicated that Landeen's company, ABC, would perform the "back office functions," including creating billing records and handling customer service calls, and named Durham and Henderson as the owners of the services. (*See e.g.*, PX-98 at 27843-44 (800 VMailbox), PX-100 at 27825-26 (Digital Vmail), PX 101 at 27855-56 (Infocall), PX-102 at 27876-77 (ESafeID), PX 104 at 27816-17 (EProtectID)). Moreover, in setting up the accounts, BSG employee, Sherry Martinez, asked Landeen for a conference call regarding the marketing of all seven products (PX-90).

92.	In November 2008, BSG LEC Relations Manager Sally Welge sent an email to Verizon asking if Verizon had "terminated within the past 5 years the following (a) InfoCall LLC; (b) owners, officers, directors, consultants, and contacts with decision making authority listed below; or (c) any company currently or formerly owned by the Vendor's principals or owners listed below." (PX-105). Welge then listed "Timothy Durham-President" and "Cindy Landeen" as "Consultant/Management Company." *Id.* Verizon's reply to BSG was clear:

> "Verizon terminated processing for My IProducts Imail in September 2007.
> Mr. Durham was a principal of this company. Verizon is not interested in
> allowing this company to submit charges for billing[.]"

*Id.*

93.	Two days later, BSG employee Denise DeSilva wrote to Cindy Landeen (and copied BSG employees Melissa Mitchell, Sherry Martinez, and Roberta Trevino): "We were

informed by Verizon that due [to] Tim Durham being associated with My I Products and the fact this account was suspended due to performance issues in 2007, they are choosing to not allow any billing related to… Needthe Info[,] eProtectID[,] InfoCall." (PX-112).

94. Within the hour, ABC's Terri Chartrand, with a copy to her boss Cindy Landeen, wrote to Denise Desilva that they "would like to go ahead without Verizon." (PX-113).

95. Two minutes later, Denise Desilva wrote to Cindy Landeen, confirming that the "data gathering side of the due diligence" was complete for eProtectID, and reminding her that eProtectID could not bill through Verizon. (PX-114 at BSG00054391) (explaining "[y]ou are only open to market in Embarq [a LEC] and AT&T").

96. Later that day, Denise Desilva sent a similar email regarding Infocall, noting "[t]his product is not open in Verizon." (PX-115 at BSG00027996).

97. BSG billed other LECs' customers for eProtectID and InfoCall, (PX-82, PX-324 at BSGRESPVII00000006-7; *see also* Miles Decl. ¶ 8, Att. D), despite Verizon's refusal to bill, the services' connection to Durham and Landeen, and their connection to MyIproducts. *See e.g.*, ¶¶ 91,92.

98. BSG also permitted 800 Vmailbox, Digital Vmail, EsafeID, and Instant411 to bill, even though their contract signator, Christian Henderson, had done the marketing for MyIproducts, PX-75 at 56627, and he submitted a letter at BSG's request stating that Cindy Landeen would "manage and oversee all the operations" for 800 Vmailbox, Digital Vmail, EsafeID, and Instant411. (PX-345); *see also* PXs 106, 107, 110 (BSG correspondence asking Henderson to confirm ABC's decision-making authority over the accounts).

99. Ultimately, BSG approved billing for six products – 800 Vmailbox, Digital Vmail, eSafeID, eProtectID, Instant411, and InfoCall. (PXs 114, 115, 116, 117, 118, 119). BSG

approved billing for these six products despite Verizon's termination of MyIproducts a year earlier and AT&T's suspension MyIproducts a mere month before. *See* ¶¶ 74, 80.

100. Indeed, despite Landeen's cramming history and her involvement with all of the services, the only one of the seven services BSG refused to bill was NeedtheInfo, and that was because ILD, another billing aggregator, had terminated it based upon its billing "performance" rather than its connections to MyIproducts, which Verizon terminated. (PXs 120, 212).

### 4. BSG Approved Yet Another Billing Application in 2009

101. In early 2009, Landeen, Durham, and Henderson proposed yet another service to be billed through BSG. On February 8, 2009, BSG's Melissa Mitchell thanked Cindy Landeen for coordinating a meeting at Tim Durham's suite in Las Vegas, but asked, "which company was executing the agreement? Will this me [sic] a new agreement between BSG and National Lampoon? Or will it a new [sic] B2P agreement between Durham Technologies and BSG and the subCIC (National Lampoon) will be under the Durham agreement?" (PX-123).

102. Within the week, Landeen clarified that the name of service provider would be Streaming Flix, LLC, and that Landeen, Durham, and Henderson would be its members. (PX-124, PX-125 at BSG00032537, PX-295). Streaming Flix would purportedly allow consumers to stream movies to their home computers, and like the six services BSG approved in the fall of 2008, all operations would occur at ABC's offices. (PX 139 at 40263-64). It would bill consumers through BSG subsidiary HBS. (PX-36 at BSG00003980).

103. Again, BSG noted that actual usage of the service was crucial. BSG's general counsel wrote to Landeen:

> Usage data has become a sensitive subject for the LECs, regulatory agencies, and BSG. What we need to confirm is that Streaming Flix will be able to identify the consumers that downloaded movies, types of movies, date of usage, etc. **This data is very helpful in showing that the consumer did in**

**fact use the service that they were charged for.**

(PX-356 at BCI_026261) (emphasis added).

104.    BSG approved Streaming Flix in May 2009.  (PX-141).

##### 5.    Billing for the New Services Generated Thousands of Unauthorized Billing Complaints

105.    BSG started billing for 800 Vmailbox, Digital Vmail, eSafeID, eProtectID, Instant411, and InfoCall, and Streaming Flix in 2009 and again soon racked up complaints from LECs, regulatory agencies, and consumers in excess of the inquiry thresholds set by BSG.  *See, e.g.,* PX-134 (800 Vmailbox generated 1885 customer service inquiries compared to 4904 billing records), PX-135 (Instant 411 generated 1919 customer service inquiries compared to 8,501 billing records), PX-136 (Digital Vmail generated 862 inquiries compared to 2,676 billing records); *see also* PX-137 (ABC emailed BSG's Roberta Trevino seeking an "allowance" or accommodation for threshold breaches for the initial months of billing for "our newest products"); PX-162 (Landeen emailed BSG CEO Carter, saying she found AT&T's 50 complaint per month threshold "alarming.").

106.    At least one – and often multiple – of these new services breached BSG's 15% inquiry threshold (which BSG had raised from 12.5%), the LECs' cramming complaint threshold, and/or BSG' regulatory complaint threshold every month from March 2009 through January 2010 and in five additional months in 2010.  (PXs 133, 134, 135, 136, 142, 143, 144, 148, 152, 153, 154, 163, 169, 181, 185, 186, 187,  205, 206, 207, 208, 209, 210, 211, 346).

107.    Digital Vmail and Infocall exceeded these thresholds for eleven straight months, from March 2009 through January 2010.  (PX-136, PX-144, PX-148 at BSG00040535, PX-153 at BSG00040852, PX-163 at BSG00060013, PX-187, PX-346 at 1B068_ITEM 71 – BSG PERFORMANCE INDICATORS_000010, 000018, 000025, 000039) (Digital Vmail

threshold breaches); (PX-142, PX-148 at BSG00040537, PX-153 at BSG00040853, PX-163 at BSG00060021, PX-169, PX-185, PX-346 at 1B068_ITEM 71 – BSG PERFORMANCE INDICATORS_000008, 000013, 000021, 000033, 000040) (Infocall threshold breaches).

108.     Instant 411 exceeded these thresholds for ten straight months, from March through December 2009.  (PX-135, PX-148 at BSG00040538, PX-153 at BSG00040854, PX-169, PX-346 at 1B068_ITEM 71 – BSG PERFORMANCE INDICATORS_000007, 000014, 000026, 000034, 000041, 000044).  In the fall of 2009, AT&T notified BSG that it suspended Instant411 from marketing to its customers.  (PX-177).

109.     800 Vmailbox exceeded these thresholds for nine straight months, from March through November 2009.  (PX-134, PX-148 at BSG00040536, PX-153 at BSG00040851, PX-163, PX-169, PX-346 at 1B068_ITEM 71 – BSG PERFORMANCE INDICATORS, 000017, 000024, 000028, 000037).

110.     The ID theft services exceeded these thresholds for six straight months, from June through November 2009.  (PX-154 at BSG00040832, PX-163 at BSG00060019, PX-169, PX-346 at 1B068_ITEM 71 – BSG PERFORMANCE INDICATORS_000015, 000022, 000032, 000038 (eSafeID threshold breaches); (PX-154 at BSG00040830, PX-163 at BSG00060017, PX-169, PX-346 at 1B068_ITEM 71 – BSG PERFORMANCE INDICATORS_000016, 000027, 000031, 000042) (eProtectID threshold breaches).

111.     Streaming Flix exceeded BSG's 15% threshold from September 2009 through March 2010: 4,157 (25.42%) (September); 7,469 (23.75%) (October); 8,943 (22.42%) (November); 13,907 (20.49%) (December); 2, 925 (16.59%) (January); 15,399 (16.05%) (February); and 14,185 (18.3%) (March).  PX-181, PX-186, PX-192, PX-205, PX 346 at 1B068_ITEM 71 – BSG PERFORMANCE INDICATORS_000009, 000019-20, 000035).

112.    Despite these consistent breaches of BSG's 15% inquiry threshold, the LECs' cramming

complaint threshold, and/or BSG' regulatory complaint threshold, BSG continued to bill for

these services.

113.    In late 2009, BSG received from Landeen an application to bill for a new service,

Uvolve, which purportedly provided a job search tool plus streaming instructional videos.

(PX-145).

### 6.    BSG Continued Billing for the Services Even After AT&T Forced BSG to Acknowledge That Thousands Were Billed Without Authorization

114.    In early 2010, in response to continuously high complaint levels, AT&T suspended all

billing for MyIproducts and stopped all new billing for 800 Vmailbox, Digital Vmail, and

Streaming Flix.  (PXs 231, 232, 233, 237); *see also* PX-347 (Melissa Mitchell notified

Landeen that AT&T is cutting off new sales of all voicemail products to its customers

effective February 1, 2010).

115.    In early 2010, AT&T told BSG that it would no longer accept new billing from

Streaming Flix due to cramming complaints.  (PX-182).  AT&T also denied BSG's request to

bill AT&T customers under the name Streaming Flix-National Lampoon because:

> This new subCIC application is for a service provider whose Principal is also the
> officer of Streaming Flix, LLC.  The service program for Streaming Flix, LLC
> offered online subscriptions to receive streaming video.  The service program
> for this applicant, Streaming Flix National Lampoon, LLC is the same offering.
> Based on the 2/9/2010 letter to HBS informing them of our intent to no longer
> accept new billing from Streaming Flix due to unacceptable levels of cramming
> complaints, we have made the decision not to accept billing from this service
> provider.
>
> This request is denied.

> *Id.*

116.    In response to a request from AT&T, BSG "scrubbed" the customer lists for those

services to determine whether the phone numbers it was billing matched the names and addresses gathered during marketing of the services. *See* (PX-184) (Melissa Mitchell sent Landeen "the attached worksheet from ATT today regarding excessive complaint levels for MyIproducts, 800VM, Digital vm, Info Call, and Instant 411 … ATT has requested for all the attached companies to scrub their existing ATT base."); (PX-190) (Mitchell sent to Landeen, Henderson and their IT contractor Brian Jones the "file format we need for the current ATT customers for MyIproducts, Digitalvm, and 800vmbox" for the scrub). Mitchell vowed that BSG would continue to "bill records that pass." (PX-184).

117. In March 2010, BSG conducted the scrubs for AT&T's southeast region for 800 Vmailbox and Digital Vmail and found that 5,430 of the 8,413 telephone numbers it was currently billing in that region – a stunning 64% – "did not pass name and address lookup," meaning the name and address of the billed consumer did not match and the billing records were invalid. (PX-193).

118. BSG also scrubbed the InfoCall customers from that region, and found that 46.7%, or 1,806 of the 3,866 telephone numbers it was currently billing, did not pass this validation check. (PX-235, PX-236).

119. In March 2010, Landeen's company conducted the scrub for Streaming Flix across all of its billings (without limiting the scrub to AT&T's southeast region) and found that 26%, or 9,341 out of 35,409, of the phone numbers billed did not belong to the consumer who purportedly ordered the service. (PX-360).

120. In March 2010, Landeen informed BSG that, in submitting Streaming Flix's new sales to BSG for billing, the "customers'" names and addresses had not been checked against the telephone numbers to be billed (also known as Name, Address, Phone or "NAP validation")

at any time before March 1, 2010.  *See* (PX-234) (in response to BSG's request to confirm when the name-address-phone number checks began, "NAP was implemented on SF new sales on March 1, 2010.").

121.    In April 2010, BSG approved billing for Uvolve.  (PX-189, *see also* PX-296).  BSG billed Uvolve through HBS.  (PX-38).

122.    In May 2010, BSG's Mitchell informed Landeen that, based on running Streaming Flix's purported customers through NAP validation (*i.e.*, checking the Name and Address against the billed Phone number), 26 of the "customers" were deceased.  (PX-194).

123.    BSG did not cut off all billing for the services, report them to law enforcement, issue credits to "scrubbed" consumers whose numbers had been improperly billed, or even conduct a full-scale investigation.  Instead, BSG simply told ABC to remove the mismatched numbers from the services' billing rosters and continued billing the rest of the services' "customers." *See* (PX 193 at BSG00045186) (reporting the total numbers of 800 Vmailbox and Digital Vmail customers that did not pass name and address lookup, BSG's Melissa Mitchell told Landeen's employee to "[h]old off on sending the Info and Instant until I can get you the numbers that did not pass so you can strip from your files.").  Mitchell even sent Landeen and Henderson a draft plan to ask AT&T for reinstatement of Streaming Flix, stating "we need to add some words related to the SF/ATT existing base and what scrubs have occurred with the existing base."  (PX-191).

124.    On July 14, 2010, Verizon sent BSG a letter terminating billings for Streaming Flix.  (PX-196).

125.    In July and October 2010, Uvolve exceeded BSG's 15% threshold.  (PXs 207, 210).

126.    Despite continuous, overwhelming evidence that all of Landeen's services were rife with

cramming, BSG then approved applications to bill two new services for her, ProIdentityProtect and MyIDsafe, in the fall of 2010. (PX-316-317) (affidavits for billing ProIdentityProtect through AT&T and Verizon signed by Cindy Landeen on August 10, 2010). These applications contained blatantly evasive statements, such as a response of "N/A" to AT&T's request to "include the names of any and all business enterprises, corporations, joint ventures with whom any of the individuals who currently serve or have served as Officers, Directors, Principals, Owners or Partners of subCIC are now or have ever been associated, and that have either generated or submitted charges to be billed on any AT&T Telcos bill." (PX-316 at BSG_Resp.-I-p.00000447).

127.    Despite BSG's willingness to continue billing for Landeen, Verizon uncovered the proposed services' connections to the terminated Streaming Flix and denied the applications. (PX-200).

128.    Still, BSG continued to seek approval to bill other LECs' customers for ProIdentityProtect and MyIDsafe. *See* (PX-201) (CenturyLink approved ProIdentityProtect, subCIC 349, noting that "this is an identical product to MyIDsafe," and asking, "What is the benefit for having the same product under multiple names?"); *see also* (PX-240) (confirming MyIDsafe was subCIC 243).

129.    In the fall of 2010, BSG attempted to convince Verizon to keep billing Streaming Flix's residual "customers," like the reinstatement request BSG submitted for MyIproducts in 2007, but Verizon told BSG "that is against the Verizon policy." (PX-195). BSG then reviewed Verizon's termination of Streaming Flix. (PX-198). Denise DeSilva wrote to CEO Greg Carter and Melissa Mitchell, reminding them that Streaming Flix's customers' names and addresses were not matched with phone numbers before billing them:

> Streaming Flix had an issue when they were authenticating their own sales…It was discovered that that during the initial query for NAP [name/address/telephone], that is [sic] the query came back as "blank" or "no data," they would then send it to NAS [name/address/SSN] for processing. The problem in doing this is that there is no confirmation that the consumer is associated with that telephone number.

*Id*.; *see also* (PX-138, PX-174) (ABC said a billed phone number that belonged to an AT&T corporate office was found to have been "disconnected" when BSG asked how it could have passed authentication to be billed for Streaming Flix).

130.   Despite this knowledge, BSG attempted to get Verizon to reinstate Streaming Flix's billing privileges and give the service another chance to meet Verizon's complaint thresholds.  (PX-199, PX-239).

### 7.     Execution of Search Warrants Finally Stops the Cramming Operation

131.   It was not until the FBI raided Landeen's Minneapolis offices in December 2010 that BSG finally stopped billing for her companies' services.  (*See* PXs 202-204).

### B.     *Consumers Did Not Use the Services for Which BSG Billed*

#### 1.     BSG Learned the Vast Majority of Consumers Billed Would Not Use the Services Prior to Billing for Them

132.   On October 20, 2008, ABC employee Gabrielle Menne emailed Cindy Landeen and BSG employees Sherry Martinez and Roberta Trevino "contract info sheets" for NeedtheInfo, EprotectID, and InfoCall, each showing only a 20% expected product usage rate.  (PX-92).

133.   That same day, Menne sent a similar email to Cindy Landeen and BSG employees Martinez and Trevino with a hyperlink to "Contract Information sheets" for "companies owned by Christian Henderson."  (PX-241).  When the FBI executed search warrants at ABC in December 2010, it seized contract info sheets for those companies -- Instant411, eSafeID, Digital Vmail, and 800 Vmailbox.  (PXs 348, 350-352).  Each showed estimated usage rates

at 20%.  *Id.*

134.    After BSG received the contract info sheets disclosing that 80% of billed consumers were

not expected to use the product they were billed for, instead of rejecting the billing

applications or questioning why so few billed customers would use the services, a BSG

employee wrote:

> mention to Cindy during your discussions that we appreciate her honesty on
> the estimated usage rate.  Please stress that usage is a very important issue right
> now with the regulatory agencies and she may at some time in the future need
> to produce usage information on each product.

(PX-93).  Denise DeSilva forwarded the email to Cindy Landeen and Terri Chartrand with a

copy to BSG employees Sherry Martinez and Roberta Trevino.  *Id.*

### 2.    Consumers Did Not Use Services for Which BSG Submitted Bills

135.    Landeen's voicemail services (800 Vmailbox, Digital Vmail, and MyIproducts Imail)

were supported by an underlying provider of voicemail boxes, NXT Telecommunications.

(PX-353 at 1B057_ITEM 63-VENDORS_000063-66).  NXT Telecommunications' records

show the usage of voicemail boxes NXT provided for these services from July 2009 through

March 2010.  Expected Testimony of Robert Zoch.

136.    NXT's data shows that consumers used a mere 209 voicemail boxes from July 2009

through March 2010.  Expected Testimony of Robert Zoch; Miles Decl. ¶¶ 5-6, PXs 381-382

(Miles Decl. Att. A and B)[2]; *see also* (PX-361) (showing only 141 active and 98,772 inactive

mailboxes as of July 27, 2009); (PX-363) (showing that voicemail boxes with 4-digit

identifiers were used by Landeen's employees rather than consumers); (PX-98 at

---

[2] The expected testimony of Ms. Miles, which is described in her declaration and its attachments,
will provide summaries of NXT's usage records and BSG's billing records pursuant to Federal
Rule of Evidence 1006.  References to Ms. Miles' expected testimony are given as references to
her declaration, previously filed at DE-121-1.

BSG00027841, PX-100 at BSG00027834) (Landeen's pre-billing answers to FAQs for billed

consumers about 800 Vmailbox and Digital Vmail: "your mailbox number is the ten digit

account number (BTN or phone number).").  During that period, BSG billed tens of

thousands of consumers each month for voicemail – for example, in July 2009, BSG billed

64,791 consumers for MyIproducts, 16,117 for 800 Vmailbox, and 7,896 for Digital Vmail.

(PX-172 at BSG000172658) (showing the number of "records" (billings) and "inquiries"

(calls) in July, August, and September 2009 for Landeen's companies).

137.    Despite billing tens of thousands of consumers each month, Landeen's voicemail services

had a total monthly limit of 5,000 minutes.  Expected Testimony of Robert Zoch; PX-353 at

1B057-VENDORS-000064; PX-363; PX-364.

138.    These facts are consistent with written complaints that BSG received from consumers,

stating they never used the services for which BSG was billing them $14.95 a month.  *See*

(PX-1 at BSG00000092-93) ("I have never used voicemail; nor would I have need of it.  This

I feel is nothing but a scam."); (PX-5 at BSG00001713-14) ("I had no idea of this service

because I have always paid my bills on live [sic] and I never check my bills.  I am requesting

reimbursement back since July of 2007 in the amount of $669.90.  I have never used this

service."); (PX-11 at BSG00002079) ("Bottom line: I was charged 6 months for a service I

never signed up for and never used."); (PX-12 at BSG00002145-6) ("Neither my wife Linda

nor I made the subscription and have never used the service.  We just realized it was on our

bill this month [after being billed for 7 months]"); (PX-16 at BSG00005031) ("Neither my

wife or I have ever ordered this service.  We don't need this service because we have an

answering machine.  I have, until this problem arose, never heard of this company.  We have

never used this service and wish to have this cancelled or disconnected or whatever."); (PX-

178 at BSG00018779) ("I have never used directory assistance and dispute this charge and would like you to issue a refund."); (PX-25) ("Through our telephone provider, AT&T, Enhanced Services Billing fraudulently billed on behalf of Digital Vmail, Inc. for voicemail services never ordered or used.") (Complaint from CyberNet Consulting, Inc.).

## VI.    BSG's Monitoring and Testing Did Not Prevent Unauthorized Billing

### A.    *BSG's Monitoring and Recording of "Customer Service" Calls from Consumers Showed Unauthorized Billing*

139.    BSG monitored and recorded what it called "customer service" inquiry calls from consumers about each of the services. *See, e.g.*, (PXs 318-320).  The form BSG used to note the monitored calls was set up to record a <u>complaint</u> about unauthorized billing, including information about whether the LOA matched the identity of the person calling and whether he or she continued to dispute the bill.  *Id.*

140.    BSG monitored calls to ABC.  Transcripts of these calls revealed:

A.    A representative told a caller from a law firm that "David Jones" ordered MyIproducts.  The caller said there was no David Jones in his office and he knew no one by that name.  After noting that charges for MyIproducts had appeared on his bill for six months, the caller said, "Nice gig you guys got, 'David Jones.'  I got seven employees and we don't have any Davids or any Joneses."  (PX-243, PX-243-A)

B.    A consumer told the representative, "I have these charges on my phone bill that were not authorized and I'm trying to figure out why."  After the representative determined that the name given on sign-up for InfoCall did not match the name on the phone bill, the consumer said, "[E]very month there's somebody trying to do this and I don't know how to – how it's done on the Internet or how it's – it's just absolutely ridiculous.  You guys got to come up with some better stuff."  When the

representative said that the order form used the consumer's address and phone number, the consumer replied, "Yeah, which you can look in the phone book and find … I can't even believe that AT&T even allows you guys to bill on this."  (PX-150, PX-150-A).  *See also* (PX-132 at BSG00016529) (BSG cover email admitting that InfoCall's customer information is "allegedly not matching on the majority of their monitored calls.").

C.      When the caller's information did not match the name and address on the Instant411 account BSG billed to her phone line, the representative said, "When they signed up for Instant411 over the Internet, they keyed in their telephone number incorrectly and that's why you're seeing the charge."  (PX-127, PX-127-B); *see also* (PX-129, PX-129-A, PX-129-B) (same).

D.      A consumer told the representative he had previously been promised a credit that had not appeared.  The consumer said, "We've been fighting this thing for two months now" and that he "got a past due" because of the unauthorized charge.  The consumer asked the representative whether she was with AT&T or ESBI, and she replied that she was with MyIproducts.  The consumer asked, "MyIproducts?  You're the guys that slammed me or did whatever you did anyway, right?"  The representative replied, "We're not slammers.  I would take that up with your son who signed up for the service."  The consumer explained that he did not know how the charge appeared on his bill but that a previous representative told him it may have occurred after he filled out a survey.  The representative said the service would have been ordered directly through Myiproducts.com.  When the consumer replied, "I doubt that very seriously," the representative told him, "You don't have to believe

that, but that is how it's ordered." (PX-244, PX-244-C).

E.      An employee of Boston Scientific called in June 2009, after beginning an audit of

the company's phone lines and discovering a charge for Instant411. The caller

learned that Boston Scientific's phone line had been billed for six months for the

service, under a name the caller did not recognize. (PX-155, PX-155-C).

F.      A representative told a consumer that eSafeID had billed her for an order placed

in her neighbor's name. When the representative told her it would take two to three

billing cycles for a credit to appear on her bill, the consumer replied, "Wait a minute,

you said a couple billing cycles to give me my credit, but it only takes a minute to

take – you know, to bill me. … This is the second time this has happened to me."

(PX-160, PX-160-A).

G.      A representative told a consumer she was being charged for a Streaming Flix

account ordered in her ex-husband's name. When the representative described the

service and said it allowed the user to download videos onto a computer, the

consumer replied, "We don't have a computer, honey." The representative initially

refused to issue a credit, however, because "he [the consumer's ex-husband] would be

held responsible for that 14.95 charge … because I do show that I have correct

information that he did sign up for a service." The consumer replied, "But this is not

right, how somebody can put something on my phone bill that I don't even have and I

have to pay it. …the phone is in my name and I did not okay this." (PX-176, PX-

176-A).

H.      A caller who BSG charged for Digital Vmail told the representative he did not

want the service. When the representative said, "I am showing your information on

the order form as the person that requested our services," the consumer replied, "I did not. I take care of the billing and I'm looking to lower the bill, not raise it. I'm not sure where the mix-up was." The representative told him the only way the company could get his information was for the consumer to "manually enter all of your information in on the order form and then click the order now button and submit it to us." (PX-171, PX-171-C).

I.      A representative told a consumer that the order for Streaming Flix was in the name of her husband. The consumer replied, "I'm pretty sure he did not mean to sign up for this. So, is that what the 14.95 extra charge on my phone bill was?" When the caller asked how her husband was enrolled, the representative said, "It'd have to be signed up for over the Internet and it did have to be signed up for directly off of the Streaming Flix website or an advertising affiliate site." The representative then led the consumer in a confusing exchange over how many Streaming Flix charges had been billed to her telephone number. (PX-180, PX-180-A).

J.      A consumer asked the representative what the $14.95 charge on his phone bill was for. The representative explained that it was for a Streaming Flix account for "unlimited access to our video database." The consumer replied, "Yeah, but I didn't ask for – I didn't ask for that, though. I mean, how could they just put that on there? … I don't know how it could be just – how you could just stick something on – you know, on a person's bill that they don't ask for?" The representative denied that the charge was crammed on the consumer's bill and said the consumer signed up directly on the Streaming Flix site or on an "advertising affiliated" site. The consumer asked to have his bill "without charging me for something that I don't know anything

about." (PX-180, PX-180-B).

K.      A caller complained about a bill for eProtectID, and the representative explained that it was for a credit-monitoring service and was in the caller's niece's name. The caller said, "Okay. Now, there we have a problem. She doesn't have any credit. She's a kid. I mean, why would she need a – you know what I mean – a credit report?" (PX-168, PX-168-A).

L.      A representative told a consumer that her son signed up for Instant411 online. When the consumer said she did not understand how that happened because her son would not need such a service, the representative replied, "Well, he may have been on one of our advertising affiliate sites and thought he was signing up for something else." (PX-127, PX-127-A).

141.    BSG's notes on monitored calls also revealed details of billing complaints, including:

A.      A caller complained that she was billed for identity theft monitoring supposedly ordered by her minor daughter. (PX-321 at BSGRESPXIII_00000290).

B.      Callers complained about being billed for Streaming Flix's online video subscriptions even though the billed parties had no Internet access. (PX-318 at BSGRESPXIII_00000033, BSGRESPXIII_00000037; PX-319 at BSGRESPXIII_00000039).

C.      A caller complained on behalf of a phone subscriber who was billed for InfoCall's directory assistance service while he was deployed. (PX-320 at BSGRESPXIII_00000226).

### B. *The LOAs BSG Requested Do Not Establish Authorization*

142.    Billings for MyIproducts consistently breached BSG's inquiry threshold throughout 2006 and 2007.  *See* ¶¶ 60-74, *supra*.

143.    Similarly, throughout 2009 and 2010, billings for 800 Vmailbox, Digital Vmail, eSafeID, eProtectID, Instant411, InfoCall, and Streaming Flix breached BSG's 15% inquiry threshold, the LECs' cramming complaint threshold, and/or BSG' regulatory complaint threshold.  *See* ¶¶ 105-11, *supra*.

144.    In its threshold breach notices, BSG asked Landeen to provide, or (in the case of a third consecutive breach) allow BSG to retrieve, the billed consumers' LOAs, which purportedly demonstrated consumers' assent to be billed.  (PXs 133, 134, 135, 136, 142, 143, 144, 148, 152, 153, 154, 163, 169, 181, 185, 186, 187, 205, 206, 207, 208, 209, 210, 211, 346).

145.    The LOAs appear to be screen shots showing what the consumers saw upon signing up for the service.  *See* (PX-156, PX-158).  These LOAs had several fields purportedly filled in by consumers, a scroll bar next to terms and conditions of the service, and a very prominent "Order Now" button, making it appear that a consumer found the service's website, read the conditions, wanted the service, and clicked on the big Order button to order it.  *See, e.g.*, (PX-39 at BSG00008298).

146.    In reality, consumers had never seen the LOAs.  Instead, they saw the Internet "offers" Christian Henderson's marketing company placed with website publishers, such as Smiley Media.  *See* Expected Testimony of Stephen Oskoui.

147.    These offers appeared to be part of the sign-up process for an unrelated, free service or event, such as voting in a picture contest or obtaining a free email account.  *See* (PXs 372-373).  As consumers clicked through the web pages related to these free events or services, the offer pages for the services appeared several pages into the click-through and appeared to

be part of the unrelated sign-up. *Id.* Indeed, the offer pages were pre-populated with information (such as name, address, and phone number) that consumers had initially entered to obtain the free email account or to vote, and contained a prominent heading such as "You're Almost Ready to Cast Your Vote!" or "Your Email Account is Almost Ready!" *Id.*; (PX-371). Though the offer pages "disclosed" the service, its cost, and that it would be billed to the user's telephone number, these disclosures appeared in a lengthy block of text sandwiched between the large-print headline and the prepopulated data fields. (PXs 372-373). Nor did the pages disclose anything about a refund policy. *Id.* Moreover, at the bottom of the page, well below the terms, was a button that (like prior screens) said "submit and go to next page," "submit and continue to next page," or "accept and go to next page." *Id.* However, when consumers clicked that button, they did not just continue to the next page related to the free event or service; they were enrolled to be LEC billed for the service. Expected Testimony of Stephen Oskoui. Nothing in the following screens indicated that they had just agreed to be billed. (PX-372, 373).

148. A 12-person empirical study of this click-through marketing demonstrated how it led to unauthorized billing. The 12 participants were asked to interact with marketing that offered a free email account and requested personal information to sign up, then led consumers through several offer pages, including one for eProtectID. (Deposition of Robert Rauschenberger ("Rausch. Dep.") 46:16 – 46:25, 84:2 – 84:12, 148:19 – 148:24, Exh. 5, Exh. 9). Of the 12 participants, six clicked "submit and continue" on the eProtectID page, triggering charges to their phone bills for the service. (Rausch. Dep. Exh. 9; Rausch. Dep. Exh. 10 (Participants 2, 8, 9, 10, 12, 13); Rausch. Dep. 161:7 – 161:12, 170:11 – 170:19 (Participant 2); 214:14 – 214:23, 216:1 – 217:5 (Participant 8); 226:8 – 226:18, 229:23 –

231:23 (Participant 9); 234:11 – 234:13, 235:5 – 237:3 (Participant 10); 241:16 – 241:22, 244:3 – 245:20 (Participant 12); 252:3 – 252:10, 253:9 – 254:15, 256:3 – 256:18, (Participant 13); 272:21 – 272:25, 278:17 – 278:22).  The participants' reactions during the study and follow-up responses revealed that none of the six who clicked "submit" on the eProtectID page wanted the service, intended to purchase it, or understood what it was.  *Id.*

149.    Furthermore, some participants in the study entered false telephone numbers at the initial signup page, expressing doubt that a valid telephone number was necessary to sign up for a free email account.  (Rausch. Dep. 179:25 – 180:4, 195:14 – 195:19, 237:21 – 237:24; Rausch. Dep. Exh. 10 (Participants 4, 5, 6, 11)).  If consumers entered altered phone numbers at signup and later clicked "submit and continue" on any offer pages, the unsuspecting consumer who actually owned the telephone number would be charged as a result.  *See, e.g.*, (PX-193, PX-235, PX-236) (phone numbers were billed even if the name and address given at signup did not match the telephone number).

150.    Consistent with the fact that consumers did not actually see the LOAs as part of the "sign-up" process, time and again, consumers notified BSG that they had never seen the LOAs.  *See* (PX-30) ("They have sent me a copy of what I supposedly filled out and sent to them.  Honestly, I have never seen this and did not send it in."); (PX-13) ("They said I ordered the service and had proof I ordered it.  I asked them to send proof.  What they sent was an order form which I never saw before."); (PX-37) (Verizon "advised me to call HBS Billing Service… they too told me I signed up for the account and sent me a typed up form … which had all my information.  My biggest concern is they sent me a form that I supposedly filled out on 11-11-09 which I had never seen before."); (PX-24) (Digital Vmail "said they would send the 'proof' they have of my order.  When it came it was apparent to

me that I had never authorized it because the entire form was filled out in all lower case letters and I NEVER write that way."); (PX-32) (Instant411 "did send a copy of my supposed transaction to prove I had made this order. However, it is in lower case, and I always capitalize proper nouns, including my own name."); (PX-229) ("They said they would cancel my subscription but I would still be responsible for the original $14.95. When I started screaming and swearing at them they offered to email me a copy of the form I filled out. I had never seen this form before."); *see also* (PX-15) ("I have contacted them, they will not disclose information on how I signed up.").

151.    Still others who were billed would not have knowingly signed up, like medical device maker Boston Scientific, who patently had no need for directory assistance service. *See* (PX-155, PX-155-C) (BSG reviewed a recorded call showing that it had billed publicly traded Boston Scientific for months for directory service Instant411).

152.    On several occasions in 2009 and 2010, BSG notified Landeen that the LOAs passed BSG's performance review while at the same time noting that the information consumers allegedly input in the LOAs did not contain specific security questions (e.g., mother's maiden name, or date of birth) that Landeen promised would be captured when consumers signed up. (PXs 130, 131, 146 ("we did not find a security question response field in the eLOA records.")); (PX-157 at BSG00077966) (same); (PX-146) ("we noticed the records did not have a response to the security question."); (PX-213) (same); (PX-158 at BSG00040752-53) ("the eloa records submitted did not have a field or a response for those questions."); (PX-215) ("the eloas have a blank or n/a as the security response"); (PX-216) (same); (PX-217) ("we noticed that on several of the eloas the security response field for the mother's maiden name is blank."); (PX-218) (same); (PX-225) (noting that security fields were not present);

(PX-226 at BSG00040333-34) (noting that LOA records for MyIproducts did not contain a security question and LOA records for Instant 411 did not have a response the security question); (PX-227) (no security response field for MyIproducts); *see also* (PX-228, PX-167) (noting discrepancy between "security question in the marketing on file" with the LECs and the LOA records).

153.    BSG's response to these discrepancies was simply to note that the Landeen/Henderson/Durham marketing material submitted to the LECs for approval was "different than what we received via testing [of the LOAs]."  (PX 167 at BSG00041798).

154.    In September 2009, BSG's performance indicator testing of MyIproducts' LOAs resulted in the following email from BSG's John Wardashki to Melissa Mitchell:  "We noticed when reviewing the LOA records they did not have a response to the security question….If the client provides the maiden name provided for each bill number, we will add it to the August PI records."  (PX-213).  Again in November 2009, BSG spoke of "adding" the missing security question responses to MyIproducts' LOA records after reviewing them.  (PX-214).

155.    Further, just as it had done with MyIproducts in 2007, BSG again requested production of the landing pages each time it sent Landeen a notification that the products exceeded the thresholds.  (*See, e.g.*, PX-133, PX-142 at BSG00033419, PX-144 at BSG00040310, PX-148, 153, 169 at BSG00042296-306); PX-346 at 1B068_ITEM 71 – BSG PERFORMANCE INDICATORS_000019-35, 37-42, 44-50).

156.    Indeed, BSG does not appear to have questioned ABC about 800 Vmailbox's Internet "marketing paths" until the summer of 2009, when ABC provided no answer.  (PX-164, PX-165).  Finally, in January 2010, when BSG asked how a particular consumer would have seen a particular advertisement (for 800 Vmailbox), Landeen's company responded, "We do not

track the signup specific info you are asking about." (PX-179).

157.    Even though BSG knew that consumers were complaining that they had never seen the

LOAs, and that continuing astronomical complaint levels were inexplicable in the face of the

LOAs' clarity, BSG continued to supply the LOAs to Better Business Bureaus, and public

regulatory authorities as proof of "authorization" by the customers.  (*See e.g.*, PXs 2, 3, 6, 7,

8, 9, 10, 18, 19, 20, 21, 22, 23, 26, 27, 28, 29, 31, 34, 35, 36, 38, 39).

**VII.    Consumer Injury**

158.    From 2006 through December 2010, BSG billed 1,160,947 consumers' telephone

numbers a net $52,631,224.46 for MyIproducts, 800 Vmailbox, Digital VMail, eProtectID,

eSafeID, InfoCall, Instant411, Streaming Flix and Uvolve.  (Miles Decl. ¶¶ 8, 10, 11); (PX-

383 (Miles Decl. Att. D)).

159.    The net amounts BSG billed for each service are: MyIproducts: $25,233,464.31; 800

Vmailbox:  $2,894,827.06; Digital VMail: $1,987,636.95; eProtectID: $2,312,880.19;

eSafeID: $1,779,405.06; InfoCall: $4,134,345.48; Instant411: $4,310,675.32; Streaming Flix:

$9,700,870.02; and Uvolve: $277,120.07.  *Id.*

160.    In the credit card billing context, a chargeback-to-billings ratio of 1% or above is

considered cause for concern.  *See* (Deposition of Andrew Chen 79:6 – 79:19, 89:4 – 89:15,

91:5 – 93:91:6 – 95:16, 97:20 – 98:12, Exh. 5).  An astronomical number of these services'

"customers" sought and received credits for at least some of the unauthorized billings,

including:  MyIproducts: 69% of phone numbers billed; 800 Vmailbox: 61%; Digital VMail:

59%; eProtectID: 46%; eSafeID: 48%; InfoCall: 55%; Instant411: 54%; Streaming Flix:

46%; and Uvolve: 37%.  (Miles Decl. ¶¶ 8, 10, 11); (PX-383 (Miles Decl. Att. D)).   Of those

who received credits, many received credits for only part of the charges BSG billed them.

For example, although 48% received credits for eSafeID charges, 15% received credit for less than all the charges billed to them. (Miles Decl. ¶ 8); (PX-383 (Miles Decl. Att. D)). The percentages of the other services' "customers" receiving less than full credits are as follows: eProtectID: 16%; Uvolve: 8%; Streaming Flix 17%; InfoCall 17%; Instant411: 17%; MyIproducts: 22%; 800 Vmailbox: 20%; and Digital Vmail: 19%. *Id.* For those consumers, the net loss from these billings was $10,889,166.66, a substantial part of the net $52,631,224.46. *Id.*

161. Overall, consumers received credits for only 28% of BSG's $73,289,129 gross billings. (Miles Decl. ¶ 8); (PX-383 (Miles Decl. Att. D)). Indeed, of those consumers who received some credit for BSG's unauthorized billings, they still lost over $10 million. *Id.*


# CONCLUSIONS OF LAW

## I. Jurisdiction

162. The Court has jurisdiction over its September 22, 1999 Order (Docket Entry 39). *See* Docket Entry 39, Section XVI.

## II. The 1999 Permanent Injunction Binds BSGNA and its Subsidiaries

163. The Permanent Injunction binds the successors and assigns of the named Defendants, Hold Billing Services, Ltd. ("Hold"); HBS, Inc., Avery Communications, Inc. ("Avery"). Permanent Injunction, Definition 1; Fed. R. Civ. P. 65(d).

164. BSGNA, Inc. is the successor in interest to named Defendant HBS, Inc. *See* ¶¶ 7, 18, 19.

165. HBS is the successor in interest to named Defendant Hold. *See* ¶ 6.

166. BSGNA and HBS are bound by the 1999 Permanent Injunction. *See* ¶¶ 163-65.

167. A party cannot escape its obligations under an order by restructuring its organization or

acquiring subsidiaries because the relationship among the corporate entities – rather than the formal corporate structure the party chooses – controls who is bound. *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14-15 (1945) (explaining that "a relation between the defendant and the successor" may establish liability under Rule 65) (citing *Walling v. Reuter, Inc.*, 321 U.S. 671, 674 (1944) and *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106 (1942)); *Wirtz v. Ocala Gas Co.*, 336 F.2d 236, 241 (5th Cir. 1964) (explaining that "[t]he operative force of [a] decree is not dependent in all instances upon the preservation of the corporate entity or structure of a defendant."); *cf. Golden State Bottling* Co. v. *NLRB*, 414 U.S. 168, 178-81 (1973) (holding bona fide purchaser of a business bound by prior order where purchaser had knowledge of the order and continued offending business practices).

168.     Where party and non-party corporate entities have a unity of operations, such as shared officers, directors, employees, and operations, the order may bind the non-party. *See Teas v. Twentieth-Century Fox Film Corp.*, 413 F.2d 1263, 1269 n.7 (5th Cir. 1969) (binding both a parent and its wholly owned subsidiary because they shared officers, directors, and employees; they operated from the same location; and the subsidiary existed only to serve the parent's purposes); *Zale Corp. v. FTC*, 473 F.2d 1317, 1321-22 (5th Cir. 1973) (unity of operations establishes legal identifiability); *see also Wirtz v. Ocala Gas Co.,* 336 F.2d 236, 242 (5th Cir. 1964) (holding that the merger of a named defendant subsidiary into another subsidiary brought the non-named subsidiary "within the operative force of the decree" where, among other things, the corporation shared the same officers).

169.     BSGNA and its subsidiaries conduct business from a single location, share employees, have fully integrated operations, and file consolidated tax returns, *see* ¶¶ 21, 23, 24, 31-34, all of which establish the unity of operations necessary to bind BSGNA's subsidiaries.

170.     A parent company cannot use its controlled subsidiary to engage in conduct that would

otherwise violate an Order that binds it.  *See* Fed. R. Civ. P. 65(d) (an order binds those in

"active concert and participation"); *Teas*, 413 F.2d at 1269 (5th Cir. 1969) (binding

subsidiary where corporate activities of the parent company were carried out by subsidiaries);

*Computer Searching Serv. Corp. v. Ryan*, 439 F.2d 6, 8-9 (2d Cir. 1971) (explaining that if

an enjoined party simply transferred its violative activities to its "controlled subsidiary," the

subsidiary would be liable under Rule 65(d)).

171.     BSGNA controls its wholly owned subsidiaries, BSG Clearing, ESBI, ACI, BCI, and

HBS.  In documents it used to obtain millions of dollars from financial institutions, BSGNA

promised to "cause each of its Subsidiaries to," among other things, "comply in all material

respects with all applicable laws, rules, regulations, orders, and decrees of any Governmental

Authority or arbitrator."  *See* ¶¶ 35-36.

## III.     The 1999 Permanent Injunction Binds BSG, Ltd.

172.     A parent company of an enjoined subsidiary can be liable for its subsidiaries' contempt

where it has knowledge of the order and "actually participated in the alleged violation

thereof."  *Wirtz*, 336 F.2d at 242.

173.     BSG Ltd. is answerable for contempt of its billing subsidiaries because it had knowledge

of the Order, *see* ¶¶ 11, 15, 17, and BSG Ltd.'s Executive Director, Greg Carter, participated

in the business of BSG's billing subsidiaries.  Carter signed the billing contracts for the six

Landeen services approved in 2008 as the CEO of ESBI, ACI, and BCI, and made business

decisions on those accounts, such as waiving the implementation fee.  *See* ¶¶ 84, 89.   His

dual role as Executive Director of BSG Ltd. and involvement in the billing subsidiaries

establishes sufficient participation to bind BSG Ltd.  *See Wirtz*, 336 F.2d at 242 (holding a

parent bound by a subsidiary's order where parent and subsidiary shared resources and employees).

## IV.    Violations of the 1999 Order

174.    An entity bound by a court order is in contempt if the order requires certain conduct and the entity fails to comply with the order.  *See Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 401 (5th Cir. 1987).  The movant in a civil contempt proceeding must establish these elements by clear and convincing evidence.  *Id.*

### A.    *Contempt Defendants Violated Paragraphs III and V.B.1 of the Permanent Injunction*

175.    Paragraph III of the Permanent Injunction prohibits "billing or causing to be billed, or collecting or attempting to collect payment, directly or indirectly, from a Line Subscriber for any Telephone-Billed Transaction, unless the charge for such Telephone-Billed Transaction was expressly authorized by the Line Subscriber."  *Id.* at 5.

176.    The Permanent Injunction defines "Line Subscriber" as "an individual or entity who has arranged with a LEC to obtain local telephone service provided through an assigned telephone number, and to be billed for such service on a monthly or other periodic basis."  DE-39 at 3.

177.    The Permanent Injunction defines "Telephone-Billed Transaction" as "any purchase or purported purchase of a good or service that is charged to a Line Subscriber's telephone bill, including any voice mail or audiotext service," excluding purchases of common-carrier transmission services and services accessed by dialing a 900 number.  *Id.*

178.    Paragraph V.B.1 of the Permanent Injunction prohibits "[b]illing or causing to be billed, or collecting or attempting to collect payment, directly or indirectly, from a Line Subscriber for any Telephone-Billed Transaction on behalf of any Vendor that … [d]oes not obtain

express authorization for such Telephone-Billed Transaction from the Line Subscriber." *Id.* at 6.

179.    The Permanent Injunction defines "Vendor" as any individual or entity who "sells or offers to sell goods or services billable as a Telephone-Billed Transaction." *Id.*

180.    Contempt Defendants billed, or caused to be billed, Telephone-Billed Transactions on behalf of a Vendor for nine services:  MyIproducts, 800 Vmailbox, Digital Vmail, eSafeID, eProtectID, Instant411, InfoCall, Streaming Flix, and Uvolve (the "nine services").  These Telephone-Billed Transactions were charges to Line Subscribers' periodic LEC telephone bills for voice mail, identity theft protection services, streaming videos, and directory assistance services.

181.    These nine services employed facially deceptive click-through marketing, which, in the Defendants' own expert's usability study, caused consumers to "sign up" for Telephone-Billed Transactions without realizing they had done so.  Additionally, the services incurred high inquiry and credit rates, prompted constant complaints from Line Subscribers who did not recognize the charges, and were repeatedly suspended and terminated by LECs over cramming.  Furthermore, very few of the hundreds of thousands of Line Subscribers billed for the voicemail services ever used them.  These facts demonstrate clearly and convincingly that the Line Subscribers billed for the Telephone-Billed Transactions at issue did not expressly authorize charges for the services and that, by billing or causing these charges to be billed, Contempt Defendants violated Paragraphs III and V.B.1 of the Permanent Injunction.

### B.     Contempt Defendants Violated Paragraph V.A of the Permanent Injunction

182.    Paragraph V.A of the Permanent Injunction prohibits:

[b]illing or causing to be billed, or collecting or attempting to collect payment, directly or indirectly, from a Line Subscriber for any Telephone-Billed

Transaction on behalf of any Vendor that does not disclose clearly and
conspicuously to the Line Subscriber before such Line Subscriber authorizes
charges for the Vendor's goods or services, the following information:
the total cost of the goods or services; the number and amount of any payments to be made;

the charges to be billed to the Line Subscriber's telephone bill; any material term, condition,

or limitation of the transaction or on the use of the good or service; the Vendor's refund

policy, or if none, the fact that refunds will not be granted; and the means by which the

purchase can be canceled. *Id.*

183.    As described in Paragraph 180, *supra*, Contempt Defendants billed Telephone-Billed

Transactions on behalf of Vendors for nine services.

184.    The Vendors sold these nine services using click-through advertising for seemingly free

services or events, such as free email accounts or photo contests.  "Offers" for these services

appeared within marketing flows concerning these innocuous events, were pre-populated

with consumers' information, and included the terms of the services in small print relative to

the large-print headline.  Moreover, the offers were accompanied by a "submit and continue"

button, rather than an "order now" button or confirmation screen that would have made clear

that the user was initiating a Telephone-Billed Transaction.  The offers did not accurately

disclose the services' refund policy as required by the Permanent Injunction.  Defendants'

own expert's usability study found that consumers who "signed up" for the services through

this click-through advertising did not realize they had just incurred charges to their telephone

bills.  The Vendors thus did not clearly and conspicuously disclose the terms of service

required by the Permanent Injunction, and Contempt Defendants violated the Permanent

Injunction by billing Telephone-Billed Transactions on behalf of vendors.

    *C.*    ***Contempt Defendants Violated Paragraph II.A.3 of the Permanent Injunction***

185.    Paragraph II.A.3 of the Permanent Injunction prohibits "[m]aking any express or implied

misrepresentation of material fact, orally or in writing, including … [a]ny misrepresentation that a Telephone-Billed Transaction has been authorized by the Line Subscriber." *Id.* at 4.

186.   As described in Paragraph 180, *supra*, Contempt Defendants submitted Telephone-Billed Transactions to the LECs for placement on Line Subscribers' bills on behalf of nine services.

187.   Submission of these Telephone-Billed Transactions resulted in the placement of charges on Line Subscribers' telephone bills, which constituted misrepresentations to the LECs and the consumers that the charges were authorized, due, and payable. *FTC v. Verity Intern., Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006) (placement of charges on telephone bills capitalized on "common and well-founded perception" by consumers that they must pay their telephone bills); *Inc21.com*, 745 F. Supp. 2d at 1000 (placement of charges on telephone bills constitutes a representation that consumer authorized the purchase and owed payment)

188.   In addition, in response to cramming complaints, Contempt Defendants misrepresented that the transactions were authorized by producing "letters of authorization" Line Subscribers had purportedly filled out.  In fact, the vendors generated these letters of authorization using Line Subscribers' information.  Contempt Defendants' use of letters of authorization thus misrepresented that Line Subscribers authorized the Telephone-Billed Transactions generated by vendors.

## V.   The 2001 and 2008 Orders Are Irrelevant

189.   Contempt Defendants have argued that the Permanent Injunction has no force because other federal courts entered orders pertaining to unauthorized billing against certain of the Contempt Defendants later in time.  *See* Stipulated Final Judgment and Order (Docket Entry 2), *United States v. ESBI, Inc, et al.*, Case No. 1:01-cv-01660-RMU (D.D.C. Aug. 9, 2001); Stipulated Final Judgment and Order (Docket Entry 778), *FTC v. Nationwide Connections,*

*Inc., et al.*, Case No. 9:06-cv-80180-KLR (S.D. Fla. Mar. 18, 2008).

190.     A court of concomitant jurisdiction cannot supersede another district court's order. *See*

*Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 407-408 (5th Cir. 1971) (power to modify

orders resides with the rendering court; if parties seek modification in a different court,

"considerations of comity and orderly administration of justice demand that the nonrendering

court should decline jurisdiction") (internal citations omitted); *see also* Permanent Injunction

(Docket Entry 39) at Section XVI (this Court retains jurisdiction for the purpose of any

modification of the 1999 Order). Nor did either the District of the District of Columbia's

Order or the Southern District of Florida's Order make any claim of modifying or

superseding the Permanent Injunction. Stipulated Final Judgment and Order (Docket Entry

2), *United States v. ESBI, Inc, et al.*, Case No. 1:01-cv-01660-RMU (D.D.C. Aug. 9, 2001);

Stipulated Final Judgment and Order (Docket Entry 778), *FTC v. Nationwide Connections,*

*Inc., et al.*, Case No. 9:06-cv-80180-KLR (S.D. Fla. Mar. 18, 2008). Therefore, both the

2001 D.D.C. Order and the 2008 S.D. Fla. Order are irrelevant.

191.     Furthermore, the 2008 order has no application to this case because it covers billing for a

"Telecommunications Charge," which is not at issue here. Stipulated Final Judgment and

Order at 7-9 (Docket Entry 778), *FTC v. Nationwide Connections, Inc., et al.*, Case No. 9:06-

cv-80180-KLR (S.D. Fla. Mar. 18, 2008).

**VI.     Compensatory Sanctions Are Appropriate**

192.     Compensatory sanctions are an appropriate remedy for Defendants' contumacious

conduct. *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947)

(sanctions for civil contempt may be employed to coerce compliance with court order or

to compensate complainant for losses sustained); *American Airlines, Inc. v. Allied Pilots*

*Assn.*, 228 F.3d 574, 584-85 (5th Cir. 2000) (compensatory civil contempt reimburses the losses the contemnor caused).

193.     Although the Court has discretion with respect to compensatory sanctions, *see American Airlines*, 228 F.3d at 585, such discretion is not unlimited. Specifically, as the Supreme Court has held, compensatory sanctions must be "based upon evidence of complainants' actual loss." *United Mine Workers*, 330 U.S. at 304; *cf. Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979) (court has wide discretion in fashioning coercive sanctions, but, "[b]y contrast, once the plaintiff has proved that he has suffered harm because of a violation of the terms of an injunction, compensatory damages are appropriate").

194.     The measure of compensatory sanctions must be proved only by a preponderance of the evidence, not by clear and convincing evidence. *FTC v. Kuykendall*, 371 F.3d 745, 751 (10th Cir. 2004); *McGregor v. Chierico*, 206 F.3d 1378, 1387 (11th Cir. 2000); *In re Gen. Motors Corp.*, 110 F.3d 1003, 1018 (4th Cir. 1997); *Graves v. Kemsco Grp., Inc.*, 864 F.2d 754, 755 (Fed. Cir. 1988); *see also Ahearn ex rel. NLRB v. International Longshore and Warehouse Union*, 721 F.3d 1122, 1129 n.3 (9th Cir. 2013) (recognizing in dicta that every circuit court to have considered the standard of proof for compensatory contempt sanctions has adopted a preponderance standard).

195.     *Verity's* limitations on equitable recovery do not apply to the calculation of contempt remedies. *Verity,* 443 F.3d at 66-67; *FTC v. EDebitPay LLC*, 695 F.3d 938, 945 (9th Cir. 2012); *FTC v. Trudeau*, 662 F.3d 947, 950-51 (7th Cir. 2011); Order at 11-12, *FTC v. Bluehippo Funding, LLC*, No. 1:08-cv-01819-PAC (S.D.N.Y. July 27, 2010), ECF No. 76. Nor have courts in the Fifth Circuit adopted *Verity's* recovery limitations

even in *de novo* FTC cases. *See FTC v. Kennedy*, 574 F. Supp. 2d 714, 724 (S.D. Tex. 2008) (holding that *Verity* does not control in the Fifth Circuit because *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 718 (5th Cir. 1982), permits the court to award complete relief).

196.     The appropriate measure of compensatory sanctions is thus consumer loss, measured by the full amount consumers were charged for the nine crammed services, less any money already returned to those consumers. *See EDebitPay*, 695 F.3d at 945; *Trudeau*, 662 F.3d at 950; *Kuykendall*, 371 F.3d at 764; *McGregor*, 206 F.3d at 1387-88.

197.     Contempt Defendants caused consumers to be charged $73,289,129.30 for the nine crammed services. A total of $20,657,904.84 has already been returned to those consumers, for a total consumer loss of $52,631,224.46. Contempt Defendants therefore must pay compensatory contempt sanctions in the amount of $52,631,224.46.


Dated: October 25, 2013              Respectfully Submitted,

                                     FEDERAL TRADE COMMISSION

                                By:     *Robin L. Moore*_____ ___


                                     Robin L. Moore (DC Bar #987108)
                                     Douglas V. Wolfe (DC Bar #437476)
                                     Sarah Waldrop (MD Bar) (numbers not issued)
(202) 326-2167 (Moore);              Jonathan Cohen (DC Bar #483454)
-3113 (Wolfe); -3444 (Waldrop);      Attorneys for Federal Trade Commission
-2551 (Cohen); -2558 (fax)           600 Pennsylvania Ave., N.W., Suite M-8102 B
rmoore@ftc.gov; dwolfe@ftc.gov;      Washington, D.C. 20580
swaldrop@ftc.gov; jcohen2@ftc.gov    Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of October, 2013, I electronically filed the foregoing Proposed Findings of Fact and Conclusions of Law with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Dina M. Cox
Robert Baker
Lewis Wagner, LLP
501 Indiana Avenue, Suite 200
Indianapolis, Indiana 46202

Ricardo G. Cedillo
Derick J. Rodgers
Mark W. Kiehne
Davis, Cedillo & Mendoza, Inc.
McCombs Plaza
755 E. Mulberry Ave., Suite 500
San Antonio, Texas 78212-3149

By: _____*Robin L. Moore*_____

(202) 326-2167 (Moore);
-3113 (Wolfe); -3444 (Waldrop);
-2551 (Cohen); -2558 (fax)
rmoore@ftc.gov; dwolfe@ftc.gov;
swaldrop@ftc.gov; jcohen2@ftc.gov

Robin L. Moore (DC Bar #987108)
Douglas V. Wolfe (DC Bar #437476)
Sarah Waldrop (MD Bar) (numbers not issued)
Jonathan Cohen (DC Bar #483454)
Attorneys for Federal Trade Commission
600 Pennsylvania Ave., N.W., Suite M-8102 B
Washington, D.C. 20580
Admitted *Pro Hac Vice*