UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

———————————————————————

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 5:98-cv-00629-FB-HJB |
| | ) |
| HOLD BILLING SERVICES, Ltd.; HBS, Inc.; | ) |
| AVERY COMMUNICATIONS, INC.; | ) |
| VETERANS OF AMERICA ASSOCIATION, | ) |
| Ltd.; THOMAS M. LYONS; KEITH C. CALIL; | ) |
| and MILFORD H. BALABAN, | ) |
| | ) |
| Defendants. | ) |

———————————————————————

## RESPONDENTS' FIRST PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, having reviewed the evidence, and being duly advised in the premises, now enters findings of fact, conclusions of law and judgment in favor of Respondents.  The following findings of fact may contain legal conclusions, and the legal conclusions may contain findings of fact.

### FINDINGS OF FACT

### Avery Communications

1.       Pursuant to the terms of a settlement agreement with the FTC, the 1999 Order in this case was issued on September 22, 1999 to three (3) entities affiliated with a company generally known as Avery Communications:  (1) Avery Communications, Inc., a publicly traded entity;  (2)  HBS, Inc.;  and,  (3)  Hold  Billing  Services,  Ltd.  (collectively  "Avery Communications"). [1]

———————————————

[1] R-1.

2.    HBS, Inc. was a holding company and subsidiary of Avery Communications, Inc. HBS, Inc. was the corporate parent of Hold Billing Services, Ltd., which was a clearinghouse providing services for long distance third-party service providers. [2]

3.    At the time of 1999 Order, Avery Communications was in no way affiliated with Billing Services Group Limited ("BSG Ltd."); BSG Clearing Solutions North America, LLC ("BSG Clearing"); Billing Concepts, Inc. ("BCI"); or, Enhanced Services Billing, Inc. ("ESBI"). In fact, BSG Ltd. and BSG Clearing were not formed until May 2005 and October 2003 respectively; and, BCI and ESBI were existing, unaffiliated clearinghouses, which were acquired December 2003, more than four (4) years following the 1999 Order. [3]

4.    In 2000, Hold Billing Services, Ltd. was renamed HBS Billing Services Company ("HBS").  This renaming was done in conjunction with this company being converted into a Texas Corporation.  Also in 2000, Avery Communications underwent a corporate restructuring. This restructuring was for legitimate business reasons – *i.e.*, to change the state of incorporation of HBS Inc., which could best be accomplished by merging HBS, Inc. into its wholly owned subsidiary Thurston Communications Corporation ("Thurston").  As a result of this merger, Thurston became the corporate parent of HBS.  Following the merger, Thurston was a holding company for HBS, which was providing clearinghouse services for third-party service provider clients.  Both companies were subsidiaries of Avery Communications, Inc. [4]

---

[2] Witness – Norman Phipps
[3] Witness – Norman Phipps
[4] Witness – Norman Phipps; R-2.



**The Clearinghouse "Roll Up"**

5.     In August 2001, Thurston, through its subsidiary ACI Communications, Inc., purchased certain assets of nTelecom Holdings, Inc.; OAN Services, Inc.; and, OAN Services of Florida, Inc. (collectively called "OAN" in the related Asset Purchase Agreement).  The asset purchase was made pursuant to an order of a bankruptcy court with jurisdiction over each of the selling entities.  The asset purchase included OAN's existing clearinghouse operations in California, and the purchase was made to expand and diversify Avery Communications Inc.'s clearinghouse operations through increasing its customer base and product set.[5]  Following, Avery Communications corporate structure was as follows:

---

[5]Witness – Norman Phipps.

**2001**



6.      Following the purchase of OAN's clearinghouse operations, Avery Communications Inc. shut down its San Antonio facility (where HBS was located), reduced its personnel, and migrated its clearinghouse operations to California, combining it with OAN's operations.  The decision to close HBS's facility in San Antonio was driven by a desire to reduce costs by managing operations within a single location.  Management's decision to centralize in the California location reflected its business judgment that the California location possessed a more robust IT infrastructure and technology platform, which was better suited to meet the needs of multiple clearinghouse businesses. [6]

7.      In October 2003, BC Holdings, LLC ("BC Holdings") owned a holding company known as BC Holding I Corporation, which in turn wholly owned two clearinghouses:  BCI and ESBI.  BCI and ESBI (and their employees and operations) were located in San Antonio, Texas.

---

[6] Witness – Norman Phipps.

These companies were providing clearinghouse services for various third-party service provider clients. [7]

8.      For some time, Avery Communications Inc. had been reviewing strategic options regarding its clearinghouse operations, and conversations with Platinum Equity, LLC (a private equity firm based in California and the owner of BC Holdings) were ongoing about the potential acquisition of BCI and ESBI.  The decision was made to expand Avery's clearinghouse business by acquiring BCI and ESBI, in part because this acquisition would add significant scale to Avery's overall business model.  This clearinghouse "roll up" was effected through several steps in late 2003:

     a.   First, two entities were created: (1) a new Delaware company named Billing Services Group, LLC ("BSG, LLC") and (2) a holding company known as BCI Acquisition, LLC ("BCI Acquisition"), which was created to purchase from BC Holdings its clearinghouses – BCI and ESBI.  These newly created entities were formed by ABRY Partners IV, L.P. ("ABRY"), which financed the "roll up" by providing both a mezzanine facility and an equity investment. ABRY was controlled by ABRY Partners, a private equity firm, which had no prior relationship with Avery Communications or any of the other entities associated with the roll up.

     b.   Second, BCI and ESBI were acquired by BCI Acquisition pursuant to a stock purchase agreement, by which BCI Acquisition purchased from BC Holdings the capital stock of BC Holding I Corporation, which, in turn, owned all the capital stock of BCI and ESBI. [8]

---

[7] Witness – Norman Phipps.
[8] Witness – Norman Phipps.





c.  As a result, the respective corporate structure of these companies was as follows:[9],[10]

---

[9] Witness – Norman Phipps.
[10] BC Holding I Corporation was merged into BCI Acquisition, which was the surviving company.



d.  Third, the newly created entity BSG, LLC acquired Avery Communications, Inc.'s assets as follows:

i.  Pursuant to a contribution agreement, Avery Communications, Inc., which merged with Avery Holdings, LLC prior to the closing of the transaction, contributed all of Thurston's stock to BSG, LLC. In exchange, Avery Holdings, LLC received a minority interest in BSG, LLC. Pursuant to this contribution, Thurston became the wholly owned subsidiary of BSG, LLC. [11]

ii.  ABRY purchased Series A shares from BSG, LLC, and the net proceeds from this financing were contributed to Thurston.

iii.  Thurston contributed such proceeds and the capital stock of HBS and ACI to BCI Acquisition. In exchange, BSG, LLC delivered to Thurston all the capital stock of BCI Acquisition, LLC. As a result, BCI Acquisition became the wholly owned subsidiary of Thurston; and, HBS and ACI became the wholly owned subsidiaries of BCI Acquisition. [12]

9.  The acquisition or contribution of certain Avery Communications Inc.'s subsidiaries by BSG, LLC is illustrated as follows:

---

[11] Witness – Norman Phipps.
[12] Witness – Norman Phipps.



10.     In 2005, BSG Ltd. was incorporated and obtained complete ownership in BSG, LLC, which was dissolved.  That same year, Thurston amended its name to Billing Services Group North America, Inc. ("BSGNA"); and, BCI Acquisition amended its name to BSG Clearing Solutions North America, LLC.  These name amendments were part of an effort to develop a recognizable brand name in "Billing Services Group" and "BSG."  After 2005, BSG Ltd.'s corporate structure, with respect to the Respondents to the Motion to Show Cause, was (and is) as follows: [13]

---

[13] Witness – Norman Phipps.



**BSG Corporate Separateness**

11.     Respondents to the Motion to Show Cause – BSG Ltd., BSGNA, BSG Clearing, HBS, ACI, BCI, and ESBI – are each separate and distinct legal entities.  Each company has been properly formed with its own corporate identity and separateness.[14]

12.     Respondents fall into two types of companies:  passive holding companies (*i.e.*, entities with no operating activities, no employees, *etc*.) and "clearinghouses."

13.     In connection with this litigation, a "clearinghouse" refers to a company providing data clearing and financial settlement offerings to service providers operating only in the wire line telecommunications industry.  A clearinghouse contracts with a service provider to enable the service provider to include charges for products or services provided to consumers on the consumers' telephone bills from Local Exchange Carriers ("LECs") such as AT&T, Verizon, and CenturyLink. [15]

---

[14] Witness – Norman Phipps.
[15] Witness – Kelli Cubeta.

14.     Respondents HBS, ACI, BCI and ESBI are clearinghouses.  It should be noted that BCI is the only entity currently providing any clearinghouse services.[16],[17]

15.     The remaining companies the FTC attempts to hold in contempt of the 1999 Order (namely:  BSG Ltd., BSGNA, and BSG Clearing) are not clearinghouses.  These companies do not enter into agreements with third-party service providers; they do not process billing records; and, none of them existed at the time of the 1999 Order. [18]

16.     Respondents arguably are bound as successors to the 1999 Order are BSGNA (f/k/a Thurston, which is f/k/a HBS, Inc.) and HBS (f/k/a Hold Billing Services, Ltd.).  These entities are not named parties to the 1999 Order, but are arguably bound by it as successors to named parties.[19]  The argument favoring "bound as successors" is tenuous at best.

17.     The remaining Respondents – BSG Ltd., BSG Clearing, ACI, BCI and ESBI – are neither parties to the 1999 Order nor bound by the Order.

18.     The FTC contends the "Non-Parties" are bound by the 1999 Order due to their corporate affiliation with BSGNA.  However, the Non-Parties were not created by BSGNA.  Rather, each of these entities became affiliated with BSGNA through subsequent corporate restructuring and/or acquisition taking place years after the entry of the 1999 Order. [20]

---

[16] Witness – Norman Phipps.

[17] Witness – Norman Phipps.

[18] Witnesses – Norman Phipps and Kelli Cubeta.

[19] BSGNA and HBS are "arguably" bound by the 1999 Order because the 2008 Order – and not the 1999 Order – should govern clearinghouse conduct.  The 2008 Order was issued to several Respondents directly; and, it provides a clear, detailed, and unambiguous outline of precisely the activities the FTC requires of a clearinghouse. The FTC cannot argue that every entity within the BSG corporate structure is bound by the 1999 Order because the companies operate as a "single enterprise," while completely ignoring the 2008 Order.  If the BSG-affiliated companies are a "single enterprise," then the FTC's most recent edict on clearinghouse conduct (the 2008 Order) must apply to that "single enterprise;" not an order that was issued long ago without the specific and detailed guidelines developed by the FTC over the last decade.  By arbitrarily deciding which of its various Orders applies to the Respondents, the FTC places the Respondents in the impossible position of trying to comply with competing Orders, which may or may not apply depending on which application of the Order benefits the FTC's interests.

[20] Witness – Norman Phipps.

19.     ACI, BCI, and ESBI – three of the four "clearinghouses" at issue in this case – existed as distinct legal entities with their own data clearing and financial settlement operations, clients, and owners prior to becoming affiliated with BSGNA through subsequent corporate restructuring. [21]

20.     Each Non-Party – clearinghouse or holding company – became corporately affiliated with BSGNA for legitimate business reasons having nothing to do with an effort to evade the 1999 Order:

a.     BSG Ltd. (f/k/a BSG, LLC) was created by ABRY – the private equity firm responsible for financing the "roll up" discussed above.  This "roll up" was undertaken for Avery Communications, Inc. to expand its clearinghouse operations and to acquire a significant share of the LEC billing market.  The roll up had nothing to do with the 1999 Order, and the 1999 Order had no influence or impact on any aspect of the rationale or business decisions leading to the formation, structure, capitalization or ownership of assets by BSG Ltd.

b.     BSG Clearing (f/k/a BSG Acquisition, LLC) was also created by ABRY as part of the "roll up."  BSG Clearing was created for the sole purpose of purchasing BCI and ESBI as part of this significant business venture.  The creation of BSG Clearing had nothing to do with the 1999 Order, and the 1999 Order had no influence or impact on any aspect of the rationale or business decisions leading to the formation, structure, capitalization or ownership of assets by BSG Clearing.

c.     ACI's business was not created by BSGNA (or its predecessors).  This existing business was acquired from OAN's bankruptcy estate in 2001 because it was a valuable asset – *i.e.*, OAN had a clearinghouse operation in California with many

---

[21] Witness – Norman Phipps.

existing clients, including Americatel, Bank of America 900 service, Bank One 900 service, Bell South Long Distance, Comerica Bank 900 service, AT&T Pic'd long distance, MCI 900 service, and 10 10220 Telecom USA Dial around, among others.

d.      Neither BCI nor ESBI was created or acquired by BSGNA.  These existing companies were acquired as part of Avery's "roll up" strategy.  These were existing clearinghouses with their own clients, as well as a significant share of the LEC billing market.  These entities were acquired by BCI Acquisition for legitimate business reasons unrelated to the 1999 Order.[22]

21.      There is no evidence that BSGNA became affiliated with (or let alone created) the Non-Parties as "shell corporations" to avoid the 1999 Order.  On the contrary, the Non-Parties were created (in the case of the holding companies BSG Ltd. and BSG Clearing) or acquired (in the case of the clearinghouses ACI, BCI, and ESBI) in connection with the "roll up" strategy for which management's economic objective was to increase scale for the clearinghouse operations.[23]

22.      The Non-Parties that were either acquired or subsequently affiliated with BSGNA held valuable assets prior to their affiliation. These were existing clearinghouses. There were legitimate business reasons for these clearinghouses remaining separate and distinct entities after their acquisition, including the fact that each had established clearinghouse operations with existing service provider clients, LEC relationships, and contractual relationships.[24]

---

[22] Witness – Norman Phipps.
[23] Witness – Norman Phipps.
[24] Witness – Norman Phipps.

23.     BSGNA has never operated as a clearinghouse; it was (and is) a passive holding company without any contractual relationships with service providers or LECs and without any clearinghouse operations. [25]

24.     BSGNA never entered into any billing agreement with the Landeen Entities. [26]

25.     BSGNA was not involved in processing charges for the Landeen Entities. [27]

26.     BSGNA never engaged in any of the acts that are the subject of the FTC's Motion to Show Cause.[28]

27.     Each of the clearinghouse Non-Parties downstream from BSGNA operates independently from BSGNA in processing billing records.  Each has its own assets, liabilities, and obligations.  At no time has BSGNA had operational control over these Non-Parties. [29]

28.     Each of the clearinghouse Non-Parties downstream from BSGNA (including HBS) acts as a guarantor with respect to a loan where BSGNA is the borrower.   The clearinghouses were required to guaranty this loan because BSGNA has no assets or operations.  This is a standard financing arrangement between corporate affiliates when a parent holding company, having no assets or operations, acts as the borrower.  This financing arrangement is unrelated to the independent clearinghouse operations of the Non-Parties. [30]

29.     BSG Ltd. has never operated as a clearinghouse.[31]

30.     BSG Ltd. never entered into any billing agreement with the Landeen Entities. [32]

---

[25] Witnesses – Norman Phipps and Kelli Cubeta.
[26] Witnesses – Norman Phipps and Kelli Cubeta.
[27] Witnesses – Norman Phipps and Kelli Cubeta.
[28] Witnesses – Norman Phipps and Kelli Cubeta.
[29] Witnesses – Norman Phipps and Kelli Cubeta.
[30] Witness – Norman Phipps.
[31] Witness – Norman Phipps.
[32] Witnesses – Norman Phipps and Kelli Cubeta.

31.     BSG Ltd. was not involved in processing charges for the Landeen Entities.[33]

32.     BSG Ltd. never engaged in any of the acts that are subject to the FTC's Contempt Motion.[34]

33.     BSG Clearing has never operated as a clearinghouse. [35]

34.     BSG Clearing never entered into any billing agreement with the Landeen Entities.[36]

35.     BSG Clearing was not involved in processing charges for the Landeen Entities. [37]

36.     BSG Clearing never engaged in any of the acts that are the subject of the FTC's Motion to Show Cause.[38]

## A Clearinghouse's Role in Third Party Billing Generally

37.     There are significant costs and technical requirements for a service provider to have a direct agreement with a LEC for billing.   Each LEC has unique infrastructure and financial requirements that are virtually impossible for third-party service providers to manage, as most are small businesses. [39]

38.     BSG's affiliated clearinghouses – HBS, ACI, BCI, and ESBI – process electronic billing records ("EMI records")[40] for services provided by their clients (third-party service providers) to consumers.   After the EMI records are received and processed, they are submitted to LECs to be included on consumers' telephone bills.   BSG's affiliated clearinghouses receive,

---

[33] Witnesses – Norman Phipps and Kelli Cubeta.
[34] Witnesses – Norman Phipps and Kelli Cubeta.
[35] Witnesses – Norman Phipps and Kelli Cubeta.
[36] Witnesses – Norman Phipps and Kelli Cubeta.
[37] Witnesses – Norman Phipps and Kelli Cubeta.
[38] Witnesses – Norman Phipps and Kelli Cubeta.
[39] Witness – Kelli Cubeta.
[40] An exchange message interface or "EMI" record is an industry specific file type used to transmit billing data between and among the service providers, the clearinghouses, and the LECs. An EMI format record is created and populated by a service provider prior to being sent to a clearinghouse for processing.

process, and submit EMI records to LECs pursuant to their contracts with the third-party service providers and the LECs. [41]

39.     BSG's affiliated clearinghouses, in turn, have on the one hand stringent contractual agreements with various service provider clients and on the other hand, with each LEC. [42]

40.     Respondents do not sell or provide products or services to consumers. [43]

41.     Respondents do not bill consumers. [44]

42.     Respondents do not advertise or market any products or services to consumers. [45]

### The 1999 Order

43.     Fourteen years ago, in the infancy of the LEC third-party billing industry and over four (4) years before BSG, LLC (n/k/a BSG Ltd.) came into existence, Avery Communications, Inc. agreed to settle this litigation with the FTC, which led to the entry of a stipulated injunction ("1999 Order"). [46]

44.     The original complaint filed by the FTC in July 1998 alleged that defendant Veterans of America Association, Ltd. ("VOAA") engaged in a deceptive practices (namely, sweepstakes and prize promotions and negative option marketing) by failing to disclose material information about charges that would appear on consumers' telephone bills. [47]

45.     The complaint contained three counts under §5 of the FTC Act, 15 U.S.C. §45(a). Count I alleged that defendants had misrepresented to consumers inquiring about the VOAA charges that they were "legally responsible for the charges, regardless of who, if anyone, ordered

---

[41] Witness – Kelli Cubeta; R-4.
[42] Witness – Kelli Cubeta.
[43] Witness – Kelli Cubeta.
[44] Witness – Kelli Cubeta.
[45] Witness – Kelli Cubeta.
[46] R-1.
[47] Dkt. #1

and received the service in question."  Count II alleged that it was an unfair business practice for defendants to bill the VOAA charges because "[l]ine subscribers cannot prevent third parties from placing their telephone numbers on sweepstakes or prize promotion entry forms."  Count III alleged that VOAA – but not Avery Communications, Inc. – failed to disclose material information about the charges that would appear on line subscribers' telephone bills. [48]

46.     The named parties to the 1999 Order were Holding Billing Services, Ltd.; HBS, Inc.; Avery Communications, Inc.; VOAA; Thomas M. Lyons; Keith C. Calil; and, Milford H. Balaban ("Defendants"). [49]

47.     The 1999 Order restrained and enjoined the above-referenced Defendants from the following:

47.1    Defendants and their Representatives are permanently restrained and enjoined from billing or causing to be billed, or collected or attempting to collect payment, directly or indirectly from a Line Subscriber for any Telephone-Billed Transaction made as a result of an authorization obtained from a sweepstakes, prize promotion or negative option marketing plan.

47.2    Defendants and their Representatives are permanently restrained and enjoined from:

(a)   making any express or implied misrepresentation of material fact, orally or in writing, including, but not limited to:

1.   Any misrepresentation that a Line Subscriber is legally obligated to pay for the purchase of any good or service that the Line Subscriber did not expressly authorize;

2.   Any misrepresentation that a Line Subscriber is obligated to pay any charge on the basis that the good or service was purchased or accessed from the Line Subscriber's telephone, unless the Line Subscriber expressly authorized the purchase; and

3.   Any misrepresentation that a Telephone-Billing Transaction has been authorized by the Line Subscriber.

---

[48] Dkt. #1.
[49] R-1.

(b)  Failing, in a timely fashion, to respond to consumer complaints and inquires, and to investigate billing disputes, and to require Vendors that provide their own customer service to do the same; and

(c)  Failing to answer promptly any telephone number for customer service that the Defendants or their Representatives cause to be placed on Line Subscribers' telephone bills, and to require Vendors to answer promptly and such number and any other number to which Defendants or their Representatives may refer customer complaints of inquiries.

47.3   Defendants and their Representatives are permanently restrained and enjoined from billing or caused to be billed, or collecting or attempting to collect payment, directly or indirectly, from a Line Subscriber for any Telephone-Billed Transaction, unless the charge for such Telephone-Billed Transaction was expressly authorized by the Line Subscriber.

47.4   Defendants and their Representatives are permanently restrained and enjoined from billing or caused to be billed, or collecting or attempting to collect payment, directly or indirectly, from a Line Subscriber for any Telephone-Billed Transaction, where the Vendor's basis for billing is its possession of the Line Subscriber's telephone number, whether obtained through Automatic Number Identification (ANI) or through any other means.

47.5   Defendants and their Representatives are permanently restrained and enjoined from:

(a) Billing or caused to be billed, or collecting or attempting to collect payment, directly or indirectly, from a Line Subscriber for any Telephone-Billed Transaction on behalf of any Vendor that does not disclose clearly and conspicuously to the Line Subscriber before such Line Subscriber authorizes charges for the Vendor's goods or services, the following information:

- The total cost of the goods or services offered;

- The number and amount of any payments to be made for the purchase;

- That charges for the good or service will be billed to the Line Subscriber's telephone bill, if such is the case;

- Any material term, condition, or limitation of the transaction or on the use of the offered good or service;

- The Vendor's refund policy, if any, or it none, the fact that refunds will not be granted; and

▪ The means, if any, by which the purchase can be canceled.

(b)  Billing or causing to be billed, or collecting or attempting to collect payment, directly or indirectly, from a Line Subscriber for any Telephone-Billed Transaction on behalf of any Vendor that:

1.  Does not obtain express authorization for such Telephone-Billed Transaction from the Line Subscriber; and

2.  Does not create and maintain for a period of two (2) years from the date of such creation, records containing the names, addresses and telephone numbers of all Line Subscribers billed by Defendants or their Representatives for the Vendor, and make sure records available to Defendants or their Representatives promptly upon request; and

(c)  Transmitting billing data to any LEC that fails to enable the LEC to prepare a bill that clearly and conspicuously discloses:

1.  an accurate description for each Telephone-Billed Transaction of the type of good or service charge, and the amount of that charge; and

2.  The local or toll-free telephone number where Line Subscribers can readily obtain resolution of their complaints and removal of unauthorized charges from their bills.

48.   The FTC contends that Respondents are in contempt of the 1999 Order and seeks $52.6 million in "consumer redress" for charges placed on consumers' telephone bills from December 2005 through December 2010 related to the service provider clients described below.

49.   However, BSGNA and HBS are the only Respondents to the Motion to Show Cause that are potentially bound by the 1999 Order as successors to the original Defendants. BSGNA is arguably the successor of Thurston Communications Corporation ("Thurston") (which had previously merged with HBS, Inc.); and, HBS is the successor Hold Billing Services, Ltd.

50.   The remaining Respondents – BSG, Ltd., BSG Clearing, ACI, ESBI, and BCI – are complete strangers to this lawsuit.  None of these entities is a named Defendant or party to

the 1999 Order.  Furthermore, none of these entities is a successor-in-interest or assign to any of the original Defendants or parties to the 1999 Order. Accordingly, these affiliated entities are "non-parties" to the 1999 Order.

## The 2001 Order

51.     In 2001, the FTC filed an action against ESBI and BCI (before Avery Communications, Inc. via BCI Acquisition acquired these clearinghouses in the 2003 "roll up") under §5 of the FTC Act, 15 U.S.C. §45(a) alleging that ESBI and BCI did not provide proper oversight of its service provider clients.  ESBI and BCI reached a settlement agreement with the FTC and agreed to enter into a stipulated injunction in August, 2001 ("2001 Order"). [50]

52.     Unlike the 1999 Order, the 2001 Order employed a "knew or should have known" standard for determining whether a clearinghouse may be liable for processing service provider records for allegedly unauthorized charges. [51]

## The 2008 Order

53.     In September 2006, the FTC filed an action against ACI, BCI, and BSG Clearing alleging that a third-party service provider client of ACI was billing consumers for products and services consumers had not authorized.  ACI, BCI, and BSG Clearing reached a settlement agreement with the FTC and entered into a stipulated injunction ("2008 Order"). [52]

54.     The 2008 Order provides with a high degree of specificity the precise conduct expected by the FTC of a billing clearinghouse.  Unlike the 1999 and 2001 Orders, which provided only general prohibitions against billing for charges that are unauthorized, the 2008 Order provides very clear instruction of the FTC's expectations for wireline clearinghouses,

---

[50]R-3.
[51]R-3.
[52]R-72.

including an unambiguous outline of precisely the activities the FTC requires of a clearinghouse to detect and prevent cramming. [53]

55.     The 2008 Order contains a "safe harbor" provision, providing that "Defendants shall be deemed to be in compliance" with the Order so long as they implement certain policies and procedures outlined in the Order.  These policies and procedures essentially require three (3) things: (1) due diligence/approval process for all service providers (including a review of marketing and authorization materials) prior to forwarding charges; (2) monthly monitoring and reporting of certain inquiries; and, (3) authorization testing of companies that exceed certain inquiry thresholds. [54]

56.     In reliance on the FTC's directives in the 2008 Order, the business practices of the BSG-affiliated clearinghouses were further developed and refined and were applied to all clearinghouses and third-party service provider clients, regardless of the type of product or service being offered. [55]

### BSG's Business Practices

### Pre-2006

57.     Since their inception, BSG-affiliated clearinghouses have vetted and monitored their third-party service provider clients to detect and prevent unauthorized billing. [56]

58.     BSG-affiliated clearinghouse have been industry leaders in preventing unauthorized billing through their quality control processes, which are the industry's most

---

[53] R-72.
[54] R-72.
[55] Witnesses – Kelli Cubeta and Sally Welge; R-32.
[56] Witnesses – Kelli Cubeta and Sally Welge.

comprehensive program focused on eliminating unauthorized billing before it occurs and proactively addressing issues when they arise. [57]

59.     While these business practices have evolved over the years, the Best Practices Program implemented by the BSG-affiliated clearinghouses initially focused on (1) contractually mandating that third-party service providers obtain valid consumer authorization prior to submitting charge records, and (2) monitoring third-party service providers to ensure compliance with this contractual obligation. [58]

60.     Since proximately 1996, every service provider agreement has required that the third-party service provider only forward charge records for charges that have been expressly authorized by the consumer. This requirement is accomplished generally through three (3) contractual obligations: (1) each third-party service provider must obtain express authorization for each charge that is forwarded to the service provider's respective clearinghouse; (2) each provider must obtain "Valid Authorizations," which is defined in each agreement as an authorization that includes assurance that the consumer is qualified to authorize billing for the product or service on that phone bill, a description of the product or service, a description of the applicable charges for the product or service, and an explicit acknowledgment by the consumer that the charges for the product or service will appear on their telephone bill; and, (3) each provider must maintain and produce, upon request, proof of "Valid Authorization." [59]

61.     During this same time period, BSG-affiliated clearinghouses also vetted their third-party service provider clients before agreeing to process charge records for them.  Before a BSG-affiliated clearinghouse would begin processing charge records for a service provider, the

---

[57] Witnesses – Kelli Cubeta and Sally Welge.
[58] Witnesses – Kelli Cubeta and Sally Welge; R-32.
[59] Witnesses – Kelli Cubeta and Sally Welge; R -90; R-890; R-12;  R-85; R-86; R-124; R-88; R-87; R-152.

clearinghouse would obtain detailed information about the service provider, the products or services to be provided, how the products/services would be provided, how the products/services would be marketed to consumers, and specifically how the products/services would be authorized. Internet marketing had to be submitted for review and approval by both the clearinghouse and the LECs. [60]

62.     Third-party service providers who were not approved after the vetting process were not allowed to bill through BSG-affiliated clearinghouses. [61]

63.     Third-party service providers who could not comply with these requirements – including the contractual requirement to obtain valid authorization – were terminated. [62]

64.     From approximately 2003 to 2006, BSG-affiliated service providers monitored customer service inquiries to determine if the third-party service provider was experiencing any issues. BSG monitored and measured the number of contacts consumers would make with customer service on a per-service-provider basis. Each contact – whether positive, negative, or neutral – was counted as one inquiry. The total number of inquiries in a given month was measured against the total number of transactions cleared for the service provider in the prior month. During this time, the target ratio or customer service inquiry threshold was 10%.[63]

---

[60] Witnesses – Kelli Cubeta and Sally Welge. *See also e.g.,*  R-19; R-46; R-47; R-74-78; R-79-84; R-93; R-94; R-99; R-100; R-104; R-105; R-106; R-107; R-108; R-109; R-110; R-111; R-112; R-117; R-120; R-122; R-123; R-125; R-130; R-149; R-150; R-193; R-216; R-221; R-222; R-225; R-226; R-237; R-238.
[61] Witnesses – Kelli Cubeta and Sally Welge; R-113;R-95; R-96; R-97; R-105; R-151; R-159; R-160.
[62] Witnesses – Kelli Cubeta and Sally Welge.
[63] Witnesses – John Wardashki and Sally Welge

65.     BSG-affiliated clearinghouses regarded the customer service inquiry threshold as a performance indicator.  When the monitoring of a third-party service provider suggested a potential issue, the service provider's performance was further assessed. [64]

66.     This performance indicator was put in place to proactively identify any potential issues with a third-party service provider, such as delays in processing refunds and impolite customer service representatives.  If a third-party service provider exceeded the threshold, the account representative would address the performance deficiency with the service provider and take further action as necessary including suspension or termination. [65]

**Fall 2006 – March 2008**

67.     In the fall of 2006, the BSG-affiliated clearinghouses refined and supplemented their performance monitoring.  A "quality assurance department" was established to focus solely on proactively monitoring and addressing potential third-party service provider issues.  Also, two additional performance indicators were made a formal part of the clearinghouses' monthly monitoring of third-party service providers:   (1) LEC inquiries (*i.e.*, any consumer inquiry directed to the LECs) and (2) regulatory inquiries (*i.e.*, any consumer inquiry directed to a regulatory agency). [66]

68.     At this same time, BSG established or formalized thresholds for each of the three performance indicators.  The regulatory inquiry threshold was 0.1%; the LEC inquiry threshold was 75% of the LEC's own threshold; and, the customer service inquiry threshold was 12.5%.[67]

---

[64] Witnesses – Kelli Cubeta and Sally Welge; R-31; R-38; R-44; R-55; R-114; R-142; R-143; R-146; R-147; R-153; R-161; R-162; R-163; R-165; R-167; R-168; R-176; R-177; R-178; R-179; R-182; R-183; R-184; R-185; R-188; R-196; R-224.
[65] Witnesses – Kelli Cubeta and Sally Welge
[66] Witnesses – Kelli Cubeta and Sally Welge.
[67] Witnesses – Kelli Cubeta and Sally Welge.

69.     Also beginning in the fall of 2006, when any one of these thresholds was exceeded, the third-party service provider would be subjected to further assessment.  The BSG-affiliated clearinghouse would request and test random samples of the third-party service providers' authorization records.  This testing was, among other things, intended to ensure that the service providers were complying with the contractual mandate to obtain valid consumer authorization. [68]

70.     The BSG-affiliated clearinghouses established these particular performance indicators and inquiry thresholds in part because they are based upon data that can be reliably and consistently collected on a monthly basis.  For instance, the customer service inquiries are able to be tallied because the clearinghouse's toll-free customer service number mandatorily appears on any telephone bill containing a third-party charge cleared through a BSG-affiliated clearinghouse. [69]

71.     In addition, these particular performance indicators are independent of any subjectivity.  For instance, in establishing the customer service inquiry threshold, the BSG-affiliated clearinghouses made the decision to count *all* consumer inquiries, not just complaints or inquiries that could be subjectively characterized as negative.  A consumer who calls customer service to request technical information regarding a product or service, for instance, is still counted as an "inquiry" for purposes of the service provider's performance indicator.  The inquiry does not have to be a "complaint" or a denial of authorization by the consumer for the inquiry to be counted against the third-party service provider's customer service inquiry threshold.  The decision to count *all* customer service inquiries as opposed to measuring just those that might be regarded as "complaints" was designed to eliminate subjectivity and to

_____

[68] Witnesses – Kelli Cubeta and Sally Welge.
[69] Witnesses – Kelli Cubeta and Sally Welge.

remove any discretion that could be exercised by the customer service representative in categorizing or characterizing the nature of the inquiry. [70]

72.    The decision to count all customer service inquiries – including innocuous inquiries unrelated to any allegation pertaining to authorization – was also designed to establish a threshold level that would help ferret out any and all issues or concerns worthy of investigation, and not just issues or concerns pertaining to consumer authorization.  Also, the thresholds were established at levels intended to capture all of the third-party services providers who were potentially experiencing issues, while at the same time allowing remaining third-party service providers to proceed with their billing efforts without additional testing and assessment.

73.    Because the 12.5% customer service inquiry threshold was including an exceptionally large number of service providers that were experiencing no issues whatsoever other than occasionally exceeding the 12.5% inquiry threshold, the customer service inquiry threshold was raised from 12.5% to 15% around July 2007 to enable the clearinghouses to better focus their monitoring resources on service providers with potential issues. [71]

### April 2008 Forward

74.    In March 2008, Respondents BSG Clearing, ACI, and BCI entered into a settlement agreement with the FTC, which resulted in a stipulated injunction ("2008 Order"). [72] The 2008 Order essentially embodied the principals of the existing business practices of the BSG-affiliated clearinghouses – specifically, their due diligence, monthly monitoring, and testing, with some modification or expansion.  Respondents testified that they have taken compliance with the FTC's cramming prohibitions, including the 2008 Order, very seriously. [73]

---

[70]Witnesses – Kelli Cubeta and Sally Welge.
[71]Witnesses – Kelli Cubeta and Sally Welge.
[72]Witness – Kelli Cubeta; R-72.
[73] Witnesses – Kelli Cubeta and Sally Welge.

75.     Despite the fact the 2008 Order was issued directly only to BSG Clearing, ACI, and BCI, *all* BSG-affiliated clearinghouses applied the Order's requirements to their business practices.   And, the requirements of the 2008 Order were applied to all third-party service provider clients of Respondents, regardless of the type of service or product being offered.   This expansive application was employed because Respondents believed it was the right thing to do; and, the 2008 Order provided a clear, detailed, and unambiguous outline of precisely the activities the FTC required of a clearinghouse in terms of detecting and preventing cramming. Also, the BSG-affiliated clearinghouses understood that the FTC regarded its orders as precedent and that the requirements of the 2008 Order were to be applied to all of the companies' clearinghouse operations. [74]

76.     Following the 2008 Order, the BSG-affiliated clearinghouses developed a "due diligence" checklist.  Included on this checklist were the following due diligence activities:

- Obtain articles of incorporation and certificate of good standing from state of incorporation;

- Obtain and confirm vendor business name and address, along with the names, address, and telephone numbers of any owner, officer, director, and principal;

- Obtain clear and complete written description of service and marketing method, along with determine that all advertising and other materials are not facially false or misleading;

- Confirm sufficient documentation exists to determine that Vendor is capable of providing its services;

- Obtain and review applicable business licenses, tariff, and application materials for consistency with other implementation docs;

- Purchase service in same manner as consumer to confirm (1) service is as described in marketing materials; (2) service will only be billed after express authorization is obtained; (3) express authorization is consistent with marketing materials; and (4) service is being provided;

- Site visit to principal place of business to confirm equipment, office, practices, and personnel are consistent with implementation information;

---

[74] Witnesses – Kelli Cubeta and Sally Welge.

- Requesting that LECs confirm that they have not terminated within the past 5 years (a) Vendor and its (b) owners, officers, directors, and principals, and (c) any company currently or formally owned by the Vendor's principals engaged in fraud or any other offense concerning dishonesty; and (d) have not been enjoined from unauthorized telephone billing by any state or federal authority;

- Analyze call records to confirm absence of suspect patterns; and

- Test sample BTNs to confirm all have express authorization. [75]

77.     With respect to the monthly monitoring that the BSG-affiliated clearinghouses had been performing since as early as 1996, the 2008 Order required the clearinghouses to lower the customer service inquiry ratio for those third-party service providers providing "telecommunications" or basic services.   For these service providers, the customer service inquiry threshold was lowered from 15% to 4.5%.   Additionally, the LEC inquiry ratio became the lesser of: (a) 50% of the LEC Inquiry Rate imposed by a LEC as of the date of the 2008 Order; or, (b) 75% of a LEC Inquiry Rate imposed by a LEC after the date of entry of the 2008 Order.[76],

78.     In implementing the 2008 Order, the BSG-affiliated clearinghouses did not lower the customer service ratio for third-party service providers providing enhanced services.[77]   The BSG-affiliated clearinghouses knew from their experience monitoring these service providers that there was a large discrepancy in the billing density as between enhanced service providers vs. telecommunications or basic service providers. [78]

79.     Billing density is the number of billing records processed in any given month for a service provider.   Beginning in 2007, the BSG-affiliated clearinghouses recognized that a

---

[75] Witnesses – Kelli Cubeta and Sally Welge.
[76] At the time, Verizon's threshold was 1%; AT&T's threshold was 50 complaints per region.
[77] Enhanced services are services such as internet access, web- hosting and design, directory listings, and technical support.
[78] Witness – Kelli Cubeta.

provider of long distance or collect call services (*i.e.*, basic services) have a significantly higher number of billing records per month than an enhanced service provider. This is because a billing record is created for **each** long distance or collect call a consumer makes during a month. A consumer of long distance or collect calls makes an average of eight (8) long distance or collect calls per month which generates an average of eight (8) billing records on one month's bill. On the other hand, for each enhanced product sold, there is typically only one (1) charge on a consumer's bill which generates only (1) billing record. [79]

80. The discrepancy in billing density between long distance/collect call providers and enhanced service providers is significant to the customer service ratio. For example, assume service provider "A" sells long distance or collect services and service provider "B" provides enhanced services. Both "A" and "B" had 100 consumers who generated billing records last month. Both "A" and "B" had 15 consumers inquire about their bill this month. The customer service ratio for service provider "B" (the provider of enhanced services) is 10 times higher than the ratio for "A" despite them both having the same number of consumers and the same number of inquiries. This is illustrated as follows:

- Long Distance Service Provider A:

100 customers each make **10** long distance or collect calls = 1000 (billing records)

$$\frac{15 \text{ (inquiries)}}{1000 \text{ (records)}} = \textbf{1.5 \% ratio}$$

---

[79] Witness – Kelli Cubeta.

- Enhanced Service Provider B:

    100 customers each purchase **<u>1</u>** enhanced service = 100 (billing records)

    15 (inquiries)

    ──────────────          = **15 % ratio**

    100 (records)

Despite "A" and "B" having the same number of consumers and inquiries, "A" would ***not*** exceed the 15% inquiry threshold, whereas "B" would exceed. [80]

81.    Based upon this billing density discrepancy, the BSG-affiliated clearinghouses left the customer service inquiry threshold for enhanced service providers at 15% following entry of the 2008 Order.   Testing data from 2008 reveals that a 15% customer service ratio for enhanced services providers was actually a more conservative threshold level when compared to the 4.5% for telecommunications or basic services, and the 15% threshold resulted in more enhanced services providers being tested than non-enhanced. [81]

82.    To ensure compliance with the 2008 Order's testing requirements, the BSG-affiliated clearinghouses calculated on a monthly basis, for each of their third-party service providers, that provider's regulatory inquiry ratio, LEC inquiry ratio, and customer service inquiry ratio.   These ratios were determined through the clearinghouses' Variable Reporting System ("VRS").   Each month, VRS generated a list of third-party service providers who exceeded or breached any one of the three thresholds.   These third-party service providers were then notified by letter or email of their threshold breaches, and of the clearinghouse's requirements for them to be tested. [82]

---

[80] Witness – Kelli Cubeta.
[81] Witness – Kelli Cubeta
[82] Witnesses – Kelli Cubeta, John Wardashki; R-32; R-153.

83.     Each service provider's 30 most recently credited charges would be identified and provided to the service provider.  The service provider was then required to provide to the BSG-affiliated clearinghouse, within 10 business days or less, their proof or documentation of consumer authorization, whether that be in the form of a third-party verification ("TPV"), switch record, or Letter of Authorization (LOA). [83]

84.     If the third-party service provider fails to provide the proof of authorization within 30 days of the initial request for authorization, then the service provider is suspended until the authorizations are provided or a Third Review Test ("TRT") is completed. [84]

85.     Upon receiving the authorizations from a third-party service provider, the BSG-affiliated clearinghouse completes its analysis of the authorizations within 10 business days.  If 95% or more of the authorizations cannot be verified, then the clearinghouse will either terminate the service provider or identify a larger sample for a second round of testing.  If 95% or more is verified, then the third-party service provider has passed testing. [85]

86.     For the larger sample (or second round) of testing, the BSG-affiliated clearinghouse identifies the 100 most recently credited charges.  The third-party service provider must provide 10 business days or less TPVs, switch records, or LOAs to show authorization for each of the 100 charges. [86]

87.     Upon receiving the authorizations from a third-party service provider, the BSG-affiliated clearinghouse completes its analysis of the authorizations within 10 business days.  If 95% or more of the authorizations cannot be verified, then the clearinghouse will either

---

[83] Witnesses – Kelli Cubeta, John Wardashki; R-32; R-153.
[84] Witnesses – Kelli Cubeta, John Wardashki; R-32; R-153.
[85] Witnesses – Kelli Cubeta, John Wardashki; R-32; R-153.
[86] Witnesses – Kelli Cubeta, John Wardashki; R-32; R-153.

terminate the service provider or complete a TRT.  If 95% or more is verified, then the third-party service provider has passed testing. [87]

88.     TRT is triggered by events outlined above.  A TRT is also triggered if a third-party service provider has exceeded thresholds in any three months within a 12-month period. [88]

89.     For TRT, the clearinghouse identifies the 40 most recently credited charges.  The BSG-affiliated clearinghouse must independently verify the TPV, switch records, or LOAs.  The third-party service provider passes TRT if 97.5% of authorizations are confirmed for Pic'd services or 95% for non-Pic'd services.  If a third-party service provider fails TRT, the BSG-affiliated clearinghouse terminates the third-party service provider by next business day. [89]

## Overview of Landeen Entities

90.     The FTC alleges that nine (9) third-party service provider clients of Respondents, all associated with an individual named Cindy Landeen, engaged in cramming.  These companies are:  Instant411; InfoCall; MyIproducts; 800 Vmailbox; Digital Vmail; Streaming Flix; eSafeID; eProtectID; and, Uvolve (collectively, the "Landeen Entities").  The Landeen Entities marketed and sold enhanced services to consumers.  The Landeen Entities, identified below, contracted to submit EMI records through three (3) of the four (4) BSG-affiliated clearinghouses, which are Respondent in this matter: [90]

| Landeen Entity | Contracting Clearinghouse |
|---|---|
| Instant411<br>InfoCall | ACI |

---

[87] Witnesses – Kelli Cubeta, John Wardashki; R-32; R-153.
[88] Witnesses – Kelli Cubeta, John Wardashki; R-32; R-153.
[89] Witnesses – Kelli Cubeta, John Wardashki; R-32; R-153.
[90] Witnesses – Kelli Cubeta and Sally Welge; R-90; R-89; R-12;  R-85; R-86; R-124; R-88; R-87; R-152.

| MyIproducts<br>800 Vmailbox<br>Digital Vmail | ESBI |
|---|---|
| Streaming Flix<br>eSafeID<br>eProtectID<br>Uvolve | BCI |

91.     Respondent HBS – the only clearinghouse that is arguably bound by the 1999 Order – did not contract with the Landeen Entities.

92.     800Vmailbox, Inc. provided an enhanced voicemail service, which allowed consumers to check their voicemail messages from anywhere in the United States or over the Internet.  It also allowed friends and family to leave messages using a toll-free number, and it permitted reminder and wake-up calls from anywhere in the United States. [91]

93.     On May 16, 2008, 800 Vmailbox, Inc. entered into a Call Records Processing And Information Management Services Agreement with Enhanced Services Billing, Inc. ("ESBI").  Pursuant to the terms of that agreement, ESBI processed charge records received from 800Vmailbox, Inc. from January 2009 until early December 2010. [92]

94.     For every month that 800Vmailbox, Inc. exceeded a threshold during January 2009 and early December 2010, it was put into testing by ESBI, which tested the company's proof of express authorization pursuant to the dictates of the 2008 Order.  For every single month that 800Vmailbox, Inc. was tested, it passed. [93]

95.     Digital Vmail, Inc. provided an enhanced voicemail service, which allowed consumers to check their messages from anywhere in the United States over the Internet.  It also

---

[91] Witness –John Wardashki; *see also e.g.,* R-72; R-79; R-108.
[92] Witness – Kelli Cubeta; R-85.
[93] Witness – John Wardashki.

enabled friends and family to leave messages using a toll-free number.  Additionally, it offered other features such as Find Me/Follow Me, eFax, and email text to speech. [94]

96.   On May 16, 2008, Digital Vmail, Inc. entered into a Call Records Processing And Information Management Services Agreement with ESBI.  Pursuant to the terms of that agreement, ESBI processed charge records received from Digital Vmail, Inc. from January 2009 until early December 2010. [95]

97.   For every month that Digital Vmail, Inc. exceeded a threshold during January 2009 and December 2010, it was put into testing by ESBI, which tested the company's proof of express authorization pursuant to the dictates of the 2008 Order.   For every single month that Digital Vmail, Inc. was tested, it passed. [96]

98.   MyIproducts provided an enhanced voicemail service, which allowed consumers instant access to their voicemail from anywhere using either a personal 800 number or via the web.  It also provided virtual fax, in which consumers could provide their iMail number as their fax number and begin receiving faxes.  Additionally, if a consumer needed to check email but did not have access to the Internet, iMail read their messages over the phone. [97]

99.   On July 6, 2005, MyIproducts entered into a Call Records Processing And Information Management Services Agreement with ESBI.  Pursuant to the terms of that agreement, ESBI processed charge records received from MyIproducts from December 2005 until early December 2010. [98]

100.   For every month that MyIproducts exceeded a threshold during April 2008 and early December 2010, it was put into testing by ESBI, which tested the company's proof of

---

[94] Witness – John Wardashki; *see also e.g.,* R-75; R-82; R-111.
[95] Witness – Kelli Cubeta; R-86.
[96] Witness – John Wardashki.
[97] Witness – John Wardashki; *see also e.g.,* R-47; R-120.
[98] Witness – Kelli Cubeta; R-12.

express authorization pursuant to the dictates of the 2008 Order.    For every single month that MyIproducts was tested, it passed. Prior to April 2008, MyIproducts was subject to and passed the monitoring and testing employed at the time. [99]

101.   Streaming Flix, LLC provided access to its premium video library for consumers to stream or download movies.  Consumers were given the option to purchase individual movies or to purchase a monthly subscription for unlimited movie downloads or streaming videos. Streaming Flix, LLC also enabled its customers to create their own personal profile and have access to uninterrupted TV shows. [100]

102.   On March 30, 2009, Streaming Flix, LLC entered into a Call Records Processing And Information Management Services Agreement with BCI.  Although Streaming Flix LLC's contract was with BCI, a portion of Streaming Flix's charge records was submitted through the HBS Carrier Identification Code ("CIC") due to LEC requirements. [101]  BCI processed charge records received from Streaming Flix, LLC from July 2009 until early December 2010. [102]

103.   For every month that StreamingFlix, LLC exceeded a threshold during July 2009 and early December 2010, it was put into testing by BCI, which tested the company's proof of express authorization pursuant to the dictates of the 2008 Order.   For every single month that StreamingFlix, LLC was tested, it passed. [103]

104.   Uvolve, Inc. provided unlimited access to University Online Classes by Uvolve instructors, articles, and skill tutorials.  Additionally, it allowed consumers to search thousands

---

[99] Witness – John Wardashki.
[100] Witness – John Wardashki; *see also e.g.,* R-112, R-125.
[101] Due to LEC requirements, a small portion of the Landeen Entity transactions were submitted through the HBS Carrier Identification Code ("CIC") to certain LECs. *See* Cubeta Affidavit, ¶ 10.  Some LECs required that certain enhanced products must be sent on a separate CIC from other types of products because these enhanced products were charged different processing rates by the LECs. *Id.*
[102] Witness – Kelli Cubeta; R-124.
[103] Witnesses – John Wardashki.

of job listings and post their resumes online.  Uvolve also kept consumers connected through their social media outlets and alerted them of any new opportunities via their mobile telephones.[104]

105.    On September 8, 2009, Uvolve, Inc. entered into a Call Records Processing And Information Management Services Agreement with BCI.  Although Uvolve, Inc.'s contract was with BCI, a portion of its charge records was submitted through the HBS CIC due to LEC requirements. [105]  BCI processed charge records received from Uvolve, Inc. from May 2010 until early December 2010. [106]

106.    For every month that Uvolve, Inc. exceeded a threshold during May 2010 and early December 2010, it was put into testing by BCI, which tested the company's proof of express authorization pursuant to the dictates of the 2008 Order.    For every single month that Uvolve, Inc. was tested, it passed. [107]

107.    eProtectID, LLC provided identity theft protection, which included free credit reports and identity insurance.  eProtectID, LLC would also contact credit bureaus to set fraud alerts on behalf consumers.  eProtectID, LLC removed consumers' names from junk mail lists and restricted junk mail. [108]

108.    On May 16, 2008, eProtectID, LLC entered into a Call Records Processing And Information Management Services Agreement with BCI.  Although eProtectID, LLC's contract was with BCI, a portion of its charge records was submitted through the HBS CIC due to LEC

---

[104] Witnesses – John Wardashki.
[105] Due to LEC requirements, a small portion of the Landeen Entity transactions were submitted through the HBS Carrier Identification Code ("CIC") to certain LECs. *See* Cubeta Affidavit, ¶ 10.  Some LECs required that certain enhanced products must be sent on a separate CIC from other types of products because these enhanced products were charged different processing rates by the LECs. *Id.*
[106] Witness – Kelli Cubeta; R-152.
[107] Witnesses – John Wardashki.
[108] Witnesses – John Wardashki; R-76; R-84; R-93.

requirements. [109]  BCI processed charge records received from eProtectID, LLC from May 2009 until early December 2010. [110]

109.    For every month that eProtectID, LLC exceeded a threshold during May 2009 and early December 2010, it was put into testing by BCI.  For every single month that eProtectID, LLC was tested, it passed. [111]

110.    eSafeID, Inc. provided identity theft protection, which included free credit reports.  eSafeID, Inc. would also contact credit bureaus to set fraud alerts for consumers. eSafeID, Inc. removed consumers' names from junk mail lists and restricted junk mail. [112]

111.    On May 16, 2008, eSafeID, Inc. entered into a Call Records Processing And Information Management Services Agreement with BCI.  Although eSafeID, Inc.'s contract was with BCI, a portion of its charge records was submitted through the HBS CIC due to LEC requirements. [113]  BCI processed charge records received from eSafeID, Inc. from May 2009 until early December 2010. [114]

112.    For every month that eSafeID, Inc. exceeded a threshold during May 2009 and early December 2010, it was put into testing by BCI, which tested the company's proof of express authorization pursuant to the dictates of the 2008 Order.    For every single month that eSafeID, Inc. was tested, it passed. [115]

---

[109] Due to LEC requirements, a small portion of the Landeen Entity transactions were submitted through the HBS Carrier Identification Code ("CIC") to certain LECs. *See* Cubeta Affidavit, ¶ 10.  Some LECs required that certain enhanced products must be sent on a separate CIC from other types of products because these enhanced products were charged different processing rates by the LECs. *Id.*
[110] Witness – Kelli Cubeta; R-87.
[111] Witnesses – John Wardashki.
[112] Witnesses – John Wardashki; *see also e.g.,* R-77; R-83; R-107.
[113] Due to LEC requirements, a small portion of the Landeen Entity transactions were submitted through the HBS Carrier Identification Code ("CIC") to certain LECs. *See* Cubeta Affidavit, ¶ 10.  Some LECs required that certain enhanced products must be sent on a separate CIC from other types of products because these enhanced products were charged different processing rates by the LECs. *Id.*
[114] Witness – Kelli Cubeta; R-88.
[115] Witness – John Wardashki.

113.   InfoCall, LLC provided unlimited directory assistance.  This service included driving directions and movie show time information.  InfoCall, LLC also provided consumers with a personal 800 number to call for such information. [116]

114.   On May 16, 2008, InfoCall, LLC entered into a Call Records Processing And Information Management Services Agreement with ACI Billing Services, Inc. ("ACI"). Pursuant to the terms of that agreement, ACI processed charge records received from InfoCall, LLC from January 2009 until early December 2010. [117]

115.   For every month that InfoCall, LLC exceeded a threshold during January 2009 and early December 2010, it was put into testing by ACI, which tested the company's proof of express authorization pursuant to the dictates of the 2008 Order.    For every single month that InfoCall, LLC was tested, it passed. [118]

116.   Instant411, Inc. offered unlimited operator assistance.  It also provided consumers with business advertising, including ways to increase exposure and sales.  Instant411 also helped to publish special promotions. [119]

117.   On May 16, 2008, Instant411, Inc. entered into a Call Records Processing And Information Management Services Agreement with ACI.  Pursuant to the terms of that agreement, ACI processed charge records received from Instant411, Inc. from January 2009 until early December 2010. [120]

118.   For every month that Instant411, Inc. exceeded a threshold during January 2009 and early December 2010, it was put into testing by ACI, which tested the company's proof of

---

[116] Witness – John Wardashki; *see also e.g.,* R-78; R-81; R-94; R-110.
[117] Witness – Kelli Cubeta; R-89.
[118] Witness – John Wardashki.
[119] Witness – John Wardashki; R-109; R-117.
[120] Witness – Kelli Cubeta; R-90.

express authorization pursuant to the dictates of the 2008 Order.    For every single month that Instant411, Inc. was tested, it passed. [121]

<u>**1999 Order and FTC's Allegations**</u>

119.    The only marketing techniques prohibited by the 1999 Order are sweepstakes and prize promotions and negative option marketing (these were the marketing technique at issue in the original action).   The marketing at issue in the FTC's Motion to Show Cause is internet marketing.   Internet marketing was virtually non-existent in 1999 and is not mentioned in the 1999 Order. [122]

120.    The FTC's allegations against Respondents bear little resemblance to the original action against VOAA. The FTC does not allege that Respondents permitted billing for sweepstakes entries or prize promotions, or that it allowed negative option marketing.   The FTC does not allege that Respondents' customer service agents were telling line subscribers or consumers that they are legally obligated to pay charges "regardless of who, if anyone, ordered and received the service in question." [123]

121.    Rather, the FTC alleges that the BSG-affiliated clearinghouses violated the 1999 Order in three (3) ways:

    i.    Processing charge records for third-party service providers who did not clearly and conspicuously disclose to consumers the total cost of the goods or services offered, the number and amount of payments to be made for the purchase, that the charges for the good or service will be billed to their telephone bill, the refund policy (if any), and the means by which the purchase can be cancelled;

    ii.    Making a material misrepresentation of fact; and,

    iii.    Processing records for charges that were not expressly authorized by consumers.

---

[121] Witness – John Wardashki.
[122] R-1.
[123] Dkt. #55.

## Marketing and Sign-Up Process Employed for Landeen Products

122.    To offer their products and services to consumers, the Landeen Entities contracted with a marketing company known as CPA Marketing (a/k/a Studio127) ("CPA Market").  CPA Market was contracted by the Landeen Entities to market their products and to obtain consumer authorization through a sign-up process that used several mediums, including the internet.[124]

123.    Consumers would encounter offers for Landeen Entities products and services on-line in several ways.   Consumers could visit a website (*e.g.*, cnn.com, ebay.com, or careerbuilder.com) and click on a banner offer, which would take the consumer to the Landeen Entities' individual web pages where the consumer could sign up for the product or service. Consumers could also encounter these offers by entering websites known as "publisher websites," which sell advertising and attract internet traffic through the placement of advertisements for their website via contextual ads.   Consumers enter the publisher websites through a registration process.[125]

124.    Consumers who encountered the Landeen Entities' offers – whether on an individual Landeen Entity web page or through the registration process for a publisher website – provided their personal identifying information, including the their first and last name, home address, e-mail address, and home telephone in order to sign-up for the product or service. During the sign-up process, the terms of the transaction were disclosed to the consumer, who had to take action – in addition to providing personal identification information – to accept the terms

---

[124] *See, e.g.,* R-105, R-106, R-107, R-108, R-109, R-110, R-144, R-153, R-178, R-198; R-268; (BCI_026435-BCI_026438;   BCI_026490-BCI_026494;   BCI_026539-BCI_026547;   BCI_026563-BCI_026569;   BCI_026583-BCI_026591;   BCI_026751-BCI_026760;   BCI_026750-BCI_026760; BCI_026854- BCI__026863;   BCI_027030- BCI_027032; BCI_027163- BCI_027175; BCI_027274-BCI_027284); R-69, R-120, R-121, R-255, R-256, and R-259.
[125] *Id*; Witnesses- Stephen Oskoui, John Wardashki, Dr. Robert Rauschenberger.

of the transaction.  For example, the terms of the offer were accepted by consumers by them "clicking" on an action button at the end of the sign-up process (*e.g.*, an "order now" or "submit" button).[126]

### Smiley Media

125.    Respondents are not advertisers. Respondents process billing information for third-party service providers, who in some instances utilize companies that specialize in internet marketing. [127]

126.    Here, the Landeen Entities' products and services were offered through several internet mediums and hundreds of websites.[128]  Despite the numerous ways consumers could sign up for a Landeen Entity product or service, the FTC's allegations focuses solely on the sign-up process employed through an affiliated marketer known as Smiley Media, Inc. ("Smiley").[129]

127.    The FTC alleges the marketing employed by Smiley was "deceptive" because consumers did not understand the offers they were accepting by entering their personal identification information and clicking on an "action" button to agree to the terms of the offer. Notwithstanding these allegations, Smiley has not been the subject of any government investigation or action relating to its advertising. [130]

128.    Affiliated marketers specialize in matching products with consumer interest. They help advertisers like CPA Market place offers on publishers' websites.  The Smiley offers that were shown on publishers' websites were jointly designed by CPA Marketing and Smiley's compliance team, which was overseen by Smiley's general counsel who had final approval of all Smiley offers   Smiley would initially get the details of the specific offer – *e.g.*, the text of the

---

[126] *Id.*; Witnesses– Stephen Oskoui, John Wardashki, Dr. Robert Rauschenberger.
[127] Witness– Kelli Cubeta
[128] *Fee notes* (insert the above 4 footnotes).
[129] Motion to Show Cause (Docket # 55-2), pp. 10-11; 18-19
[130] Witness – Stephen Oskoui.

offer; the different fields of consumer data that were to be collected; and, the technical manner the data was to be transmitted. Smiley would also confirm with marketers as to whether any industry specific compliance rules applied.[131]

129.    Smiley employed several policies and procedures to ensure that its offers were not deceptive and were compliant with all laws and regulations.[132]

130.    First, all offers were approved by Smiley's compliance team, which was responsible for ensuring the offers were compliant with regulations and directives for Internet marketing issued by governmental entities.    Smiley also developed a set of "best practices" based upon testing.  Best practices for products and services included: (1) making sure it was clear what the consumer was signing up for; (2) what the amount and frequency of the charge was; (3) the placement of the terms of the agreement in a visible location (*i.e.*, "above the fold")[133]; (4) disclosure of a privacy policy; (5) a confirmation step (*i.e.*, requiring additional critical or personal information be entered by the consumer); and, (6) the use of visible and legible font and colors.[134]

131.    Second, Smiley designed and employed offers that required cognitive decision making by consumers.  For example, when Smiley's offers were presented to the consumers, the consumers had the option to either sign up for the offer or skip the offer.  Offers were presented after a consumer had taken action on the publisher's page.  Generally, consumers had provided some information while registering on the publisher's page.  However, to accept a Landeen

---

[131] Witness – Stephen Oskoui.
[132] Witness – Stephen Oskoui.
[133] Smiley considered where items were placed on the page.  Placement of information "above the fold" means that a consumer does not need to scroll down to see the terms and conditions.
[134] Witness – Stephen Oskoui.

Entity offer, consumers had to enter additional personal information and click an action button.[135]

132.     Third, Smiley took additional steps to confirm the validity of the consumer authorization.   After a consumer would accept an offer and authorize the charge by entering their information and accepting the terms of the transaction by clicking an "action" button, the consumer's data would be verified by Smiley, which determined if the "lead" was valid.  Smiley would only forward data for "valid" leads – *i.e.*, the consumer had accepted the offer.[136]

## The Landeen Offer

133.     The "MyEmail.com workflow" cited by the FTC contains one offer for eProtectID.

134.     At the top of the webpage for this offer, the following disclosure is made: "all offers are optional – Sign Up if you are interested."

135.     Below this additional disclosure are the terms of the offer, which are delineated by the use of a border, or a rectangle drawn around the respective section.   The delineated section containing the terms of the offer is labeled "advertisement."

136.     Along with the disclosures made within the Terms and Conditions link accessible from the offer page, the following disclosures are made in the actual offer itself:

> a.   "You will simply be billed a low monthly service fee of $14.95 that will automatically be included on your phone bill";
>
> b.   "No credit check or long-term contract is required";
>
> c.   "The monthly recurring charges for eProtectID will appear on the HBS/OANBILL bill page billed on behalf of eProtectID";
>
> d.   "eProtectID is not affiliated with your local telephone provider"; and,

---

[135] Witness – Stephen Oskoui.
[136] Witness– Stephen Oskoui.

     e.  "There is no long term commitment and you can cancel at any time, with no cost to you, by contacting us at 1-877-376-6505, writing to us at eProtectID Customer Service 24078 Greenway Rd., Ste.3, Forest Lake , MN 56025, or by emailing us at customerservice@eprotect.com."

137.    The registration process for the eProtectID is completed in two phases. First, a consumer's name, address, and home phone is populated using the information the consumer previously entered registering for the MyEmail.com website.  Second, to accept the eProtectID offer, consumers must take two (2) affirmative actions. The consumer must enter the last four (4) of his or her social security number. After entering this data, the consumer must click on the action button stating "submit and continue to next page." [137]

138.    Consumer were given the option to reject the offer, which could be accomplished by either electing not to enter their social security number or by clicking the "skip" button which was placed directly below the action button. [138]

139.    After consumers enter their personal information, were provided the terms of the transaction, and had taken action to order the product or service, the Landeen Entities would send consumers a welcome email, confirming their purchase of the product or service. [139]

140.    The welcome email confirms the following regarding the transaction: "Welcome to eProtectID and thank you for your patronage.  We recently received your identity theft protection service registration. . . You will see your low monthly service fee of $14.95 automatically billed to your home telephone bill each month under the HBS/OAN bill page." [140]

141.    The welcome email further states that consumers have the right to contest any charge on their phone bill by stating that "[i]f you wish to contact us or cancel your service, you

---

[137]Witness – Robert Rauschenberger; R-243.
[138]Witness – Robert Rauschenberger; R-243.
[139]Witness – Robert Rauschenberger; R-243.
[140]Witness – Robert Rauschenberger; R-243.

may do so by calling our customer service center at 1-877-376-6505.  You can also email us at customerservice@eprotectid.com." [141]

142.    Consumers then receive the charge on their local telephone bill, which provided additional information about the charge and information needed to dispute the charge or cancel the service.   The local phone company places a third-party charge in several places on the consumer's bill in clear and conspicuous fashion.  The third-party service provider's charge is set forth on the first page of that bill and on an entirely separate page of the bill.   The bill conspicuously advises consumers on the stand-alone page setting forth the charge from the service provider – under a heading entitled "Important Information" – as follows: "Please review all charges carefully . . . If you have any questions about any of the charges appearing on this page, please call the number shown above."  The 800-hundred number for the clearinghouse is mandatorily provided. The stand-alone bill page clearly and conspicuously discloses the nature and amount of the charge and the product or service for which the consumer is being charged. [142]

## The Data Produced by Smiley

143.    As part of its regularly conducted business activities, Smiley tracks various data points relating to its sign-up process including the "conversion" and "progression" rates for a particular series of offers consumers encounter. Smiley stores this data as part of its regular activities. [143]

144.    The "conversion" rate is the number of offers, on average, consumers accept when presented with a particular series of offers. The fewer offers selected in the series, the lower its conversation rate. The "progression" rate is the frequency with which a consumer

---

[141]Witnesses – Stephen Oskoui; Robert Rauschenberger; R-243.
[142]Witnesses – Stephen Oskoui; Robert Rauschenberger; R-243.
[143]Witness – Robert Rauschenberger; R-243.

navigates the series of offers (either by accepting or rejecting each) without aborting the process and leaving the publisher's website. [144]

145.    Smiley has produced data relating to the conversation and progression rates for those series of offers containing Landeen Entity offers. [145]

146.    The Smiley data for the relevant time frame shows that nearly 99% of consumers who encountered a Landeen Entity offer skipped over at least one, if not several, or even all, of the offers presented in the series. In other words, 99% of consumers who encountered the subject offers were not indiscriminately accepting the offers without cognitive decision making as is alleged by the FTC. [146]

147.    This data supports the conclusion that the overwhelming majority of consumers understood that they had the option to reject the optional offers that were being presented and, in fact, most often exercised that option by rejecting one or more of the offers presented. [147]

### Expert Testimony regarding Smiley Sign-Up Process and Landeen Offer

148.    The FTC cites to a "MyEmail.com workflow" in support of its contention that the BSG-affiliated clearinghouses cleared charge records for the Landeen Entities who – "instead of clearly and conspicuously disclosing the terms of their services," – used "deceptive Internet click-through marketing." [148]

149.    The FTC submits that this "workflow" is a representation of the sign-up process and offers consumers would have encountered when registering at "MyEmail.com," which was a publisher website with whom Smiley had a contract to place offers for its advertising clients.

---

[144] Witnesses – Stephen Oskoui; Robert Rauschenberger; R-243.
[145] Witnesses – Stephen Oskoui; Robert Rauschenberger; R-243.
[146] Witnesses – Stephen Oskoui; Robert Rauschenberger; R-243.
[147] Witnesses – Stephen Oskoui; Robert Rauschenberger; R-243.
[148] Witness – Robert Rauschenberger; R-243.

The FTC contends this work flow shows that the terms of the Landeen Entities services were not clearly and conspicuously disclosed.  "[149]

150.    The FTC has failed to submit any expert testimony or opinion to support its contentions.

151.    The only evidence before the Court on these issues is the expert testimony and opinion of Dr. Robert Rauschenberger who holds a Ph.D. in cognitive psychology.   Dr. Rauschenberger is currently employed as a managing scientist in the human factors practice at Exponent. He previously held an adjunct professorship at the School of Interactive Arts and Technology at Simon Fraser University, Vancouver, BC.  His relevant prior experience includes fifteen years of conducting research on the way humans process information, perceptually organize information, attend to various aspects of the visual world, and interact with technology.[150]

152.    Dr. Rauschenberger was retained by Respondents to offer opinions regarding the Smiley sign-up process and the offers it presented, specifically including the design and user-ability of this process and the Landeen Entity offer contained in the "MyEmail.com workflow," which is relied upon by the FTC.[151]

153.    In rendering his opinions, Dr. Rauschenberger conducted a heuristic evaluation of "MyEmail.com workflow." Dr. Rauschenberger also conducted user-ability testing intended to obtain qualitative data relating to consumer interactions with the "MyEmail.com workflow." And, he analyze empirical data provided by Smiley relating to the "conversion" rates – *i.e.*, the

---

[149] Witness – Robert Rauschenberger; R-243.
[150] Witness – Robert Rauschenberger; R-234.
[151] Witness - Robert Rauschenberger; R-234.

rates at which consumers accepted or rejected offers in the Smiley offer path – to assess the cognitive decision making of consumers who encountered these offers. [152]

154.    Dr. Rauschenberger's first opinion is that the design of the subject webpages is adequate and appropriate to alert reasonable consumers to the consequences of their actions. That is, consumers understood that the offers being presented in the "MyEmail.com workflow" were separate offers from the registration for MyEmail.com and that, by clicking "submit," they were signing up for an optional service that had certain financial conditions that applied to acceptance of the offer.  This opinion is adequately supported by the following testimony: [153]

> The design of MyEmail employs soft color tones, such as light sky blue and white; rounded edges, such as those on the bounding boxes for the signup forms and the outlines of the buttons; color gradients, such as those on the page background and buttons; as well as cloud- or sky-themed images, either on the welcome panel (slide 2), or as the background for the signup forms on the subsequent pages (slides 3-6).  This design stands in stark contrast to the visually barren, rectilinear design of the advertisements, which employ predominantly the colors black, white and red, sharp edges all around, crudely styled controls (*e.g.*, submit button), and any absence of any adornment such as background images of clouds.

> ****

> Observers should be able to apprehend the difference between the two disparate designs even at a very cursory glance, given that they employ rather different and characteristic visual features, and that rapid visual recognition by the visual system has been shown to operate on the basis of such crude information . . .  The rather evident break in branding, when transitioning from the MyEmail webpages to the subsequent advertisements, signals strongly to the user that he or she has transiently left the MyEmail workflow and is now "respond[ing] to … optional questions" pertaining to "offers [that] are optional" and for which the user can "[s]ign up if [he or she] [is] interested," as described at the very top of the advertisement.

> The first line of each advertisement in the lower rectangle is always a summary of the product or service being offered; for example, "PROTECT YOUR IDENTITY!", "Enhance Firefox with the ShopAtHome Toolbar Plugin," "GET HOT NEW TRUETONES, WALLPAPERS AND MORE FOR YOUR CELL

---

[152] Witness – Robert Rauschenberger; R-234.
[153] Witness – Robert Rauschenberger; R-234.

PHONE," etc.  All of these products and services are clearly distinct from the free email account being offered by MyEmail.  The material terms of the offer follow immediately below the product or service summary.  Where the material terms are presented at the bottom of the lower rectangle, they are highlighted by the creation of a further subdivision; for example, by the use of (a) thick orange-red horizontal line(s) (e.g., slides 9 and 10).  The use of hyperlinks, which are ubiquitous on the Internet, identifies key phrases, such as "Terms & Condition" or "Privacy Policy," as additionally available information not presented on the current page.  Users are quite familiar with this convention as a means of navigating between different pages of information.  The standard hyperlink formatting of medium blue color and underlining isolates the hyperlinks visually against the otherwise black local context.  Scientific research shows such local contrast to cause items to stand out against their immediate surroundings.

155.    Dr. Rauschenberger's second opinion is that the design of the subject webpages clearly and conspicuously discloses the materials terms of the offer and complied with the FTC's recommendations regarding on on-line disclosures. This opinion is adequately supported by the following testimony: [154]

First . . . the presentation of the material terms of the agreements fulfills the proximity and prominence criteria of the 2000 and 2013 FTC guidance. Indeed, the material terms of the offer follow immediately below the product or service summary. Second, the material terms of the various offers are described in clear and unambiguous language, stating the consequences of accepting the offer and the user action that indicates an acceptance of the offer; for example, "… a low cost of $14.95/month.  Click 'Submit' to enroll Today!"  To the extent that an offer involves a charge, the terms also include the method of billing; for example, "eProtectID is authorized to charge my local phone bill for services provided." Both the material terms and, where applicable, the method of payment is, part and parcel of the advertisement itself:  They are not stated separately; they are described in the same continuous prose that details the advertised service or product.  The consumer is told what he or she receives in terms of products and services, how much these will cost (including the frequency and how they will be billed), and that he or she can cancel at any time (and the means by which they can cancel).

156.    Dr. Rauschenberger's third opinion is that the empirical data for Smiley demonstrates that consumers were not deceived into believing the offers were part of the

---

[154] Witness – Robert Rauschenberger; R-234.

MyEmail.com work flow but, rather, were making conscious decisions whether to accept or reject the optional offers. This opinion is adequately supported by the following testimony: [155]

> The [Smiley] data shows that nearly 99% of the visits to those advertisement pages involved a user skipping over at least one, if not several, or even all, of the advertisements. They show, further, that only a quarter of the site visits involved a signup, corresponding roughly to one quarter of participants in the usability study who had chosen to accept an offer for at least one of the advertised services and products. Finally, the data show that an almost equal proportion of site visits involved the acceptance of at least one offer in the face of the rejection of other offers. The extremely small difference between the latter two, nearly equal-sized proportions constitutes the number of site visits that resulted in an acceptance of all offers.

### Verification of Consumer Authorization

157.    The 1999 Order requires third-party service providers to obtain consumers' express authorization; record the consumers' "names, addresses and telephone numbers"; and, make this information available promptly upon request. [156]

158.    The Billing Services Agreement executed by the Landeen Entities required them to "verify all [consumer] authorizations to receive products or services offered" through "written letters of authorization." [157]

159.    To accept an internet offer, a consumer enters his or her personal identification information (*e.g.*, name, address, telephone number). After entering this information, the consumer accepts the offer by clicking on an action button (*e.g.*, a "submit" button). By clicking on the action button, the consumer's personal identification information is captured and the charge is considered authorized. A letter of authorization ("LOA") is simply the capture of data electronically, which is captured to document verification of a consumer's authorization. [158]

---

[155] Witness – Robert Rauschenberger; R-234.
[156] R-1.
[157] Witness – Kelli Cubeta; R-90; R-89; R-12;  R-85; R-86; R-124; R-88; R-87; R-152.
[158] Witnesses – Kelli Cubeta; Stephen Oskoui; Dr. Robert Rauschenberger; John Wardashki

160.    The Billing Services Agreement mandated that the verification of authorization "must comply with applicable federal and state rules, regulations and laws."  Further, the Agreement mandated that the verification of authorization must include the following: [159]

(a) The date of the authorization;
(b) The name, address and telephone number of the [consumer];
(c) Assurance that the [consumer[ is qualified to authorize billing for the product or service on that phone bill;
(d) A description of the product or service;
(e) An explicit acknowledgment by the [consumer] that the charges for the product or service will appear on his/her telephone bill;
(f) A toll free number that [consumer] may call to make inquiries concerning the service; and
(g) The acceptance by the [consumer] of the offer.

161.    This method of verification was approved by the LECs.

162.    When a consumer accepted a Landeen Entity offer through the Smiley sign-up process, the personal information and data entered by that consumer was collected by Smiley.

163.    Smiley would then vet this data to determine the validity of the consumer action. Specifically, Smiley had internal filters in place to validate whether there was profanity in any of the fields, along with ensuring that the consumer provided a legitimate mailing address, telephone number, and email address (if applicable).  Consumer data that passed Smiley's vetting was submitted to marketers such as CPA Market, which would store the data in its raw format.

164.    Once the consumer data was submitted to marketers such as CPA Market, it was again vetted by CPA.

165.    After the consumer data was vetted by both Smiley and CPA Market, the data was transmitted to the Landeen Entities, where it was stored it its raw format in a "CRM database."

---

[159] Witness – Kelli Cubeta; R-90; R-89; R-12;  R-85; R-86; R-124; R-88; R-87; R-152.

166.    The Landeen Entities would then transmit consumer data (*i.e.*, the LOA) for purposes of verifying consumer authorization.

167.    For example, when a letter of authorization was requested by a BSG-affiliated clearinghouse for purposes of verifying a particular consumer's authorization, the CRM database would create an LOA containing the consumer's personal identifying data. The Landeen Entities would then transmit an LOA containing the consumer's data to the clearinghouse.  Other service providers would transmit consumer data in an Excel spreadsheet for purpose of validating consumer authorization.

168.    The LOA consumer data that was transmitted by the Landeen Entities to the BSG-affiliated clearinghouses is the exact same information that the customer provided to Smiley when they accepted and authorized the service or product.

### Respondents' Representations Regarding Authorization

169.    The FTC contends the consumer telephone bills constitute material misrepresentations "that the charges were authorized, due, and payable." The FTC further contends that Respondents "frequently misrepresented that the transactions were authorized in response to consumer complaints by pointing to LOAs that consumers never saw." [160]

170.    As clearinghouses, neither Respondents nor their third-party service provider clients made representations to consumers via their local telephone bills. Consumers' local telephone bills were issued by the LECs, and the information that was contained on these bills were the representations of the LECs.

171.    Respondents did not misrepresent the nature of the LOAs.  The evidence establishes that the BSG-affiliated clearinghouses represented only that the LOAs constituted the "authorization information" that had been produced by the third-party serviced provider. This is

[160]Dkt. #55.

51

an accurate representation. There is no evidence that Respondents ever represented that the LOA was an electronic record which consumers saw or which consumers completed in conjunction with sign-up for Landeen services.

### Consumer Authorization

172.    The FTC contends Respondents violated the 1999 Order by processing EMI records for charges that were not expressly authorized by consumers. [161]

173.    Respondents BSGNA and BSG Clearing are not clearinghouses. Neither engaged in any conduct which could be argued to have been in violation of the 1999 Order.  Neither contracted with the Landeen Entities nor provided clearinghouse services, including the processing of charge records. [162]

174.    In the absence of direct evidence of cramming, the FTC relies on circumstantial variables to support its theory of lack of authorization – inquiry levels, refund volumes, and usage rates.

175.    There is no measurable link between lack of authorization and inquiries, refunds, or usage that could serve as clear and convincing evidence that consumers did not authorize the Landeen Entities' products and services or the LEC billing for them.  Inquiries – as this term has been defined for purposes of client monitoring – include ***all consumer contacts regardless of the nature of the contact.*** [163]

---

[161] Dkt. #55.
[162] Witness – Kelli Cubeta.
[163] Witnesses – Kelli Cubeta and Sally Welge

176.     Furthermore, each Landeen Entity charge was documented by an LOA.   The authorization records of those Entities which exceeded monthly monitoring thresholds were tested.  Each Landeen Entity that went through testing passed that testing, with no exceptions. [164]

### DAMAGES (Alternative – If Violation is Found)

### Class Action Settlements

*Moore v. Verizon*[165]

177.     The *Moore* class action was filed on April 29, 2009 in the Northern District of California (Case No. 4:09-cv-01823) against Verizon by two consumers alleging they had been billed for charges submitted by various third party service providers to billing clearinghouses, including Respondents, and Verizon that  they did not authorize.

178.     In January 2012, two months before the FTC filed this enforcement action, the *Moore* Plaintiffs and Verizon reached a settlement agreement.

179.     The Settlement Agreement provides for a 100% refund of all unauthorized charges for class members filing claims for full payment and a flat payment of $40 for class members who do not file full payment claims.

180.     Of the $49,002.612.75 in charges  billed by the Landeen Entities, $6,929,615.28 is related to Verizon consumers, who received third-party charges during the class period and are a member of the Settlement Class unless they opted out.   Each of these Verizon consumers who either received a settlement payment or failed to opt out is a member of the Settlement Class and has thus released their claim to any further refund.  Of the consumers billed by the Landeen Entities, only 668 exclusion requests (including 21 late requests and 19 duplicate requests) have been received (as of June 2013).   Thus, the remaining Verizon consumers who were billed by

---

[164] Witnesses – Kelli Cubeta, John Wardashki.
[165] Witness – Kelli Cubeta as to all facts relating to *Moore v. Verizon.*

the Landeen Entities are members of the Settlement Class having either received a settlement payment or elected not to opt out.

181.    On July 10, 2013, the *Moore* court entered an Order granting final approval of the Settlement Agreement, which is a final judgment on the merits.

*Nwabueze v. AT&T*[166]

182.    The *Nwabueze* class action was filed on April 7, 2009 in the Northern District of California (Case: 3:09-cv-01529) against AT&T by consumer alleging she had been billed for charges submitted by third party service providers to billing clearinghouses, including Respondents, and AT&T that she did not authorize.

183.    In December 28, 2012, the *Nwabueze* Plaintiffs and AT&T reached a Settlement Agreement that was preliminarily approved by the court on January 16, 2013.

184.    Like the settlement in *Moore*, the *Nwabueze* settlement provides AT&T consumers the opportunity for full refund in exchange for a broad release, including a release of Respondents.

185.    Of the $49,002.612.75 in charges billed by the Landeen Entities, $36,505,271.11 is related to AT&T consumers, who received third-party charges during the class period and are a member of the Settlement Class unless they opt out.   Each AT&T consumer who fails to opt out is a member of the Settlement Class and, thus, will have released their claim to any further refund in *Nwabueze*.

186.    The *Nwabueze* Settlement Agreement is set for a final approval hearing on November 15, 2013.

187.    The FTC seeks $52,631,224.46 from Respondents for charges BSG-affiliated clearinghouses processed for the nine (9) Landeen Entities at issue.   When credits, refunds,

---

[166]Witness – Kelli Cubeta as to all facts pertaining to *Nwabueze v. AT&T*.

and/or uncollected amounts are taken into account, the total amount of charges is $49,002,612.75. [167]

188.    HBS – the only BSG-affiliated clearinghouse that could arguably be bound by the 1999 Order – transmitted a total of $12,253,598.88 for the following Landeen Entities: StreamingFlix, LLC, Uvolve, Inc., eSafeID, Inc. and eProtectID, Inc. [168]

189.    Of this amount, $10,550,000.00 has been or will be released as a result of the *Nwabueze* and *Moore* class actions.  Thus, the total amount of HBS-cleared charges for the Landeen Entities not released by *Nwabueze* and *Moore* and potentially subject to the FTC's claim for consumer redress is $1,700,000.00.  Of this amount paid by consumers, Respondents retained only a small portion, the bulk of consumer payments having gone to the LECs and the Landeen Entities. [169]

190.    Disgorgement of profits is the more appropriate remedy (and not consumer redress).  The profit retained by Respondents with respect to HBS-cleared charges on behalf of the Landeen Entities is $544,000.00. [170]

Respectfully submitted,

By:   /s/ *Dina M. Cox*
Dina M. Cox, Atty No. 18590-49
dcox@lewiswagner.com
Robert M. Baker, IV*
Indiana Atty No. 25471-49
**LEWIS WAGNER, LLP**
501 Indiana Avenue, Ste. 200
Indianapolis, Indiana 46202
Telephone:  (317) 237-0500
Facsimile:  (317) 237-6390
*pro hac vice*

---

[167] Witness – Cathy Coleman-Ackerman.
[168] Witness – Cathy Coleman-Ackerman.
[169] Witness – Cathy Coleman-Ackerman.
[170] Witness – Cathy Coleman-Ackerman.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served electronically in compliance with Local Rule CV-5(a). As such, the foregoing document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1). Pursuant to Fed. R. Civ. P. 5(a)-(b) and Local Rule CV-5(b)(2), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email and/or fax, on October 28, 2013.

**Douglas V. Wolfe**
**Sarah Waldrop**
**Robin L. Moore**
**Jonathan Cohen**
Federal Trade Commission
600 Pennsylvania Ave., NW
Suite M-8102B
Washington, DC 20580

**Robert Shaw-Meadow**
U.S. Attorney's Office
601 N.W. Loop 410
Suite 600
San Antonio, TX 78216

By: __/s/ *Dina M. Cox*_____
Dina M. Cox, Atty No. 18590-49