**LEWIS WAGNER** LLP
Attorneys at Law

Skilled Advocacy. Practical Solutions.

May 23, 2013

Mythili Raman
Acting Assistant Attorney General for the Criminal Division
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Joseph Hogsett
United States Attorney, Southern District of Indiana
10 West Market Street
Suite 2100
Indianapolis, Indiana 46204

Drew Northern
Chief Division Counsel
8825 Nelson B Klein Parkway
Indianapolis, Indiana 46250

**RE:**   *Discovery Sought Against FBI in Cause No. 5:98-cv-629*

Dear Ms. Raman, Mr. Hogsett, and Mr. Northern:

Lewis Wagner, LLP represents Hold Billing Services LTD n/k/a HBS Billing Services Company ("HBS") in Cause No. 5:98-cv-629, pending in the United States District Court for the Western District of Texas.  In this case, the FTC seeks an order to show cause ("Show-Cause Motion") why HBS and several Non-Parties (collectively "BSG") are not in contempt of a Consent Order and Injunction entered in 1999.[1]  The FTC filed a Fact Appendix in support of its Show-Cause Motion.  Copies of both the Show-Cause Motion and the Fact Appendix are enclosed for your reference[2].

On May 3, 2013, Magistrate Judge Bemporad issued an order relating to discovery in this case, ruling that BSG was entitled to discovery of *all* FBI materials shared with the FTC and that BSG is entitled to depose Special Agent Brian D. Percival – the agent who investigated Cindy Landeen (and several companies with which she is associated) relating to alleged placement of

---

[1] Lewis Wagner, LLP also represents these Non-Parties, which include Billing Services Group Limited ("BSG Ltd."), Billing Services Group North America, Inc. ("BSGNA") BSG Clearing Solution North America, LLC ("BSG Clearing") ACI Billing Services, Inc. ("ACI") Billing Concepts, Inc. ("BCI") Enhanced Services Billing, Inc. ("ESBI").

[2] Because the attachments to the Fact Appendix comprise thousands of pages, we are not including all of the attachments with this letter.  However, we will furnish them upon your request if you need them in order to respond to this request.



Mythili Raman, Acting Assistant Attorney General for the Criminal Division
United States Department of Justice
Joseph Hogsett, United States Attorney
Southern District of Indiana
Drew Northern, Chief Division Counsel
May 23, 2013
Page 2

unauthorized charges on the telephone bills of consumers.[3] Judge Bemporad has instructed BSG to comply with the *Touhy* regulations in obtaining this Court-ordered discovery.[4]

This letter sets forth the scope of BSG's request for discovery and relevance of the information it seeks in compliance with 28 C.F.R. 16.22(c) and (d).

### A. The Scope of BSG's request

The FTC's Show-Cause Motion is predicated almost exclusively on allegations that Ms. Landeen and her affiliated companies "crammed" consumers and that BSG is liable for Ms. Landeen's actions as the billing clearinghouses that processed the disputed charges. These allegations are based extensively upon the investigation conducted by the FBI (led by Special Agent Percival) and the materials the FBI has obtained from consumers and the general public,[5] as well as from Durham Technology, Alternate Billing Services, PhoneBillit, MyIproducts, SafeguardMyCredit, 800 Vmailbox, Digital Vmail, Eprotect ID, Esafe ID, InfoCall, Instant 411, Streaming Flix, and Uvolve, LLC. Therefore, BSG seeks all documents that the FBI has shared with the FTC that (1) relate the allegations in the Motion to Show Cause or (2) were created, obtained, or maintained in connection with the investigation of Ms. Landeen, Timothy Durham, Durham Technology, Alternate Billing Services, PhoneBillit, MyIproducts, SafeguardMyCredit, 800 Vmailbox, Digital Vmail, Eprotect ID, Esafe ID, InfoCall, Instant 411, Streaming Flix, and Uvolve, LLC. This second category of documents includes documents that were obtained in this investigation – not just that information the FTC has chosen to cite as "evidence."

Additionally, because Special Agent Percival investigated the entities whose conduct the FTC claims BSG is liable for, BSG seeks to depose Special Agent Percival to obtain information regarding what he learned and observed during the investigation of the above entities. This includes relevant information he possesses relating to the alleged cramming by the Landeen-affiliated entities, and the information and conclusions he reached regarding BSG's role (if any) in the alleged conduct.

### B. Relevance

Relevant material for the purpose of discovery encompasses any matter that may bear upon, or reasonably could lead to other matters that could bear upon, any issue that is or likely may be raised in the case. *Minch v. City of Chicago*, 213 F.R.D. 526, 527 (N.D. Ill. 2003).

---

[3] A copy of Judge Bemporad's Order is also enclosed.
[4] BSG respectfully disagrees with Judge Bemporad's finding that the *Touhy* regulations are applicable.
[5] E.g., http://www.fbi.gov/news/pressrel/press-releases/billing_121610

2



Mythili Raman, Acting Assistant Attorney General for the Criminal Division
United States Department of Justice
Joseph Hogsett, United States Attorney
Southern District of Indiana
Drew Northern, Chief Division Counsel
May 23, 2013
Page 3

Thus, a discovery request is considered to seek relevant information if there is any possibility that the information sought may be relevant to the claim or defense of any party in the action. *Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto*, 211 F.R.D. 658, 663 (D. Kan. 2003).

The information the FBI has obtained in its investigation of Ms. Landeen and the above entities certainly satisfies the broad relevancy standard for discovery. Judge Bemporad has already recognized this, and correctly so. There are several reasons this information is relevant to the issues raised by the FTC's Show-Cause Motion. For example, despite a very extensive and lengthy investigation that included the solicitation of information from consumers, the FTC has submitted handful materials from this investigation to support the allegations of fraud against Ms. Landeen. BSG seeks the remainder of these investigation materials which the FTC has chosen to ignore or omit from its papers. The remainder of the FBI's files is of particular importance here given that Ms. Landeen – the individual whose office was "raided" by the FBI and whom it has been alleged to have engage in widespread consumer fraud – has not been criminally charged. Thus, it is reasonable to conclude that the information and material obtained by the FBI (and subsequently shared with the FTC) reveals no evidence of fraud or other criminal conduct on Ms. Landeen's part. Yet, the FTC relies upon the alleged fraud of Landeen in an effort to sustain its burden of proof against BSG.

With respect to the deposition of Special Agent Percival, the FTC's Show-Cause Motion is predicated to a great extent upon Special Agent Percival's Declaration, which we are including for your reference. Special Agent Percival's Declaration makes clear that his Declaration does not reflect all of the information that he learned from his investigation. In Paragraph 6 of his Declaration, he states that "...I have not included each and every fact known to me concerning this investigation." Thus, Special Agent Percival has underscored that he has information that is relevant to the FTC's allegations that is not reflected in his Declaration. BSG needs to know what that information is so that it can thoroughly investigate the factual bases for the FTC's allegations and prepare a defense.

If you believe that you need additional information from BSG in order to respond to its requests, please let me know.

Sincerely,

LEWIS WAGNER, LLP

DINA M. COX

Enclosures
\\lwfilesrv\DOCS\17802\6 - FTC\Correspondence\FBI Touhy letter.docx

501 INDIANA AVENUE • SUITE 200 • INDIANAPOLIS, INDIANA  46202-6150 • 317.237.0500 • 800.237.0505 • F: 317.630.2790 • www.lewiswagner.com

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

_____

**FEDERAL TRADE COMMISSION**,

                   Plaintiff,

vs.

**HOLD BILLING SERVICES, et. al**.

                   Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)

**Case No. SA-98-CA-0629-FB**

<u>**FACT APPENDIX IN SUPPORT OF MOTION FOR AN ORDER TO SHOW CAUSE WHY BILLING SERVICES GROUP LIMITED; BILLING SERVICES GROUP NORTH AMERICA, INC.; HBS BILLING SERVICES COMPANY f/k/a HOLD BILLING SERVICES, LTD.; ENHANCED BILLING SERVICES, INC.; BILLING CONCEPTS, INC.; and ACI BILLING SERVICES, INC., SHOULD NOT BE HELD IN CONTEMPT**</u>

The Federal Trade Commission ("FTC"), pursuant to Local Rule CV-7(c), submits this Fact Appendix in support of its Motion for an Order that Billing Services Group Limited ("BSG Ltd."); Billing Services Group North America, Inc., f/k/a HBS, Inc. ("BSGNA"); BSG Clearing Solution North America, LLC ("BSG Clearing"); HBS Billing Services Company f/k/a Hold Billing Services, Ltd. ("HBS"); Enhanced Billing Services, Inc. ("ESBI"); Billing Concepts, Inc. ("BCI"); and ACI Billing Services, Inc. ("ACI") (collectively, "Contempt Defendants" or "BSG") show cause why they should not be found in civil contempt of the Stipulated Final Judgment and Order for Permanent Injunction as to Defendants Hold Billing Services, Ltd., HBS, Inc., and Avery Communications, Inc., issued by the Court on September 22, 1999.

1

("Permanent Injunction") [DE39, Permanent Injunction]. [1]

## LEC Billing and the History of Cramming

1.      In the late 1990s, consumer complaints surfaced about a practice that became known as "cramming": the placement of unauthorized charges by third parties on consumers' Local Exchange Carrier ("LEC") telephone bills. Wolfe Att. A, [Senate Commerce Committee, Office of Oversight and Investigations, Majority Staff Report, *Unauthorized Charges on Telephone Bills* (July 12, 2011), pp. i, 2-4]. LECs are telephone companies, such as AT&T and Verizon, through which consumers receive local telephone service. *Id.* at 8-9. The relevant parties to the practice are LECs, the consumers who receive their local phone service through the LECs, third-party vendors who wish to charge for their purported goods or services on LEC telephone bills, and the billing aggregators. *Id.*

2.      Billing aggregators serve as intermediaries between the vendors and the LECs. *Id.* Aggregators contract with the LECs for billing and collection, and they contract with vendors to submit vendors' billing applications to the LECs. *Id.* If a vendor is granted billing privileges, billing aggregators pass the charges from the vendor to the LEC for placement on its customers' bills. *Id.* at 9. After receiving the LEC bills, consumers pay the vendor's charge as part of their total phone bill payment. *Id.*

---

[1] The citation conventions for facts cited herein and filed herewith are as follows: Declarant's last name, paragraph number in the declaration (if applicable), attachment # (where # is a letter referred to in the declaration), [description of document (if applicable), and specifically identified document, including page number or Bates number]. Additionally, citations to documents already on the docket in this case are as follows: [DE (for Docket Entry), document number, document description, paragraph number within the document (if applicable)]. The short citation form "*id.*" refers to the same declaration and attachment as in the previous citation, with references to specific documents or page numbers given if applicable. Certain documents have been redacted to remove references to an individual's phone or fax number, complaint ID number, street address, or email address; names of minor children; account numbers; and any portion of a Social Security number.

3.      As a result of consumers' cramming complaints, the FTC filed several law enforcement

actions in the 1990s, including the action that lead to the entry of the Permanent Injunction

against Avery Communications and its billing aggregator subsidiaries, HBS, Inc., and Hold

Billing Services, Ltd.

**Entry of the Permanent Injunction**

4.      This Court entered the Permanent Injunction on September 22, 1999.  The Permanent

Injunction named, among other parties, Hold Billing Services, Ltd. ("Hold"), a Texas limited

partnership; HBS, Inc., a Texas corporation; and Avery Communications, Inc. ("Avery"), a

Texas corporation.  [DE39, Permanent Injunction].

5.      At the time the Permanent Injunction was entered, Avery held HBS, Inc., as a wholly

owned subsidiary, and HBS, Inc. was the sole general partner of Hold.  [DE 1, Complaint ¶¶

5-7].

**Formation of the BSG Enterprise**

6.      After entry of the Permanent Injunction, Hold was converted into a Texas corporation

and renamed HBS Billing Services Company ("HBS").  Wolfe Att. B, [HBS Compliance

Report, p. 15].  HBS reported this change in the Compliance Report it submitted to the FTC

on May 22, 2000, as required by the Permanent Injunction, stating that the change would not

"affect its compliance obligations arising out of the Order" and "does not effect [sic] the

continuity of the legal entity under Texas law."  *Id*.

7.      Also after entry of the Permanent Injunction, HBS, Inc. merged into Delaware

corporation Thurston Communications Corporation ("Thurston Corp.").  *Id*. at 15-16.

Thurston Corp. reported this change to the FTC in the May 22, 2000, Compliance Report,

stating that it "had no corporate structure changes that would affect its compliance obligations arising out of the Order." *Id.*

8.    The relationships between the three defendants remained essentially unchanged.  Avery reported in the 2000 Compliance Report that it was still the sole owner of the two subsidiaries, "although such entities now operate under different names." *Id.* at 16; *see also* Wolfe Att. C, [Avery's Amended Schedule 14C, filed with the Securities and Exchange Commission on February 13, 2003, p. 26] ("Through its operating subsidiaries, HBS Billing Services Company and ACI Billing Services ('ACI'), Avery provides billing and collection services."); *id.* at p. F-58 (disclosing the Permanent Injunction).[2]

9.    In 2003, Avery, Thurston Corp., and HBS merged with billing aggregator Billing Concepts, Inc. ("BCI"), to form BSG.  Wolfe Att. D, [Contribution Agreement, III.B.5 – 000009-69].[3]  In the merger, Avery contributed all of the stock of Thurston Corp. to Billing Services Group, LLC ("BSG, LLC"), making Thurston Corp. (f/k/a HBS, Inc.) a wholly owned subsidiary of BSG, LLC.  *Id.* at [Contribution Agreement, III.B.5 – 000014, 23-24, ¶2.4(a); Senior Subordinated Loan Agreement, III.B.5. – 000308].  Thurston Corp. then contributed all the stock of HBS to BCI Acquisition, LLC ("BCI Acquisition"), and received all the stock of BCI Acquisition, making BCI Acquisition a wholly owned subsidiary of Thurston Corp.  *Id.*  BCI Acquisition also received all the stock of Avery's subsidiary ACI, BCI, and Enhanced Services Billing, Inc. ("ESBI").  *Id.* at [Senior Subordinated Loan

---

[2] In 2001, Avery "through its wholly owned subsidiary ACI Billing Services, Inc. ("ACI"), completed the acquisition of certain assets of OAN Services, Inc. ("OAN")." *Id.* at p. F-24. OAN was also a LEC billing aggregator.  *Id.*

[3] BCI and its subsidiary Enhanced Services Billing, Inc. ("ESBI"), stipulated to a permanent injunction as a result of alleged cramming in 2001.  *United States v. Enhanced Services Billing Inc., et. al.*, 01-CV-1660 (D.D.C. Aug. 9, 2001).

Agreement, III.B.5 – 000309].  The resulting corporate structure placed BSG, LLC, at the top; Thurston Corp. below BSG, LLC, as its wholly owned subsidiary; BCI Acquisition under Thurston Corp., BCI Acquisition's sole member; and HBS, ACI, BCI, and ESBI at the bottom as wholly owned subsidiaries of BCI Acquisition.

10.     Agreements that effectuated the merger disclosed the Permanent Injunction, and all parties to the merger signed the documents and had notice.  *Id*. at [Contribution Agreement, III.B.5 – 000184, Part 3.15(c); Senior Subordinated Loan Agreement, III.B.5 – 000308-9, 317, 370, 386, 408].  In 2005, BSG provided these documents in response to an FTC Civil Investigative Demand that specifically requested documents related to the Permanent Injunction.  *Id.* at [CID Specifications, p. 7, document request 3].

11.     In June 2005, the BSG companies became publicly traded on the AIM market of the London Stock Exchange.  Goldstein Att. A, [Admission to trading on AIM, p. 1-2].  BSG accomplished this by creating Billing Services Group Limited ("BSG Ltd."), a Bermuda limited partnership, which was "formed to succeed to the business of" BSG, LLC, and its subsidiaries.  *Id*. at [BSG's 2008 annual report, p. 22; BSG's 2009 annual report, p. 26].

12.     In December 2005, Thurston Corp. (known as HBS, Inc., at the time of the permanent Injunction) again changed its name to Billing Services Group North America, Inc. ("BSGNA"), and BCI Acquisition changed its name to BSG Clearing Solutions North America, LLC ("BSG Clearing").  *Id*. at [BSG Disposal of Wireless Business, p. 14].  BSG then sold its overseas wireless billing subsidiaries, leaving BSGNA as its sole asset.  *Id*. at pp. 1-15; Wolfe Att. E-32, [BSGRESPXVI00002747].  BSG thus assumed its current corporate structure and nomenclature.  *Id*.

**BSG Operates as One Enterprise**

13.     Following the 2003 merger, the BSG companies integrated their operations.  This "operational merger" took place in the summer of 2004.  Wolfe Att. F, [Deposition of Greg Carter, p. 23 lines 18-23];[4] Goldstein Att. B, [BSG Description of Business] ("The company has approximately 120 employees with headquarters in San Antonio, Texas.").

14.     A single board of directors acts on behalf of all the BSG companies.  Goldstein Att. A, [BSG's 2008 annual report, p. 11].  The same individuals serve as officers for all of the entities.  *Id.* at p. 4; Wolfe Att. F, [Deposition of Greg Carter, p. 20 lines 4-25].  CEO and Executive Director Greg Carter serves as both an officer and a director, as did CFO Norman Phipps until December 31, 2007.  Goldstein Att. A, [BSG 2009 annual report, p.4]; Wolfe Att. E-23, [BSG00087216, 87221].  The entities file consolidated financial statements with each annual report.  *E.g.*, Goldstein Att. A, [BSG's 2009 annual report, pp. 18-48].

15.     BSG has only one roster of employees.  Wolfe Att. F, [Deposition of Greg Carter, p. 20 lines 4-25].  The enterprise's employees perform the same functions regardless of which subsidiary is nominally involved in a particular transaction or activity.  *Id.* at [p.17 lines 5-10]; *see also* ¶¶ 60-61, 64, 67, 69, 83-86, 92, *infra*.  BSG houses all of its employees in and conducts all of its business from its offices in San Antonio, Texas.  Wolfe Att. F, [Deposition of Greg Carter, p. 25 lines 1-16]; *see also* Goldstein Att. B, [BSG Description of Business].

16.     In practice, BSG does not differentiate between its billing subsidiaries:  HBS, ESBI, ACI, and BCI.  Wolfe Att. F, [Deposition of Greg Carter, p. 19 line 17 – p. 20 line 12].  As BSG CEO Carter testified, subsidiary BCI is unique only in that it employs all the BSG personnel,

---

[4] BSG Clearing, ACI, and BCI agreed to a permanent injunction restricting unauthorized billing of telecommunications services in 2008 in *FTC v. Nationwide Connections*, Civ 06-80180 (S.D. Fla.), in which the FTC alleged cramming of $34.5 million in charges for collect phone calls that were never made.  Wolfe Att. A, [Senate Majority Staff Report, *Unauthorized Charges,* p. 5].

and "the other identities are just that. They're contracts and identities on the local telephone bill." *Id*. at [p. 20 lines 13-21]. Standard contracts between the billing subsidiaries and BSG's customers provide that the contracts may be freely assigned among BSG's subsidiaries. Wolfe Att. E-27, [BSG_Resp.-II-p.00000022]; Wolfe Att. E-28, [BSG_Resp.-II-p.00000131, 150]; Wolfe Att. E-29, [BSG_Resp.-II-p.00000245, 306]; Wolfe Att. E-30, [BSG_Resp.-II-p.00000342, 374]; Wolfe Att. E-31, [BSG_Resp.-II-p.00000402, 442]. CEO Carter signed these billing contracts for BSG regardless of which subsidiary's name was on them. *Id*. at [BSG_Resp.-II-p.00000012 (ESBI), 235 (ESBI), 296 (ESBI), 332 (BCI), 364 (BCI), 392 (ACI), 432 (ACI)]. Similarly, when the BSG companies entered loan and guaranty agreements in 2011, CFO Phipps signed the loan for BSGNA and the guaranty agreements on behalf of each of BSGNA's subsidiaries. Goldstein Att. B, [BSGNA Credit Agreement, June 30, 2011; Guaranty Agreements, June 30, 2011]. Phipps also signed the tax-sharing agreement as CFO of BSGNA and of each billing subsidiary. Wolfe Att. E-22, [BSG00086897-902].

17.     A single billing and collection contract with a LEC (like Verizon or Embarq) applies to the billings for all of BSG's subsidiaries. *See* Wolfe Att. G-1, [Billing agreements with Embarq and Verizon, filed as DE23-9 in *Lady Di's, Inc v. ESBI*, Case No. 10-3903 (7th Cir.)].

18.     BSGNA, the enterprise's North American parent company, controls its subsidiaries BSG Clearing, HBS, ESBI, ACI, and BCI. In loan documents executed in 2011, BSGNA acted as the borrower and its subsidiaries acted as guarantors. Goldstein Att. B, [BSGNA Credit Agreement, June 30, 2011; Guaranty Agreements, June 30, 2011]. In those documents, BSGNA promised to perform various tasks as follows: "Borrower shall, and shall cause each

of its Subsidiaries to" . . . "maintain insurance," "to discuss its business operations with its officers, employees, and…accountants, in each instance at [BSGNA]'s expense," and "to comply in all material respects with all applicable laws, rules, regulations, orders, and decrees of any Governmental Authority or arbitrator." Goldstein Att. B, [BSGNA Credit Agreement, June 30, 2011, pp. 28-29]. BSGNA also files a single, consolidated tax return on behalf of itself and all of its subsidiaries. Wolfe Att. E-22, [BSG00086896-934].

19.    BSG Ltd. retains its ability to set policy for BSG. BSG Ltd. authorized the funding that supports BSGNA's billing activities. Goldstein Att. B, [2011 credit agreement, p. 20 § 5.1(a); BSG Ltd.'s Bye-Laws, pp. 28-29]. BSG Ltd.'s board of directors are responsible for BSG's "system of internal control," including "both financial and non-financial controls," and "seeks to continuously assess the risks to which it is exposed and to take appropriate steps to mitigate or eliminate those risks wherever possible." Goldstein Att. A, [BSG's 2008 annual report, p. 12; BSG's 2009 annual report, p. 15]. BSG's board of directors "agreed to a schedule of items that are specifically reserved for its consideration, which is reviewed on an annual basis….[and] includes setting and monitoring strategy, reviewing trading performance, guiding business development, examining acquisition possibilities and approving reports to shareholders." *Id.* at [BSG's 2008 annual report, p. 11; BSG's 2009 annual report, p. 14]. BSG Ltd.'s board also approves the annual budget. *Id.* The board also commissioned audits that included BSG's billing operations, and established an audit committee that made recommendations on the scope of the audits. *Id.*; *see* Wolfe Att. E-23, [BSG00093255, 94682, 97265] (audit committee meetings), Wolfe Att. E-22 [BSG00086935-83] (Ernst & Young audit), Wolfe Att. E-32, [BSGRESXVIIII00002747-64] (Accenture audit). BSG Ltd.'s bylaws allow it to pass a resolution to wind up its affairs and

distribute its assets among its shareholders.  Goldstein Att. B, [BSG Ltd.'s Bye-Laws, p. 39].

BSG Ltd.'s only asset is BSGNA.  *See* ¶ 12, *supra*.

**BSG Accepts Enhanced Billing Records from Vendors, and Places Them with LECs to Bill
Their Telephone Customers**

20.    BSG "enables third-party service providers [vendors] to include their charges on the

telephone bills of LECs."  Wolfe Att. A, [Comment of Billing Concepts, Inc., *In re:*

*Empowering Consumers to Prevent and Detect Billing for Unauthorized Charges*

*(Cramming)*, FCC CG Docket 11-116, (filed Oct. 24, 2011), p. 1].

21.    Vendors can bill charges for "enhanced" or telecommunications services through BSG in

the name of its billing subsidiaries.  *Id*. at pp. 1-3.

22.    "Enhanced" services are those products or services unrelated to the completion of a call,

such as web hosting, directory listings, and e-mail services.  Wolfe Att. G-2, [Deposition of

Cathy Coleman-Ackerman, filed as DE35-7 in *Lady Di's, Inc v. ESBI*, Case No. 10-3903 (7th

Cir.), pp. 55-57; Deposition of Denise DeSilva, filed as DE23-7 in *Lady Di's, Inc v. ESBI*,

Case No. 10-3903 (7th Cir.), pp. 26-27].

**BSG Only Requires Data Fields, Not Actual Consumer Authorizations, Before Submitting
Enhanced Services Charges for Billing**

23.    Vendors interact with BSG through its Webtrack® system, where vendors log in and

deliver file data to BSG's subsidiaries and access BSG's reports.  Wolfe Att. G-2,

[Deposition of Cathy Coleman-Ackerman, pp. 29-30].[5]

24.    BSG gives all its vendors a handbook that contains the requirements for submitting

billing data to BSG.  *Id*. at [Deposition of Cathy Coleman-Ackerman, p. 30]; *see also id.* at

---

[5] Ms. Coleman-Ackman testified about subsidiary ESBI, the named defendant in that action;
however, she made clear that the Webtrack file-delivery and reporting system serves all of
BSG's billing subsidiaries. *Id.* at p. 30.

[BSG LEC Billing Carrier Handbook, filed as DE23-7 in *Lady Di's, Inc v. ESBI*, Case No. 10-3903 (7th Cir.), pp. 8-43].

25.     BSG requires that vendor records submitted for placement on LEC telephone bills be in a particular electronic format. *Id.* at [Deposition of Cathy Coleman-Ackerman, p. 38]. BSG treats a charge as "authorized" by the consumer when a particular field in that format is populated with the number "4." *Id.* at [Deposition of Cathy Coleman-Ackerman, pp. 38-43, 55-56].

26.     If the record is missing any digits in the required data fields, then the charge is rejected. *Id.* at [Deposition of Cathy Coleman-Ackerman, p. 63 line 9 – p. 65 line 4].

27.     At the time the vendor presents the billing records to BSG, the only consumer "authorization" information possessed by BSG, other than the data field populated with the number "4," is its subsidiary's contract with the vendor, which requires that the vendor send only authorized charges. *Id.* at [Deposition of Cathy Coleman-Ackerman, p. 65 lines 5-19].

**BSG and Its Subsidiaries Have Long Provided Billing and Collection of Unauthorized Charges for Businesses Run by Cindy Landeen**

28.     Cindy Landeen was an officer of a company known as Innovative Calling Technologies, later known as Phonebillit, Inc., a voicemail service which billed through ESBI from 2002 until mid-2005. Wolfe Att. D, [BSG 2005 CID Response, III.B.13.a – 000716-719, III.B.13.d – 001696-98].

29.     In 2002, ESBI monitored consumers' calls to Phonebillit complaining of unauthorized charges, notifying Landeen that her company was receiving excessive cramming complaints, and was suspended by PAC Bell. *Id.* at [III.B.13.d – 001889-90].

30.     In 2003, ESBI notified Landeen that BellSouth reviewed a sales recording from a Phonebillit sale and found that the telemarketer's pitch differed from the script submitted to

BellSouth for approval. *Id.* at [III.B.13.d – 001815]. Because of the discrepancy, BellSouth suspended new billing for Phonebillit. *Id.*

31.    In March 2005, ESBI notified Landeen that Phonebillit exceeded Qwest's 15% credit threshold (percentage of dollars credited versus dollars billed) for three straight months, with ratios of 42.9%, 27.2%, and 21.8%. *Id.* at [III.B.13.d – 001933-34].

32.    Landeen's involvement in the LEC billing operation and break-up of Phonebillit is the subject of a reported federal court decision. *Landeen v. Phonebillit, Inc.*, 519 F. Supp. 2d 844 (S.D. Ind. 2007). Christian Henderson's involvement as Phonebillit's marketer is also detailed in the decision. *See id.* at 853-54 (Landeen contended that Henderson's "marketing was not appropriate because of issues that had arisen with the Texas Public Utilities Commission and a Verizon cramming complaint").

33.    When Landeen resigned from Phonebillit in 2005, she wrote to BSG employees that she would return to the LEC billing industry. Wolfe Att. D., [III.B.13.d – 001995] ("I plan on being in the LEC business one way or the other and I can guarantee that you have not seen the last of me!").

## MyIproducts

34.    Later in 2005, Cindy Landeen did return to LEC billing through BSG with associate Timothy Durham and an entity called Durham Technology, LLC. Wolfe Att. E-11, [BSG00036085]; Wolfe Att. E-29, [BSG_Resp.-II-p.00000296-320].

35.    On its billing agreement with ESBI, Durham Technology listed its address as 111 Monument Circle, Suite 4800, Indianapolis, Indiana, the same address used by Phonebillit. *Compare id.* at [BSG_Resp.-II-p.00000296] *with* Wolfe Att. D, [III.B.13.a – 000716-719]; *see also* Wolfe Att. E-14, [BSG0004931-6] (Landeen reminded BSG of her connection to

Phonebillit).

36.    In late 2005, Landeen communicated with BSG about the LECs' billing approvals for Durham Technology to bill in the name of MyIproducts Imail.  Wolfe Att. E-21, [BSG00078447-8].  BSG approved and started billing for MyIproducts in December 2005. Wolfe Att. E-14, [BSG00049527-8].

37.    Landeen's communications with BSG about MyIproducts' additional LEC approvals continued into 2006.  *Id*. at [BSG00049397].

38.     MyIproducts Imail purported to offer a voicemail service where messages could be accessed via phone or the Internet.  Wolfe Att. E-18, [BSG00054491].[6]

39.    Soon after MyIproducts began operating, consumers complained to Landeen's company Alternate Billing Corp ("ABC") about MyIproducts' billing.  Wolfe Att. E-14, [BSG00049409-15, 49386-90, 49376-83].  ABC handled the customer service calls for MyIproducts, and BSG frequently monitored those calls.  *Id*.

40.    In early 2006, BSG employees noted MyIproducts was not issuing billing credits to consumers even when consumers denied all knowledge of the billings or said they never ordered the service.  *Id*. at [BSG00049494-5].

41.    In March 2006, BSG employee Denise DeSilva questioned Landeen's failure to issue credits for unauthorized billing just because the consumer's information matched the information ABC had on file.  Specifically, DeSilva asked, "How can you ensure that the person that is billed for the service is the one that hit the enter key?"  Wolfe Att. E-6, [BSG00019025-26].

_____

[6] Durham also billed consumers for MyIproducts via another billing aggregator (not related to BSG), ILD Teleservices of Ponte Vedra, FL.  Wolfe Att. H, [ILD Subpoena Response, pp. 0001-4].  Durham also billed two other products via ILD, SafeguardMyCredit and NeedTheInfo.  *Id.*

-12-

42.     In May and June, BSG warned Landeen that ABC was failing to credit consumers for unauthorized MyIproducts charges on their phone bills.  Percival Att. A, [1B056_ITEM 57-BINDER JUNE-MAY-MARCH-FEB 06, pp. 000177-82, 000186-91].

43.     In June, BSG's LEC relations manager, Sally Welge, informed Landeen that 154 Verizon customers had made cramming complaints about MyIproducts, and Welge requested an action plan to address them.  Wolfe Att. E-14, [BSG00049546-48].

44.     In July 2006, BSG again notified Landeen that it had monitored her call center and that her company was failing to issue credits.  Percival Att. A, [1B056_ITEM 57-BINDER JUNE-MAY-MARCH-FEB 06, pp. 000001-3].

45.     Also in July, BSG employee Melissa Covarrubias notified Landeen of another 103 Verizon cramming complaints, that her action plan failed to reduce complaints, and that MyIproducts was "over the threshold for two months in a row."  Wolfe Att. E-14, [BSG00049554-6].

46.     In July 2006, BSG scheduled a meeting with Cindy Landeen, Tim Durham, and attorney Gary Sallee in San Antonio because MyIproducts was on the "verge of getting suspended in the Verizon region."  Wolfe Att. E-11, [BSG00037238].

47.     At the end of August 2006, BSG notified Landeen that for the last 3 months, MyIproducts had exceeded BSG's threshold for allowable customer service inquiries (versus bills sent), writing that MyIproducts' inquiry rate was "higher than our target of 10% inquiry."  Wolfe Att. E-6, [BSG00019616-17] (showing monthly billing inquiry rates of 28%, 24%, and 16% respectively).[7]  In the same month, Southwestern Bell informed BSG

---

[7] Meanwhile, billing aggregator ILD applied to bill Verizon's customers for MyIproducts, but Verizon refused because of "a recent problem with cramming complaints under this subCIC[.]" Wolfe Att. H, [ILD Subpoena Response, pp. 0581-82].

that MyIproducts had crammed a phone line belonging to Southwestern Bell's vice president. Wolfe Att. E-5, [BSG00009895].

48.     At the end of 2006, MyIproducts again exceeded BSG's customer service inquiry threshold (which BSG had by then raised to 12.5%) with 2,794 consumer inquiries for a ratio of 12.68% in October and 5,623 such calls for a ratio of 19.92% in November.  Percival Att. B, [1B501_ITEM 32-CINDY'S PAPERS, pp. 000007, 9]; Wolfe Att. E-6, [BSG00019638-40].  On both of these occasions, BSG requested a sample of 30 Letters of Authorization ("LOAs"), which are documents demonstrating consumers' assent to be billed.  BSG stated that, "since Internet marketing is also utilized, BSG requires the website creative or landing pages that were used during each end user's sign-up process," *i.e.*, pages consumers had allegedly navigated to on the Internet to sign up for MyIproducts Imail.  *Id.*

49.     Consumer complaints about MyIproducts continued into 2007.  In January, BSG notified Landeen that Durham Technology had again exceeded BSG's 12.5% inquiry threshold in December 2006, with 4,843 calls from consumers for a ratio of 13.52%.  Wolfe Att. E-7, [BSG00026863-64].  Again, BSG requested LOAs and landing pages.  *Id.*

50.     In February, BSG notified Landeen that Durham Technology exceeded the threshold with 6,081 calls for a ratio of 18.1% during January.  Percival Att. B, [1B051_ITEM 32-CINDY'S PAPERS, p. 000020].  Again, BSG requested LOAs and landing pages from Landeen.  *Id.*

51.     At the end of February, BSG notified Landeen of 73 Verizon cramming complaints against MyIproducts, where "end-users contacted Verizon to deny all knowledge of the product and/or signing up for the service."  Wolfe Att. E-20, [BSG00068166-69].  In March 2007, BSG notified Landeen of 91 such cramming complaints by Verizon customers.  *Id.* at [BSG00068244-7].

52.     In April, May, and June 2007, BSG notified Landeen that MyIproducts had surpassed

BSG's threshold for billing inquiries, and generated 8,398, 7,798, and 7,616 complaint calls

that breached the 12.5% threshold each month at 19.7%, 16.19%, and 17.89% respectively.

Wolfe Att. E-6, [BSG00024052-53, 24058-59, 24088].  Even though BSG nominally

requested the landing pages each time it sent these notifications, BSG produced no document

showing that anyone produced landing pages in response to those requests.[8]

53.     In June 2007, BSG notified Landeen that both Verizon and BSG wanted action plans to

address the cramming complaints.  Landeen responded not with a plan, but with denials of

the complaints and allegations that consumers filled out LOAs and agreed to the charges.  *Id.*

at [BSG00024014-8].

54.     Still, consumers' complaints of unauthorized billing continued to breach BSG's

threshold, with a whopping 9,363 calls (15.87%) from complaining consumers in October

2007.  Wolfe Att. E-20, [BSG00070794-95].[9]

---

[8] The FTC sent document requests to BSG for the following:

> 9.  All notifications sent by BSG (and all communications related thereto) that any entity
> identified in Request 6 [Durham Technology/MyIproducts, 800 Vmailbox, Digital VMail,
> EprotectID, EsafeID, InfoCall, Instant411, Streaming Flix, and Uvolve] has exceeded any
> complaint or inquiry threshold, including any threshold set by a LEC.

> 10.  All responses, including LOAs and landing pages, marketing materials, and other
> information (and all communications related thereto) provided to BSG regarding the
> notifications responsive to Request 9.

BSG responded by designating thousands of emails as responsive to this request, but none of
those emails appear to show that anyone sent landing pages "used in each end user's sign-up
process" in response to the threshold breach notifications.  *See also* Wolfe Att. E-32, [Accenture
BSG On-site Assessment, BSGRESPXVIIII00002754 ("Actual website not verified against the
approved material on file.")].

[9] Throughout 2007, BSG set the threshold at a ratio of 12.5% complaint calls to bills sent.  *See* ¶¶
49-52, *supra*.

55. Finally, that same month in 2007, Verizon notified BSG that it was terminating MyIproducts' ability to bill Verizon's customers "as they have not and will not bring cramming complaint level" down to meet Verizon's thresholds. *Id.* at [BSG00056583]. Further, Verizon stated that:

> "it would be irresponsible for Verizon to allow this service provider to continue billing."

*Id.* at [BSG00056585-6].

56. In response, BSG's LEC relations manager, Sally Welge, attempted to get Verizon to reconsider by sending a reinstatement plan authored by Landeen. *Id.* at [BSG00056621-27]. Landeen's plan attached an email from Christian Henderson promising to end a free coupon promotion, but stating that it could only end within 60-90 days "due to the number of publishers and websites currently running the campaign." *Id.* at [BSG00056627]. BSG's proposal for MyIproducts' reinstatement was to allow BSG to continue billing those 8,503 Verizon customers who had been billed for more than 6 months, and to make the termination, instead, into a suspension of new sales until inquiries were under the threshold. *Id.* at [BSG00056692-98].

57. Verizon rebuffed BSG's effort to reinstate MyIproducts because "in our ongoing discussions about internet marketing, co-registration marketing, and the like, these are exactly the programs that continue to generate cramming related complaints." *Id.* at [BSG00056672-82]. That, plus a 5-month analysis of MyIproducts' threshold breaches, "bolstered" Verizon's decision to terminate MyIproducts' ability to bill Verizon customers. *Id.* at [BSG00056672].

58. BSG continued to bill other LECs' customers for MyIproducts despite Verizon's termination of its billing privileges. Wolfe Att. E-32, [LEC Dilution Report,

BSGRESPVII00000001-2]; *see also* Wolfe Att. E-20, [BSG00057695-6, 59898-9] (subsequent threshold breaches by MyIproducts), Wolfe Att. E-13, [BSG00044790] (AT&T terminated BSG's ability to bill its customers for MyIproducts in March 2010).

59.     In February 2008, AT&T required an action plan from MyIproducts to address cramming complaints in the BellSouth region.  Wolfe Att. E-20, [BSG00071654-60].

**BSG Accepted More Billing Applications from Landeen in 2008**

60.     BSG sales representative Beth Kimball "went to see Cindy Landeen [on February 13, 2008] because we've been talking about adding two or 3 new companies/products for several months now." *Id*. at [BSG00062963-64].  Kimball informed BSG CEO Greg Carter that she was drafting the billing agreements.  *Id*.

61.     On March 5, 2008, Kimball told BSG CEO Carter that the potential agreements with Landeen "probably won't be under the Durham name, by the way." *Id*. at [BSG00062963]. Carter approved Kimball's request to waive the application fee and give the new contracts the same call-transfer fee that Durham Technology had in its contract to bill consumers for MyIproducts.  *Id*.  On March 10, 2008, Cindy Landeen wrote to BSG's Kimball that the "three companies to start" were eSafeID, Instant411, and Digital Vmail, and Christian Henderson would sign the contracts to bill through three different BSG subsidiaries.  Wolfe Att. E-11, [BSG00039448-51].[10]

62.     On April 24, 2008, aggregator ILD suspended billing for all new sales of MyIproducts and two other services with Tim Durham listed as President:  SafeguardMyCredit (ID theft

---

[10] In March 2008, BSG stipulated to another Permanent Injunction, this one prohibiting unauthorized billing for telecommunications services. *FTC v. Nationwide Connections*, Case No. 06-80180, Stipulated Permanent Injunction as to Billing Concepts, ACI Billing Services, and BSG Clearing [DE778] (S.D. Fla. 2008).  BSG's billing and collections detailed in this contempt motion are for "enhanced" services (recurring charges unrelated to the carriage of a phone call), and thus are not subject to that order.

protection) and NeedtheInfo (a 411 directory service).  Wolfe Att. H, [ILD Subpoena

Response pp.0002-3].  ILD later terminated SafeguardMyCredit and NeedtheInfo in

September 2008.  *Id.* at [ILD Subpoena Response p. 0001].

63.     Within weeks, Landeen sent BSG contracts that Durham and Henderson signed to bill for

seven new services, including the three she discussed with Kimball.[11]  Two were for

voicemail service providers, **800 Vmailbox**, **Digital Vmail**, with Christian Henderson

signing the agreements to bill through ESBI.  Wolfe Att. E-27, [BSG_Resp.-II-p.00000012-

37]; Wolfe Att. E-29, [BSG_Resp.-II-p.00000235-8, 245, 257-8].  The ID theft protection

service providers were **eSafeID** and **eProtectID**, with Henderson and Durham, respectively,

signing agreements with BCI.[12]  Wolfe Att. E-30, [BSG Resp.-II-p.00000332-350, 364-382].

In addition to an application for **NeedtheInfo**, Landeen also submitted directory assistance

services **Instant411** (Henderson) and **InfoCall** (Durham) to bill through ACI.  Wolfe Att. E-

31, [BSG_Resp.-II-p.00000392-415, 432-3, 442, 454-5]; Wolfe Att. E-23, [BSG00102765-7,

87-90].

64.     BSG CEO Greg Carter counter-signed the billing agreements with the following titles:

CEO of ESBI, Wolfe Att. E-27[BSG_Resp.-II-p.00000012], Wolfe Att. E-29, [BSG_Resp.-

II-p.00000235]; CEO of BCI, Wolfe Att. E-30, [BSG_Resp.-II-p.00000332, 364]; and CEO

of ACI, Wolfe Att. E-31, [BSG_Resp.-II-p.00000392-415, 432-3, 442, 454-5], Wolfe Att. E-

23, [BSG00102765].

---

[11] Documents found by the FBI when it executed search warrants at Landeen's business premises
in December 2010 show that employees were told they were "launching 7 new products" to
replace and "work the same as" the services suspended by ILD.  Percival Att. C, [1B071_ITEM
80-OLD MEMOS, p. 000233].

[12] Although these agreements were with BSG subsidiary BCI, the charges were actually billed by
HBS.  *E.g,* Wolfe Att. E-5, [BSG00003980, 4000].

65.    At the same time the proposed vendors signed the billing agreements, they also submitted

information about their proposed LEC-billed services on a BSG-supplied "iForm."  Wolfe

Att. E-24, [BSG_Resp.-I-p.00000021-60]; Wolfe Att. E-25, [BSG_Resp.-I-p.00000061-100,

122-140]; Wolfe Att. E-26, [BSG_Resp.-I-p.00000216-234].  These applications contained

blatant false statements, including Tim Durham's answer to Question 9: "Have you ever

submitted billings under a different business, company or marketing name? No."  Wolfe Att.

E-24, [BSG_Resp.-I-p.00000022]; Wolfe Att. E-25, [BSG_Resp.-I-p.00000062].

66.    The seven vendors' relationship to one another and to Cindy Landeen was apparent from

the start, and certainly well before BSG started billing for them.  Wolfe Att. E-11,

[BSG00039463] (BSG's Beth Kimball emailed Denise DeSilva and Melissa Mitchell

referring to eProtectID as "one of Cindy Landeen's accounts"); *id.* at [BSG00039464-71]

(Mitchell emailed DeSilva, attaching forms for NeedtheInfo, InfoCall, Instant411, 800

Voicemail, Digitial Voicemail, and stating "most of these are related/Cindy Landeen is doing

back office."), Wolfe Att. E-15, [BSG00054480] (Kimball emailed Roberta Trevino: "Do

you know if you are going to be the rep on the 7 new Landeen accounts for Christian

Henderson and Tim Durham yet?"); Wolfe Att. E-7, [BSG00027349-51] (Sherry Martinez

asked Landeen for a conference call regarding the marketing of all seven products).  In fact,

when some BSG employees were planning a due diligence site inspection at Tim Durham's

office, BSG employee Denise DeSilva wrote to them on October 30, 2008:  "I don't know if

you want to kick off a visit to Tim's office.  All of the 'moving parts' are happening at

Alternate Billing Corporation."  Wolfe Att. E-7, [BSG00027800-1].

67.    The same BSG employees handled the applications for all seven proposed vendors, even

though their agreements were nominally with separate BSG subsidiaries.  Wolfe Att. E-23,

[BSG00089246-7, 249-65].  The same BSG employees communicated with ABC, often in serial emails about the seven services, during the "due diligence" period between the signing of the billing agreements and the commencement of billing.  *See* Wolfe Att. E-16, [BSG00054481-5], Wolfe Att. E-17, [BSG00054486-9], Wolfe Att. E-18, [BSG00054490-1], Wolfe Att. E-19, [BSG00054492-7] (Cindy Landeen's son sent BSG's Denise DeSilva "3 separate emails containing the product profiles for each product type" (voicemail, directory service, ID products)); Wolfe Att. E-15, [BSG00054391-98, 54101-6], Wolfe Att. E-9, [BSG00027996-28004, 27971-9, 27980-8], Wolfe Att. E-8, [BSG00027960-8] (DeSilva sent identical emails telling ABC it was "free to launch your marketing" for eProtectID, InfoCall, Digital Vmail, 800 Vmailbox, and Instant411); Wolfe Att. E-10, [BSG00034081-95], Wolfe Att. E-7, [BSG00027802-21], Wolfe Att. E-8, [BSG00027822-36, 27837-51, 27852-66, 27867-86] (ABC employee Terri Chartrand sent consecutive emails attaching the services' completed due diligence files to BSG employee Denise DeSilva, with copies to Cindy Landeen).

68.     Those completed due diligence files stated that for each service "all operational aspects will occur" at ABC's offices in Minnesota.  Wolfe Att. E-10, [BSG00034091]; Wolfe Att. E-7, [BSG00027816]; Wolfe Att. E-8, [BSG00027825, 27843, 27855, 27876].  Denise DeSilva described the phrase "all operational aspects will occur" as meaning "basically, whomever is 'driving' the account."  Wolfe Att. E-10, [BSG00034078].

### BSG Learned the Vast Majority of Consumers Billed Would Not Use the Services

69.     On October 20, 2008, ABC employee Gabrielle Menne emailed Cindy Landeen and BSG employees Sherry Martinez and Roberta Trevino "contract info sheets" for NeedtheInfo, EprotectID, and InfoCall, each showing only a 20% expected product usage rate.  Wolfe Att.

E-20, [BSG00054512-18].  Those sheets also answered the question, "do you have any direct/indirect associations with any BSG contracts?" by disclosing MyIproducts.  *Id*. [13]

70.    That same day, Menne sent a similar email to Cindy Landeen and BSG employees Martinez and Trevino with a hyperlink to "contract info sheets" for "companies owned by Christian Henderson."  *Id*. at [BSG00054520].  When the FBI executed search warrants at ABC in December 2010, the FBI seized contract info sheets for those companies -- Instant411, eSafeID, Digital Vmail, and 800 Vmail.  Percival Atts. D- H, [1B057_ITEM 63-INSTANT 411 CA, 1B057_ITEM 63-INFOCALL, 1B057_ITEM 63-ESAFEID CA, 1B057_ITEM 63-DIGITAL VMAIL CA, 1B057_ITEM 63-800VMAILBOX CA].  Each showed estimated usage rates of 20% .  *Id*.

71.    After BSG received the contract info sheets disclosing the 20% expected usage, instead of rejecting the billing applications or questioning why so few billed customers would use the services, a BSG employee wrote:

> "mention to Cindy during your discussions that we appreciate her honesty on the estimated usage rate.  Please stress that usage is a very important issue right now with the regulatory agencies and she may at some time in the future need to produce usage information on each product."

Wolfe Att. E-8, [BSG00027922].  Denise DeSilva forwarded the email to Cindy Landeen and Terri Chartrand with a copy to BSG employees Sherry Martinez and Roberta Trevino. *Id*.

**BSG Continued to Bill for Crammers Despite Verizon's Termination of MyIproducts**

72.    During BSG's purported pre-billing due diligence in the summer and fall of 2008 for these seven services, BSG received word from competitor billing aggregator ILD Teleservices that it had terminated billing for one of the services, NeedTheInfo.  Wolfe Att.

---

[13] On September 29, 2008, BSG notified Cindy Landeen that AT&T (whose customers BSG was still billing) suspended MyIproducts from billing any newly signed-up AT&T customers in the Southeast region.  Wolfe Att. E-12, [BSG00040237].

E-11, [BSG00039495]; Percival Att. N, [FBI search warrant emails, 0000966-967]; *see also* Wolfe Att. H, [ILD Subpoena Response, p. 0001].

73.    In November 2008, BSG LEC Relations Manager Sally Welge sent an email to Verizon asking if Verizon had "terminated within the past 5 years any of the following (a) InfoCall LLC; (b) owners, officers, directors, consultants, and contacts with decision making authority listed below; or (c) any company currently or formerly owned by the Vendor's principals or owners listed below."  Wolfe Att. E-23, [BSG00100549-50].  Welge then then listed "Timothy Durham-President" and "Cindy Landeen" as "Consultant/Management Company." *Id.*  Verizon's reply to BSG was clear:

> "Verizon terminated processing for My IProducts Imail in September 2007.
> Mr. Durham was a principal of this company.  Verizon is not interested in
> allowing this company to submit charges for billing[.]"

*Id*.

74.    Two days later, Denise DeSilva wrote to Cindy Landeen (and copied BSG employees Melissa Mitchell, Sherry Martinez, and Roberta Trevino): "We were informed by Verizon that due [to] Tim Durham being associated with My I Products and the fact this account was suspended due to performance issues in 2007, they are choosing to not allow any billing related to… Needthe Info[,] eProtectID[,] InfoCall."  Wolfe Att. E-9, [BSG00028009].

75.    Within an hour came the response from ABC's Terri Chartrand, with a copy to her boss Cindy Landeen, that they "would like to go ahead without Verizon."  Wolfe Att. E-10, [BSG00034246].

76.    BSG allowed eProtectID and InfoCall to "go ahead without Verizon" and billed other LECs' customers for these three services (Wolfe Att. E-7, [BSG00027495], Wolfe Att. E-32, [BSGRESPVII00000006-7]; *see also* Genetski ¶ 8, Att. D) despite Verizon's refusal to bill,

the services' connection to Tim Durham, Landeen's connection to MyIproducts, and that "all of the moving parts" for these services were happening at Landeen's place of business.

77.    BSG also permitted 800 Vmailbox, Digital Vmail, EsafeID, and Instant411 to bill, even though their contract signator Christian Henderson had done the marketing for MyIproducts, and he submitted a letter at BSG's request stating that Cindy Landeen would "manage and oversee all the operations" for 800 Vmailbox, Digital Vmail, EsafeID, and Instant411. Wolfe Att. E-8, [BSG00027928-34]; Percival Att. H, [800 VMAILBOX CA, p. 108]; *see also* Wolfe Att. E-27, [BSG_Resp.-II-p.00000102-5] (Landeen later signed amendments to Digital Vmail's and 800 Vmailbox's billing agreements with BSG).

78.    BSG's approval of billing for services run by Cindy Landeen, Christian Henderson, and Tim Durham after it knew of their involvement in cramming and termination by a major LEC contradicts BSG's past testimony about its due diligence process.  In 2007, in a deposition in *FTC v. Nationwide Connections*, BSG CEO Greg Carter testified under oath that "BSG screens potential vendors to eliminate certain vendors that BSG doesn't want to enter into a service contract with," such as "[a]ny known entity or organization, company that has had issues or problems with third-party billing in the past."  Wolfe Att. F, [Deposition of Greg Carter, p. 76].

79.    Indeed, despite Landeen's cramming history and her involvement with all of the services, the only one of the seven services BSG refused to bill was NeedtheInfo, and that was nominally based upon its "performance" at billing aggregator ILD, rather than its connections to MyIproducts, which Verizon terminated.  Wolfe Att. E-15, [BSG00054273-4]; *see also* Wolfe Att. E-8, [BSG00027958-9] (BSG's general counsel stating NeedTheInfo will be the only service of the seven Landeen applied for in 2008 that would not be approved

for billing).

## BSG Approved Yet Another Landeen Application in 2009

80.     In early 2009, Landeen, Durham, and Henderson proposed yet another service to be

billed through BSG.  On February 8, 2009, BSG's Melissa Mitchell thanked Cindy Landeen

for coordinating a meeting at Tim Durham's suite in Las Vegas, but asked, "which company

was executing the agreement? Will this me [sic] a new agreement between BSG and National

Lampoon? Or will it a new [sic] B2P agreement between Durham Technologies and BSG

and the subCIC (National Lampoon) will be under the Durham agreement?"  Wolfe Att. E-

11, [BSG00039742].

81.     Within the week, Landeen clarified that the name of service provider would be Streaming

Flix, LLC, and that Landeen, Durham, and Henderson would be its members.  Wolfe Att. E-

13, [BSG00048166]; Wolfe Att. E-10, [BSG00032536-7]; Wolfe Att. E-28, [BSG_Resp-II-

p.00000118-34, 138-39].  Streaming Flix would purportedly allow consumers to stream

movies to their home computers, and like the six services BSG approved in the fall of 2008,

all operations would occur at ABC's offices.  Wolfe Att. E-12, [BSG00040257-74].  It would

bill consumers through BSG subsidiary HBS.  Wolfe Att. E-5, [BSG00003980].

82.     Again, BSG noted that actual usage of the service was crucial.  BSG's general counsel

wrote to Landeen:

> "Usage data has become a sensitive subject for the LECs, regulatory agencies,
> and BSG.  What we need to confirm is that Streaming Flix will be able to
> identify the consumers that downloaded movies, types of movies, date of
> usage, etc.  This data is very helpful in showing that the consumer did in fact
> use the service that they were charged for."

Percival Att. N, [FBI search warrant email 0001046].

**Billing for Landeen's Services Generated Thousands of Unauthorized Billing
Complaints**

83.     BSG approved six of Landeen's products – 800 Vmailbox, Digital Vmail, eSafeID,
        eProtectID, Instant411, and InfoCall – in November 2008.  Wolfe Att. E-8, [BSG00027960-
        68]; Wolfe Att. E-9, [BSG00027971-88, 27996-2800]; Wolfe Att. E-15, [BSG00054391-98,
        54101-06].  BSG approved Streaming Flix in May 2009.  Wolfe Att. E-9, [BSG00028353-
        60].[14]  Predictably, the results for consumers were disastrous.

84.     BSG started billing for each of these services in 2009 and soon racked up complaints
        from LECs, regulatory agencies, and consumers (once again) in excess of the inquiry
        thresholds set by BSG.[15]  Wolfe Att. E-20, [BSG00054811] (ABC emailed BSG's Roberta
        Trevino seeking an "allowance" or accommodation for threshold breaches for the initial
        months of billing for "our newest products"); Wolfe Att. E-7, [BSG00024678] (Landeen
        emailed BSG CEO Carter, saying she found AT&T's 50 complaint per month threshold
        "alarming.").  BSG notified Landeen and her employees that these new services breached
        BSG's 15% threshold month after month.  Wolfe Att. E-10, [BSG00033419]; Wolfe Att. E-
        12, [BSG00040310, 40532-38, 40829-33, 40850-54]; Wolfe Att. E-13, [BSG00042296-306,
        44484-86, 44492-4, 44497-99; 46280, 47107, 47769, 48068, 48071]; Wolfe Att. E-14,

---

[14] In late 2009, BSG received from Landeen an application to bill for Uvolve.  Landeen first
asked if this service, which purportedly provided a job search tool plus streaming instructional
videos, could be billed through Streaming Flix.  Wolfe Att. E-12, [BSG00040489]; *see also*
Wolfe Att. E-20, [BSG00073657-8] ("redo the marketing and focus on being able to stream the
tutorials.").  In April 2010, BSG approved a separate application signed by Landeen.  Wolfe Att.
E-28, [BSG_Resp.-II-p.00000140-41, 150, 158-59]; Wolfe Att. E-10, [BSG00034763-4].  BSG
billed Uvolve through HBS.  Wolfe Att. E-5, [BSG00008186-94].

[15] Some time between 2007 and 2009, BSG raised the permissible customer complaint call
threshold from 12.5% to 15%.  Although the FTC in discovery requested "all documents relating
to BSG's determination of appropriate or reasonable inquiry thresholds for enhanced services"
BSG did not provide documents explaining why the threshold went up from 12.5% to 15%.  In
any event, these services could not meet even a 15% threshold.

[BSG00052783-84]; Wolfe Att. E-20, [BSG00057831-2, 57835-6, 57695-96, 60010-24, 75458-59]; Percival Att. I, [1B068_ITEM 71 – BSG PERFORMANCE INDICATORS, pp. 000007-55]; *see also* Wolfe Att. E-10, [BSG00033413, 33439-40], Wolfe Att. E-13, [BSG00042307, 47614] (notifications that the services exceeded the permissible LEC and regulatory complaint thresholds).  Digital Vmail exceeded the threshold for eight straight months (April through November) in 2009, then again for two months (January and February) in 2010, with ratios ranging from 15.17% to 32.21%; and 800 Vmailbox exceeded it for seven of those same eight months (April, then June through November) in 2009 with ratios ranging from 16.59% to 38.39%.  Wolfe Att. E-12, [BSG00040310, 40535-6], Wolfe Att. E-14, [BSG00052783-4], Wolfe Att. E-20, [BSG00057831-2, 578]; Percival Att. I, [1B068_ITEM 71 – BSG PERFORMANCE INDICATORS pp. 000024-25, 28-29, 37, 39, 49-52].  Also in 2009, Instant411 and InfoCall exceeded the threshold for seven and eight straight months, respectively. Wolfe Att. E-10, [BSG00033419], Wolfe Att. E-12, [BSG00040537-8], Percival Att. I, [1B068_ITEM 71 – BSG PERFORMANCE INDICATORS pp. 000014, 21, 26, 33-34, 40-41, 44, 48, 53-54].[16]  The ID theft services exceeded the thresholds for five straight months with ratios ranging from 16.35% to 20.23% (eSafeID) and 18.76% to 20.65% (eProtectID). Wolfe Att. E-12, [BSG00040830, 40832], Percival Att. I, [1B068_ITEM 71 – BSG PERFORMANCE INDICATORS pp. 000022, 27, 31-32, 38, 42, 46-47]; *see also* Wolfe Att. E-6, [BSG00017267-68] (November 12, 2009, internal BSG email from Blanca DeLeon to Melissa Mitchell consolidating threshold breach ratios for the last 3 months for all 8 services and asking "what their plan of action will be").

---

[16] The high number of complaints about unauthorized billing is not surprising, as InfoCall and Instant 411 were to "work the same" as another Landeen service that simply gave consumers a toll-free number they could call to ask one of Landeen's employees to perform an Internet search.  Percival Att. C, [1B071_ITEM 80-OLD MEMOS, pp. 000030, 33, 233].

The total numbers of complaints included in these threshold breaches were: 11,348 about eSafeID, representing 23.84% of its "customers"; 6,922 about eProtectID, representing 12.64% of its "customers"; 25,893 about Instant411, or 25.2%; and 26,665 about InfoCall, or 27.1%. *Compare* Wolfe Att. E-10, [BSG00033419], Wolfe Att. E-12, [BSG00040537-8, 40830, 40832], Wolfe Att. E-13 [BSG00044497, 44499], Wolfe Att. E-20, [BSG00057835-6], Percival Att. I, [1B068_ITEM 71 – BSG PERFORMANCE INDICATORS pp. 000007-8, 14, 21-22, 26-27, 31-34, 38, 40-42, 44, 46-48, 53-54] *with* Genetski Att. D.

85.     From October 2009 through January 2010, and again in March and April of 2010, BSG notified ABC that inquiries about Streaming Flix greatly exceeded the 15% threshold with the following numbers of billing inquiries: 4,157 (25.42%); 7,469 (23.75%); 8,943 (22.42%); 13,907 (20.49%); 15,399 (16.05%); and 14,185 (18.3%). Percival Att. I, [1B068_ITEM 71 – BSG PERFORMANCE INDICATORS, pp. 000009, 19-20, 35]; Wolfe Att. E-13, [BSG00044108-9, 44492-4, 45089-91, 45273-4]. These complaint totals represented 25.67% of consumers BSG billed for Streaming Flix. *Compare id. with* Genetski Att. D.[17]

86.     In each of these threshold breach notices, BSG asked Landeen to provide, or (in the case of a third consecutive breach) allow BSG to retrieve, the billed consumers' LOAs, which purportedly demonstrated consumers' assent to be billed. Wolfe Att. E-10, [BSG00033419, 33413, 33439-40]; Wolfe Att. E-12, [BSG00040310, 40532-38, 40752-53, 40829-33, 40850-54]; Wolfe Att. E-13, [BSG00042296-307, 44108-9, 44484-86, 44497-99, 45089-91, 45273-4, 47107, 47614, 48068]; Wolfe Att. E-14, [BSG00052783-84]; Wolfe Att. E-20, [BSG00057695-96, 60010-24, 75458-59]; Percival Att. I, [1B068_ITEM 71 – BSG PERFORMANCE INDICATORS, pp. 000007-55]. The LOAs appear to be screen shots

---

[17] Uvolve breached the threshold twice, garnering 738 complaints. Wolfe Att. E-13, [BSG00047107, 48068].

showing what the consumers saw upon signing up for the service. *E.g.*, Wolfe Att. E-13, [BSG00040993-41083].  These LOAs had several fields purportedly filled in by consumers, a scroll bar next to terms and conditions of the service, and a very prominent "Order Now" button, making it appear that a consumer found the service's website, read the conditions, wanted the service, and clicked on the big Order button to order it. *E.g*, Wolfe Att. E-5, [BSG0008297-98]. [18]

87.     On several occasions in 2009 and 2010, BSG notified Landeen that the LOAs passed BSG's performance review while at the same time noting that the information consumers allegedly input in the LOAs did not contain specific security questions (e.g., mother's maiden name, or date of birth) that Landeen promised would be captured when consumers signed up. Wolfe Att E-15, [BSG00053815-47]; Wolfe Att. E-10, [BSG00032286]; Wolfe Att. E-10, [BSG00033429] ("we did not find a security question response field in the eLOA records."); Wolfe Att. E-21, [BSG00077966] (same); Wolfe Att. E-10, [BSG00033430] ("we noticed the records did not have a response to the security question."); Wolfe Att. E-21, [BSG00079770-72] (same); Wolfe Att. E-12, [BSG00040752-53] ("the eloa records submitted did not have a field or a response for those questions."); Wolfe Att. E-21, [BSG00081285] ("the eloas have a blank or n/a as the security response"); Wolfe Att. E-21, [BSG00081327] (same); Wolfe Att. E-21, [BSG00083046] ("we noticed that on several of the eloas the security response field for the mother's maiden name is blank.").  BSG's response to these discrepancies was simply to note that the Landeen/Henderson/Durham

---

[18] In the fall of 2009, AT&T notified BSG that it suspended Instant411 from marketing to its customers.  Wolfe Att E-13, [BSG00043580].  Around that same time, BSG's CEO Carter was negotiating to make Landeen a "reseller/agent" of BSG, apparently as a result of their "prior conversation" in Los Angeles.  Wolfe Att. E-7, [BSG00024782, 24386]; Wolfe Att. E-20, [BSG00073198-203].

marketing material submitted to the LECs for approval was "different than what we received via testing [of the LOAs]."  Wolfe Att. E-13, [BSG00041798].

88.     Time and again, consumers notified BSG that they had never seen the LOAs.  *See* Wolfe Att. E-2, [BSG00001594-1603] ("They have sent me a copy of what I supposedly filled out and sent to them.  Honestly, I have never seen this and did not send it in."); Wolfe Att. E-4, [BSG00002843-57] ("They said I ordered the service and had proof I ordered it.  I asked them to send proof.  What they sent was an order form which I never saw before."); Wolfe Att. E-3, [BSG00004726-29] (Verizon "advised me to call HBS Billing Service… they too told me I signed up for the account and sent me a typed up form … which had all my information.  My biggest concern is they sent me a form that I supposedly filled out on 11-11-09 which I had never seen before."); Wolfe Att. E-5, [BSG00005654-7] (Digital Vmail "said they would send the 'proof' they have of my order.  When it came it was apparent to me that I had never authorized it because the entire form was filled out in all lower case letters and I NEVER write that way."); Wolfe Att. E-4, [BSG00006389-95] (Instant411 "did send a copy of my supposed transaction to prove I had made this order.  However, it is in lower case, and I always capitalize proper nouns, including my own name."); Wolfe Att. E-21, [BSG00086522-4] ("They said they would cancel my subscription but I would still be responsible for the original $14.95.  When I started screaming and swearing at them they offered to email me a copy of the form I filled out.  I had never seen this form before.")]; *see also* Wolfe Att. E-4, [BSG0004471-4] ("I have contacted them, they will not disclose information on how I signed up.").  Still others who were billed would not have knowingly signed up, like medical device maker Boston Scientific or the owner of restaurant chains Hardee's and Carl's Jr., who patently had no need for directory assistance service.  Percival

Att. J (complaint from CKE Restaurants about InfoCall's billings); *see also* Wolfe Att. E-24, [BSG00016628] (BSG reviewed a recorded call showing that it had billed publicly traded Boston Scientific for months for directory service Instant411).

89.    In September 2009, BSG's performance indicator testing of MyIproducts' LOAs resulted in the following email from BSG's John Wardashki to Melissa Mitchell: "We noticed when reviewing the LOA records they did not have a response to the security question….If the client provides the maiden name provided for each bill number, we will add it to the August PI records."  Wolfe Att. E-21, [BSG00079770-72].  Again in November 2009, BSG spoke of "adding" the missing security question responses to MyIproducts' LOA records after reviewing them.  *Id*. at [BSG00079952].

90.    Further, just as it had done with MyIproducts in 2007, BSG again nominally "required" production of the landing pages each time it sent Landeen a notification that the products exceeded the thresholds.  *See, e.g.*, Wolfe Att. E-10, [BSG00033419]; Wolfe Att. E-12, [BSG00040310, 40532-38, 40850-54]; Wolfe Att. E-13, [BSG00042296-306]; Wolfe Att. E-20, [BSG00054811, 75458-59]; Percival Att. I, [1B068_ITEM 71 – BSG PERFORMANCE INDICATORS, pp. 000019-35, 37-42, 44-50].  Even though BSG nominally requested the landing pages each time it sent these notifications, BSG produced no document showing that that anyone produced landing pages in response to those requests.  See n.8, *supra*.  BSG therefore did not receive the marketing consumers actually saw before being enrolled in these services, nor, apparently, did BSG follow up on this failure to supply the pages consumers actually saw.

91.    Indeed, BSG does not appear to have questioned ABC about 800 Vmailbox's Internet "marketing paths" until the summer of 2009, but ABC provided no answer.  Wolfe Att. E-9,

[BSG00028561-65].  Finally, in January 2010, when BSG asked how a particular consumer would have seen a particular advertisement (for 800 Vmailbox), Landeen's company responded, "We do not track the signup specific information you are talking about."  Wolfe Att. E-13, [BSG00043957-58].

**BSG and Its Vendors Misrepresented What Consumers Saw When They Were Enrolled in the Services**

92.     Even though BSG knew that the LOAs it reviewed were inconsistent with the marketing approved by the LECs, that consumers were complaining that they had never seen the LOAs, and that continuing astronomical complaint levels were inexplicable in the face of the LOAs' clarity, BSG continued to supply the LOAs to Better Business Bureaus, and public regulatory authorities as proof of "authorization" by the customers.  *E.g.*, Wolfe Att. E-1, [BSG00000773-4, 854-5, 1039-41, 1043-48, 1140-46, 1264-5, 1341-3, 1380-1]; Wolfe Att. E-2, [BSG00001461-73 1502-1506, 1508-12, 1568-71, 1667-75]; Wolfe Att. E-3, [BSG00001726-31, 1807-9, 1837-47, 1849-61, 1939-46]; Wolfe Att. E-5, [BSG00001948-52, 3980-6, 4000-7, 8186-94, 8297-302].[19]

93.     In reality, consumers had never seen the LOAs.  Instead, they saw the Internet "offers" Christian Henderson's marketing company placed with website publishers.  *See* Oskoui ¶¶3, 5-7.  The offers appeared to be part of the sign-up process for an unrelated, free service or event, such as voting in a picture contest or obtaining a free email account.  Oskoui ¶6, Att. A and B.  As consumers clicked through the web pages related to these free events or services,

_____

[19] The same BSG employee sent the LOAs, no matter which BSG subsidiary billed the charge. *See* Wolfe Att. E-1, [BSG00000773-4 (ESBI), 1043 (ACI d/b/a OAN)]; Wolfe Att. E-5, [BSG00003980 (HBS)].  Occasionally, BSG provided no LOA regarding the complaint, but simply credited the charge and told the complainant to contact the Landeen company that billed the complainant to get "additional information" about the authorization.  Wolfe Att. E-1, [BSG00001211, 1236-1241, 1259].

the offer pages for the services appeared several pages into the click-through and appeared to be part of the unrelated sign-up. *Id.* Indeed, the offer pages were pre-populated with information (such as name, address, and phone number) that consumers had initially entered to obtain the free email account or to vote, and contained a prominent heading such as "You're Almost Ready to Cast Your Vote!" or "Your Email Account is Almost Ready!" Oskoui ¶10, 12, Att. A and B; Goldstein Att. D. Though the offer pages "disclosed" the service, its cost, and that it would be billed to the user's telephone number, these disclosures appeared in a lengthy block of tiny text sandwiched between the large-print headline and the prepopulated data fields. Oskoui Att. A and B. Nor did the pages disclose anything about a refund policy. *Id.* Moreover, at the bottom of the page, well below the terms, was a button that (like prior screens) said "submit and go to next page", "submit and continue to next page," or "accept and go to next page." *Id.* However, when consumers clicked that button, they did not just continue to the next page related to the free event or service; they were enrolled to be LEC billed for the service. Oskoui ¶3. Nothing in the following screens indicated that they had just agreed to be billed. Oskoui Att. A and B.

### BSG Monitored and Recorded "Customer Service" Calls from Consumers

94.     BSG monitored and recorded what it called "customer service" inquiry calls from consumers about each of the services. *See* ¶ 95, *infra*. The form BSG used to note the monitored calls was set up to record a <u>complaint</u> about unauthorized billing, including information about whether the LOA matched the identity of the person calling and whether he or she continued to dispute the bill. *See* ¶ 96, *infra*. BSG apparently did not produce documents showing that monitored calls involved typical "customer service" issues, such as inquiries for help accessing or using any of the services for which BSG was billing a calling

consumer $14.95 a month.

95.     BSG constantly recorded and monitored calls to ABC.  Transcripts of these calls

revealed:

   A.     A representative told a caller from a law firm that "David Jones" ordered

   MyIproducts.  The caller said there was no David Jones in his office and he knew no

   one by that name.  After noting that charges for MyIproducts had appeared on his bill

   for six months, the caller said, "Nice gig you guys got, 'David Jones.'  I got seven

   employees and we don't have any Davids or any Joneses."  Wolfe Att. E-24,

   [BSG00016505].

   B.     A consumer told the representative, "I have these charges on my phone bill that

   were not authorized and I'm trying to figure out why."  After the representative

   determined that the name given on sign-up for InfoCall did not match the name on the

   phone bill, the consumer said, "[E]very month there's somebody trying to do this and

   I don't know how to – how it's done on the Internet or how it's – it's just absolutely

   ridiculous.  You guys got to come up with some better stuff."  When the

   representative said that the order form used the consumer's address and phone

   number, the consumer replied, "Yeah, which you can look in the phone book and find

   … I can't even believe that AT&T even allows you guys to bill on this."  *Id*. at

   [BSG00016590].  *See also* Wolfe Att. E-6, [BSG00016529] (BSG cover email

   admitting that InfoCall's customer information is "not matching on the majority of

   their monitored calls.").

   C.     When the caller's information did not match the name and address on the

   Instant411 account BSG billed to her phone line, the representative said, "When they

signed up for Instant411 over the Internet, they keyed in their telephone number

incorrectly and that's why you're seeing the charge."  Wolfe Att. E-24,

[BSG00016519]; *see also id.* at [BSG00016520, 16500, 16499] (same).

D.      A consumer told the representative he had previously been promised a credit that

had not appeared.  The consumer said, "We've been fighting this thing for two

months now" and that he "got a past due" because of the unauthorized charge.  The

consumer asked the representative whether she was with AT&T or ESBI, and she

replied that she was with MyIproducts.  The consumer asked, "MyIproducts?  You're

the guys that slammed me or did whatever you did anyway, right?"  The

representative replied, "We're not slammers.  I would take that up with your son who

signed up for the service."  The consumer explained that he did not know how the

charge appeared on his bill but that a previous representative told him it may have

occurred after he filled out a survey.  The representative said the service would have

been ordered directly through Myiproducts.com.  When the consumer replied, "I

doubt that very seriously," the representative told him, "You don't have to believe

that, but that is how it's ordered."  *Id.* at [BSG00018440].

E.      An employee of Boston Scientific called in June 2009, after beginning an audit of

the company's phone lines and discovering a charge for Instant411.  The caller

learned that Boston Scientific's phone line had been billed for six months for the

service, under a name the caller did not recognize.  *Id.* at [BSG00016628].

F.      A representative told a consumer that eSafeID had billed her for an order placed

in her neighbor's name.  When the representative told her it would take two to three

billing cycles for a credit to appear on her bill, the consumer replied, "Wait a minute,

you said a couple billing cycles to give me my credit, but it only takes a minute to
take – you know, to bill me. … This is the second time this has happened to me." *Id.*
at [BSG00016642].

G.    A representative told a consumer she was being charged for a Streaming Flix
account ordered in her ex-husband's name.  When the representative described the
service and said it allowed the user to download videos onto a computer, the
consumer replied, "We don't have a computer, honey."  The representative initially
refused to issue a credit, however, because "he [the consumer's ex-husband] would be
held responsible for that 14.95 charge … because I do show that I have correct
information that he did sign up for a service."  The consumer replied, "But this is not
right, how somebody can put something on my phone bill that I don't even have and I
have to pay it. …the phone is in my name and I did not okay this." *Id.* at
[BSG00016670].

H.    A caller who BSG charged for Digital Vmail told the representative he did not
want the service.  When the representative said, "I am showing your information on
the order form as the person that requested our services," the consumer replied, "I did
not.  I take care of the billing and I'm looking to lower the bill, not raise it.  I'm not
sure where the mix-up was."  The representative told him the only way the company
could get his information was for the consumer to "manually enter all of your
information in on the order form and then click the order now button and submit it to
us." *Id.* at [BSG00016704].

I.    A representative told a consumer that the order for Streaming Flix was in the
name of her husband.  The consumer replied, "I'm pretty sure he did not mean to sign

up for this.  So, is that what the 14.95 extra charge on my phone bill was?"  When the

caller asked how her husband was enrolled, the representative said, "It'd have to be

signed up for over the Internet and it did have to be signed up for directly off of the

Streaming Flix website or an advertising affiliate site."  The representative then led

the consumer in a confusing exchange over how many Streaming Flix charges had

been billed to her telephone number.  *Id*. at [BSG00016858].

J.    A consumer asked the representative what the $14.95 charge on his phone bill

was for.  The representative explained that it was for a Streaming Flix account for

"unlimited access to our video database."  The consumer replied, "Yeah, but I didn't

ask for – I didn't ask for that, though.  I mean, how could they just put that on there?

… I don't know how it could be just – how you could just stick something on – you

know, on a person's bill that they don't ask for?"  The representative denied that the

charge was crammed on the consumer's bill and said the consumer signed up directly

on the Streaming Flix site or on an "advertising affiliated" site.  The consumer asked

to have his bill "without charging me for something that I don't know anything

about."  *Id*. at [BSG00016859].

K.    A caller complained about a bill for eProtectID, and the representative explained

that it was for a credit-monitoring service and was in the caller's niece's name.  The

caller said, "Okay.  Now, there we have a problem.  She doesn't have any credit.

She's a kid.  I mean, why would she need a – you know what I mean – a credit

report?"  *Id*. at [BSG00016668].

L.    A representative told a consumer that her son signed up for Instant411 online.

When the consumer said she did not understand how that happened because her son

would not need such a service, the representative replied, "Well, he may have been on one of our advertising affiliate sites and thought he was signing up for something else." *Id.* at [BSG00016518].

96.     BSG's notes on monitored calls also revealed details of billing complaints, including:

A.     A caller complained that she was billed for identity theft monitoring supposedly ordered by her minor daughter. Wolfe Att. E-32, [BSGRESPXIII_00000290].

B.     Callers complained about being billed for Streaming Flix's online video subscriptions even though the billed parties had no Internet access. *Id.* at [BSGRESPXIII_00000033, 37, 39].

C.     A caller complained on behalf of a phone subscriber who was billed for InfoCall's directory assistance service while he was deployed. *Id.* at [BSGRESPXIII_00000223, 226].

**BSG Continued Billing for the Services Even After AT&T Forced BSG to Acknowledge that Thousands Were Billed Without Authorization**

97.     In early 2010, in response to continuously high complaint levels, AT&T suspended all billing for MyIproducts and stopped all new billing for 800 Vmailbox, Digital Vmail, and Streaming Flix. Wolfe Att. E-21, [BSG00081623-4]; *see also* Percival Att N, [FBI warrant email 0171] (Melissa Mitchell notified Landeen that AT&T is cutting off new sales of all voicemail products to its customers effective February 1, 2010).

98.     In early 2010, AT&T told BSG that cramming complaints about Streaming Flix had reached an unacceptable level. Wolfe Att. E-11, [BSG00035208]. AT&T also denied BSG's request to bill AT&T customers under the name Streaming Flix-National Lampoon because

"This new subCIC application is for a service provider whose Principal is also the officer of Streaming Flix, LLC. The service program for Streaming Flix, LLC offered online subscriptions to receive streaming video. The service

program for this applicant, Streaming Flix National Lampoon, LLC is the same offering.  Based on the 2/9/2010 letter to HBS informing them of our intent to no longer accept new billing from Streaming Flix due to unacceptable levels of cramming complaints, we have made the decision not to accept billing from this service provider.

This request is denied."

*Id.*

99.    In response to a request from AT&T, BSG "scrubbed" the customer lists for those services to determine whether the phone numbers it was billing matched the names and addresses gathered during marketing of the services.  *See* Wolfe Att. E-13, [BSG00044516-7] (Melissa Mitchell sent Landeen "the attached worksheet from ATT today regarding excessive complaint levels for MyIproducts, 800VM, Digital vm, Info Call, and Instant 411…ATT has requested for all the attached companies to scrub their existing ATT base."); Wolfe Att. E-13, [BSG00044525-6] (Mitchell sent to Landeen, Henderson and their IT contractor Brian Jones the "file format we need for the current ATT customers for MyIproducts, Digitalvm, and 800vmbox" for the scrub).  Mitchell vowed that BSG would continue to "bill records that pass." *Id.* at [BSG00044516].

100.   BSG conducted the scrubs (but, curiously, only in AT&T's southeast region) for 800 Vmailbox and Digital Vmail and found that 5,430 of the 8,413 telephone numbers it was currently billing in that region – a stunning 64% – "did not pass name and address lookup," meaning BSG had billed the telephone numbers of thousands of consumers without their authorization.  *Id.* at [BSG00045186-88].  BSG also scrubbed the InfoCall customers from that region, and found that 46.7%, or 1,803 of the 3,866 telephone numbers it was currently billing, did not pass.  *Id.* at [BSG00045189].  Landeen's company conducted the scrub for Streaming Flix across all of its billings (without limiting the scrub to AT&T's southeast

region) and found that 26%, or 9,341 out of 35,409, of the phone numbers billed did not

belong to the consumer who purportedly ordered the service.  Goldstein Att C,

[Idataworx\abc\sent items 03/04/2010, HBSDOC-0009372].[20]

101.    But BSG did not cut off all billing for the services, report them to law enforcement, issue

credits to "scrubbed" consumers whose numbers had been improperly billed, or even conduct

a full-scale investigation.  Instead, BSG simply told ABC to remove the mismatched

numbers from the services' billing rosters and continued billing the rest of the services'

"customers."  *See* Wolfe Att. E, [BSG00045186] (reporting the total numbers of

800Vmailbox and Digital Vmail customers that did not pass name and address lookup,

BSG's Melissa Mitchell told Landeen's employee to "[h]old off on sending the Info and

Instant until I can get you the numbers that did not pass so you can strip from your files.").

Mitchell even sent Landeen and Henderson a draft plan to ask AT&T for reinstatement of

Streaming Flix, stating "we need to add some words related to the SF/ATT existing base and

what scrubs have occurred with the existing base."  *Id*. at [BSG00044554-6].

102.    In May 2010, BSG's Mitchell informed Landeen that, based on running Streaming Flix's

purported customers through NAP validation (*i.e.*, checking the Name and Address against

the billed Phone number), 16 of the "customers" were dead.  *Id*. at [BSG00045874-5].

103.    On July 14, 2010, Verizon sent BSG a letter terminating billings for Streaming Flix.

Wolfe Att. E-7, [BSG00024431].

104.    Despite continuous, overwhelming evidence that all of Landeen's services were rife with

cramming, BSG then approved applications to bill two new services for her,

---

[20] In March 2010, Landeen informed BSG that, in submitting Streaming Flix's new sales to BSG
for billing, the "customers'" names and addresses had not been checked against the telephone
numbers to be billed (also known as "NAP validation") at any time before March 1, 2010.
Wolfe Att. E-13, [BSG00045161-2].

ProIdentityProtect and MyIDsafe, in the fall of 2010. Wolfe Att. E-26, [BSG_Resp-I-p.00000446-50, 457-62] (affidavits for billing ProIdentityProtect through AT&T and Verizon signed by Cindy Landeen on August 10, 2010). These applications contained blatantly false statements, such as a response of "N/A" to AT&T's request to "include the names of any and all business enterprises, corporations, joint ventures with whom any of the individuals who currently serve or have served as Officers, Directors, Principals, Owners or Partners of subCIC are now or have ever been associated, and that have either generated or submitted charges to be billed on any AT&T Telcos bill." *Id*. at [BSG_Resp.-I-p.00000447]. Despite BSG's willingness to continue billing for Landeen, Verizon caught the proposed services' connections to the terminated Streaming Flix and denied the applications. Wolfe Att. E-11, [BSG00035286. Still, BSG continued to seek approval to bill other LECs' customers for ProIdentityProtect and MyIDsafe. *See* Wolfe Att. E-21, [BSG00082858] (CenturyLink approved ProIdentityProtect, subCIC 349 , noting that "this is an identical product to MyIDsafe," and asking, "What is the benefit of having the same product under multiple names?"); *see also* Wolfe Att. E-20, [BSG00076869] (confirming MyIDsafe was subCIC 243).

105.    In the fall of 2010, BSG attempted to convince Verizon to keep billing Streaming Flix's residual "customers," like the reinstatement request BSG submitted for MyIproducts in 2007, but Verizon told BSG "that is against the Verizon policy." Wolfe Att. E-7, [BSG00025325]. BSG then reviewed Verizon's termination of Streaming Flix. *Id*. at [BSG00024418-19]. Denise DeSilva wrote to CEO Greg Carter and Melissa Mitchell, reminding them that Streaming Flix's customers' names and addresses were not matched with phone numbers before billing them:

"Streaming Flix had an issue when they were authenticating their own sales…It was discovered that that during the initial query for NAP [name/address/telephone], that is [sic] the query came back as "blank" or "no data", they would then send it to NAS [name/address/SSN] for processing. The problem in doing this is that there is no confirmation that the consumer is associated with that telephone number."

*Id*.; *see also* Wolfe Att. E-12, [BSG00040060-8], Wolfe Att. E-21, [BSG00080881-3] (ABC said a billed phone number that belonged to an AT&T corporate office was found to have been "disconnected" when BSG asked how it could have passed authentication to be billed for Streaming Flix).  Despite this knowledge, BSG attempted to get Verizon to reinstate Streaming Flix's billing privileges and give the service another chance to meet Verizon's complaint thresholds.  Wolfe Att. E-7, [BSG00024706-9; Wolfe Att. E-21, [BSG00082631].

**BSG Billed for Services Barely Any Consumer Used**

106.    BSG received written complaints from consumers stating they never used the services for which BSG was billing them $14.95 a month.  *See* Wolfe Att. E-1, [BSG00000092-93] ("I have never used voicemail; nor would I have need of it. This I feel is nothing but a scam."); Wolfe Att. E-2, [BSG00001713-14] ("I had no idea of this service because I have always paid my bills on live [sic] and I never check my bills. I am requesting reimbursement back since July of 2007 in the amount of $669.90.  I have never used this service."); Wolfe Att. E-4, [BSG00002079] ("Bottom line: I was charged 6 months for a service I never signed up for and never used."); Wolfe Att. E-4, [BSG00002145-6] ("Neither my wife Linda nor I made the subscription and have never used the service.  We just realized it was on our bill this month [after being billed for 7 months]"); Wolfe Att. E-1, [BSG00005031] ("Neither my wife or I have ever ordered this service.  We don't need this service because we have an answering machine.  I have, until this problem arose, never heard of this company.  We have never used this service and wish to have this cancelled or disconnected or whatever."); Wolfe

Att. E-6, BSG00018779] ("I have never used directory assistance and dispute this charge and would like you to issue a refund."); Wolfe Att. E-21, [BSG00008145-49] ("Through our telephone provider, AT&T, Enhanced Services Billing fraudulently billed on behalf of Digital Vmail, Inc for voicemail services never ordered or used.").

107.    The three voicemail services that BSG billed (800 Vmailbox, Digital Vmail, and MyIproducts Imail) were supported by an underlying provider of voicemail boxes, NXT Telecommunications. Percival Att. K [1B057_ITEM 63-VENDORS, pp. 000063-66].  Had BSG ever bothered to ask for the voicemail usage data, it would have learned that while BSG was billing between 98,000 and 150,000 "customers" for voicemail boxes each month, NXT's records showed that a mere 209 voicemail boxes were used.  Wolfe Att. I, [NXT Records Declaration]; Genetski ¶¶ 5-6 and Att. B;[21] *see also* Goldstein Att. C, [Idataworx\abc\inbox 07/23/2009, HBSDOC-0006504; 07/27/2009, HBSDOC-0006471] (showing only 141 active and 98,772 inactive mailboxes as of July 27, 2009); *id.* at [Idataworx\abc\inbox 10/21/2009, HBSDOC-0005260] (ABC employee Angela Leal stating "these 4 digit Imail accounts were provided to employees to use for personal usage."); Wolfe Att. E-8, [BSG00027834, 27841] (Landeen's pre-billing answers to FAQs for billed consumers about 800 Vmailbox and Digital Vmail: "your mailbox number is the ten digit account number (BTN or phone number).").

108.    Not surprisingly, Streaming Flix had a similar track record of non-usage:  hundreds of thousands of billings, and barely any movies streamed.  In fact, between July 2009 and December 2010, BSG billed 253,269 consumers a net $9,642,992.00 for StreamingFlix. Genetski Att. D; *see also* Wolfe Att. E-10, [BSG00033460] (showing that BSG billed 28,932

---

[21]  Genetski ¶¶ 5-6 and Att. B provide a summary of NXT's usage records pursuant to Rule 1006, Fed. R. Evid.  Copies of NXT's records are available upon request.

Verizon customers for Streaming Flix in January 2010).  For all those billings, the underlying

video provider, Rovi Corporation, owner of CinemaNow, reported that there were 23 total

videos streamed.   Wolfe Att. J, [Rovi Corporation records].  Some of those were rented by

Landeen's employees. *Compare id. with* Percival Att. C, [1B071_ITEM 80-OLD MEMOS,

pp. 000220-221] (showing names of ABC's employees whose names appear in Rovi's

records).  Again, BSG failed to ask for usage information at any time during the lucrative

year and a half it billed over 250,000 consumers for Streaming Flix.

109.    In addition, the identity theft protection services (eSafeID and eProtectID) approved by

BSG were unused by at least 95% of those billed.  These companies allegedly offered

identity theft protection services that would place fraud alerts on consumers' credit reports

and order copies of the reports from the credit bureaus. Wolfe Att. E-7, [BSG00027802-21];

Wolfe Att. E-8, [BSG00027867-86].  To place a fraud alert on a consumer's credit report,

eSafeID and eProtectID requested additional information from consumers after the sale.

According to BSG's files, consumers could provide the information by using a hyperlink in a

"Welcome" letter, and creating a user name and password to "log in" to their eSafeID or

eProtectID account.  Wolfe Att. E-16, [BSG00054484, pp. 13-14; 54485, pp. 13-14].  BSG

billed consumers a net $4,082,940 for these two products from May 2009 until the execution

of search warrants.  Genetski Att. D.  But, in October 2010, one of Christian Henderson's

employees, when asked about creating a cancellation page for all services, admitted that

users would "have to create their user name and login and 95% of the user[s] don't bother

doing that."  Goldstein Att. C, [Idataworx\abc\inbox 10/20/2010, HBSDOC-0001726].

110.    Uvolve also was not used by consumers.  Uvolve purported to be an online instructional

video and job training service.  Wolfe Att. E-10, [BSG00034763-64].  To utilize the

instructional videos and to access articles, a consumer would purportedly have to create a user name and password and login to the website. *Id.* As noted above, 95% of those billed for Landeen's services never provided that information.

### Execution of Search Warrants Finally Stops the Cramming Operation

111.   It was not until the FBI raided Landeen's Minneapolis offices in December 2010 that BSG finally stopped billing for her companies' services. *See* Wolfe Att. E-13, [BSG00048335-36]; Wolfe Att. E-21, [BSG00077100-3, 83176].

### Consumer Injury

112.   From 2006 through December 2010, BSG billed 1,196,346 consumers' telephone numbers a net $52,631,224.46 for MyIproducts, 800 Vmailbox, Digital VMail, eProtectID, eSafeID, InfoCall, Instant411, Streaming Flix and Uvolve.  Genetski ¶¶ 8, 10, Att. D.

113.   The net amounts BSG billed for each service are: MyIproducts: $25,233,464.31; 800 Vmailbox: $2,894,827.06; Digital VMail: $1,987,636.95; eProtectID: $2,312,880.19; eSafeID: $1,779,405.06; InfoCall: $4,134,345.48; Instant411: $4,310,675.32; Streaming Flix: $9,700,870.02; and Uvolve: $277,120.07.  *Id.*

114.   An astronomical number of these services' "customers" sought and received credits for at least some of the unauthorized billings, including: MyIproducts: 58% of phone numbers billed; 800 Vmailbox: 61%; Digital VMail: 59%; eProtectID: 46%; eSafeID: 48%; InfoCall: 55%; Instant411: 54%; Streaming Flix: 46%; and Uvolve: 37%.  *Id.*  In the credit card billing context, a credit-to-billings ratio of 1% or above is considered to be an indicator of fraud. Chen ¶ 10.

115.   Of those who received credits, many received credits for only part of the charges BSG billed them.  For example, although 48% received credits for eSafeID charges, 15% received

credit for less than all the charges billed to them.  Genetski ¶ 8, Att. D.  The percentages of the other services' "customers" receiving less than full credits are as follows: eProtectID: 16%; Uvolve: 8%; Streaming Flix 17%; InfoCall 17%; Instant411: 17%; MyIproducts: 20%; 800 Vmailbox: 20%; and Digital Vmail: 19%.  *Id.*  For those consumers, the net loss from these billings was $10,670,672.03, a substantial part of the net $52,631,224.46.

116.  The lucre from these billing is astounding.  Overall, consumers received credits for only 28% of BSG's $73,289,129 gross billings. Genetski ¶8, Att. D.  Indeed, of those consumers who received some credit for BSG's unauthorized billings, they still lost over $10 million. *Id*.

WHEREFORE, the FTC submits this fact Appendix, pursuant to Local Rule CV-7(c) and requests an Order to Show Cause Why BSG and its Subsidiaries Should Not be Held in Contempt for Violating the Permanent Injunction.

Dated:  March 28, 2012                                 Respectfully Submitted,

*/s/ Douglas V. Wolfe*
Douglas V. Wolfe (DC Bar #437476)
Telephone:  (202) 326-3113
Fax:  (202) 326-2558
Email: dwolfe@ftc.gov
600 Pennsylvania Ave., N.W., M-8102 B
Washington, D.C. 20580
Attorney for Federal Trade Commission
Admitted *Pro Hac Vice*

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

_____

**FEDERAL TRADE COMMISSION**,           )     **Case No. SA-98-CA-0629-FB**
                                        )
                        Plaintiff,      )
                                        )
vs.                                     )
                                        )
**HOLD BILLING SERVICES,** *et. al*.    )
                                        )
                        Defendants.     )
_____)

### <u>FEDERAL TRADE COMMISSION'S MOTION FOR AN ORDER TO SHOW CAUSE WHY BILLING SERVICES GROUP LIMITED; BILLING SERVICES GROUP NORTH AMERICA, INC.; HBS BILLING SERVICES COMPANY; ENHANCED BILLING SERVICES, INC.; BILLING CONCEPTS, INC.; and ACI BILLING SERVICES, INC. SHOULD NOT BE HELD IN CONTEMPT</u>

# Table of Contents

I.    BSG Placed Millions of Unauthorized Charges on Consumers' Telephone Bills. .......... 2

    A.    BSG billed for nine crammed services. .................................................................. 2

        1.    Crammed Voicemail Services ................................................................... 2

        2.    Crammed Streaming Video Service ........................................................ 4

        3.    Crammed Identity Theft Protection Services ....................................... 4

        4.    Crammed Directory Assistance Services ............................................. 5

        5.    Crammed Job Skills Training Service .................................................... 6

    B.    Contempt Defendants ignored repeated red flags that their billings were fraudulent. ................................................................................................................... 6

        1.    BSG ignored red flags raised during its inadequate "due diligence." .................. 6

        2.    BSG failed to investigate the services' marketing even when faced with astronomical complaint rates that were completely inconsistent with purported consumer authorizations. ....................................................................... 8

        3.    BSG never followed up on usage of any of the services. .................................... 11

        4.    BSG continued billing for the services even after AT&T forced them to acknowledge that thousands of consumers were improperly billed. .................... 12

    C.    BSG billed more than $50,000,000 in net unauthorized charges. .......................... 13

II.    BSG's Unauthorized Billings Violated the Permanent Injunction. ............................... 13

    A.    The Permanent Injunction binds each of the Contempt Defendants. .................... 13

        1.    BSGNA's subsidiaries BSG Clearing, ESBI, ACI, and BCI aided and abetted BSGNA and are subject to BSGNA's control. .................................................. 14

        2.    Parent company BSG Ltd. aided and abetted BSGNA, and BSG Ltd. is fully identified in interest with BSGNA. ..................................................................... 15

    B.    The Contempt Defendants act as a common enterprise. .......................................... 17

    C.    The Contempt Defendants violated the Permanent Injunction. .............................. 18

        1.    Contempt Defendants billed and collected for vendors who did not disclose terms of service clearly and conspicuously. .......................................................... 18

        2.    Contempt Defendants billed and collected for vendors who sold services that consumers never authorized. ............................................................................... 19

        3.    Contempt Defendants misrepresented that consumers authorized charges for vendors' services. ............................................................................................... 19

    D.    Contempt Defendants' violations caused more than $50,000,000 in harm. ........... 20

From 2006 through 2010, billing aggregator Billing Services Group ("BSG")[1] violated this Court's Permanent Injunction by putting more than $70 million in bogus charges on consumers' phone bills for "enhanced services," such as voicemail and streaming video, that consumers never authorized or even knew about.  BSG billed for these services on behalf of a serial phone bill crammer[2] amid a flood of complaints, while utterly failing to investigate either the highly deceptive marketing for these services or whether consumers actually used them. Rather, in the face of stark evidence of ongoing fraud, BSG continued to bill month after month for these services, even approving billing for new services pitched by the same crammer.  In fact, BSG continued to bill and collect for these services after major telephone companies refused to do so.  BSG did not turn off its lucrative illicit billing spigot until the FBI forced its hand by executing a search warrant at the crammer's office.

BSG's billing violated three core provisions of the Permanent Injunction this Court entered on September 22, 1999 (the "Permanent Injunction"), which prohibits unauthorized billing, misrepresentations to consumers, and billing for vendors who fail to clearly disclose the

---

[1]  "BSG" or "Contempt Defendants" refers collectively to Billing Services Group Limited ("BSG Ltd."); Billing Services Group North America, Inc. f/k/a HBS, Inc. ("BSGNA"); BSG Clearing Solution North America, LLC ("BSG Clearing"); HBS Billing Services Company f/k/a Hold Billing Services, Ltd. ("HBS"); Enhanced Billing Services, Inc. ("ESBI"); Billing Concepts, Inc. ("BCI"); and ACI Billing Services, Inc. ("ACI").  As discussed below, the seven companies operate as a single enterprise and are all subject to the Permanent Injunction entered by the Court against Defendants Hold Billing Services, Ltd., HBS, Inc., and Avery Communications, Inc. on September 22, 1999.

[2]  "Cramming" is the placement of unauthorized charges on a consumer's phone bill.  ¶ 1.  In the phone billing industry, vendors contract with billing aggregators (such as BSG) to submit their charges to the phone companies, which then include the vendors' charges on consumers' monthly phone bills.  ¶¶ 1-2.  (All factual citations in this Motion refer to paragraph numbers in the accompanying Fact Appendix, see Local Court Rule CV-7(c).)

terms of their services.[3]  Accordingly, the FTC moves this Court to find BSG in contempt and

order compensatory sanctions of $52,631,224.46, the total amount BSG billed consumers and

failed to refund.[4]

I.       **BSG Placed Millions of Unauthorized Charges on Consumers' Telephone Bills.**

         A.       **BSG billed for nine crammed services.**

         For five lucrative years, BSG billed consumers through Local Exchange Carriers

("LECs," or telephone companies providing local phone service) for nine crammed "enhanced

services."[5]  ¶¶ 20, 112.  As discussed further in Section I.B below, BSG worked with known

crammer Cindy Landeen and her associates to bill consumers for these services, which were

deceptively marketed on the Internet.  They included three voicemail services, one streaming

video service, two identity theft protection services, two directory assistance services, and one

job skills training service.  ¶¶ 38, 63, 81, 83 n.4

                  1.       Crammed Voicemail Services

         BSG subsidiary ESBI billed consumers for three of Landeen's voicemail services:

**MyIproducts**, **800 Vmailbox**, and **Digital Vmail**.  ¶¶ 35-38, 63.  It charged consumers for these

---

[3]  This contempt filing marks the fourth FTC action addressing extensive cramming by BSG entities.  In addition to the Permanent Injunction, the FTC previously obtained two other cramming orders against BSG:  *FTC v. Nationwide Connections, Inc.*, which addressed $34.5 million in charges for collect calls that never occurred, ¶ 13 n.4, and *United States v. Enhanced Services Billing, Inc.*, which, like this action, addressed crammed charges for enhanced services, ¶ 9 n.3.

[4]  The FTC contacted BSG on March 13 to initiate the Conference required by Local Court Rule CV-7(h).  Although not required by the Rule, the FTC provided BSG with a draft of this motion, as well as the detailed Fact Appendix and all cited documents the FTC received from third parties.  Counsel then met on March 21 to discuss a possible resolution, followed by a lengthy teleconference on March 23.  The parties, however, did not come close to an agreement to resolve the more than $50 million in consumer harm at issue.

[5]  "Enhanced" services are those products or services unrelated to the completion of a call, such as web hosting, directory listings, and e-mail services.  ¶ 22.

services without their authorization, as demonstrated by voluminous consumer complaints, astronomical refund rates, and the fact that almost none of the consumers BSG billed for the services ever used them.

The voicemail services generated tens of thousands of complaints, consistently tripping BSG's complaint-to-billings thresholds of 12.5% and, later, 15%.[6]  ¶¶ 47-54, 84, 84 n.15, 85, 85 n.17.  Specifically, complaints about MyIproducts ranged between 12.68% and 19.92% from October 2006 to October 2007, complaints about 800 Vmailbox ranged from 16.59% to 38.39% from April to November 2009, and complaints about Digital Vmail ranged from 15.19% to 32.21% from April 2009 to February 2010.  ¶¶ 48-54, 84.

Not surprisingly, in October 2007, Verizon notified BSG that it was terminating MyIproducts' ability to bill its customers, "as they have not and will not bring cramming complaint level" down.  ¶¶ 54-55.  AT&T followed suit in early 2010, terminating MyIproducts and refusing to bill for any new sales of 800 Vmailbox or Digital Vmail.  ¶ 97.  Despite the terminations, BSG continued to bill consumers for the voicemail services through other LECs.  ¶¶ 58, 99-101.

These consistently high complaint levels culminated in astronomical refund rates.  Approximately 60% of the consumers BSG billed for each of the voicemail services sought and received credit for at least one charge from either BSG or the LECs.  ¶ 114.  For comparison, in the credit card billing industry, a chargeback rate of 1% is considered suspicious and an indicator of fraud.  ¶ 114.

---

[6]  BSG notifies its vendors when the ratio of consumer inquiries about a service in a one-month period to telephone numbers billed for the service in that period exceeds a certain threshold.  *See, e.g.*, ¶¶ 47-54.  This threshold was initially 12.5% for non-telecommunications services, but BSG later raised the threshold to 15%.  ¶¶ 47-52, 84, 84 n.15.

Moreover, barely anyone used these voicemail services.  BSG billed tens of thousands of consumers for voicemail boxes each month from July 2009 through March 2010, but consumers used a mere 209 boxes during that time.  ¶ 107.  Despite this overwhelming evidence of fraud, BSG billed consumers a net $30,115,928.32 for the voicemail services.  ¶ 113.

### 2.    Crammed Streaming Video Service

BSG subsidiary HBS billed consumers for Landeen's **Streaming Flix**, a service that purportedly allowed consumers to stream movies through their computers.  ¶¶ 80-83.  Like the voicemail services, BSG's charges for the video service were unauthorized, as evidenced by voluminous complaints and credits, and essentially no usage.

BSG knew of at least 65,025 billing complaints about Streaming Flix, comprising 25.67% of the consumers it billed.  ¶ 85.  Indeed, 46% of the consumers BSG billed sought and received at least one credit.  ¶ 114.  In July 2010, Verizon terminated Streaming Flix's billing privileges due to excessive cramming complaints.  ¶ 103.  In early 2010, AT&T terminated the service's ability to bill new customers.  ¶ 97.  But again, BSG simply continued billing consumers through other LECs for the service.  ¶¶ 101; *see also* ¶¶ 108, 112.

Almost none of the hundreds of thousands of consumers BSG billed used the service. The underlying video provider, Rovi Corporation, reports that between July 2009 and December 2010, there were 23 total movies streamed.  ¶ 108.  In that time, BSG billed 253,269 consumers for the service, meaning that at least 99.99% of the consumers BSG billed for the service never used it.  ¶ 108.  Still, BSG billed consumers a net $9,700,870.02 for the service.  ¶ 113.

### 3.    Crammed Identity Theft Protection Services

BSG also billed two of Landeen's crammed identity theft protection services through subsidiary HBS:  **eSafeID** and **eProtectID**.  ¶¶ 63, 63 n.12.  These vendors were supposed to

place fraud alerts on billed consumers' credit reports, copies of which would purportedly be sent to consumers by the credit bureaus. ¶ 109. However, high complaint and refund rates, along with low usage rates, demonstrate that consumers never authorized the charges.

BSG knew about at least 11,348 eSafeID billing complaints (representing 23.84% of customers), and 6,922 eProtectID complaints (12.64% of customers). ¶ 84. Moreover, about 47% of those billed received at least one credit for the services that consumers never received. ¶ 114. Indeed, "welcome letters" eSafeID and eProtectID supposedly sent their customers directed them to create an online account and provide personal information required to place fraud alerts and order credit reports. ¶ 109. However, 95% of consumers billed by all the crammed services never created such accounts. ¶ 109. But BSG disregarded the overwhelming evidence of cramming and billed a net $4,092,285.25 for these services. ¶ 113.

4.     Crammed Directory Assistance Services

BSG also billed for identical directory assistance services, **Instant411** and **InfoCall**, through BSG subsidiary ACI. ¶ 63. Few consumers would knowingly sign up for such a service, as it provided only a toll-free number a consumer could call to ask one of Landeen's employees to perform an Internet search for the requested listing. ¶ 84 n.16. It is no wonder, then, that these services generated significant consumer complaints and credit rates. Instant411 generated at least 25,893 complaints (25.2% of its customers) between June 2009 and April 2010, while InfoCall generated at least 26,665 complaints (27.1% of its customers) between May 2009 and February 2010. ¶ 84. In the end, about 54% of the consumers BSG billed for the two services received credits, and BSG billed a net $8,445,020.80 for these worthless services. ¶¶ 113-114.

Case 5:98-cv-00629-FB Document 179-2 Filed 10/30/13 Page 56 of 75

     5.     <u>Crammed Job Skills Training Service</u>

BSG began billing for **Uvolve**, a job skills training service, through subsidiary HBS not long before the FBI executed a search warrant at Landeen's offices. ¶¶ 83 n.14, 111. Like Streaming Flix, Uvolve purported to offer streamed video services. ¶ 83 n.14. Also like Streaming Flix, few if any "customers" ever watched a Uvolve video. While Uvolve's net billings were relatively light – $277,120.07 – it garnered at least 738 complaints in 8 months of billing and tripped BSG's complaint thresholds twice, and 37% of the 13,900 consumers BSG billed received credits. ¶¶ 85 n.17, 113-114.

**B.    Contempt Defendants ignored repeated red flags that their billings were fraudulent.**

BSG billed for these unauthorized services despite numerous red flags. BSG conducted no meaningful pre-billing due diligence and failed to adequately monitor or address the services' deceptive marketing, enormous complaint volume, and near-complete lack of usage. Finally, even after some LECs refused to do business with the crammers, BSG kept billing for their bogus services and even solicited more business from them.

     1.     <u>BSG ignored red flags raised during its inadequate "due diligence."</u>

Contempt Defendants demonstrated their willingness to bill for crammers by approving **MyIproducts,** the first of Landeen's subject vendors, in 2005. ¶¶ 34-36. As BSG knew, Landeen had a history as a crammer with Phonebillit, a former ESBI client with the same address as MyIproducts. ¶¶ 28-33, 35. During Landeen's time with Phonebillit, her company frequently exceeded the LECs' cramming complaint levels and credit-to-billings ratios; PAC Bell suspended Phonebillit's billing privileges in 2002, and Bell South did the same in 2003. ¶¶ 29-31. When Landeen resigned from Phonebillit in 2005, she wrote to BSG employees that "I plan

-6-

on being in the LEC business one way or the other and I can guarantee that you have not seen the last of me!" ¶ 33.

Despite knowing about Landeen's past cramming and her substantial involvement with MyIproducts, BSG agreed to bill for it and permitted Landeen's company, ABC, to handle customer service. ¶¶ 34-39. As noted above, MyIproducts predictably soon spurred voluminous cramming complaints, leading Verizon to terminate it in 2007 and another billing aggregator, ILD, to refuse billing any new sales for it soon thereafter. ¶¶ 43-55, 62.

Nonetheless, in 2008, when Landeen submitted billing applications to BSG for **800 Vmailbox**, **Digital Vmail**, **eSafeID**, **eProtectID**, **Instant411**, and **InfoCall**, plus another directory service, NeedtheInfo, BSG again agreed to bill for her.[7] ¶¶ 63, 83. Even after Verizon notified BSG that it would not allow any billing of its customers for InfoCall, eProtectID, and NeedtheInfo because of their connection to MyIproducts, BSG agreed to "go ahead without Verizon" and bill other LECs' customers for eProtectID and InfoCall. ¶¶ 73-76. BSG also approved billing (including of Verizon's customers) for 800 Vmailbox, Digital Vmail, eSafeID, and Instant411, even though it knew that Landeen would "manage and oversee all the operations" of those vendors. ¶ 77. Soon thereafter, BSG agreed to bill for Landeen's **Streaming Flix**. ¶ 83.

Significantly, BSG agreed to bill for the services even though it knew barely anyone would use them – an important cramming indicator. ¶¶ 69-71. As BSG's General Counsel acknowledged in an email to Landeen, "Usage data has become a sensitive subject for the LECs, regulatory agencies, and BSG" and "is very helpful in showing that the consumer did in fact use

---

[7] BSG's CEO, Greg Carter, signed each agreement as an officer for each BSG subsidiary, and the same BSG employees handled the due diligence for all seven proposed vendors, no matter which BSG subsidiary proposed to handle the billing. ¶¶ 64, 67.

the service that they were charged for." ¶ 82.  But BSG agreed to bill for the services even after

Landeen's company submitted "Contract Information Sheets" stating it expected only 20% of

those billed to actually use the services.  ¶¶ 69-71, 83.  Instead of rejecting the applications on

the spot, a BSG employee stated, "mention to Cindy [Landeen] during your discussions that we

appreciate her honesty on the estimated usage rate."  ¶ 71.

    2.    <u>BSG failed to investigate the services' marketing even when faced with astronomical complaint rates that were completely inconsistent with purported consumer authorizations.</u>

Predictably, after BSG approved billing on behalf of these known crammers and

delegated oversight of ensuring "authorized" sales to them,[8] the nine services quickly racked up

cramming complaints.  ¶¶ 83-85, 95.  The specifics of some of these complaints demonstrated

unequivocally that BSG billed consumers who did not knowingly sign up for the services.  For

example, BSG received complaints showing that Streaming Flix billed internal business lines at

AT&T for video subscriptions.  ¶ 105.  BSG also received complaints about billings for identity

theft protection services supposedly ordered by minor children, streaming video services

supposedly ordered by consumers who lacked Internet access, and directory assistance services

supposedly ordered by medical device maker Boston Scientific and a deployed serviceman.

¶¶ 95E, 95G, 95K, 96A, 96B, 96C.  BSG even had notice that the streaming video service tried

to bill at least 16 deceased consumers.  ¶ 102.  But these ludicrous billings and emphatic denials

of authorization did not prompt BSG to investigate how such charges could have made it onto

the consumers' bills.  ¶¶ 52, 52 n.8.

Complaint levels for the nine services constantly tripped BSG's inquiry thresholds.

---

[8]  BSG requires no documentation of consumer authorization before submitting a charge for billing.  ¶¶ 23-27.  Instead, as long as a particular data field in a billing record is populated with the number "4," BSG assumes that charge is "authorized" and submits it for billing.  ¶¶ 25-26.

¶¶ 45-54, 84.  Specifically, MyIproducts exceeded BSG's 12.5% threshold for five of the last six months in 2006, and four of the first six months in 2007.  ¶¶ 45-54.  Digital Vmail exceeded the threshold for eight straight months in 2009 with ratios ranging from 15.17% to 32.21%; and 800 Vmailbox exceeded it for seven of those same eight months with ratios ranging from 16.59% to 38.39%.  ¶ 84.  Also in 2009, Instant411 and InfoCall both exceeded the threshold for seven and eight straight months, respectively. ¶ 84.  The identity theft services exceeded the thresholds for five straight months with ratios ranging from 16.35% to 20.23% (eSafeID) and 18.76% to 22.65% (eProtectID).  ¶ 84.  From October 2009 through January 2010, and again in March and April of 2010, BSG notified ABC that inquiries about Streaming Flix billing greatly exceeded the 15% threshold as follows:  4,157 (25.42%); 7,469 (23.75%); 8,943 (22.42%); 13,907 (20.49%); 15,399 (16.05%); and 14,185 (18.3%).  ¶ 85.  BSG notified Landeen and ABC of these breaches month after month.  ¶¶ 84-85.  However, BSG did not contact purported "customers" to ask whether they agreed to be billed, used any of the services, or even knew they existed.

Instead, each time one of the vendors tripped the complaint thresholds, BSG asked Landeen's company for a sample of 30 Letters of Authorization ("LOAs") and the "landing pages" (*i.e.*, the web pages consumers actually saw when they were enrolled). ¶ 86.  LOAs are images of web pages with data fields purportedly filled in by consumers with sufficient information to show the consumer agreed to purchase the service, such as name, address, and phone number.  ¶¶ 86-87.  Significantly, each month, ABC failed to provide any of the landing pages to show how the services were actually marketed to consumers.  ¶¶ 52, 52 n.8, 90.  Rather, it provided only the purported LOAs.  ¶¶ 86-90.

These LOAs prominently displayed the name of the service and the heading "LETTER OF AGENCY" at the top of the page, above data fields consumers had purportedly filled in. ¶ 86.  They disclosed the nature, costs, and terms of the service, just above a very prominent "Order Now" button.  ¶ 86.  These LOAs made it appear that consumers navigated to the service's website, wanted the service, filled in the fields, and clicked the Order Now button to agree to purchase the service.  ¶ 86.

Despite the obvious inconsistency between these straightforward LOAs and the astronomical complaint rates, BSG never followed up when ABC failed to produce the marketing consumers actually saw.  ¶¶ 52 n.8, 90, 92.  This marketing was completely contrary to the LOAs.  ¶¶ 86, 93.  Specifically, it consisted of Internet "offers" that appeared to be part of the sign-up process for an unrelated, free service or event, such as voting in a picture contest or obtaining a free email account.  ¶ 93.  As consumers clicked through the web pages related to these free events or services, the offer pages for the crammed services appeared several pages into the click-through and appeared to be part of the unrelated sign-up.  ¶ 93.  Indeed, the offer pages were pre-populated with information (such as name, address, and phone number) that consumers had initially entered to obtain the free email account or to vote, and contained a prominent heading such as "You're Almost Ready to Cast Your Vote!" or "Your Email Account is Almost Ready!"  ¶ 93.  Though the offer pages "disclosed" the service, its cost, and that it would be billed to the user's telephone number, these disclosures appeared in a lengthy block of tiny text sandwiched between the large-print headline and the pre-populated data fields.[9]  ¶ 93.  Moreover, at the bottom of the page, well below the terms, was a button that (like prior screens) said "submit and go to next page", "submit and continue to next page," or "accept and go to next

---

[9]  The offer pages disclosed nothing about any refund policy.  ¶93.

page." ¶ 93.  However, when consumers clicked that button, they did not just continue to the next page related to the free event or service; they were signed up to be LEC billed for the service. ¶ 93.  Nothing in the following screens indicated that they had just agreed to be billed. ¶ 93.

But BSG did nothing to investigate or address this patently deceptive marketing.  In fact, when BSG once asked how a particular consumer would have seen an advertisement, ABC responded, "We do not track the signup specific information you are asking about[.]"  ¶ 91.  BSG never followed up on this admission.  ¶¶ 52 n.8, 90.  Nor did BSG follow up on, or treat with any urgency, the recorded calls from angry consumers alleging fraud in the online sign-up process.[10]

       3.       <u>BSG never followed up on usage of any of the services.</u>

Faced with voluminous complaints, Landeen's failure to provide the actual marketing, and woefully inconsistent LOAs, BSG still failed to monitor usage information.  That usage

---

[10] Consumers often stated, in no uncertain terms, that they never signed up for the services. ¶ 95.  When a call-center representative told a consumer that his law firm's phone line had paid six months of charges for voicemail ordered by "David Jones," the consumer replied, "Nice gig you guys got, David Jones.  I got seven employees and we don't have any Davids or any Joneses."   ¶ 95A.  Another consumer complained of unauthorized charges for InfoCall, and the representative countered that the LOA included her correct address and telephone number.  The consumer responded, "Yeah, which you can look in the phone book and find … I can't even believe that AT&T even allows you guys to bill on this." ¶ 95B.  Another representative refused to issue credits to a consumer who was charged for Streaming Flix, even though consumer did not have a computer and the order was in her ex-husband's name.  The consumer responded, "But this is not right, how somebody can put something on my phone bill that I don't even have and I have to pay it. … the phone is in my name and I did not okay this." ¶ 95G.

On these calls, representatives sometimes misrepresented the services' sign-up process in an effort to sustain the charges.  For example, when a consumer disputed charges for Digital Vmail, the representative told him he could only be charged after "manually enter[ing] all of your information in on the order form and then click[ing] the order now button and submit it to us." ¶ 95H.  But the representatives had moments of accidental honesty as well.  When a consumer disputed charges for Instant411 that were in her son's name, the representative told her, "Well, he may have been on one of our advertising affiliate sites and thought he was signing up for something else." ¶ 95L.

information reveals that for the hundreds of thousands of the consumers BSG billed, usage was practically nonexistent.  ¶¶ 106-110.  For example, while BSG was billing between 85,000 and 100,000 "customers" each month for voicemail boxes, only 209 voicemail boxes were used by consumers.  ¶ 107.  Likewise, during the lucrative year and a half BSG billed over 250,000 consumers a net $9,642,992.00 for Streaming Flix, at least 99.99% of Streaming Flix's "customers" never streamed any movies.  ¶ 108.

4.   <u>BSG continued billing for the services even after AT&T forced them to acknowledge that thousands of consumers were improperly billed.</u>

In early 2010, in response to continuously high complaint levels, AT&T terminated billing for MyIproducts and stopped all billing of new "customers" for 800 Vmailbox, Digital Vmail, and Streaming Flix.  ¶ 97.  At AT&T's prompting, BSG then "scrubbed" the existing customer lists for those services in AT&T's southeast region to determine whether the phone numbers it was billing matched the names and addresses purportedly provided by consumers when they "signed up" for the services.  ¶ 99.  BSG conducted the analysis for 800 Vmailbox and Digital Vmail, finding that 5,430 of the 8,413 telephone numbers it was currently billing in that region for the two services – a stunning 64% – did not match the provided name and address.  ¶ 100.  Moreover, when Landeen's company conducted a similar scrub for Streaming Flix for all billings (not limited to AT&T's southeast region), it found that 26% of the phone numbers billed did not belong to the consumer who purportedly ordered the service.  ¶ 100.

With this stunning information in hand, BSG still did not cut off all billing for the services.  ¶¶ 101, 111.  Nor did it issue credits to "scrubbed" consumers whose numbers were improperly billed, conduct a full-scale investigation commensurate with such widespread unauthorized billing, or report the matter to law enforcement.  ¶ 101.  Instead, BSG simply

removed the mismatched numbers from the services' billing rosters and continued billing the rest

of the Landeen companies' "customers."  ¶ 101.  In fact, BSG then doubled down on its

relationships with the crammers, approving two new Landeen services for billing in the fall of

2010.  ¶ 104.  Fortunately for consumers, Verizon caught the services' connections to the

terminated Streaming Flix and denied the applications.  ¶ 104.  However, it was not until the FBI

raided Landeen's Minneapolis offices in December 2010 that BSG finally stopped billing for her

companies' services.  ¶ 111.

> ### C.      BSG billed more than $50,000,000 in net unauthorized charges.

In total, BSG billed 1,196,346 telephone numbers for Landeen's services.  ¶ 112.  This

resulted in $52,631,224.46 in net billings collected from consumers.  ¶ 112.

## II.      BSG's Unauthorized Billings Violated the Permanent Injunction.

> ### A.  The Permanent Injunction binds each of the Contempt Defendants.

The Permanent Injunction binds HBS and BSGNA as parties to the underlying

proceeding.  Fed. R. Civ. P. 65(d)(2)(A).  When the Court entered the Permanent Injunction,

HBS was known as Hold Billing and BSGNA was known as HBS, Inc.  ¶¶ 4, 6, 7, 12.  Both

entities have since changed their names and made superficial adjustments to their corporate

forms, none of which affects their status as parties to the Permanent Injunction.  ¶¶ 6, 7, 12; *see*

*New York v. Operation Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996) (an organization may not

avoid an order "merely by making superficial changes in the organization's name or form").

Injunctions also bind nonparties who (1) have actual notice of the injunction and (2) are

"in active concert or participation with" a party.  Fed. R. Civ. P. 65(d)(2)(c).  Bound nonparties

fall into two categories:  first, those who aid or abet a party's violation of an order; and second,

those who have "sufficiently close identity of interests [with a party] to justify . . . the

-13-

enforcement of an injunction against a nonparty." *Nat'l Spiritual Assembly of the Baha'is of U.S. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of the Baha'is of U.S., Inc.*, 628 F.3d 837, 848-49 (7th Cir. 2010) (internal quotation marks omitted).  In the second category, nonparties who have sufficiently close relationships with parties include those who are "identified with them in interest, in 'privity' with them, represented by them or subject to their control." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13-14 (1945); *see Waffenschmidt v. MacKay*, 763 F.2d 711, 717 (5th Cir. 1985).

Here, all of the BSG entities have actual notice of the Permanent Injunction, as evidenced by its disclosure in agreements that each company signed during a 2003 merger.  ¶ 10.  Additionally, as described below, all of the companies both aided and abetted Defendant BSGNA and are closely identified in interest with BSGNA.  Accordingly, they are all bound by the Permanent Injunction.

> 1. BSGNA's subsidiaries BSG Clearing, ESBI, ACI, and BCI aided and abetted BSGNA and are subject to BSGNA's control.

BSGNA's subsidiaries BSG Clearing, ACI, ESBI, and BCI aided and abetted BSGNA to violate the Permanent Injunction, as the subsidiaries are simply shells through which BSGNA acts.  *See Waffenschmidt*, 763 F.2d at 717 ("[D]efendants may not nullify a decree by carrying out prohibited acts through aiders and abettors"), quoting *Regal Knitwear*, 324 U.S. at 14.  In fact, CEO Greg Carter testified that the billing subsidiaries (HBS, ACI, ESBI, and BCI) exist only as "identities" on a consumer's telephone bill.  ¶ 16.  Indeed, the insignificance of the companies' nominal corporate structure is highlighted by their integrated daily operations.  Notably, BSGNA and its subsidiaries have operated from one building in San Antonio ever since an "operational merger" of the six companies in 2004.  ¶ 13, 15.  Moreover, one roster of

-14-

employees performs the work of all the entities, and the same officers manage all of them.
¶¶ 14-15.  Further, BSGNA files one consolidated tax return for the BSG companies.  ¶ 18.
BSGNA's subsidiaries are thus "aiders and abettors" through which BSGNA carries out the acts
prohibited by the Permanent Injunction.

        The companies' intertwined corporate structure also demonstrates BSGNA's control over
its subsidiaries and, thus, the "close identity of interests" among the entities.  *Baha'is*, 628 F.3d
at 849; *see Regal Knitwear*, 324 U.S. at 13-14.  As discussed above, BSGNA runs its operations
from a single office and uses the same personnel to conduct all of the enterprise's business.
Indeed, BSGNA highlighted its subsidiaries' status as mere instruments of its will by
covenanting in loan documents to ensure that the subsidiaries – among other things – "comply in
all material respects with all applicable . . . orders."  ¶ 18.  In a similar case, the Fifth Circuit
found a "control relationship" that justified enforcing a parent's order against an unnamed
subsidiary where, as with BSGNA, the subsidiary and the parent operated from the same office;
the same officers, directors, and employees conducted the business of both parent and subsidiary;
and the subsidiary existed only to carry out its parent's transactions.  *Teas v. Twentieth-Century
Fox Film Corp.*, 413 F.2d 1263, 1268-69 (5th Cir. 1969).

        2.    <u>Parent company BSG Ltd. aided and abetted BSGNA, and BSG Ltd. is
fully identified in interest with BSGNA.</u>

        BSGNA's parent company BSG Ltd. aided and abetted BSGNA to violate the Permanent
Injunction by enabling and overseeing its violative conduct.  *See Waffenschmidt*, 763 F.2d at
717; *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 75-76 (1st Cir. 2002) (non-party
"played an essential role in consummating the forbidden transaction" by executing contracts to
carry out a sale).  BSG Ltd.'s board is responsible for approving the budget for all of the

companies and monitoring the companies' financial performance. ¶ 19. BSG Ltd. also authorized the funding that supports BSGNA's billing activities. ¶ 19. Further, BSG Ltd.'s board regularly audits the enterprise's "internal controls," including its supposed anti-cramming measures, and CEO Greg Carter – who oversees the entire billing operation – sits on BSG Ltd.'s board as "executive director." ¶¶ 14, 19. BSG Ltd. therefore aided and abetted BSGNA's violative billing actions because it worked "hand in glove" with BSGNA to determine corporate strategy, fund their operations, and audit billing activities. *See Gemco Latinoamerica, Inc. v. Seiko Time Corp.*, 61 F.3d 94, 99 (1st Cir. 1995) (finding a nonparty bank in contempt of an asset remittance order because it controlled the parties' funds).

Because BSG Ltd. is integrated with BSGNA and responsible for its subsidiary's conduct, the companies also have a sufficiently close relationship to justify enforcement of the Permanent Injunction against BSG Ltd. *See Baha'is*, 628 F.3d at 849; *Regal Knitwear*, 324 U.S. at 13-14 (1945). For example, where a parent corporation has knowledge of an order against its subsidiary, is responsible for the subsidiary's conduct, and fails to take action within its power to ensure compliance, it is equally liable with its subsidiary for violations of the order. *Wirtz v. Ocala Gas Co., Inc.*, 336 F.2d 236, 242 (5th Cir. 1964) (quoting *Wilson v. United States*, 221 U.S. 361, 376 (1911)). As noted above, BSG Ltd. has notice of the Permanent Injunction through its predecessor entity. ¶¶ 9-11. Moreover, as BSG Ltd.'s board of directors oversees the group's operations, BSG Ltd. is responsible for setting the group's policies. ¶¶ 14, 19. Oversight of BSGNA is in fact BSG Ltd.'s primary responsibility, as BSGNA is BSG Ltd.'s sole asset. ¶¶ 9, 11-12.[11] In particular, BSG Ltd. has demonstrated its compliance authority over BSGNA's

---

[11] As the same directors oversee the actions of BSG Ltd. and BSGNA, BSGNA's CEO sits on BSG Ltd.'s board, and BSG Ltd.'s sole asset is BSGNA, it appears the companies' rights and

operations by commissioning audits that examined the group's billing practices.  ¶ 19.  Yet, BSG's long record of unauthorized billing, described above, demonstrates that BSG Ltd. utterly failed to ensure its subsidiaries' compliance with the Permanent Injunction, rendering it liable for the group's violations of the Permanent Injunction.[12]

> **B.      The Contempt Defendants act as a common enterprise.**

The BSG companies operate as a single enterprise.  ¶¶ 13-19.  As discussed above, all the BSG companies share directors, officers, and employees; all of the companies' operations are integrated and occur in the group's San Antonio office; all of the companies present themselves under the BSG brand.  ¶¶ 13-15.  *See Zale Corp. v. FTC*, 473 F.2d 1317, 1321-22 (5th Cir. 1973); *Delaware Watch Co., Inc. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 722-23 (S.D. Texas 2008) (common enterprise exists where companies share control group, office space, and officers, and transact business through interrelated companies). It is therefore appropriate not only to bind each of the Contempt Defendants under the Permanent Injunction, but also to consider their actions as a whole rather than company-by-company.  *See Zale*, 473 F.2d at 1321-22 (when a group of companies acts as a common enterprise and recognition of their corporate forms would frustrate a statutory policy, the Fifth

---

interests are identical.  *See Regal Knitwear*, 324 U.S. at 13-14; *Teas*, 413 F.2d at 1269 n.7 (finding "substantial identity" where a subsidiary and parent had integrated operations and a single group of officers and directors acted for both); *compare Harris County v. Carmax Auto Superstores Inc.*, 177 F.3d 306, 314 (5th Cir. 1999) (declining to enforce an order obtained against the El Paso district attorney as to actions taken by the Harris County attorney where the two defendants represented separate jurisdictions and did not have a sufficiently close relationship to establish privity).

[12]  Although the facts demonstrate that BSG knew or should have known that it was billing unauthorized charges for vendors who ensnared consumers with deceptive marketing, the Permanent Injunction imposes liability on BSG for such conduct regardless of its knowledge.  *See also McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) (willfulness is not an element of civil contempt).

Circuit treats them as one).  Turning a blind eye to the realities of BSG's operation would

frustrate enforcement of an order obtained in the public interest to protect consumers under the

FTC Act.  Therefore, all of the BSG companies are responsible for any acts the enterprise took to

violate the Permanent Injunction and for all of the harm caused by the enterprise's violative

conduct.

      **C.**     **The Contempt Defendants violated the Permanent Injunction.**

BSG violated the Permanent Injunction in three ways.  First, the enterprise billed on

behalf of corrupt vendors who, instead of clearly and conspicuously disclosing the terms of their

services, used deceptive Internet click-through marketing.  Second, it billed for services that

consumers never authorized.  Third, by placing charges for those services on consumers' bills, it

misrepresented that consumers authorized the charges.

          1.     <u>Contempt Defendants billed and collected for vendors who did not</u>
                    <u>disclose terms of service clearly and conspicuously.</u>

Permanent Injunction Paragraph V.A prohibits Defendants from "[b]illing" or

"collecting" payments, directly or indirectly, for any vendor that does not "clearly and

conspicuously" disclose certain terms before making a sale, including the cost of service, the fact

that the service will be LEC-billed, and the vendor's refund policy.  Contempt Defendants billed

for vendors who buried their "offers" several screens into click-through pages of an unrelated,

free service sign-up, and even those offers failed to disclose all required terms.

Contempt Defendants violated Paragraph V.A by billing for all of the vendors described

above.  Those vendors sold services through click-through advertising for seemingly innocuous,

free services or events, such as free email accounts or photo contests.  "Offers" for the vendors'

crammed services were hidden within numerous pages concerning these innocuous events, were

pre-populated with consumers' information, and only disclosed terms of the crammed services in

tiny print.  Moreover, the offers were accompanied by a "submit and continue" button, instead of

an "Order Now" button or confirmation screen that would have made clear that the user was

ordering a LEC-billed service.  These offers utterly failed to disclose the services' terms "clearly

and conspicuously" and entirely failed to address the refund policy as required by the Permanent

Injunction.

2.      <u>Contempt Defendants billed and collected for vendors who sold services<br>that consumers never authorized.</u>

Permanent Injunction Paragraph III prohibits Defendants from "billing" or "collecting"

payment, directly or indirectly, for any charge that was not "expressly authorized" by the owner

of the phone line billed.  Similarly, Permanent Injunction Paragraph V.B.1 prohibits Defendants

from "[b]illing" or "collecting" payment for any charge on behalf of a vendor that did not obtain

"express authorization" for the charge.

Contempt Defendants violated these paragraphs by billing and collecting for the vendors

described above.  These vendors charged for services that were not expressly authorized, as

demonstrated by their deceptive click-through marketing, astronomical complaint rates, and

miniscule usage.  Additionally, more than 50% of consumers billed for these services sought and

received credits for some or all of the charges.  In the credit card billing context, such a

chargeback rate is extraordinarily high and a clear indicator of fraud.

3.      <u>Contempt Defendants misrepresented that consumers authorized charges<br>for vendors' services.</u>

Paragraph II.A.3 of the Permanent Injunction prohibits Defendants from "[m]aking any

express or implied misrepresentation of material fact" in connection with LEC billing, including

any misrepresentation that a consumer authorized a charge.

-19-

Contempt Defendants violated this provision when they billed consumers for the vendors discussed above. These bills to consumers constituted misrepresentations that the charges were authorized, due, and payable. In addition, Contempt Defendants frequently misrepresented that the transactions were authorized in response to consumer complaints by pointing to LOAs that consumers never saw. Misrepresentations that influence consumers' decisions are "material." *See, e.g., FTC v. Figgie Int'l*, 994 F.2d 595, 603-04 (9th Cir. 1993); *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992). By placing charges on consumers' phone bills, and by presenting phony LOAs for those charges, BSG influenced thousands of consumers to pay its charges. BSG thus made material misrepresentations in violation of the Permanent Injunction.

**D.     Contempt Defendants' violations caused more than $50,000,000 in harm.**

The measure of the compensatory civil contempt remedy is the amount required to reimburse the injured party for harm the contemnor caused. *See American Airlines, Inc. v. Allied Pilots Assn.*, 228 F.3d 574, 585 (5th Cir. 2000). Consumer loss is the proper measure of compensation in FTC-initiated contempt proceedings. *See FTC v. Trudeau*, 662 F.3d 947, 950 (7th Cir. 2011); *FTC v. Kuykendall*, 371 F.3d 745, 765 (10th Cir. 2004); *McGregor v. Chierico*, 206 F.3d 1378, 1388-89 (11th Cir. 2000). Contempt Defendants' net billings for the nine bogus services totaled $52,631,224.46. The FTC therefore seeks an Order to show cause why they should not be held in civil contempt and ordered to pay a compensatory sanction in this amount.

Dated:  March 28, 2012          Respectfully Submitted,

*/s/ Douglas V. Wolfe*
Douglas V. Wolfe (DC Bar #437476)
Attorney for Federal Trade Commission (Admitted *Pro Hac Vice*)
Telephone:  (202) 326-3113; Fax:  (202) 326-2558
Email: dwolfe@ftc.gov
600 Pennsylvania Ave., N.W., M-8102 B
Washington, D.C. 20580

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | SA-98-CA-629-FB (HJB) |
| | § | |
| HOLD BILLING SERVICES, LTD., | § | |
| ET AL., | § | |
| | § | |
| Defendants. | § | |

## ORDER

The matter before the Court is Respondents' Amended & Supplemental Motion for Leave to Conduct Discovery. (Docket Entry 104.) Pretrial matters have been referred to the undersigned for disposition pursuant to 28 U.S.C. § 636(b). (*See* Docket Entry 96.)

Plaintiff filed a Motion to Show Cause Why Respondents Should Not be Held in Contempt on April 4, 2012. (Docket Entry 65.) This motion claims that Respondents violated a permanent injunction issued in 1999. (*Id.; see* Docket Entry 39.) As part of its response to that motion, Respondents filed a Motion for Leave to Conduct Discovery on April 2, 2013. (Docket Entry 94.) A status conference in the case was held the following day. At the conference, Respondents' motion fo discovery was discussed, and the Court stated that Respondents would be given an "opportunity to contest the issues in" Plaintiff's Motion to Show Cause, and that this opportunity would "involve some limited discovery." (Docket Entry 104-1, at 4.)[1] The Court encouraged the parties to attempt

---

[1] *Cf D. Patrick, Inc. v. Ford Motor. Co.* 8 F.3d 455, 459 (7th Cir. 1993) ("Due process may entitle the parties to discovery and an evidentiary hearing to the extent necessary to resolve relevant factual disputes. . . . However, because the contempt proceeding is concerned solely with whether or not the respondent's conduct violates a prior court order, the parties cannot reasonably expect to

to reach an agreement on the nature and scope of the discovery to be conducted. (*Id.* at 9.)

On April 24, 2013, Respondents filed the instant motion, informing the Court that the parties were unable to reach a complete agreement concerning Respondents' discovery requests. The motion modifies and amends Respondents' previous motion, and it requests that the Court determine the scope and nature of the requested discovery. (Docket Entry 104, at 2.) As amended, Respondents' discovery requests include: (1) the material and documents the Federal Bureau of Investigation (FBI) shared with Plaintiff; (2) a deposition of Anabel Genetski, the depositions of up to six other individuals, and four depositions of corporate representatives; (3) written discovery, including single sets of Requests for Production, Interrogatories, and Requests for Admissions; and (4) a reasonable discovery and pre-hearing schedule.[2] (*Id.* at 5–10.) Respondents contend that this discovery is reasonably calculated to lead to the discovery of admissible evidence, and that it is necessary to help them prepare their defense to Plaintiff's claim for violation of a permanent injunction. (*Id.*)

Plaintiff responds to these discovery requests by arguing that Respondents already have all the relevant documents they need to defend the contempt action, except certain documents the FBI obtained through a search warrant executed at the business premises of Cindy Landeen. (Docket Entry 105, at 4.) As to those documents, Plaintiff states that the "FBI has asserted to [Respondents] that the documents it provided to [Plaintiff] are non-public but that it will consider releasing, or allowing [Plaintiff] to release, the documents if [Respondents] counsel submits to the FBI a letter

_____

litigate to the same extent that they might in a new and independent civil action.") (citations omitted).

[2] The request for a discovery and pre-hearing schedule is addressed in a separate Scheduling Order issued this date.

setting forth the scope and relevance of the requested documents." (*Id.*)

Plaintiff further responds that it is opposed to Respondents' deposition request for Anabel Genetski, but that it has already agreed to Respondents' depositions of Stephen Oskoui, Andrew Chen, and Brian Percival. (Docket Entry 105, at 8–9.) It notes that Genetski is no longer employed by the FTC, and it argues that it would be a waste of time to depose Genetski because she only summarized "the total billings and credits in documents" that Respondents produced in discovery and that, because the summaries are admissible evidence, there is no need to depose Genetski. (*Id.* at 9.) However, Plaintiff states that if the Court decides Genetski's deposition is necessary, then it "will have a currently-employed data analyst re-run the summary calculations, sign a new declaration, and be made available for deposition." (*Id.* at 10.) As for the deposition of any other individuals, Plaintiff argues that Respondents should be required to identify these persons and the reasons it believes the additional depositions are necessary; Plaintiff states that it will then respond to the requests for additional depositions once those witnesses are disclosed. (*Id.*)

Next, Plaintiff responds that Respondents request for open-ended written discovery is too broad because Respondents request unlimited, unspecified discovery without identifying a dispute of material fact or a cognizable defense in which its requests are based. (Docket Entry 105, at 6.) Specifically, Plaintiff contends that Respondents' request for "all Documents that were generated, obtained, and/or maintained in connection with *Federal Trade Commission v. Nationwide Connections, Inc.* lawsuit, and which have been reviewed, considered, or relied upon by [Plaintiff for] its investigation of any company Affiliated with BCG and/or FTC's allegations in the [Motion to Show Cause]" is too broad because the *Nationwide* case has no bearing on whether Respondents violated the Permanent Injunction at issue in this case. (*Id.*; *see* Docket Entry 104-10, at 7.) Plaintiff

3

also argues that many of Respondents' request for written discovery call for documents that are privileged. (*Id.* at 7.) Plaintiff asks the Court to consider Respondents written discovery requests only if the requests are reasonably calculated to lead to the discovery of admissible evidence. (*Id.* at 8.)

Having carefully considered the parties' contentions, the Court finds that Respondents' Amended & Supplemental Motion for Leave to Conduct Discovery (Docket Entry 104) should be **GRANTED IN PART** and **DENIED IN PART**, as follows:

1. The motion is **GRANTED IN PART** as to Respondents' request for any FBI material shared with and used by Plaintiff in preparing its Motion to Show Cause Why Respondents Should Not be Held in Contempt. (Docket Entry 65.) Respondents are entitled to discover such material, but they must abide by the regulations for seeking such documents from the FBI. *See* 28 C.F.R. § 16.21 *et. seq.*; *Touhy v. Regan*, 340 U.S. 462 (1951).[3]

2. The motion is **GRANTED IN PART** as to Respondents' requested depositions. As Anabel Genetski is no longer employed with Plaintiff, Plaintiff must have a currently employed data analyst re-run the summary calculations and sign a new calculation, and Plaintiff must make that employee available for deposition. Respondents may also take the depositions of Stephen Oskoui and Andrew Chen. Respondents may take the deposition of Brian Percival, but only after compliance with the proper regulations as noted above. No other depositions may be taken without leave of Court.

---

[3]Respondents' argument that the regulations do not apply because the United States is a party to this litigation is rejected. *See* 28 C.F.R. § 16.21(a)(1) ("This subpart sets forth procedures to be followed with respect to the production or disclosure of any material contained in the files of the Department . . . (1) In all federal and state proceedings in which the United States is a party . . . .").

3.  The motion is **GRANTED IN PART** as to Respondents' request for written discovery. Respondents may serve a single set of Requests for Production, Interrogatories, and Requests for Admission upon Plaintiff.  The written discovery requests must seek material that is relevant to Respondents' defense—that is, they must be "reasonably calculated to lead to the discovery of admissible evidence."  FED. R. CIV. P. 26(b)(1).  As Respondents have not demonstrated the relevance of documents that relate to the case of *Federal Trade Commission v. Nationwide Connections, Inc.*, that request is **DENIED**.  With regard to any documents that Plaintiff claims may be privileged, Respondents' motion is **DENIED WITHOUT PREJUDICE**.  Plaintiff must identify such documents in a privilege log pursuant to Federal Rule of Civil Procedure 26(b)(5)(A), and if Respondents dispute any such claim, they may seek disclosure through a timely motion to compel production.

4.  All other discovery requested in Respondents' Supplemental Motion (Docket Entry 104), and not addressed in this Order or the Court's contemporaneously filed Scheduling Order, is **DENIED**.

In light of the filing of Respondents' Supplemental Motion, Respondents' original discovery motion (Docket Entry 94) is **DENIED AS MOOT**.

It is so **ORDERED**.
**SIGNED** this 3rd day of May, 2013.

Henry J. Bemporad
United States Magistrate Judge

5