IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION** | § | |
| | § | |
| Plaintiff, | § | |
| vs. | § | No. 5:98-CV-0629-FB-HJB |
| | § | |
| **HOLD BILLING SERVICES, LTD., et al.** | § | |
| | § | |
| Defendants | § | |

RESPONDENTS' OPPOSITION TO
FEDERAL TRADE COMMISSION'S MOTION *IN LIMINE* TO EXCLUDE
THE TESTIMONY OF DR. ROBERT RAUSCHENBERGER

These contempt proceedings are being tried to the Court – not a jury. "Motions in limine are intended to prevent allegedly prejudicial evidence from being so much as whispered before a jury prior to obtaining the Court's permission to broach the topic. In a bench trial, such procedures are unnecessary, as the Court can and does readily exclude from its consideration inappropriate evidence of whatever ilk." *Cramer v. Sabine Transp. Co.*, 141 F. Supp. 2d 727, 733 (S.D. Tex. 2001). Further, because there is no risk of tainting the trial by exposing a jury to unreliable or irrelevant evidence in bench trials, the importance of the trial court's gatekeeper role under *Daubert* is significantly diminished. *Whitehouse Hotel Ltd. Partnership v. C.I.R.*, 615 F.3d 321, 330 (5th Cir. 2010). On these legal predicates alone the Court can deny the FTC's Motion *In Limine* and hear Dr. Rauschenberger's testimony. However, the Court should also deny the FTC's Motion because Dr. Rauschenberger's opinions are relevant and helpful.

The FTC claims Dr. Rauschenberger's conclusions are "irrelevant" because Dr. Rauschenberger did not try to determine whether consumers actually understood the terms of the products or services at issue or realized that they had signed up. (Motion, p. 8). According to the FTC, Dr. Rauschenberger fails to address "any of the facts at issue in this case," which are, in

the Government's terms, "whether the consumers expressly authorized charges, and whether the marketing's disclosures were 'clear and conspicuous.'" (Motion, p. 9).

It is true that Dr. Rauschenberger is not offering conclusions about whether any particular consumer did or did not authorize Landeen Entity charges. Indeed, this is what the FTC must ultimately prove by clear and convincing evidence. Instead, Dr. Rauschenberger renders the opinion that the terms and conditions of the Landeen Entity offers presented by Smiley Media were clear and conspicuous so consumers could make informed choices. Dr. Rauschenberger's opinions, backed by scientific literature, refute the FTC's unsubstantiated assertion that all the Landeen Entity consumers who were presented with ads from Smiley Media were duped. Thus, Dr. Rauschenberger's expert psychological testimony will be helpful to the Court. Moreover, Dr. Rauschenberger's testimony is relevant: It shows precisely why the FTC's allegations regarding the allegedly deceptive marketing do not support its ultimate burden.

## INTRODUCTION

Dr. Rauschenberger is a cognitive psychologist whose master's and Ph.D. research focused on perception and attention – how people take visual and auditory input from the world, organize and interpret it, and make decisions based upon it. (Depo.[1] 12:4-23). His professional work concentrates on human-computer interaction – the study of how people interact with technology, including how people make decisions in response to webpages. (Depo. 13:7-10). Dr. Rauschenberger has published in peer reviewed scientific literature and serves as a grant reviewer for the National Science Foundation in this field. (Report,[2] p. 1-2). His peer reviewed publications include those on topics of human-computer interaction and consumers' responses to

---

[1] Depo refers to the Deposition of Robert Rauschenberger dated September 27, 2013, excerpts of which are attached hereto as Exhibit A.
[2] Dr. Rauschenberger's Report is attached as Exhibit A to the Motion.

webpages.[3]  (*Id.*, p. 26).  He has evaluated consumers' interaction with products using the Food and Drug Administration's and Consumer Product Safety Commission's databases.  (*Id.*, p. 2).

The FTC contends that the Landeen Entities at issue in the FTC's Motion to Show Cause "employed facially deceptive click-through marketing."  FTC FOF,[4] p. 44, ¶ 181.  Dr. Rauschenberger's work and opinions refute this allegation in three ways:

*First*, Dr. Rauschenberger applied established heuristic methodology to evaluate the allegedly deceptive marketing materials.[5]  Using the FTC's published marketing guidelines, Dr. Rauschenberger assessed whether the terms and conditions of the offers were clear and conspicuous.  (Report, pp. 2, 3-7).  Based on the heuristic evaluation, Dr. Rauschenberger concluded that computer users who encountered the marketing materials would be able to identify and differentiate the offers and advertisements, including the consequences of their acceptance or rejection of the advertised offers.  (*Id*., pp. 3-7, 19; Depo., 93:22-94:20).

*Second*, through a usability study, Dr. Rauschenberger presented consumers with the Landeen marketing materials to confirm that consumers were not distracted by other design aspects of the advertisement from the clearly and conspicuously disclosed terms and conditions. (*Id.*, pp. 7-11, 19).  Some of the participants to the study were fitted with eye-tracking equipment to record the areas of the computer screen the participant saw.  This eye gaze analysis confirmed that the terms and conditions texts were seen.  (*Id.*, pp. 9-12).

*Third,* Dr. Rauschenberger reviewed and analyzed data from Smiley Media as to what end users did while experiencing a series of Smiley Media ads in which a Landeen Entity offer

---

[3] *See* Zheng, X. S., Chakraborty, I., Lin, J. J. W., & Rauschenberger, R. (2009). *Correlating low-level image statistics with users' rapid aesthetic and affective judgments of web pages*. Long Paper presented at the 2009 CHI conference, Boston, MA, 2009.

[4] FTF FOF refers to the Federal Trade Commission's Proposed Findings of Fact and Conclusions of Law, Doc. 157.

[5] The allegedly deceptive marketing materials were "Internet 'offers' … placed with … Smiley Media." FTC FOF p. 34, ¶ 146.

was placed.  This analysis confirmed the results of Dr. Rauschenberger's heuristic evaluation and userability study.  The Smiley Media data demonstrated that 99% of the users skipped <u>at least</u> one advertisement in the offered series, which implicates discernible acceptance and rejection of advertisements.  (Report, p. 12).  Also, the Smiley Media data showed that the vast majority of users confronted with the advertisements skipped at least one advertisement; and, only 1 percent selected all products advertised.[6]  (Report, p. 12).

The FTC's arguments on why Dr. Rauschenberger's testimony and opinions should be excluded are simply challenges to the weight of the evidence, more appropriately suited for cross examination.  They are not grounds to exclude the ***only*** expert testimony proffered to this Court on the issue of whether the Landeen Entities "employed facially deceptive click-through marketing" as alleged by the FTC.

## ARGUMENT

### I. Dr. Rauschenberger's Heuristics Evaluation Is Proper and Reliable

Dr. Rauschenberger's analysis started (but did not end) with the heuristic assessment.  Dr. Rauschenberger determined that the visibility of the system was the heuristic most germane to the FTC's sole piece of "evidence" regarding its charge of "deceptive click-through marketing" – i.e., the MyEmail.com work flow,[8] and that other heuristics were encompassed under that broad category.  (Depo. Ex. 5[9]; Report, p. 3; Depo., 22:20-24; 60:20-61:14; 64:10-67:15).[10]  The

---

[6] Dr. Rauschenberger also draws from psychology studies to offer alternative explanations for the consumer acts (such as the failure to heed warnings, user error, and buyer's remorse) instead of jumping to the FTC's conclusion that all subscribers were deceived. (*Id.,* pp. 13-19).

[8] As Dr. Rauschenberger explained in his deposition, not every heuristic or criteria is applicable to every test performed and nominally applying a heuristic to record the null result is meaningless.  Depo. 21:1-14.  The literature cited by the FTC (Zhang, *Using Usability Heuristics*) recognizes this additional heuristics, but fails to show that any other criteria is necessary to the assessment.  In fact, Zhang notes the heuristics it identifies are intended to evaluate medical devices. Zhang, p. 24.

[9] Depo. Ex. 5 is attached to the FTC's Motion as Exhibit F.

question Dr. Rauschenberger explored was whether the design of the workflow adequately communicated to the reasonable consumer that he or she was temporarily leaving the workflow to evaluate the optional offers and advertisements which bore terms and conditions to acceptance.  (Report, p. 3; Depo. 64:10-65:25).  Dr. Rauschenberger chose visibility as the primary criterion because the issue he wanted to address was whether the disclosures were clear and conspicuous to users.  (Depo., 59:15-62:17).  Based on Dr. Rauschenberger's review, the MyEmail.com work flow did visibly communicate the transition.

### A. Assessment of MyEmail.com Work Flow

Strong visual cues prompt differentiation between the MyEmail signup screen and the advertisements.  A "branding" expertise is not necessary to discern the visual cues necessary for the heuristic evaluation.  Dr. Rauschenberger uses "branding" to refer to "the visual design of a product or a company representation that connotes the features of that company or that product consistently across different instantiations, different representations, different products of the same brand." (Depo. 81:16-22).  Dr. Rauschenberger does not consider himself a "branding

---

[10] Heuristic assessments are not foreign to the FTC.  In fact, the FTC has advocated their use.  In *F.T.C. v. Commerce Planet, Inc.*, 878 F.Supp.2d 1048 (C.D. Cal. 2012), the FTC presented a researcher and third-year Ph.D. candidate from the U.C. Berkeley School of Information as an expert on human-computer interaction ("HCI").  *Commerce Planet,* at 1068.  Ms. King, who is still a Ph.D. candidate, introduced HCI as an interdisciplinary study encompassing qualitative and quantitative methods and drawing upon fields including computer science, cognitive psychology and social psychology.  *Id.*  The FTC retained Ms. King to review the defendant's webpages to determine whether consumers would understand the negative option offers and continuity programs presented.  *Id.*  Ms. King conducted an inspection of the websites focusing on what a user can perceive and what the user should do.  *Id.*  Using HCI heuristics or principles of usability, the FTC's expert testified that most people who encountered the subject website would not understand the negative option.  *Id.* at 1068-69.  While Dr. Rauschenberger is more qualified and experienced than the graduate student the FTC proffered, he applied the same basic heuristic principles of cognitive psychology to reach his preliminary conclusions that the terms and conditions in the Smiley Media marking materials were clear and conspicuous.  Respondents should not be precluded from presenting Dr. Rauschenberger's opinions using the scientific methodologies the FTC championed in *Commerce Planet*.  Moreover, Dr. Rauschenberger went <u>further</u> than the *Commerce Planet* expert:  In addition to a heuristic evaluation, Dr. Rauschenberger conducted a usability study and analyzed Smiley Media data.

expert" in the academic sense, but notes that he is "a visual designer, and visual design is used in the service of branding…." (Depo. 83:10-23).

The "branding" that Dr. Rauschenberger reviewed within the MyEmail.com flow concentrated on the consistent soft color tones, rounded edges, and color gradients on the blue cloud-themed MyEmail.com pages which contrast the advertisements which are stark, rectilinear, and set-off on the screen with sharp-edged boundaries. (Report, p. 3; Depo. 65:4-66:9). The scientific research cited by Dr. Rauschenberger indicates that such crude distinctions are quickly recognized by the human visual system and signals to the user the transition between operative environments. *See* Greene, M.R. & Oliva, A. (2009), Recognition of natural scenes from global properties: Seeing the forest without representing the trees, *Cognitive Psychology 58*, 137-176. Indeed, once the user moves from the MyEmail.com signup pages into the optional advertisements, the advertisements continue with their own brand consistency until the user transitions back to the MyEmail.com welcome page. These readily apparent "branding" transitions coupled with the visual hierarchies, such as groupings, are recommended in human computer interaction for structuring visual information to increase comprehension, access, and speed by which a user searches out information. Gribbons, W.M. (1992), Organization by design: Some implications for structuring information. *Journal of Technical Writing and Communication, 22,* 57-75. As Dr. Rauschenberger concluded, the visual design aspects of the MyEmail.com work flow signaled the transition to advertisements which should alert the user to the different tasks being performed.

**B. Comparing the FTC Guidelines to MyEmail.com Work Flow**

Dr. Rauschenberger also compared the MyEmail.com work flow against the FTC's publication, *Dot Com Disclosures: Information About Online Advertising* (2000)[11], which provide guidance to advertisers regarding how to make disclosures clear and conspicuous. (Report, p. 5).  As noted in the 2000 publication, "[g]uides help businesses in their efforts to comply with the law by providing examples or direction on how to avoid unfair or deceptive acts or practices."  (*Dot Com Disclosures* (2000), p. 3).  Among the considerations outlined by the FTC publication are: (a) the placement of the disclosure and its proximity to the claim it qualifies; (b) the prominence of the disclosure; (c) distractions drawing attention away from the disclosure; and (d) whether the disclosure language is understandable. (*Id.* p. 5-6; Report, p. 6). Notably, the FTC's instructions state "[t]here is no set formula for a clear and conspicuous disclosure" and "[a]dvertisers have the flexibility to be creative in designing their ads, so long as necessary disclosures are communicated effectively and the overall message conveyed to consumers is not misleading." *Id.* at 5.  As an expert in visual perception and human-computer interaction, Dr. Rauschenberger is fully capable and qualified to assess whether, and capably describe how, these objective visual cues were fulfilled by the MyEmail.com work flow.[12] (Report, p. 6).[13]

---

[11] A true and correct copy is attached as Exhibit B.

[12] There are no witnesses identified in this litigation who will testify to the subjective standard of performance generally described in the FTC's online advertisers' guideline as "how consumers actually perceive and understand the disclosure in the context of the entire ad."  Regardless, that subjective standard is not controlling authority on the subject.

[13] And Dr. Rauschenberger's opinions in this regard are not "legal conclusions" as asserted by the FTC. (Motion, pp. 3-4).  Indeed, since the FTC's guidelines do not create any binding legal standard, Dr. Rauschenberger's comparison of the MyEmail marketing flow to the FTC's published guidelines is not a legal opinion.  *See* FTC's Dot.Com Disclosures (2000), fn. 6 (guides "do not have the force and effect of law.").

Dr. Rauschenberger's opinions do not rest exclusively on the heuristic evaluation and the fulfillment of the FTC's disclosure recommendations. While these are important empirical hurdles to satisfy, Dr. Rauschenberger's conclusions are augmented by the usability study that he performed and the data he analyzed. As noted in his Report, heuristic reviews are "no substitute for a test of the product using prospective users." (Report, p. 7).

## II. Dr. Rauschenberger Confirmed the Heuristic Assessment with the Usability Study

Following the heuristic evaluation, Dr. Rauschenberger conducted a usability study. In this portion of Dr. Rauschenberger's work, the FTC concedes that Dr. Rauschenberger is sufficiently qualified to design and perform the usability study. (Motion, p. 7). Additionally, the FTC does not contest the reliability of the data generated from the study. (*Id.*) Nevertheless, the FTC takes the incongruous position that Dr. Rauschenberger lacks the credentials to interpret the results of his usability study while the FTC attorneys are competent to draw their own erroneous conclusions. (*Id.*, p. 6-7).[14] The FTC misapprehends the purpose and effect of the usability study altogether.

Dr. Rauschenberger's usability tests provide direct information about how people interact with the subject marketing. (Depo. 25:12-26:7). The testing demonstrated that the study participants accepted the advertised products for several different reasons – none of which was because the participant was "deceived." To the contrary, the usability study shows that – despite the fact that users saw, read, and understood the disclosures, including the subscription costs and billing methodologies (i.e., the disclosures were clear and conspicuous) – some users rejected the offers while others seemingly accepted the product anyway as a result of user inattention, inadvertence, or error, or because they had taken other avoidance measures. (Report, pp. 8-9;

---

[14] The FTC has not offered any witness to testify to dispute Dr. Rauschenberger's opinions.

Depo. Ex. 11[15]; *see, e.g.,* Depo. 158:4-10; 179:17-19; 179:25-180:10; 195:11-25; 206:1-10).  In this respect, Dr. Rauschenberger's explanation and evaluation is not only pertinent, it is critical to understanding the usability study.  It illustrates the fallacy of the FTC's assertion that every consumer of the Landeen Entities was unaware of the terms and conditions that were initially offered to them.  Succinctly stated, user inattention, inadvertence, and error might excuse a user's action, but it does not lead to the conclusion that the terms and conditions were not clearly and conspicuously presented to the consumer.

Dr. Rauschenberger's visual perception usability study confirmed that attentive participants recognized and understood the terms and conditions of the offers presented. (Report, pp. 8-9; Depo. Ex. 11).  Participants to the study took affirmative steps to avoid incurring the charges presented associated with unwanted products and services and acted to accept products and services they wanted.  (*Id*., p. 9, Depo. Ex. 11).  Avoidance measures included announcing the intention to exit the site altogether, submitting artificial information, and skipping the advertisements one-by-one. (*Id.*) These actions reflect discerning consumer behavior on the part of the users based on the terms and conditions of the products offered.

Dr. Rauschenberger's opinions are relevant to the issue of whether the terms and conditions were clear and conspicuous to the user, or, as framed by the FTC, whether the Landeen Entities "employed facially deceptive click-through marketing."  Users who took time to read individual offers were less likely to accept offers in error.  (Report, p. 9).  The eye-tracking data confirmed that consumers were able to identify where the terms and conditions of any individual offer were located on the computer screen. (Report, p. 9).  Thus, the conclusion is that consumers are capable of understanding disclosures if they take the time to read them, but consumers are also capable of committing errors.  (Report, p. 11).  Based on his studies and

---

[15] Deposition Exhibit 11 is attached hereto as Exhibit C.

research, Dr. Rauschenberger concludes that users are not misled, but may be inattentive, careless and imprudent when accepting offers and expressly authorizing charges. (Report, p. 11-12).

Significantly, Dr. Rauschenberger's conclusions are confirmed in the advertising data supplied by Smiley Media. Dr. Rauschenberger's analysis of that data showed that 99% of the users skipped <u>at least</u> one advertisement in the offered series, which implicates discernible acceptance and rejection of advertisements. (Report, p. 12).[16]

### III.     Alternative Explanations for Consumer Behavior

Dr. Rauschenberger has studied, researched, trained in and lectured on cognitive as well as social psychology, human-computer interaction, and human factors to explain the manner in which people interact and react with their environment, including consumer behavior. (Report, pp. 25-32). While his empirical research emphasis is in vision, attention and HCI, Dr. Rauschenberger studied and taught social psychology (Depo. 335:22-337:2) which investigates, among other things, how people behave and respond in different circumstances and how they make decisions based on specific information presented to them. (Report, pp. 25-32). In particular, Dr. Rauschenberger has published on HCI topics such as consumer judgment based on webpages (*supra,* Zheng fn. 1). Because social psychology helps frame his understanding of user experience, Dr. Rauschenberger is generally aware of peer reviewed publications in the field

---

[16] The FTC's criticism of Dr. Rauschenberger's reliance upon the Smiley Media data is misplaced. Experts are entitled to base opinions on facts or data that the expert has been made aware of which need not be admissible for the opinion to be admitted so long as the data would reasonably be relied upon. FED. R. EVID. 703. From the Smiley Media data, Dr. Rauschenberger's showed that the vast majority of users confronted with the advertisements skipped at least one advertisement and that only 1 percent selected all products advertised. (Report, p. 12). Additional correlation between the Smiley Media data and Dr. Rauschenberger's study appeared when 45 percent of test participants exited out of the website without proceeding through the flow, which matched the Smiley Media data. (Report, p. 12; Depo. 263:14-20). Accordingly, Dr. Rauschenberger had no reason to doubt the conclusions from the usability test because they matched the Smiley data. (Report, p. 12).

that explains user behaviors, including consumer complaints, product usage and purchasing behaviors. (*Id.*, Depo. 317:512). Hence, by virtue of his education, training, experience, research and study in psychology, as well as his applied work in designing user experience of web products, he is qualified to testify to such subjects as an expert. FED. R. EVID. 702. Dr. Ruaschenberger's testimony is not outside his field of expertise and experience.

As part of his expert opinions in this case, Dr. Rauschenberger offers alternative explanations for consumer behavior that the FTC argues can only arise in response to unclear and inconspicuous disclosures. (Report, p. 13-19). The FTC distorts Dr. Rauschenberger's testimony by recasting his acknowledgement of possibilities as affirmations of fact. Further, the FTC seeks to prevent testimony that Dr. Rauschenberger is not offering. Dr. Rauschenberger is not and will not offer testimony about how many – by number or percentage – individual consumers selected or rejected any products for any particular reason. On the other hand, Dr. Rauschenberger will dispute the FTC's contention that all consumers who accepted the Landeen Entities' offers via the Smiley Media marketing path were deceived. The psychological literature is replete with instances of consumer conduct cases that establish many reasons for identical consumer behavior.

First, Dr. Rauschenberger rebuts the FTC's premise the disclosures are unclear because consumers would heed warnings if they understood them. The literature soundly refutes the FTC's sweeping claims, and Dr. Rauschenberger provides examples of "real-world" studies where warnings are routinely disregarded. (Report, p. 13, *see e.g.* Kerpelman (1978)). In fact, studies attempting to show improved behavior as a result of warning labels or signs have shown the opposite. (*Id.*, *see* Ayres et al. (1998)). As additional examples, Dr. Rauschenberger cites studies of consumers with food allergies who repeatedly fail to read ingredient labels for their

specific allergen. (*Id*., Vierk, et al (2007) and Hefle et al. (2007))  These references readily illustrate that consumer tendencies to ignore warnings can explain how some consumers may disregard what is clear and conspicuous.  This is simply one alternative reason to reject the FTC's leap that unclear and inconspicuous terms and conditions always or must lead to consumer deception.

Similarly, usage rates cannot be conclusively linked to deception or cramming[17] because there are ample psychological references which show that purchases of unused or underutilized products occur frequently.  (Report, p. 15, citing Trocchia, P.J. et al. (2002)); and Della Vigna, S. et al., (2006).  Common examples that are readily verifiable are unused gift cards or gym memberships.  (Report, p. 15)  Again, Dr. Rauschenberger will not quantify the number of persons who intentionally acquired Landeen Entity products or services but failed to use them.[18]  In this respect, the FTC wants to exclude Dr. Rauschenberger from giving testimony that he is not offering.

---

[17] Dr. Rauschenberger needs no experience or training in the telecommunication arena is needed to render these opinions in this case.  Dr. Rauschenberger is not offering opinions regarding "cramming" or the "detection of cramming." (Depo. 51:3-18).  Rather, his opinions simply relate to whether the terms and conditions of the marketing materials were clear and conspicuous to users.  This testimony directly refutes the FTC's unsupported contention that the terms and disclosures were not clear and conspicuous, or that the Landeen Entities "employed facially deceptive click-through marketing."  FTC FOF, p. 44, ¶ 181.

[18] The FTC has done nothing to establish that any of the products were not intentionally purchased, but not used.  The FTC has not even conceded that any charges were legitimately incurred – even when the products were used.

WHEREFORE, Respondents request that the FTC's motion in limine be denied and Dr. Rauschenberger's testimony be received by the Court.

Dated:  November 1, 2013                    Respectfully submitted,

                                          By:   /s/ Derick J. Rodgers
                                                Ricardo G. Cedillo
                                                State Bar No. 04043600
                                                rcedillo@lawdcm.com
                                                Derick J. Rodgers
                                                State Bar No. 24002857
                                                drodgers@lawdcm.com

                                                **DAVIS, CEDILLO & MENDOZA, INC.**
                                                McCombs Plaza, Suite 500
                                                755 E. Mulberry Avenue
                                                San Antonio, Texas  78212
                                                Telephone:  (210) 822-6666
                                                Telecopier:  (210) 822-1151


                                                DINA M. COX
                                                Indiana Atty No. 18590-49
                                                dcox@lewiswagner.com
                                                ROBERT M. BAKER, IV*
                                                Indiana Atty No. 25471-49
                                                rbaker@lewiswagner.com
                                                **LEWIS WAGNER, LLP**
                                                501 Indiana Avenue, Suite 200
                                                Indianapolis, Indiana  46202
                                                (317) 237-0500
                                                * *Pro hac vice*

## CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was served electronically in compliance with Local Rule CV-5(a). As such, the foregoing document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1). Pursuant to Fed. R. Civ. P. 5(a)-(b) and Local Rule CV-5(b)(2), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email and/or fax, on this the November 1, 2013.


                                                 /s/     Derick J. Rodgers
                                                       Derick J. Rodgers