**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

_____

|  |  |  |
|---|---|---|
| **FEDERAL TRADE COMMISSION**, | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. SA-98-CA-0629-FB-HJB** |
| | ) | |
| vs. | ) | |
| | ) | |
| **HOLD BILLING SERVICES, et al**. | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**FEDERAL TRADE COMMISSION'S POST-TRIAL BRIEF**

## **TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................................1

II.     LEGAL STANDARD....................................................................................................2

III.    THERE IS CLEAR AND UNDISPUTED EVIDENCE THAT DEFENDANTS
        ENGAGED IN UNAUTHORIZED BILLING.. .................................................................3

        A.      LESS THAN 1% OF CONSUMERS CHARGED FOR VOICEMAIL
                SERVICES BETWEEN JULY 2009 AND MARCH 2010 EVER
                USED THOSE SERVICES.. ..................................................................................3

                1.      The Lack of Usage Alone Is Clear and Convincing Evidence That
                        Consumers Have Not Authorized Charges. .................................................3

                2.      Less Than 1% of Voicemail Services' Consumers Accessed the NXT
                        Platform Between July 2009 and March 2010.............................................5

                3.      The Fact That Defendants Continued Billing After March 2010
                        Provides Still Further Unrebutted Evidence of Pervasive Cramming. ......12

        B.      THE HIGH REFUND RATES ARE CLEAR AND CONVINCING
                EVIDENCE THAT CONSUMERS DID NOT AUTHORIZE CHARGES..........13

        C.      THOUSANDS OF MISMATCHED BILLINGS FURTHER ESTABLISH
                THAT CRAMMING OCCURRED........................................................................16

                1.      There Are Numerous Examples of Mismatched Billing............................16

                2.      When AT&T Forced Defendants To Validate Voicemail Charges, the
                        Validation Revealed Thousands of Mismatched Names.. ........................17

        D.      THE LECS' TERMINATION OF BILLING FOR VOICEMAIL SERVICES
                DEMONSTRATES CRAMMING. ........................................................................19

        E.      DEFENDANTS' BILLINGS EXCEEDED THEIR OWN ANTI-
                CRAMMING THRESHOLDS MONTH AFTER MONTH. ...............................23

                1.      Purported "Customer Service" Inquiries Tripped Defendants' Own
                        Inquiry-To-Billing Threshold Dozens of Times.. ......................................23

　　　　2.　　Defendants' Testing Program – Which Relied Solely on "Letters of Agency" – Did Not Prevent Cramming...................................................26

　F.　CONSUMER COMPLAINTS ADMITTED FOR THEIR TRUTH ESTABLISH CRAMMING....................................................................28

　　　　1.　　The Sixty-Seven Consumer Complaints the Court Admitted for Their Truth Support a Pattern of Widespread Cramming.. ...............................28

　　　　2.　　There Is Sufficient Corroborative Evidence To Admit All Remaining Cramming Complaints for Their Truth...................................................29

IV.　DEFENDANTS' OTHER ATTEMPTS TO EVADE LIABILITY FAIL. ......................31

　A.　The 1999 Order Binds BSG, Ltd., BSGNA, and All of BSGNA's Subsidiaries.............................................................................31

　B.　Defendants Have Not Proven "Substantial Compliance.".....................................33

　　　　1.　　Defendants Have Not Proven That They "Took All Reasonable Steps" To Comply With the 1999 Order... ...............................................34

　　　　2.　　Defendants Have Not Proven That They "Achieved Substantial and Diligent Compliance" With the 1999 Order.... ...........................................37

V.　THE LAW REQUIRES THE COURT TO REDRESS CRAMMED CONSUMERS......38

　A.　The Court Must Award Redress for Consumers' Loss..........................................38

　B.　The Evidence Establishes That Consumers Lost Millions. ...................................39

　C.　The Court Should Issue an Appropriate Order Ensuring that No "Double Recovery" Occurs. ...............................................................................40

VI.　CONCLUSION...................................................................................................40

## I.  INTRODUCTION

The evidence clearly and convincingly establishes that Defendants[1] violated this Court's 1999 Permanent Injunction by wrongfully billing hundreds of thousands of consumers for services they never agreed to purchase.[2]  Although more than a million consumers were crammed, the FTC recognizes the Court's concern about the burden of proof associated with civil contempt.  Accordingly, the following focuses on the 600,000 consumers Defendants charged on behalf of three related voicemail resellers:  MyIProducts, Digital Vmail, and 800 Vmailbox (collectively, the "Voicemail Services").  The record contains undisputed evidence establishing that, from July 2009 through March 2010, less than 1% of the Voicemail Services' consumers ever accessed the service they purportedly purchased.  Even standing alone, this spectacularly low usage rate is clear and convincing evidence that widespread unauthorized billing occurred.

Significantly, however, this essentially nonexistent usage rate does not stand alone.  First, a staggering 60% of Voicemail Services' consumers received at least partial refunds, which is powerful evidence of unauthorized charges—especially given that Defendants' own anti-cramming program used a 12% threshold (until Defendants inexplicably stopped using refund rates as a metric).  Second, there are thousands of uncontroverted instances in which consumers' names and numbers did not match those Defendants billed.  This fact alone also clearly demonstrates unauthorized billing to those individuals and corroborates the mass of additional evidence in this case.  Third, 67 cramming complaints from individual consumers that the Court admitted for their truth further bolster the fact that Defendants billed consumers without

---

[1] "Defendants" include Billing Services Group Ltd.; Billing Services Group North America, Inc. ("BSGNA," f/k/a HBS, Inc.); and BSGNA's subsidiaries:  BSG Clearing, ESBI, BCI, ACI, and HBS Billing Services Company (f/k/a Hold Billing Services Company).

[2] This Court's Permanent Injunction specifically prohibits billing charges that were not authorized by the line subscriber.  Permanent Injunction (Sept. 22, 1999) (DE-39) at Section III.  The Permanent Injunction also prohibits billing on behalf of vendors who do not clearly and conspicuously disclose the terms of their services, and misrepresenting that a charge was authorized.  *Id.* at Sections II.A.3, V.A.   The dispute in this case focuses on whether the FTC has proved by clear and convincing evidence that Defendants billed crammed charges, in violation of these provisions of the Permanent Injunction.

authorization.  Fourth, Local Exchange Carriers ("LECs") questioned and ultimately terminated the Voicemail Services due to excessive "cramming related inquiries."[3] Defendants responded to the LECs' actions without disputing that the Voicemail Services were cramming consumers. Fifth, as part of their supposed "focus on responsible billing practices,"[4] Defendants established customer "inquiry" thresholds that the Voicemail Services tripped twenty-eight times.

Although each of these lines of evidence independently establishes cramming, their true force comes from the fact that they corroborate each other.  When considered together, this overwhelming body of evidence more than clearly and convincingly demonstrates that Defendants engaged in widespread billing without consumers' authorization.  Faced with this mountain of damning evidence, Defendants ask the Court to disaggregate the different lines of proof.  The evidence, however, is not disconnected pieces, but a cohesive whole that unquestionably establishes that Defendants violated this Court's Permanent Injunction.

## II.    LEGAL STANDARD

While contempt must be proved by "clear and convincing" evidence, this standard is lower than the "beyond a reasonable doubt" standard applied in criminal cases.  *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995); *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976).  The "clear and convincing" standard does not require proof to a scientific certainty, and circumstantial evidence is sufficient to meet the FTC's burden.  *See Toussaint v. Comm'r of Internal Revenue*, 743 F.2d 309, 312 (5th Cir. 1984) (finding the government had proved fraud under "clear and convincing" standard with circumstantial evidence); *cf. United States v. Hunt*, 794 F.2d 1095, 1101 (5th Cir. 1986) (even under higher standard in criminal case, upholding conviction based on circumstantial evidence).

---

[3] *See* PX-51.

[4] *See*, *e.g.*, PX-314.

- 2 -

**III.     THERE IS CLEAR AND UNDISPUTED EVIDENCE THAT DEFENDANTS ENGAGED IN UNAUTHORIZED BILLING.**

**A.     LESS THAN 1% OF CONSUMERS CHARGED FOR VOICEMAIL SERVICES BETWEEN JULY 2009 AND MARCH 2010 EVER USED THOSE SERVICES.**

Even viewed in isolation from the mountain of other evidence that proves cramming occurred, undisputed usage evidence clearly and convincingly establishes that tens of thousands of consumers were charged for voicemail services without their authorization.  First, case law, logic, and even Defendants' own practices demonstrate that the absence of usage proves that consumers did not authorize charges.  Second, Robert Zoch's undisputed testimony shows that his company, NXT Technologies ("NXT"), served as Voicemail Services' sole voicemail provider for a significant period, and usage on NXT's platform was less than 1%.

**1.     The Lack of Usage Alone Is Clear and Convincing Evidence That Consumers Have Not Authorized Charges.**

Consumers' widespread failure to use a service is convincing evidence that they did not agree to be charged.  *See FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (affirming finding that consumers had not consented to pay "for a service that less than one percent of them ever attempted to use"); *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1000-01 (N.D. Cal. 2010) (finding liability where "96 percent of . . . 'customers' had not received any services from defendants"); *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1222 (D. Nev. 2011) (finding deception in part because less than 1% of defendant's customers used defendant's website every month).

The logic behind this reasoning is simple and compelling:  consumers are likely to use services they purchase.  Although some services may go unused by a small portion of purchasers, and some services may be underused, there is no legitimate scenario where hundreds of thousands of consumers knowingly purchase a service, but less than 1% of them use it even once.

- 3 -

In fact, Defendants never seriously suggested that it was possible to reconcile extremely low usage with widespread consumer authorization (and it is not). Tellingly, the opposite is true: Defendants themselves recognized that the absence of usage demonstrates that charges are not authorized. For instance, General Counsel Kelli Cubeta informed Landeen that usage had become a "sensitive subject" for Defendants, and Cubeta asked Landeen to confirm that she could provide usage information for StreamingFlix:

> Usage data has become a sensitive subject for the LECs, regulatory agencies, and BSG. What we need to confirm is that Streaming Flix will be able to identify the consumers that downloaded movies, types of movies, date of usage, etc. **This data is very helpful in showing that the consumer did in fact use the service that they were charged for**.
>
> Can you please confirm that Streaming Flix will be able to provide this type of data upon request?

Email from K. Cubeta to C. Landeen (Feb. 18, 2009), PX-356 (emphasis added).[5]

Likewise, when dealing with telecommunications services, Defendants had no reservations about collecting usage data to confirm consumer authorization. Specifically, Defendants' "Third Review Testing" required telecommunications vendors to provide actual switch records "that show[] the actual call flowing through the switching system," D. DeSilva, Tr. v.3 (Nov. 6, 2013), 712:12-14, which confirms that the consumer used the service.[6] "[I]f

---

[5] In fact, Cubeta's email was not the first time Defendants asked the Landeen entities for usage information. With respect to several of the Landeen entities—including Digital Vmail and 800 Vmailbox—Defendants asked Landeen to report the "[e]xpected product usage." Each time, Landeen reported "expected product usage" of 20%. *See, e.g.*, BSG Contract Information Sheets (Oct. 15, 2008) (Digital Vmail and 800 Vmailbox), PX-351-52. Defendants instructed their representatives communicating with Landeen to "make mention to Cindy during your discussions that we appreciate her honesty on the estimated usage rate." Email from R. Juarez to D. DeSilva (Oct. 23, 2008), PX-93. Putting aside the fact that Defendants had no qualms about billing hundreds of thousands of consumers for services that most were never expected to use, Defendants' request for usage projections underscores that usage matters significantly.

[6] Cubeta attempted to evade this proposition initially, *see* Tr. v.5 (Nov. 8, 2013), 1171:6-24, but eventually conceded the point, *id.* at 1171:25-1172:3 ("Q: Yes or no, Ms. Cubeta, whatever the reason, it is the case that switch records are used here to substantiate that unauthorized billing did not occur? A: It is part of our testing, yes."). Defendants' General Counsel also contended that ascertaining usage would require Defendants to rely on information Landeen provided, *see id.* at 1139:19-23, but Cubeta could not explain why Defendants could not

- 4 -

defendants cannot verify that 97.5 percent of the telecommunications service providers' charges were used for services that the consumer actually used, then defendants terminate that service provider[.]" I. Ratner, Tr. v.7 (Nov. 14, 2013), 1626:10-16. This further illustrates that—consistent with the case law and irrefutable logic—almost complete non-usage is clear and convincing evidence of cramming.

### 2. Less Than 1% of Voicemail Services' Consumers Accessed the NXT Platform Between July 2009 and March 2010.

Zoch's voicemail platform company (NXT) provided the sole source of voicemail to all three of the Voicemail Services' consumers between January 2009 and March 2010.[7] During that period, the Voicemail Services created approximately 400,000 accounts on NXT's platform.[8] Usage, however, was practically nonexistent. Zoch gave uncontroverted testimony that NXT provided a specialized voicemail product (a "unified messaging platform") that offered each user a variety of voicemail-related services.[9] However, Landeen contracted for only 5000

---

have obtained usage data directly from companies providing fulfillment services to Landeen (like NXT). *See id.* at 1163:20-1164:3 ("Q: It wouldn't be hard to figure out whether MyiProducts had a contract with a business that provided a voicemail platform that MyiProducts' consumers could use, would it? . . . . A: . . . I don't know. I don't know."); *id.* at 1165:19-1166:8 ("A: Well, I don't know if we obtained a copy of [the contract with NXT, PX-353]. I don't know if we spoke to the representatives at NXT. I don't know if maybe we even – because [NXT is] here in Texas, I don't know if we even went to their offices. I don't know. Q: But you could have done all of those things? A: Possibly. Q: And you could have waited a few months after the contract incepted and contacted NXT and asked them, 'is anybody using this service'? A: I don't – I don't know that we didn't. I don't know – I don't know. . . . Q: Who might know? A: I don't know.").

[7] Zoch testified that the NXT platform was "up and running" for ABC by "January or February 2009." R. Zoch, Tr. v.2, 307:14-15 (Nov. 5, 2013). Both Digital Vmail and 800 Vmailbox began charging consumers in January 2009. *See* LEC Dilution Report (Sept. 28, 2011), PX-324 at 3-4. NXT's relationship with ABC ended in March 2010, R. Zoch, Tr. v.2, 314:13-15, when several major LECs ceased accepting new billing for the voicemail services. M. Mitchell, Tr. v.4, 969:1-970:17, PX-231, PX-347, S. Welge Tr. v.3, 803:19 – 804:14, 808:24 – 809:8.

[8] R. Zoch, Tr. v.2, 312:9-12 (Nov. 5, 2013) ("Q: During the time that NXT was providing voice mail services to MyiProducts, approximately how many voice mail accounts were created? A: A little over 400,000.").

[9] *Id.* at 300:18-301:1 (defining "unified messaging platform"); 303:5-12 (testifying that NXT provided "unified messaging service" to Landeen).

minutes of this service per month.[10]  *See* R. Zoch, Tr. v.2, 304:25-354:5 (Nov. 5, 2013); NXT

Contract, PX-353.  Zoch explained that 5000 minutes per month is enough time for—at most—

one to two thousand consumers, and vastly fewer if the consumers were "road warriors"

(traveling businesspeople) who typically used the unified messaging platform product.  *See id.* at

306:19-22 (agreeing that the "upper end would be one to two thousand consumers"); *id.* at 306:6-

11 (stating that a "typical road warrior" could use "as many as 3,000" minutes per month on the

unified messaging platform).  Critically, however, the Voicemail Services exceeded the 5000

minute per month cap only three times.[11]

      The fact that the Voicemail Services rarely exceeded the 5000 minute per month cap

means that, even adopting all assumptions consistent with the record in Defendants' favor, no

matter how unrealistic, the usage rate was incredibly low.  For instance, assuming: (1) 2000

consumers per month (which is the highest number the record will permit and would mean that

each consumer would receive no more than five seconds of voicemail time per day);[12] and (2)

100% turnover among consumers every month (this assumption strongly favors Defendants

because higher turnover means more new users and therefore greater usage), then 92.5% of

consumers would never have used their accounts—a rate still so low it is consistent only with

widespread unauthorized billing.  *See* Appendix A (detailing 7.5% calculation with references to

---

[10] Technically, NXT had a contractual relationship with Alternate Billing Corporation ("ABC").  R. Zoch, Tr. v.2, 302:21-303:1 (Nov. 5, 2013); NXT Contract, PX353.  Landeen owned ABC, which served various "back office" functions for the Landeen Entities, *see, e.g.*, Letter from C. Henderson to D. DeSilva (Nov. 10, 2008), R-82 at 23629 ("I've written this letter in response to your recent email regarding eSafeID, 800 Vmailbox, Digital Vmail, and Instant411.  We have retained Alternate Billing Corporation to manage and oversee all the operations for our companies.").  NXT charged a fee per minute over 500 minutes per month. *See* R. Zoch, Tr. v.2, 305:3-5 (Nov. 5, 2013); NXT Contract, PX-353 at 2.

[11] Specifically, Zoch testified:  "There were only two or three months that it exceeded the 5,000 minutes, and one of those was when one of the accounts had been compromised and someone had been . . . doing a lot of international calling across that account."  *Id.* at 306:25-307:4.

[12] 2000 consumers sharing 5000 minutes per month works out to only 5 seconds per day per consumer (2.5 minutes per consumer per month = 150 seconds per consumer per month; 150 seconds/30 days = 5 seconds per day).

record evidence).  Slightly more plausible assumptions (that still favor Defendants) lead to more realistic usage rates consistent with the data for the period from July 2009 through March 2010 (*see infra* at 8-11):  500 users per month (twenty seconds of voicemail time per consumer per day)[13] and 50% turnover gives a 1% usage rate.  *See* Appendix B (detailing 1% calculation with references to record evidence).

Significantly, additional uncontroverted testimony corroborates the all but nonexistent usage.  For instance, in the middle of 2009, Zoch deleted at least 200,000 unused accounts to clean up his server.  *See* R. Zoch, Tr. v.2, 313:6-24 (testifying that he asked MyIProducts' representatives about at least 200,000 unused accounts that both he and MyIProducts wanted to delete; "I was asking them: . . . .  There are a lot of accounts that are here that aren't being used.  Can we delete some of these?").  Zoch also testified to facts that corroborate cramming rather than normal "sign ups" from knowing consumers:

- New voicemail accounts were being created "[v]ery rapidly"; in fact, so rapidly "that it took our system down for a little bit," and NXT "had to make some changes . . . to be able to create as many accounts as they were creating, as fast as they were creating them."  *Id.* at 311:14-18.

- Sometimes accounts were created "within . . . a minute of each other," and on some days, "tens of thousands of accounts [were] created in a day."  *Id.* at 311:19-23.

- Accounts were created at all hours, including odd times like the middle of the night.  *Id.* at 312:1-2 ("There were some at midnight and 3:00 o'clock in the morning.").[14]

- Landeen enjoyed "wild success[]" relative to other resellers marketing the same voicemail product.[15]

---

[13] 5000 minutes and 500 consumers per month = 10 minutes per consumer (500/5000 = 10); ten minutes per consumer per month = 600 seconds per consumer per month; 600 seconds/30 days = 20 seconds per day)

[14] Suffice it to say, Zoch testified that this was abnormal.  *See id.* at 312:4-8.

[15] R. Zoch, Tr. v.2, 303:25-304:3 ("Well, when we came out with the product [unified messaging service], it was a little before its time, if you will.  We had some resellers that were fairly successful, none that were wildly successful, other than Alternate Billing.").

Put simply, cramming is the only reason why Landeen could have enjoyed "wild success" notwithstanding the fact that almost none of her purported consumers ever used the service.

Significantly, after his relationship with the Voicemail Services concluded, Zoch provided the FTC with usage records he had retained in a series of eighteen spreadsheets covering the nine-month period from July 2009 through March 2010.[16]  During that period, NXT hosted "around 200,000" accounts for the Voicemail Services.  Zoch, Tr. v.2, 317:12-17.  FTC data analyst Anne Miles counted only 209 unique mailboxes used during this period, *see* A. Miles, Tr. v.2, 342:13-343:5, giving a usage rate of less than 1%.  This is consistent with Zoch's testimony that, out of approximately 200,000 accounts, only "[a] couple of hundred" were used, Zoch, Tr. v.2 (Nov. 5, 2013), 319:18-21, which confirms that less than 1% of the consumers the Voicemail Services charged during this nine-month period actually used the service.

Defendants raise a series of desperate objections to this damning evidence.  Initially, they imply (without offering any evidence) that NXT might not have served as Landeen's sole voicemail provider from July 2009 through March 2010.  However, four related facts prove that NXT had a *de facto* exclusive relationship with the Voicemail Services.  First, Zoch testified that Landeen directed voicemail consumers to his platform through one of four dial-in numbers.[17]  Although Zoch believed that his client was marketing voicemail services under the "MyiProducts" name, *see id.* at 303:1-4, undisputed evidence established that the two other Voicemail Services (Digital Vmail and 800 Vmailbox) both provided consumers the same access number that NXT made available to MyIProducts:  866-889-0615.[18]  *See* R. Zoch, Tr. v.2 (Nov.

---

[16] R. Zoch, Tr. v.2 (Nov. 5, 2013), 316:14-317:17; *see also* A. Miles, Tr. v.2 (Nov. 5, 2013), 336:22-337:12.

[17] R. Zoch, Tr. v.2 (Nov. 5, 2013), 310:2-17.

[18] *See* R. Zoch, Tr. v.2 (Nov. 5, 2013), 308:2-309:1, 310:2-311:9 (testifying that "866-889-0615" was one of the four numbers NXT provided to ABC and that enabled consumers to call-in to check their voicemail); D. DeSilva, Tr. v.3 (Nov. 6, 2013), 738:1-11 ("Q:  So this would indicate, then, that consumers would call this number . . . to access their voice mailbox, correct?  A:  This is something that . . . quality compliance would have gone through. . . .   Q: Who in quality compliance?  A:  John Wardashki."); J. Wardashki, Tr. v.4 (Nov. 7, 2013),

5, 2013), 327:17-23 (testifying that he was unaware that NXT was supporting Digital Vmail and 800 Vmailbox, but also that his client "**could have been marketing under any name they wanted to market under, to tell you the truth**") (emphasis added).  Thus, NXT was the only provider for all the Voicemail Services.

Second, when Digital Vmail and 800 Vmailbox provided "due diligence" information to Defendants explaining how consumers would access their systems, they referred only to the 866-889-0615 number linked to Zoch's platform.[19]  Third, Zoch has extensive experience managing voicemail platforms, including more than twenty years in the telecommunications industry, R. Zoch, Tr. v.2 (Nov. 5, 2013), 300:2-5, and commercial relationships with approximately fifty voicemail resellers, *see id.* at 302:1-4.  He testified clearly that there was nothing about NXT's relationship with Landeen that suggested there was any other voicemail platform involved.[20] Furthermore, Defendants offered no evidence that the Voicemail Services used any other voicemail platform during the period at issue.

Fourth, Zoch's undisputed testimony establishes that, once a consumer dialed one of the four telephone numbers—including the number that Digital Vmail and 800 Vmailbox used—the consumer was routed directly to NXT's platform.  *Id.* at 308:22-309:1 ("Q:  Once the consumer dialed in through one of those four numbers, would they automatically interface with NXT's platform or would they remain on MyiProducts' server?  A:  All of the telephony services were on my platform, the NXT platform.").  As Zoch explained, NXT established "real time API" for

---

1029:15-18 ("Q: You assume that (866) 889-0615 was the number consumers would call to check their voice mail through the Digital Voicemail service?  A:  Yes.  On this page [R-82 at 23681] it is identified as an access number."); R-82 at 23681 (Digital Vmail Service "FAQ"; "The access number is 1-866-889-0615"); R-233 at 023681 (same); R-233 at 22719 (800 Vmailbox Service "FAQ"; "The access number is 1-866-889-0615").

[19] *Supra* at 8 n.18.

[20] R. Zoch, Tr. v.2 (Nov. 5, 2013), 309:18-310:1 ("Q:  Was it common for a reseller like Alternate Billing Corporation to have its own voicemail platform in addition to the one that NXT was providing?  A:  The majority of my resellers did not.  Q:  Was there anything about your relationship with ABC or Alternate Billing Corporation that caused you to understand that MyiProducts was using a voicemail platform other than yours?  A:  No.").

- 9 -

his client,[21] which meant that when a customer ordered the service, "it would immediately create the [voicemail] account on [NXT's] server."  R. Zoch, Tr. v.2 (Nov. 5, 2013), 304:20-24.  Thus, once the consumer signed up – or was signed up – and used one of four dial-in numbers Landeen's affiliates distributed, that consumer went directly to NXT's platform.  There was no opportunity to be directed or diverted to some other platform the Voicemail Services theoretically could have used.  Accordingly, during the relevant time, NXT functioned as the *de facto* exclusive voicemail platform for the Voicemail Services.

Next, Defendants observe that Zoch failed to provide usage information for the period from January 2009 through June 2009.  This is correct, but largely irrelevant.  Zoch could not provide records for the entire period because a virus damaged his server in 2011.  R. Zoch, Tr. v.2, 318:23-319:2 (Nov. 5, 2013).  However, before the virus, Zoch backed up data from July 2009 through March 2010, which is the data he later provided to the FTC.[22]  *See id.* at 319:3-6; *see also id.* at 319:7-9 (testifying that the virus did not affect the backup, because it was on "a totally different server").  Furthermore, given the evidence that usage was miniscule (at most 7.5%) throughout the period for which NXT served as Landeen's voicemail provider, *see supra* at 6, there is no reason to believe usage was significantly different during NXT's first six months than during NXT's last nine months.

Finally, Defendants' other misguided objections concern minute issues with the precise usage calculation.  For example, Miles excluded 63 mailboxes that apparently belonged to Landeen employees[23] and 222 records that Zoch provided separately from the spreadsheet set.[24]

---

[21] API means "Application Programmatic Interface," through which ABC's website could communicate directly with NXT's voicemail platform.  R. Zoch, Tr. v.2, 304:7-11.

[22] NXT's relationship with Landeen concluded in March 2010, when Landeen cancelled the service.  *Id.* at 314:13-15.

[23] Specifically, Miles counted mailboxes identified by numbers with more than four digits.  A. Miles, Tr. v.2 (Nov. 5, 2013), 343:4-5.  NXT identified each mailbox with a unique number, *see id.* at 340:18-20, generally a user's ten-digit phone number.  Accounts established for ABC's employees used "a four-digit extension."  R. Zoch, Tr. v.2 (Nov. 5, 2013), 314:1-4. In total, there were 63 such accounts.  *Id.* at 314:10-12.

- 10 -

But neither of these numbers is significant enough to alter the usage rate.  Likewise, Zoch testified that exactly 1000 email (as opposed to voicemail) accounts were created on NXT's server, *id.* at 328:21-25, but even assuming that these exactly 1000 email accounts were both created **and used** by consumers, it would not materially affect the usage calculation.

Specifically, even assuming:  (1) that exactly 1000 consumers inexplicably signed up for a product marketed primarily as a voicemail service yet used only its email feature; (2) 209 consumers accessed the voicemail platform at least once; (3) the 63 Landeen employees who accessed the platform at least once qualify as consumers; (4) the 222 unidentified records each reflect a separate voicemail consumer who used the product; and (5) there is no overlap among the first four categories of users, then 1494 consumers used the Voicemail Services between July 2009 and March 2010.  Given the undisputed testimony that 200,000 consumers had accounts created for them during this period, the usage rate was .7%.  *See* Appendix C (detailing .7% calculation with references to the record).  It is impossible to reconcile this with anything other than widespread cramming.

Indeed, although the negligible usage rate independently establishes cramming on a large scale, this evidence is also corroborated by the way Landeen's services were marketed.  As Stephen Oskoui testified, consumers entered their name and telephone number on the "publisher's website," which transferred – and prepopulated – their information on a series of "offers" presented by Smiley Media.  PX-372; S. Oskoui, Tr. v.1 (Nov. 4, 2013), 218:4-218:16, 222:2-223:5.[25]  In analyzing how consumers interacted with this marketing, Defendants' own

---

[24] Miles did not include 222 records that were not part of the nine-month, eighteen-file "package" that NXT provided to the FTC.  *See* A. Miles, Tr. v.2 (Nov. 5, 2013), 348:19-350:25.

[25] Smiley Media CEO Stephen Oskoui testified that he marketed several voicemail services under contracts with Studio 127 and CPA Market, the firms Landeen used to market her products.  S. Oskoui, Tr. v.1 (Nov. 4, 2013), 214:9-215:6, 216:15-216:22; *see also* R-233 at BCI_022672 (CPA Market marketed 800 Vmailbox), BCI_023631 (CPA Market marketed Digital Vmail).  Smiley Media generated a high volume of Landeen's sales, as it regularly transmitted 10,000 "leads" per month, and sometimes up to 30,000 per month, for Landeen's companies.  S. Oskoui, Tr. v.1 (Nov. 4, 2013), 236:24-237:11.

- 11 -

study showed that 100% of the study participants who signed up for Landeen's service did so without realizing it.[26]  The negligible usage is also corroborated by the extremely high refund rates, the fact that Defendants billed consumers who never saw Landeen's marketing – much less signed up for – her so-called "services," the fact that the LECs stopped billing for these Voicemail Services, and the fact that Defendants' billings for these services consistently tripped their own anti-cramming thresholds.  *See infra* at III(B)-III(E).  When considered together, this evidence provides near certain proof that cramming occurred on a massive scale.

### 3.      The Fact That Defendants Continued Billing After March 2010 Provides Still Further Unrebutted Evidence of Pervasive Cramming.

Finally, Defendants do not dispute that – even though NXT's relationship with the Voicemail Services concluded in March 2010[27]– all three entities continued charging customers for another nine months.[28]  *See* LEC Dilution Report (Sept. 29, 2011), PX-324 at 1-4.  As Zoch testified, the four dial-in numbers were not "ported over to another service" after March 2010. R. Zoch, Tr. v.2 (Nov. 5, 2013), 314:21-23.  This meant that voicemail consumers could access existing messages online, but "no new messages could have come in."  *Id.* at 315:16-18; *id.* at 315:22-25 (testifying that consumers "would not be able to get any new messages or do anything with [their] account[s]").  Yet the Voicemail Services charged consumers a combined $436,107 in April 2010 (approximately 29,000 consumers at $14.95 each).[29]  The only remotely believable explanation for this continued billing is that the Voicemail Services had 100% turnover between

---

[26] R. Rauschenberger, Tr. v.6, 1406:22-1408:7, 1410:5-1410:16 (Participant 2), 1413:6-1414:9 (Participant 8), 1416:5-1417:1 (Participant 9), 1419:22-1420:9 (Participant 10), 1423:21 -1426:25 (Participant 12), 1430:11-1431:4 (Participant 13), 1432:2-1432:5.

[27] R. Zoch, Tr. v.2 (Nov. 5, 2013), 314:13-15.

[28] In total, Defendants placed **$2,396,681** in Voicemail Services charges on consumers' bills from April 2010 through December 2010.  *See* LEC Dilution Report (Sept. 29, 2011), PX-324 at 1-4.

[29] *See id.*; R-82 at 23631 (Digital Vmail charged $14.95 a month); R-233 at 22672 (800 Vmailbox charged $14.95 a month); I. Ratner, Tr. v.7 (Nov. 14, 2013), 1642:16-17 (MyiProducts charged $14.95 a month).

March and April – effectively, they began anew in April by signing up 29,000 new consumers (without messages on NXT's platform) in April 2010 and then providing them access to a different voicemail platform.  But this is impossible given the record evidence that, by this time, the LECs had refused to accept billings for new voicemail customers.[30]  Put simply, the fact that the Voicemail Services continued charging consumers after their relationship with NXT ended and without porting over consumers' access numbers adds to the unrebutted evidence that cramming occurred.[31]

### B. THE HIGH REFUND RATES ARE CLEAR AND CONVINCING EVIDENCE THAT CONSUMERS DID NOT AUTHORIZE CHARGES.

A high refund rate provides independent clear and convincing evidence that consumers did not agree to be charged.  For example, in the financial services industry, courts have found

---

[30] Verizon had already terminated MyIProducts, PX-223, while AT&T and smaller LECs limited billing to residual customers in the first half of 2010, *see* PX-231; M. Mitchell, Tr. v.4 (Nov. 7, 2013), 969:1-970:17, PX-347, S. Welge, Tr. v.3 (Nov. 6, 2013), 803:19-804:14, 808:24-809:8.  This explains the sudden drop in Voicemail Services billings between March and April 2010, followed by a roughly linear decline as residual customers complained about being charged.  *See* LEC Dilution Report (Sept. 29, 2011), PX-324 at 1-4.  As an aside, the FTC reiterates its objection to the exclusion of PX-237.  PX-237 is a party admission that the Court nonetheless excluded in its entirety because Melissa Mitchell referred to an inquiry as a "loaded question," and the Court stated it was difficult "to ascribe meaning" to "whether something is a loaded question."  Tr. v.5 (Nov. 8, 2013), 1096:21-1097:5.  The FTC could not have asked Mitchell to explain the remark because this objection to PX-237 was not raised until after her testimony and, regardless, the important component of PX-237 is not the "loaded question" phrase, but the substantive admission that Landeen's companies were "no longer actively marketing any of their vm products."  *See* PX-237.

[31] It is theoretically possible that the Voicemail Services required their March 2010 consumers to straddle two platforms – specifically, to access March messages through NXT and April messages through a new access number linked to an unidentified new platform.  There is no evidence supporting this far-fetched scenario, and the FTC's burden does not require it to negate every possible explanation other than cramming no matter how fantastic or improbable. *See, e.g.*, *Victor v. Nebraska*, 511 U.S. 1, 20 (1994) (affirming criminal conviction despite challenge to jury instruction that distinguished the "reasonable doubt" necessary to require acquittal from "doubt arising from mere possibility, from bare imagination, or from fanciful conjecture"); *United States v. Williams*, 20 F.3d 125, 131-32 (5th Cir. 1994) (even in criminal case, guilt need not be proved "to an absolute certainty," and acquittal is improper if factfinder possesses only "fanciful speculation" that defendant is not guilty).

high chargeback, return, and refund rates indicative that consumers were deceived,[32] a

conclusion corroborated by the fact that industry participants become concerned and increase

scrutiny on vendors that have a one percent chargeback ratio.  A. Chen Dep., 79:6-79:22, 90:21-

95:16; *see also Grant Connect*, 827 F. Supp. 2d. at 1222 n.3 (noting Visa's and MasterCard's 1%

chargeback monitoring thresholds); *FTC v. Willms*, 2011 WL 4103542, at *9 (W.D. Wash. Sept.

13, 2011) (same).  Indeed, as a representative from Visa explained, a one percent chargeback rate

can be an indicator of fraud.  A. Chen Dep., 113:1-6.  Although chargebacks are not exactly the

same as LEC adjustments and refunds provided by Defendants and its vendors, Defendants'

expert testified that chargebacks "have some similarities with refund rates."  I. Ratner, Tr. v.7

(Nov. 14, 2013), 1647:6-8.  This is because – at bottom – both chargebacks and refunds measure

consumer dissatisfaction.

 Indeed, Defendants and Qwest, a LEC, recognized the importance of refund rates in

demonstrating unauthorized billing.  In monitoring a previous Landeen product, Melissa Mitchell

informed Landeen that if customer refunds and credits from the LEC continued to exceed 15%

for the product, she could "lose the ability to market and bill this product" with the LEC.  PX-

334; M. Mitchell, Tr. v.4 at 935:13-937:6.  Ms. Mitchell went on to explain that Landeen should

focus on "key areas" to address the refund issue, including:

- All aspects of the service and associated charges **should be clearly communicated** to the end-user; and

- Make sure immediate action is taken to **improve the process of verifying that the person ordering the service is indeed the appropriate authorized party**.

---

[32] *See e.g.*, *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1222 (D. Nev. 2011) (finding refund and chargeback rates of 15% indicative of deception); *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1075-76 (C.D. Cal. 2012) (finding chargeback rates of up to 8% indicative of deception); *FTC v. MacGregor*, 360 Fed. App'x 891, 894 (9th Cir. 2009) (high rates of return are "probative of widespread material misrepresentation and other abusive conduct."); *FTC v. Direct Benefits Grp., LLC*, No. 6:11-cv-1186-Orl-28TBS, 2013 WL 3771322, at *15 (M.D. Fla. July 18, 2013) (high return rates are probative of deception).

PX-334 (emphasis added).   In addition, prior to 2008, Defendants' anti-cramming program employed a 12% refund rate as a way of identifying, among other things, unauthorized billing by its vendors.  R-31, K. Cubeta, Tr. v.5 (Nov. 8, 2013), 1115:3-1119:23, 1177:8-1179:7.   Refund rates for 800 Vmailbox, Digital Vmail, and MyIPProducts, were an astounding 61%, 59%, and 60%, respectively – rates that dwarf Qwest's monitoring ratios and, indeed, those ratios previously used by Defendants as part of their anti-cramming program.  *See* PX-383 (summarizing refund rates by refunded BTNs and by percentage of revenues refunded).

Defendants do not dispute these staggeringly high refund rates, arguing instead that because they have a liberal refund policy – and require the same from their vendors – refund rates are not probative of unauthorized billing.  K. Cubeta, Tr. v.5 (Nov. 8, 2013), 1123:22-1124:11; I. Ratner, Tr. v.7 (Nov. 14, 2013), 1654:9-1654:22.  This argument, however, is contradicted by contemporaneous documentary evidence and misses the point.  First, the evidence shows that Landeen did not have a liberal refund policy and, indeed, her refusal to refund complaining consumers was a source of concern for Defendants, who worried that such consumers would escalate their complaints to the LECs or government agencies.  D. Desilva, Tr. v.3, 699:5-18 *see also* PX-48 (email from Denise DeSilva regarding call monitoring:  "Because no credit was issued, the customer stated they were calling the LEC to dispute the charges."); PX-341 (email from Denise DeSilva regarding call monitoring, noting her "concern" that a customer who was denied credit stated he was going to call his phone company).  Moreover, many consumers who sought refunds obtained only partial satisfaction.  *See* PX-383.  Second, all a liberal refund policy means is that the number of consumers who sought a refund would be roughly equal to the number of refunds.  It does not negate the fact that **at least** 59% of the consumers charged for the Voicemail Services sought refunds.  *See id.*

That these refund requests stemmed from unauthorized billing rather than mere dissatisfaction with the Voicemail Services or consumers lying to obtain a refund is borne out in

the extremely low usage data.  The undisputed evidence shows that more than 99% of the consumers who were charged for the 400,000 Voicemail Services provided by NXT did not access their mailbox even once, *see supra* at III(A)(2), making it impossible for their refund request to be related to the features or utility of the service.  Buttressing this fact are consumer complaints – all of which involve unauthorized billing and none of which even mention dissatisfaction with the service.[33]

Thus, to find that these high refund and low usage rates do not show unauthorized billing, the Court would have to conclude that hundreds of thousands of consumers signed up for a service, had buyer's remorse without using it a single time, and then created the same lie – that they were charged without permission – to get back their money.  This proposition – which defies logic and has no support in the record – should be rejected by the Court.  *See Womack v. United States*, 673 A.2d 603, 614 (D.C. 1996) ("Black robes are not supposed to eviscerate our common sense.").  Indeed, that droves of consumers sought refunds for services they never accessed is powerful proof that massive cramming occurred.

## C.   THOUSANDS OF MISMATCHED BILLINGS FURTHER ESTABLISH THAT CRAMMING OCCURRED.

### 1.   There Are Numerous Examples of Mismatched Billing.

The huge number of Defendants' billings where the billed consumers' information did not match the information collected at sign-up clearly and convincingly demonstrates cramming on a massive scale.  Twenty-nine consumer complaints – which were admitted for their truth – involve mismatched billings where the consumer was billed through the "sign-ups" of individuals whom the consumer often did not even know.[34]  For instance, Defendants monitored

---

[33] PX 1-39, 44, 47-50, 56, 58, 127, 127-A, 127-B, 127-C, 129, 129-A, 129-B, 132, 150, 150-A, 150-B, 150-C, 155, 155-A, 155-B, 155-C, 160, 160-A, 168, 168-A, 171, 171-A, 171-B, 171-C, 173, 173-A, 173-B, 176, 176-A, 180, 180-A, 180-B, 180-C, 219, 220, 243, 243-A, 244, 244-A, 244-B, 244-C, 318-323, 341-343, 359.

[34] *See* Appendix D (PXs 47-50, 58, 127-B, 127-C, 129-A, 129-B, 132, 150-A, 150-B, 155-A, 155-B, 155-C, 219, 220, 243-A, 318, 322, 341).

Landeen's call center, and when a call center representative told a consumer that his law firm's phone line was charged for voicemail purportedly ordered by "David Jones," the consumer replied, "Nice gig you guys got, 'David Jones.'  I got seven employees and we don't have any Davids or any Joneses."  PX-243-A at 3:6-3:25.  This is typical of many calls Defendants' monitored, as consumers regularly reported that they did not know the individual who purportedly authorized the voicemail charges.[35]  Similarly, Quality Assurance manager John Wardashki reviewed letters of agency showing an "unusual amount of mismatched information," including a number for Time Weather & Temperature billed in the name of "Kateelinn G."  PX-222.  Furthermore, in response to multiple complaints from regulatory agencies, Defendants sent "sign-up" information showing mismatched sign-up and billing data.  PXs 2, 3, 6, 9, 10, 15, 18, 19, 22, 23, 27.

Indeed, Defendants' own expert study of the way Landeen's services were marketed explained how these mismatched billings occurred – some of the twelve study participants took "evasive action" by entering a false telephone number.[36]  Because Defendants had no verification process, *see infra* at 35-36, nothing prevented this sort of "evasive auction" from causing widespread unauthorized billing.

### 2. When AT&T Forced Defendants To Validate Voicemail Charges, the Validation Revealed Thousands of Mismatched Names.

Unsurprisingly, when AT&T finally required Defendants to scrub their southeast region billing records in early 2010, an astounding two thirds of billed numbers for 800 Vmailbox and

---

[35] *See e.g.*, PX-243-A at 3:15-3:25, PX-127-B at 2:18-2:21, PX-127-C at 2:19-3:3, PX-129-A at 2:18-2:21, PX-129-B at 2:19-2:23, PX-150-A at 4; 6-4:12, PX-150-B at 2:14-3:3, PX-155-A at 4:11-5:24, PX-155-B at 3:9-4:16, PX-47 at call #10; PX-48 at call #9; PX-49 at call #7; PX-50 at call #3; PX-58 at call #1; PX-219 at call #3; PX-220 at calls #2 and #10; PX-341 at calls #1, #4.

[36] Specifically, some participants in Dr. Rauschenberger's study entered a false telephone number on the "publisher's page," R. Rauschenberger, Tr. v.6 (Nov. 13, 2013), 1433:1 – 1433:8, 1433:24 – 1434:8, 1434:22 – 1435:20, 1441:13 – 1441:21, which was then prepopulated on offer pages that could result in charges.  *Id.* at 1434:2-1434:6; S. Oskoui, Tr. v.1 (Nov. 4, 2013), 232:4-232:17, 233:5-233:25, 238:4-238:18.

Digital Vmail contained mismatched billing and sign up information.  PX193; M. Mitchell, Tr. v.4 (Nov. 7, 2013), 976:7-978:14, 979:24-980:15; PX-184.  Defendants' response was to remove the thousands of mismatched numbers – but continue billing the rest.  PX193; M. Mitchell, Tr. v.4 (Nov. 7, 2013), 976:7-978:14, 979:24-980:15.

In a desperate attempt to explain away this irrefutable evidence of cramming, Defendants asserted that mismatches could occur when consumers move, change their names, or change their telephone numbers[37] – justifications that have no support in the record and, indeed, make no sense.  First, the evidence of mismatches involves instances where the billed consumers did not even recognize the name provided at sign up and were credited instantly because of the "wrong information" provided at sign-up.  *See* Appendix D.  Second, Defendants' argument ignores that the AT&T-requested scrubbing was meant to "instant[ly] decrease" the level of those complaints.  PX-193.  If these mismatch billings were attributable to outdated information about happy consumers – who would have no reason to complain in the first place – ceasing to bill them would hardly reduce the complaints.  Third, Defendants' argument that these mismatches could be explained by reassigned phone numbers is no explanation at all because it would be *prima facie* evidence that the billed consumer did not authorize the charges.

Moreover, even if Defendants' explanation could account for some small fraction of the mismatched billings, it would not explain how a staggering two thirds of the thousands of consumers billed for 800 Vmailbox and Digital Vmail in AT&T's southeast region had mismatched billing and sign-up information.  *See* PX193; M. Mitchell, Tr. 976:7 – 978:14, 979:24 – 980:15.  Indeed, that these mismatched billings involved unauthorized billing is corroborated by the negligible usage which, when considered with the utter lack of authentication, high percentage of refunds, LEC terminations, and consistently tripped inquiry-to-billings thresholds, provides irrefutable evidence of cramming on a large scale.

---

[37] *See* M. Mitchell, Tr. v.4 (Nov. 7, 2013), 978:24-979:9, 994:20-995:15.

Finally, at trial, Defendants noted that some mismatched billings could be in the name of a line subscriber's spouse, child, or other known individual, *see* M. Mitchell, Tr. v.4, 995:2 – 995:5, presumably to imply somehow that the charges were authorized. *See* Argument of counsel, Tr. v.2, 359:17 – 360:6. Even if that proposition were true, the Permanent Injunction requires that Defendants bill only charges authorized <u>by the line subscriber</u> – not a neighbor, child, or spouse. DE 39, at Section III. Thus, any charge Defendants billed as "authorized" by anyone other than the line subscriber is contempt of the Permanent Injunction.

### D.   THE LECS' TERMINATION OF BILLING FOR VOICEMAIL SERVICES DEMONSTRATES CRAMMING.

The LECs' decision to halt billing for Landeen's Voicemail Services – and forego this lucrative revenue stream – in the face of rampant consumer complaints further corroborates that cramming occurred. For example, throughout 2006 and 2007, billings for MyIproducts repeatedly exceeded Verizon's cramming complaint threshold, PX-51, PX-52, PX-63, PX-64, PX-73, which, as Defendants recognized, was part of Verizon's "anti-cramming policy." PX-51 at BSG00049547. In the wake of these breaches, Verizon terminated billing for MyIProducts.[38]

Undaunted, Defendants continued to bill for MyIProducts through other LECs and, later, began billing for two additional Voicemail Services – 800 Vmailbox and Digital Vmail.[39] Predictably, these billings also resulted in LEC complaints, *e.g.*, PX-79, PX-148, PX-153, PX-163, PX-346, and hundreds of thousands of dollars in LEC credits to consumers. *See* PX-324 (showing LEC adjustments in the hundreds of thousands for MyIproducts, Digital Vmail, and -

---

[38] *See* PX-51, PX-52, PX-63, PX-64, PX-73, PX-223; S. Welge, Tr. v.3 (Nov. 6, 2013), 772:14-25, 773:15-774:6; M. Mitchell, Tr. v.4 (Nov. 7, 2013), 868:4-16, 869:12-22 (admitting that Verizon terminated MyIProducts for exceeding its "inquiry" limit, and that these "inquiries" were consumer complaints).

[39] *See* PX-193 (March 2010 email regarding 800 Vmailbox and Digital Vmail's then-current billings), PX-116 (Defendants approved Digital Vmail in November 2008), PX-117 (Defendants approved 800 Vmailbox in November 2008), PX-324 (reports showing that all three voicemail products billed through Defendants until December 2010); M. Mitchell, Tr. v.4, 883:17-884:1 (Nov. 7, 2013).

800 Vmailbox); M. Mitchell, Tr. v.4 (Nov. 7, 2013), 935:21-936:5.   Finally, in February 2010,

AT&T and Embarq stopped all new billing for voicemail services, including 800 Vmailbox,

Digital Vmail, and MyIProducts, and Cincinnati Bell Telephone refused to bill new or residual

"customers" for any of them.  *Id*. at 969:1-970:17, PX-231, PX-347; S. Welge Tr. v.3 (Nov. 6,

2013), 803:19-804:14, 808:24-809:8.  These actions reduced billings for these products by nearly

$800,000 a month and cost the LECs significant revenue.[40]  That Verizon, AT&T, and other

LECs cut off this lucrative revenue stream is evidence of cramming.

   In an effort to explain away the LECs' refusal to bill for Landeen's Voicemail Services,

Defendants make a series of unsupported and illogical arguments.  First, Defendants assert that

complaints to the LECs were a "catchall" that were not necessarily related to cramming.  *See* S.

Welge, Tr. v.3 (Nov. 6, 2013), 766:15-17.  However, this explanation – based solely on self-

serving, after-the-fact testimony – ignores the reality that Defendants consistently characterized

these complaints as cramming complaints.[41]

   Defendants' business practices and response to these complaints further show that

tripping these LEC thresholds and ultimate billing terminations demonstrate cramming.

Specifically, Defendants used LEC complaints as part of their anti-cramming monitoring

program.  K. Cubeta, Tr. v.5 (Nov. 8, 2013), 1118:22-1119:1, 1154:18-1155:22.  Indeed, in

---

   [40] D. Desilva, Tr. v.3, 739:5-10, 741:20-742:12; PX-324 at 1-4 (Defendants' revenue report showing (1) revenue for MyIProducts declining from $727,557 in March 2010 to $105,099 in April 2010; (2) revenue for 800 Vmailbox declining from $256,079 in March 2010 to $187,368 in April 2010; and (3) revenue for Digital Vmail declining from $242,863 in March 2010 to $143,640 in April 2010); C. Ackerman, Tr. v.6 (Nov. 13, 2013), 1456:7-11 (testifying that LECs assess fees before forwarding payments for billed services to Defendants and, as an example, Verizon's fee was $1.50 on a $14.95 charge).

   [41] *Compare e.g.,* PX-170, S. Welge, Tr. v.3, 797:24-798:17 *with* S. Welge, Tr. v.3, 766:12-17 (Nov. 6, 2013); *see also* Letter from Welge to Landeen, PX-51 (informing Landeen that MyIProducts exceeded Verizon's cramming complaint threshold with "154 cramming related inquiries"); Memo from Vivian Obledo to Myiproducts imail re: Verizon cramming complaints, PX-63; Memo from Lacey Kite to Myiproducts imail re: Verizon cramming complaints, PX-64; *see also* M. Mitchell, Tr. v.4 (Nov. 7 , 2013), 869:18-22 (admitting that LEC "inquiries" were, in fact, consumer complaints).

explaining why Defendants' monitoring required testing of its vendors before the LECs' threshold was breached, Cubeta explained, "The LECs and BSG share the – we have the same incentive and same objective **to make sure that the consumer is not receiving any unauthorized charges**." *Id.* at 1155:18-1156:4 (emphasis added).  Moreover, in response to receiving these complaints,  Defendants requested action plans requiring Landeen to explain how she would reduce the number of complaints; suggested that Landeen's companies be "more liberal with the credit policies"[42]; asked Landeen for proof of authorization; and warned Landeen that her billing privileges for these products might be terminated if the complaints were not brought under control.[43]  Furthermore, when Landeen's company continued to breach LEC complaint thresholds, Defendants suggested two additional ways to reduce these complaints: (1) ensuring that all aspects of the service, including the charge, are "clearly communicated" to the consumer; and (2) verifying charges to ensure that the "person ordering the service is indeed the appropriate authorized user."  PX-65, S. Welge, Tr. v.3 (Nov. 6, 2013), 765:9-767:25.  All of these actions, most notably, urging Landeen to ensure that consumers actually authorized the charges demonstrate Defendants' acknowledgement that the LEC complaints involved cramming.

Defendants did not challenge the LECs' characterization or coding of these complaints as cramming complaints, or suggest even once that the LECs' cramming complaint figures were inaccurate or inflated.  This point is significant because cramming complaints, if not brought under control, result in the LEC terminating billing for that product – and a concomitant reduction in Defendants' revenue.  It would have made no business sense for Defendants to blithely accept inflated cramming complaint counts that threatened its revenue.  Likewise, the LECs – which were also receiving revenue from these billings – would have no incentive to

---

[42] PX-52 at BSG00049554.

[43] *See* PX 51-52, S. Welge, Tr. v.3 (Nov. 6, 2013), 750:25-756:11, 762:19-763:8; PX-221, S. Welge, Tr. v.3 (Nov. 6, 2013), 759:5-760:18.

inflate these cramming numbers because doing so would have increased the likelihood of termination for such product and, accordingly, decreased the LECs' revenue, as happened with MyIProducts.

Second, Defendants assert that the LECs' refusal to bill for voicemail services in 2010 extended to all of Defendants' vendors – rather than just Landeen. M. Mitchell, Tr. v.4, 970:3-12. This point, however, is irrelevant to the question of whether cramming occurred. The contemporaneous documentary evidence makes clear that the LECs' action was prompted by concerns about unauthorized billing. As Defendants' Director of National Accounts explained:

> We are working with the LECs like Verizon, ATT, and Embarq to agree **if customers use the BSG B2P authentication** to allow new sales to be done using this method.

PX-231 (emphasis added). That same month, AT&T asked Defendants to "scrub" its existing customer lists for MyIproducts, 800 Vmailbox, and Digital Vmail because of excessive consumer complaints – a process identical to Defendants' previously unused B2P authentication procedure that would have compared consumer sign-up information against the consumer account to be billed. PX-184, Mitchell, Tr. v.4 (Nov. 7, 2013), 971:12-973:7. Indeed, the results of finally scrubbing the list establish beyond all doubt that Landeen was billing without authorization on a large scale. An astounding two-thirds of the telephone numbers billed in AT&T's southeast region for 800 Vmailbox and Digital Vmail contained mismatched billing and sign-up information. PX-193, M. Mitchell, Tr. v.4 (Nov. 7, 2013), 976:1-980:15; *see also id.* 960:25 – 962:14, 974:17 – 975:12, S. Welge, Tr. v.3 (Nov. 6, 2013), 805:20-807:4, PX-230, PX-234 (Defendants billed Landeen's charges as "pre-authenticated," without validating that the information matched, until AT&T required the scrubs). This staggering number of mismatched billings is corroborated by the 1% usage for these products. Indeed, the LECs' refusal to bill for these products against their economic self-interest, the mismatched billings, and the negligible

usage, when considered together, provide near-certain evidence that unauthorized billing occurred on a large scale.

> E.  **DEFENDANTS' BILLINGS EXCEEDED THEIR OWN ANTI-CRAMMING THRESHOLDS MONTH AFTER MONTH.**
>
>> 1.  **Purported "Customer Service" Inquiries Tripped Defendants' Own Inquiry-To-Billing Threshold Dozens of Times.**

The tens of thousands of "customer service inquiries" – which consistently tripped Defendants' own inquiry-to-billing threshold – also corroborate cramming.  Significantly, Defendants' monitoring of these inquiry-to-billing thresholds was a key component of their anti-cramming program.  As Defendants explained repeatedly to Landeen:

> BSG has implemented new procedures associated with monitoring each of our client's "performance indicators."  These performance indicators include regulatory inquiries, LEC inquiries, and end-user inquiries, or other factors that **might be symptomatic of a concern**.  .  .  .  BSG has implemented these proactive measures in order **to help maintain our shared focus of responsible billing practices**.  Working together, we can minimize escalated actions that could have a detrimental impact on our business relationship.[44]

This contemporaneous explanation of the program is corroborated by Ms. Cubeta's testimony that the "purpose" of monitoring program – combined with the testing that a threshold breach triggered – was to "ensure" that cramming did not occur.  K. Cubeta, Tr. v.5, 1157:1-13.

From the beginning, Defendants' billing for Landeen's Voicemail Services triggered an avalanche of consumer inquiries far in excess of the billing-to-inquiry thresholds.  For example, MyIProducts billings tripped the customer service inquiry thresholds a staggering eleven times between May 2006 and September 2007, with ratios ranging from 12.68% to 28.71%.[45]  Similarly, billings for 800 VMailbox tripped the threshold six times from March to October

---

[44] *See, e.g.*, PX-134, PX-136, PX-142, PX-144, PX-148, PX-153 (threshold breach letters from Defendants to Landeen) (emphasis added).

[45] *See* PX-54, PX-57, PX59-61, PX-66, PX-70, PX-74, PX-344 at 20 (customer service inquiry ratio breach notifications); *see also* PX-51 at BSG00049547; memos from Lacey Kite to Myiproducts imail, PXs 64-65; S. Welge, Tr. v.3 (Nov. 6, 2013), 763:19-765:14; PX-73, S. Welge, Tr. v.3 (Nov. 6, 2013), 770:4-16; PX-79, M. Mitchell, Tr. v.4 (Nov. 7, 2013), 872:18-19, 873:19-25 (LEC threshold breach notifications).

2009, with ratios ranging from 16.5968% to 38.3989%.[46]  Digital Vmail also racked up

thousands of inquiries, breaching Defendants' threshold eleven times between March 2009 and

January 2010, with ratios ranging from 15.2% to 38.4%.[47]

In attempt to explain why these breaches – which were integral to Defendants' anti-

cramming program – are not evidence of cramming, Defendants have asserted that some of these

tens of thousands of inquiries involved consumer questions, such as password help or questions

about the service.  M. Mitchell, Tr. v.4 (Nov. 7, 2013), 856:12-859:13.  However, the

contemporaneous documentary evidence contradicts this self-serving testimony.  Significantly,

not a single call monitoring record in evidence –  whether admitted for its truth or for notice –

includes a complaint for supposed "customer service" issues or password help.  Indeed, that

Defendants have not pointed to a single record to corroborate their claim shows that – far from

being, a "pebble on the beach," Tr. v.3 (Nov. 6, 2013), 667:17-24 – the records in evidence

reflect the entire shoreline.

More fundamentally, Defendants' argument ignores that Defendants' sole response to the

threshold breaches related to whether charges were authorized.  To that end, breach notices

themselves made a single demand – that the vendor produce **proof of authorization**, in the form

of a letter of agency.  J. Wardashki, Tr. v.4, 1051:3-1055:4; D. DeSilva, Tr. v.3, 711:1-711:13.

Indeed, no aspect of the testing that these breaches triggered involved determining whether

customers liked the product or had any other purported customer service issue.  Rather, as Mr.

Wardashki explained, Defendants' testing had a sole function – "to determine that there are valid

letters of authorization[] for accounts" Defendants billed.  J. Wardashki, Tr. v.4, 1016:2-9.

Moreover, Defendants monitored these customer service inquiries using call-recording forms set

up to record details about whether billing had been authorized[48] and whether the account had

---

[46] PX-134, PX-148, PX-153, PX-163, PX-346 at 24, 28, 50.

[47] PX-136, PX-144, PX-148, PX-153, PX-163, PX-187, PX-346 at 10, 25, 29, 39, 49.

[48] For example, the call recording form included entries for whether: (1) the complaining

- 24 -

been cancelled and credited, a fact that further demonstrates that these inquiries were related to crammed charges. *See*, *e.g.*, PX-176 at BSG00016674.   Significantly, not a single question on the form had anything to do with password help or any other customer service issue.

The hundreds of thousands of consumers who sought refunds for the Voicemail Services, *see* PX-383, also corroborate that these threshold breaches demonstrate cramming rather than some imaginary "customer service" issue.   This is because consumers requesting password help or information about the service would have no reason to obtain a refund.   Indeed, as both Ms. Cubeta and Mr. Ratner admitted, the customer service inquiries and refund requests contain significant overlap – a fact that underscores that these inquiries were "negative."  *See* I. Ratner, Tr. v.7 (Nov. 14, 2013), 1654:15-1654:22; K. Cubeta, Tr. v.5 (Nov. 8, 2013), 1124:4-1124:11 (explaining that Defendants stopped using refund rates as an indicator of unauthorized billing because, among other things, they are "duplicative" of the customer service inquiries).

Finally, Defendants' alternate explanation for the threshold breaches – that consumers had "buyer's remorse" and simply lied to obtain refunds – has no support in the record and is simply absurd.   99% of the 400,000 voicemail "customers" NXT serviced never accessed the product even once, making it clear that these complaints could not have been dissatisfaction or consumer lies.   Indeed, all of the evidence – negligible usage, high refund rates, the LECs' refusal to bill for the services, and thousands of mismatched billings – corroborate that the frequent tripping of Defendants' inquiry-to-billing ratio demonstrates cramming.

---

consumer was provided a letter of agency, (2) the information on the letter of agency matched the consumers', (3) the consumer continued to dispute the charge after being provided a matching letter of agency, and (4) if the information on the letter of agency did not match the consumers' information, the consumer knew the person whose information was reflected on the letter of agency.

- 25 -

**2.      Defendants' Testing Program – Which Relied Solely on "Letters of Agency" – Did Not Prevent Cramming.**

Defendants testing program – which relied solely on the **collection** of "letters of agency" – did not prevent cramming.    Indeed, the evidence shows that consumers never saw – much less completed – these forms and that Defendants took no steps to validate their accuracy.[49]

Consumers who were signed up through affiliate marketing never saw or filled out these "letters of agency,"[50] a fact Defendants knew or, at least, strongly suspected.  *See e.g.*, PX-88, PX-89 (listing co-registration as a method of marketing for 800 Vmailbox and Digital Vmail); PX-179 (questioning how a consumer would have seen the letter of agency).  Indeed, that these letters of agency could not have been part of the sign-up process is apparent on their face.  First, the letters of agency captured information not common in order forms, such as IP addresses.[51]  Second, they contained incomplete fine print that makes no sense, such as "For TEXAS RESIDENTS: In Lieu of submitting an Electronic LOA you can print this page and mail it along with a copy of your drivers license, etc."  *Id.*  Third, they often contained mismatched billing information, *see supra* at III(C), and improbable consumer names, such "Benjamin Benjamin" or "Joe Mudd."  *See* PX-6, PX-18.

In an apparent attempt to defend their blind reliance on these fabricated order forms, Defendants' employees testified that the letters of agency were merely methods of transmitting data captured at sign-up, and Defendants argue that it was the captured data – not the purported order form – that proved consumers had authorized the charges.[52]  But it was not merely data that

---

[49] Whenever one of Defendants' vendors breached a complaint threshold, Defendants' sole response was to request a sample of letters of agency from the vendor.  J. Wardashki, Tr. v.4 (Nov. 7, 2013), 1051:3-1055:4; D. DeSilva, Tr. v.3 (Nov. 6, 2013), 711:1-711:13.

[50] S. Oskoui, Tr. v.1 (Nov. 4, 2013), 240:24-242:3, 279:10-280:10; *compare* PX-372 *with* PX-156 at BSG00040995.

[51] *See, e.g.*, PX-18, PX-19, PX-20, PX-21, PX-22, PX-23, PX 25-27 (800 Vmailbox and Digital Vmail letters of agency); J. Wardashki, Tr. v.4 (Nov. 7, 2013), 1056:15-22.

[52] K. Cubeta, Tr. v.5 (Nov. 8, 2013), 1110:10-1110:23, 1196:4-1194:24, 1198:3-1198:11; M. Mitchell, Tr. v.4 (Nov. 7, 2013), 893:15-893:23; D. DeSilva, Tr. v.3 (Nov. 6, 2013), 711:11-711:16, 712:15-712:25; *see also* argument of counsel, Tr. v.1, 277:10-277:14 ("[t]hey don't

- 26 -

was sent to consumers as "proof" that Landeen's charges were legitimate – it was an image made to look like an order form with a large "Order Now" button.  *E.g.*, PX-6, PX-18, PX-25; PX-13 at BSG00002847-49 (consumer complained that MyIproducts provided LOA as proof of authorization when he disputed charge, but he never saw LOA before).  Indeed, to obtain billing approval in the first instance, BSG told the LECs that these letters of agency were Landeen's marketing,[53] and after consumers complained about unauthorized billing, sent these images to the LECs as proof of authorization.  *See* S. Welge, Tr. v.3 (Nov. 6, 2013), 835:14-16.   BSG even sent these images in response to regulatory cramming complaints as "the authorization information" and, at no time, explained that the letter of agency was just data rather than what the consumer actually saw.  PXs 2-39.  Indeed, Defendants carefully worded these regulatory responses to imply – but not explicitly state – that consumers authorized the charges – telling evidence of Defendants' knowledge that the letters of agency did not constitute authorization. That Defendants sent these ginned-up order forms – rather than providing the marketing consumers actually saw – corroborates that massive unauthorized billing occurred.

Moreover, given Defendants' utter failure to validate this "data," the data proves nothing. As described *supra* at III(C) and *infra* at 35-36, Defendants did no validation before billing and, indeed, billed for charges that were facially suspect.  *See* PX-6, PX-18, PX-222 (billing for consumers named "Benjamin Benjamin" "Joe Mudd," and "Kateelinn G").  Likewise, Defendants failed to validate the data through testing.  As Mr. Wardashki explained, "testing" involved simply comparing the letters of agency submitted by the vendor against the vendor's "marketing," J. Wardashki, Tr. v.4 (Nov. 7, 2013), 1053:2-18, which, as Ms. Mitchell explained, was also obtained – without question – from the vendor.  *See* M. Mitchell, Tr. v.4 (Nov. 7, 2013),

---

understand that an electronic LOA is data.  It is not a picture.  It is not a PDF.").

[53] *See* PX-117; M. Mitchell, Tr. v.4, 892:8-893:20.  Indeed, these letters of agency submitted to the LEC as "marketing" contained the same facially suspect elements as the letters of agency collected in the wake of a threshold breach, including the capture of IP addresses and incomplete fine print that makes no sense.  *See* PX-117.

891:2-10.  Accordingly, this so-called "testing" cannot address whether charges are authorized.
Indeed, as discussed *supra* at III(C), this nonsensical testing process could not even halt
widespread billing of consumers whose information did not match that provided at sign-up.
Defendants' testing process – which amounted to blind reliance on the say-so of a vendor that
Defendants had already determined needed a "second look," K. Cubeta, Tr. v.5 (Nov. 8, 2013),
1214:8-1215:3, combined with the other evidence of cramming, *see supra* at III(A)-(D) –
soundly demonstrates that the letters of agency in no way prove that charges were authorized.

### F.   CONSUMER COMPLAINTS ADMITTED FOR THEIR TRUTH ESTABLISH CRAMMING.

#### 1.   The Sixty-Seven Consumer Complaints the Court Admitted for Their Truth Support a Pattern of Widespread Cramming.

The Court admitted complaints from sixty-seven consumers about unauthorized billing
for their truth on three bases:  the complaining consumer did not know the person who signed up
for the service,[54] the complaint was a business record upon which Defendants relied
(specifically, complaints recorded on "case worksheets," including those in which the consumer
"denied all knowledge"),"[55] or the complaint form included an affirmation or warning that would

---

[54] *See* Tr. v.2 (Nov. 5, 2014), 505:15-506:19 (using the "David Jones" audio recording
(PX-243-A) as an example of those complaints that the Court would admit because "the
authorizing person was David Jones," but "David Jones was not the actual person" who called
the call center, nor did the caller know any David Jones); *id.* at 507:25-508:2 (identifying "a very
important exception of those people where the names, the addresses rather and the numbers do
not match at all").  Respectfully, the FTC preserves its objection to the Court's decision.
Because the 1999 Order prohibits Defendants from billing unless the charge was "**expressly
authorized by the Line Subscriber**," Permanent Injunction (Sept. 22, 1999) (DE-39) at Section
III (emphasis added), the fact that the line subscriber might know the person who allegedly
consummated the transaction is largely immaterial to whether the charge is unauthorized within
the meaning of the 1999 Order.

[55] *See* Tr. v.3 (Nov. 6, 2013), 678:1-8 ("With regard to the summaries, I have to break
them into two categories.  When we're talking about the summaries that are simply a call record,
a case report, the summaries that were created by BSG, I find that those can be admitted.  The
name of the person.  Did the customer allege that the LOA matched the authorized person?  Yes
or no.  Does the authorized party know the person?  Yes or no.  Those answers can come in.");
*id.* at 680:23-681:13 ("[C]ase worksheets will be admitted for the exact same reasons and for the
exact same purposes as the case summaries that I just described to you . . . .  They are summaries
that have been created by BSG.  They are acting upon them.  I find them to have equivalent

- 28 -

discourage misstatements.[56]  *See* Appendix D (listing admitted complaints and the basis for admission).[57]  Significantly, Defendants offered no evidence that any of these sixty-seven consumers was incorrect – which leaves these complaints as undisputed instances of cramming.[58] More important, these unchallenged complaints support a pattern of widespread cramming consistent with the substantial evidence discussed above.

### 2.  There Is Sufficient Corroborative Evidence To Admit All Remaining Cramming Complaints for Their Truth.

The Court admitted only a portion of the consumer complaints the FTC submitted, after analyzing individual proffered complaints that typified four larger sets of cramming complaints (recorded calls to Landeen's call center, Defendants' narrative summaries of such calls, Defendants' case worksheets concerning such calls, and complaints to regulatory agencies).  *See* Tr. v.2 (Nov. 5, 2013), 502:1-511:6; Tr. v.3, 675:22-691:12 (Nov. 6, 2013).  With respect to its ruling regarding audio recordings in particular, the Court invited the FTC to raise the issue again after hearing all the evidence.[59]  Pursuant to FRE 807, there is now more than sufficient

---

guarantees of trustworthiness as other business records. . . .  That includes the information in these, [including] the yes and nos, the DAKs and other matters[, but not] narrative information[.]").

[56] *See* Tr. v.3 (Nov. 6, 2013), 682:10-683:24 (excluding regulatory complaints, but admitting those where the complaint was both signed and verified, where the complaint form specifies that the complaint could be used to enforce laws, or where the form warns the consumer that filing a false complaint is illegal).

[57] After consulting with Defendants' counsel and providing them with the FTC's list of complaints affected by the Court's ruling, the FTC filed the agreed list on November 14.  *See* DE 198.  Defendants did not object, either before the FTC filed the list or afterwards.  Appendix D presents information drawn from the complaints listed in the FTC's November 14 filing.

[58] Almost half of the undisputed complaints admitted for their truth concern voicemail. *See* Appendix D (identifying thirty-two complaints about unauthorized charges for MyIProducts, 800 Vmailbox, and Digital Vmail).

[59] *See* Tr. v.2 (Nov. 5, 2013), 508:13-16 ("I will reconsider this ruling if the FTC wishes me to . . . after hearing all the evidence if they believe that the corroboration is so strong it would overcome my other concerns about this evidence.").

corroborative evidence to admit both the audio recordings and all other cramming complaints.[60]
*See* Appendix E (proffered complaints).

Specifically, the universe of corroborative evidence now includes:  (1) the fact that
complaints within each category corroborate each other; (2) the fact that complaints within
different categories corroborate each other;[61] (3) extraordinarily high refund rates and LEC
threshold breaches, *see supra* at III(B) and III(E)(1), which both corroborate the proffered
complaints by indicating the presence of (literally) hundreds of thousands of other complaints;[62]
and (4) evidence that independently establishes cramming, including practically non-existent
usage and data showing thousands of "mismatches," *see supra* at III(A)(2) and III(C)(2).  There
is no evidence – nor is it conceivable as a practical matter – that the proffered complaints are all

---

[60] Similarity among complaints is a key consideration when evaluating them under the
residual exception.  *See, e.g.*, *FTC v. Magazine Solutions, LLC*, No. 7-692, 2009 WL 690613, 1
(W.D. Mar. 16, 2009) ("I find compelling the fact that so many of the complaints corroborate
each other . . . .  The consistency of the representations again reinforces the trustworthiness of
the complaints.").  Significantly – and contrary to Defendants' implication – the complaints need
not be identical to be corroborative.  In *Figgie*, the Court ascertained "an **average** price per head
detector of $170" based on a declarant "who complied the prices described in 127 letters of
complaint[.]"  *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 608 (9th Cir. 1993) (emphasis added).
The Ninth Circuit found them trustworthy in part because "[t]he fact that they all reported
roughly similar experiences suggests their truthfulness," not because they reported identical
experiences.  *See id.*  Although the proffered complaints differ in various ways, they all similarly
involve a claim that the consumer was charged without consent for a service associated with the
Landeen Entities.

[61] The FTC acknowledges the Court's prior statement that, "[c]ontrary to what the FTC
has suggested, I do need to go bucket by bucket with these because I see these [types of
complaints] as very different circumstances."  Tr. v.2 (Nov. 5, 2013), 502:12-14; *see also id.* at
503:10-12 (distinguishing *Figgie* and regulatory complaints from the audio recordings; "That's a
different bucket than the bucket before me.").  Respectfully, however, this analysis erroneously
compartmentalizes the evidence.  There is no reason why, for example, a complaint to
MyiProducts' call center about unauthorized billing is not corroborative of a complaint to a
regulatory agency about MyiProducts' unauthorized billing.  Although a complaint's audience
may be relevant to the weight the Court ultimately assigns it, the substance of the grievance, or
of hundreds of grievances, is what gives them corroborative quality.

[62] Only consumers who inquired received refunds, and there is no evidence whatsoever
that any consumer ever received a refund for any reason other than unauthorized billing.  *See
supra* at 15-16.  Likewise, the LEC thresholds track consumer inquiries to the LECs, and the
evidence uniformly supports the conclusion that LEC "inquiries" were inquiries about
unauthorized billing rather than tens of thousands of "customer service" inquiries inexplicably
misdirected to the LECs rather than the entities providing the services at issue.  *See id.* at III(D).

- 30 -

untrustworthy notwithstanding both their similarity and the consistency between them and

independent corroboration by multiple lines of evidence.  In short, the FTC asks the Court not

view each complaint (or category) in isolation when the totality of the circumstances leaves it

beyond any doubt that widespread cramming occurred.[63]

## IV.    DEFENDANTS' OTHER ATTEMPTS TO EVADE LIABILITY FAIL.

### A.    The 1999 Order Binds BSG, Ltd., BSGNA, and All of BSGNA's Subsidiaries.

The relationship among corporate entities – rather than the formal corporate structure –

controls whether non-party corporate entities are bound by an order under Rule 65(d).[64]   Here,

the corporate entities comprising the Defendants' enterprise share officers and board members;[65]

---

[63] The FTC recognizes that, at least in criminal matters in the Fifth Circuit, "[t]he determination of trustworthiness is drawn from the totality of the circumstances surrounding the making of the statement, but cannot stem from other corroborating evidence."  *United States v. El-Mezain*, 664 F.3d 467, 498 (5th Cir. 2011).  *El-Mezain* relied on *United States v. Ismolia*, 100 F.3d 380, 383 (5th Cir. 1994), which concerned the Confrontation Clause rather than Rule 807. *See El-Mezain*, 664 F.3d at 498 (quoting *Ismolia*, 100 F.3d at 383).  Importantly, because the Confrontation Clause does not apply, Rule 807 is more flexible in civil cases.  *See, e.g.*, *Figgie*, 994 F.2d at 608 (noting that use of the residual exception in criminal trials "must satisfy the rigors of the confrontation clause," whereas "its use in this civil case presents no constitutional questions").  Significantly, as the Fifth Circuit has explained, the residual exception is "designed to encourage the progressive growth and development of federal evidentiary law by giving courts the flexibility to deal with new evidentiary situations which may not be pigeon-holed elsewhere." *United States v. Mathis*, 559 F.2d 294, 299 (5th Cir. 1977).  This case is a unique civil matter in which in which hundreds of complaints about the same practice and the same set of services corroborate each other.  Accordingly, a Confrontation Clause-type analysis should not apply.

[64] *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14-15 (1945) (explaining that "a relation between the defendant and the successor" may establish liability under Rule 65) (citing *Walling v. Reuter, Inc.*, 321 U.S. 671, 674 (1944) and *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106 (1942)); *Wirtz v. Ocala Gas Co.*, 336 F.2d 236, 241 (5th Cir. 1964) (explaining that "[t]he operative force of [a] decree is not dependent in all instances upon the preservation of the corporate entity or structure of a defendant."); *cf. Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 178-81 (1973) (holding bona fide purchaser of a business bound by prior order where purchaser had knowledge of the order and continued offending business practices).

[65] N. Phipps, Tr. v.6, 1490:15-1490:25, 1506:15-1507:3, 1508:25-1509:6, 1512:1-1521:19, PX 265 at Signature Pages (Mr. Phipps served simultaneously on the Board of BSG, Ltd. and BSGNA and as the CFO for BSG, Ltd., BSGNA, BSG Clearing, as well as all of the billing clearinghouses); PX-254 at 4, PX-255 at 4 (The Executive Director of the Board also serves as the CEO); K. Cubeta, Tr. v.5, 1102:13-1102:17, 1146:3-1146:9, 1265:7-1265:12 (Cubeta serves as General Counsel for BSGNA, BSG Clearing, and all of the billing clearinghouses);  *see also* PX-259 at Signature Pages, N. Phipps, Tr. v.6, 1514:7-1514:19 (explaining that Greg Carter simultaneously served as President of all of the clearinghouses).

- 31 -

Defendants' employees perform the same diligence, monitoring, testing of Defendants' vendors regardless of which billing clearinghouse is involved;[66] the company conducts all of its business, including that of its billing subsidiaries, from its offices in San Antonio, Texas, where all of its employees are located.  PX-256; N. Phipps, Tr. v.6, 1495:21 – 1496:13.  Moreover, the Defendants' corporate entities act as a unit for critical corporate activities, such as obtaining financing.  For example, in both 2007 and 2011 BSG Ltd. approved multimillion dollar loans taken out by BSGNA, and the clearinghouses served as the guarantors on the loans, because BSGNA does not have operating income.  N. Phipps, Tr. v.6., 1511:17-1511:20, 1512:20-1513:9; PX-257, PX-259, PX-265.  Additionally, BSGNA files a consolidated tax return on behalf of the clearinghouses, N. Phipps, Tr. v.6, 1520:6-1520:20, PX-268 at BSG00086855-888 (Form 1120), and BSG, Ltd. files consolidated financial statements on behalf of BSGNA and its subsidiaries.  *See*, *e.g.*, PX-254 at 18-48; PX-255 at 18-48.  Where party and non-party corporate entities have such unity of operations, courts have applied Rule 65(d) to bind the non-party entities.[67]

Defendants erroneously suggest because BSG acquired subsidiary clearinghouses and underwent a corporate restructuring in conjunction expanding its clearinghouse business – rather than to evade the 1999 Order – the 1999 Order does not apply to non-party corporate entities.

---

[66] D. DeSilva, Tr. v.3, 729:20-730:1; PX-149, PX 153-154, M. Mitchell, Tr. v.4, 892:8-192:15, 943:1-945:17; J. Wardashki, Tr. v.4, 1014:13-1015:15; *see also* PX-281 at BSG Resp.-II-p.00000022, PX-295 at BSG Resp.-II-p.00000131, PX-296 at BSG_Resp.-II-p.00000150; PX-300 at BSG Resp.-II-p.00000245, PX-302 at BSG Resp.-II-p.00000306; PX-304 at BSG Resp.-II-p.00000342, PX-306 at BSG Resp.-II-p.00000374; PX-308 at BSG Resp.-II-p.00000402; PX-311 at BSG Resp.-II-p.00000442 (BSG's contracts with vendors provide that the contracts may be freely assigned among Defendants' clearinghouses).

[67] *See Teas v. Twentieth-Century Fox Film Corp.*, 413 F.2d 1263, 1269 n.7 (5th Cir. 1969) (binding both a parent and its wholly owned subsidiary because they shared officers, directors, and employees; they operated from the same location; and the subsidiary existed only to serve the parent's purposes); *Zale Corp. v. FTC*, 473 F.2d 1317, 1321-22 (5th Cir. 1973) (unity of operations establishes legal identifiability); *see also Wirtz v. Ocala Gas Co.*, 336 F.2d 236, 242 (5th Cir. 1964) (holding that the merger of a named defendant subsidiary into another subsidiary brought the non-named subsidiary "within the operative force of the decree" where, among other things, the corporation shared the same officers).

This argument, however, ignores Supreme Court law, which makes clear that an order may be enforced "'against those to whom the business may have been transferred, whether as a means of evading the judgment **or for other reasons**.'"  *Regal Knitwear*, 324 U.S. at 14 (quoting *Walling v. Reuter, Inc.*, 321 U.S. 671, 674 (1944)) (emphasis added); *see also Golden State Bottling Co.*, 414 U.S. at 179 (holding bona fide third-party purchaser successor bound by previous order). Because the evidence overwhelmingly establishes that Defendants' corporate entities have the necessary unity of operations to be legally identified with one another, the 1999 Order binds all BSG corporate entities.[68]

     **B.**     **Defendants Have Not Proven "Substantial Compliance."**

     Although Defendants argue that they "substantially complied with the 1999 Order," ECF 155, ¶ 200, they failed to satisfy the significant burden associated with a "substantial compliance" defense.  Specifically, "[t]o prove this defense, the contemnor bears the burden of proving that it **took all reasonable steps** within its power to comply with the court's order." *Cobell v. Babbitt*, 37 F. Supp.2d 6, 10 (D.D.C. 1999) (quotation omitted) (emphasis added). Although four circuits have adopted the "all reasonable efforts" requirement,[69] Defendants

---

[68] Furthermore, the 2008 order has no application to this case because it covers billing for a "Telecommunications Charge," which is not at issue here.  Stipulated Final Judgment (ECF 778) at 7-9, *FTC v. Nationwide Connections, Inc., et al.*, Case No. 9:06-cv-80180-KLR (S.D. Fla. Mar. 18, 2008).  Indeed, a court of concomitant jurisdiction cannot supersede another district court's order.  *See Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 407-408 (5th Cir. 1971) (power to modify orders resides with the rendering court; if parties seek modification in a different court, "considerations of comity and orderly administration of justice demand that the nonrendering court should decline jurisdiction") (internal citations omitted); *see also* Permanent Injunction (ECF 39) at Section XVI (this Court retains jurisdiction for the purpose of any modification of the 1999 Order).

[69] *See Harris v. City of Phila.*, 47 F.3d 1311, 1324 (3d Cir. 1995) ("[T]he burden is that of the defendant to introduce evidence . . . to show that it has made in good faith **all reasonable efforts** to comply.") (quotation omitted) (emphasis added); *General Signal Corp. v. Donnallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986) (substantial compliance defense applies only when alleged contemnor took "**all reasonable steps**" to comply") (quotation omitted) (emphasis added); *Satyam Computer Servs., Ltd. v. Venture Global Eng'g, LLC*, 323 F. App'x 421, 430 (6th Cir. 2009) (same); *Food Lion, Inc. v. United Food & Commercial Workers*, 103 F.3d 1007, 1017 (D.C. Cir. 1997) (same).

contend that they can establish substantial compliance if they have "'achieve[d] substantial and diligent compliance in meaningful respects with what the court has ordered.'"  ECF 155, ¶ 192 (quoting *Palmigiano v. Di Prete*, 700 F. Supp. 1180, 1191 (D.R.I. 1988)).  Defendants are wrong about the law, but it makes no difference because they have not satisfied either the "all reasonable efforts" standard or the *Palmigiano* test.

### 1.  Defendants Have Not Proven That They "Took All Reasonable Steps" To Comply With the 1999 Order.

Defendants utterly failed to establish that they took "all reasonable steps" necessary to comply with the 1999 Order, which enjoined them from causing any line subscriber to be billed unless the charge "was expressly authorized by the line subscriber."  DE-39 at 5.  First, the only purported assurance that Defendants ever obtained that any consumer authorized a charge at issue was the consumer's purported "letter of agency."[70]  As noted above, *supra* at III(E)(2), consumers never saw these "letters of agency" nor do they establish that the consumer authorized the transaction.

More importantly, even if Defendants thoroughly conducted their own due diligence process (and they did not),[71] and even if that process was genuinely intended to prevent

---

[70] *See, e.g.*, S. Welge, Tr. v.3 (Nov. 6, 2013), 835:24-836:10 ("Q:  That testing process involved asking the vendors for a sample of LOAs, correct?  A:  Correct.  Q:  And if the LOA was received, the testing was complete, correct?  A:  Yes. . . .  Q:  BSG conducted no additional investigation as part of its testing process?  A:  No, I don't believe so."); J. Wardashki, Tr. v.4 (Nov. 7, 2013), 1016:10-14 (testifying that, from Defendants' perspective, if the LOA "is valid, then it is not a crammed account"); K. Cubeta, Tr. v.5 (Nov. 8, 2013), 1259:17-19 (agreeing, in response to the Court's question, that "enhanced services" provide only LOAs during the testing process); I. Ratner, Tr. v.7 (Nov. 14, 2013), 1700:6-8, 1702:19-1703:2, 1705:4-8 (testifying that all three testing levels involve only LOAs).

[71] As the Court will recall, Defendants' quality assurance manager, John Wardashki, appeared unable to discuss the asserted due diligence process in any meaningful way.  There are also multiple examples in Defendants' "due diligence" files where records are missing. *See, e.g.*, I. Ratner, Tr. v.7 (Nov. 14, 2013), 1682:5-1683:4 (conceding that the StreamingFlix due diligence file does not contain call records (step 17) or samples of BTNs (step 19), but arguing that the procedures still might have been completed).  Defendants simply sent letters to LECs and approved the proposed vendors without receiving responses, including one instance in which a response from Verizon would have revealed that the proposed vendor (StreamingFlix) was ineligible under Defendants' own criteria.  *See* StreamingFlix Prospective Vendor Review (July

crammers from billing through Defendants (it was not),[72] the fact that Defendants completed a checklist with respect to two of the three voicemail vendors does not establish that they took "all reasonable steps" to prevent unauthorized charges.[73]

Defendants entirely failed to prove why taking additional steps to prevent cramming would be unreasonable. For instance, Defendants easily could have prevented unauthorized billing by validating that the purported consumer's name, phone number, and address matched before billing. However, they did no such thing until March 2010, when AT&T forced them to.[74] Instead, they simply allowed Landeen's companies to submit purportedly "pre-

_____

13, 2009), R-233 at 23843 (due diligence checklist requiring confirmation from LECs that StreamingFlix was not managed by anyone who previously owned a terminated vendor (steps 14-15)); *id.* at 23923 (email from BSG to Verizon identifying Tim Durham as MyiProducts' managing partner); PX-73, S. Welge, Tr. v.3, 773:15-774:6 (Verizon terminated billing for MyiProducts in September 2007). Furthermore, Defendants fail to explain how their 2008 due diligence process protected MyiProducts consumers, whom Defendants began charging in 2005. Email from M. Covarrubias to M. Mitchell (Feb. 27, 2006), PX-45; *see also* I. Ratner, Tr. v.7 (Nov. 14, 2013), 1635:20-25 (agreeing that he was not opining "one way or the other as to whether whatever due diligence may have been done, if any, with respect to MyiProducts was adequate"). Because 800 Vmailbox and Digital Vmail collectively represent only 108,874 of the 593,582 unique BTNs billed for voicemail, even if every Digital Vmail and 800 Vmailbox consumer was billed between July 2009 and March 2010, almost half of the affected consumers during this period were charged for MyIProducts. *See* A. Miles 1006 Summary, PX-383.

[72] Much of Defendants' "due diligence" did little or nothing to prevent cramming (for instance, verifying that a vendor has a certificate of incorporation or reviewing its Dunn & Bradstreet report). *See* Digital Vmail Prospective Vendor Review (May 16, 2008), R-82 at 23591. Defendants relied substantially on information prospective vendors provided them, and they also failed to confirm that critical information vendors provided (like screenshots) represented what consumers actually saw. *See, e.g.,* J. Wardashki, Tr. v.4 (Nov. 7, 2013), 1037:16-21 ("Q: If a service is being sold to consumers in more than one way, you don't know whether what the quality assurance department is experiencing is what every consumer experiences, do you? A: I don't know if consumers experience the service differently than how we experienced it in QA.").

[73] Defendants' "due diligence" does not comply with the 2008 Order, but even if it did, that would be irrelevant to whether Defendants' took "all reasonable steps" to comply with the 1999 Order addressed to cramming.

[74] M. Mitchell, Tr. v.4 (Nov. 7, 2013), 960:25-962:14, 974:17-975:12; S. Welge, Tr. v.3 (Nov. 6, 2013), 805:20-807:4; Email from M. Mitchell to V. Landeen (Mar. 9, 2010), PX-230 (discussing new authentication process); Email from M. Mitchell to B. Jones (Mar. 23, 2010) (discussing authentication), PX-234 .

authenticated" charges, notwithstanding strong evidence that Landeen was not authenticating any transaction:

- In 2007, Quality Assurance manager John Wardashki listed mismatched billings for MyIProducts, including billings of lines that belonged to businesses, and questioned whether "they use any type of CNAM[75] to verify the name of the person matches the bill number."  PX-222.

- When an AT&T office line was billed for another Landeen product, Director of National Accounts Melissa Mitchell questioned how the charge "was able to pass validation."  PX-174; M. Mitchell, Tr. v.4, 958:19-962:15; and

- Defendants' "testing" procedures revealed that Landeen's companies did not capture a response to a security question, meaning charges were billed solely on unvalidated, publicly available information.[76]

Indeed, rather working to prevent mismatches, Defendants coached Landeen to hide the absence of any verification process from consumers.  Specifically, Defendants suggested that Landeen's call center representatives "refrain from stating that the authorizing party mistakenly mistyped the BTN [billed telephone number] **as this may cause the customer to believe that a validation process is currently not in place?**"  Email from M. Laredo (Mar. 18, 2009), PX-129 (concerning complaints regarding DigitalVMail charges) (emphasis added).  Attempting to hide the absence of basic safeguards is the antithesis of "substantial compliance" and reveals Defendants' own acknowledgement that they had not taken "all reasonable steps."

Additionally, Defendants have failed to prove why implementing other obvious anti-cramming measures would have been unreasonable.  For instance, Defendants easily could have: (1) employed usage to verify authorization (even if only in conjunction with other measures, or even if only to verify that a sample of consumers used the services at issue);[77] (2) employed

---

[75] CNAM stands for "Caller Name" and refers to a database that matches names to telephone numbers.

[76] J. Wardashki, Tr. v.4 (Nov. 7, 2013), 1047:18 – 1048:9; PX-130, PX-158, PX-213, PX-214, PX-215, PX-216, PX-217, PX-218, PX-222, PX-225; See also PX-198 (In 2010, Denise DeSilva explains that another Landeen company's processing of records provided "no confirmation that the consumer is associated with that telephone number.")

[77] When asked why Defendants chose not to employ usage even as "one factor among many," Ratner testified:  "It's not something we looked at."  Tr. v.7 (Nov. 14, 2013), 1641:24-

refund rates to guard against cramming (again, even if only in conjunction with other measures); or (3) contacted consumers, or a sample of consumers, to investigate whether the thousands who complained about unauthorized charges were telling the truth.  In short, Defendants did not take "all reasonable steps."

> ### 2.     Defendants Have Not Proven That They "Achieved Substantial and Diligent Compliance" With the 1999 Order.

Not only did Defendants fail to establish that they took "all reasonable steps" to prevent cramming, their "substantial compliance" defense fares even worse under the alternative test they propose.  *See* ECF 155, ¶ 192 (quoting *Palmigiano v. Di Prete*, 700 F. Supp. 1180, 1191 (D.R.I. 1988)).  *Palmigiano* looks at what the defendant has "achieve[d]" rather than the defendant's efforts, *see* 700 F. Supp. at 1191, and subsequent courts in the First Circuit have applied *Palmigiano* in this manner, *see*, *e.g.*, *Rolland v. Patrick*, 483 F. Supp.2d 107, 112 (D. Mass. 2007) ("it is not really Defendants' effort that counts but, given the remedial nature of the court's previous orders, the outcome of that effort") (citing *Palmigiano*, 700 F. Supp. at 1194).[78] Even if "only" 200,000 people were crammed, that result substantially deviates from the 1999 order – which prohibits cramming completely – and is not "substantial compliance."[79]

_____

1642:8.  When asked the same thing, Cubeta testified that usage data was "not effective" as a means to detect unauthorized billing and was too "subjective."  Tr. v.5, 1176:21-1177:3.

[78] Like *Palmigiano*, the Tenth Circuit determines "substantial compliance" in accordance with results rather than efforts.  *See Joseph A. by Wolfe v. New Mexico Dep't of Human Servs.*, 69 F.3d 1081, 1086 (10th Cir. 1995).  Specifically, the Tenth Circuit analogized the order at issue to a contract, and applied the test from the seminal contract substantial compliance case *Jacob & Youngs, Inc. v. Kent*, 129 N.E. 889, 891 (N.Y. 1921) (Cardozo, J.).  *See Joseph A.*, 69 F.3d at 1086.  Under *Jacob & Youngs*, there is no "substantial compliance" if the deviation "in any real substantial measure . . . frustrate[s] the purpose of the contract."  *Joseph A.*, 69 F.3d at 1086 (quoting *Jacob & Youngs*, 129 N.E. at 891) (Tenth Circuit's alterations).  Thus, because Defendants allowed tens of thousands of people to be crammed, they "frustrated the purpose" of the 1999 Order, which means they have no "substantial compliance defense."  *See Joseph A.*, 69 F.3d at 1086.

[79] *Palmigiano* found contempt because the order violations "are not minor technicalities," 700 F. Supp. at 1192, which is consistent with other authority limiting the "substantial compliance" defense to "technical" or "inadvertent" violations.  *See*, *e.g.*, *General Signal*, 787 F.2d at 1379.  Suffice it to say, 200,000 victims are not a "minor technicality."

## V.     THE LAW REQUIRES THE COURT TO REDRESS CRAMMED CONSUMERS.

### A.     The Court Must Award Redress for Consumers' Loss.

Compensatory sanctions redress the losses the contemnor caused.[80]  *See, e.g., United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947).  As the Supreme Court has held, the calculation of compensatory sanctions must be "based upon evidence of complainants' actual loss."[81]  *United Mine Workers*, 330 U.S. at 304.  Although the Court has discretion in determining how to calculate the actual loss, *see, e.g., American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585-86 (5th Cir. 2000), it has no discretion to reduce the award based on factors unrelated to the loss amount,[82] *see, e.g., Thompson v. Cleland*, 782 F.2d 719, 722 (7th Cir. 1986) (explaining that, once an order violation is found, "the award of compensatory damages for past violations would not be subject to the discretion of the court") (citations omitted); *Vuitton et Fils S. A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979) ("The district court is not free to exercise its discretion and withhold an order in civil contempt awarding damages, to the extent they are established.") (citations omitted).[83]

---

[80] The FTC will not repeat legal arguments already before the Court through other filings. First, the FTC already has addressed Defendants' misguided argument concerning *FTC v. Verity International, Ltd.*, 443 F.3d 48 (2d Cir. 2006).  *See* ECF 157 ¶ 195 (Oct. 25, 2013).  Second, as the FTC previously explained, Defendants' claim that the FTC must prove injury on an individualized, consumer-by-consumer basis grossly misstates the law.  *See* ECF 188 at 1-3 (Nov. 1, 2013).  Finally, the FTC is not seeking any form of double recovery here, *see infra* at V(C), and the Court already rejected the other material aspects of Defendants' various "preclusion" arguments, *see* Tr. v.1 (Nov. 4, 2013), 103:3-105:7.

[81] *See also FTC v. EDebitPay, LLC*, 695 F.3d 938, 945 (9th Cir. 2012) (consumer loss is the appropriate measure of contempt sanctions); *FTC v. Trudeau*, 662 F.3d 947, 950 (7th Cir. 2011) (same); *FTC v. Kuykendall*, 371 F.3d 745, 764 (10th Cir. 2004) (en banc) (same); *McGregor v. Chierico*, 206 F.3d 1378, 1387-89 (11th Cir. 2000) (same).

[82] *See also Milburn v. Coughlin*, 83 F. App'x 378, 380 (2d Cir. 2003) (holding that "the district court committed clear error" when it found contempt, but declined to award compensatory sanctions); *In re Grand Jury Subpoena*, 690 F. Supp. 1451, 1453 (D. Md. 1988) ("Once the complainant demonstrates actual losses stemming from the contumacious behavior, the Court is **not free** to exercise its discretion and withhold an order awarding compensatory damages.") (Court's emphasis) (citations omitted); *McGuffin v. Springfield Housing Auth.*, 662 F.Supp. 1546, 1549 (C.D. Ill. 1987) (same).

[83] This Court observed, correctly, that the progeny of *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949) turns the "measure of [the Court's power] into a demand upon its

**B.**     **The Evidence Establishes That Consumers Lost Millions.**

Although the net billings for all nine crammed services is the best measure of relief,

should the Court find liability only with respect to voicemail, there is definitive and essentially

uncontested evidence establishing consumer loss:[84]

- Net of refunds, Defendants billed 593,582 consumers identified by unique Billed
  Telephone Numbers ("BTNs") **$30,115,928.32** for the Voicemail Services.  *See*
  PX-383.

- The Court may also award damages for the period that NXT served as the
  Services' exclusive voicemail platform (Zoch testified that the creation of
  accounts was highly suspect and hundreds of thousands were unused, *see supra* at
  7).  Approximately 400,000 accounts were created, *see id.* at 5, which is 67% of
  the Services' total billed BTNs.  *See* PX-383.  Reducing the $30 million total by
  33% gives a damages figure of **$20,117,672**, net of all refunds.

- The Court may also award damages for the period from July 2009 through March
  2010, which involved approximately 200,000 consumers and a usage rate of .7%.
  *See supra* at 11.  The 200,000 consumers represent approximately 33% of the
  total unique BTNs the Voicemail Services charged.  33% of the total charges for
  represents **$9,938,256.34**, net of all refunds.

The FTC derives these figures from an FRE 1006 summary of Defendants' own business records

to which Defendants did not object.  *See* A. Miles, Tr. v.2 (Nov. 5, 2013), 346:2-8 (admitting

PX-383 as an FRE 1006 summary without objection).  Accordingly, these calculations more than

---

power," Tr. v.1 (Nov. 4, 2013), 105:1-2, but this does not lessen the logic upon which this
progeny relies:  namely, the fact that the sanction serves "not to vindicate the court's authority
but to make reparation to the injured party and restore the parties to the position they would have
held had the injunction been obeyed," *Vuitton*, 592 F.2d at 130.  Put differently, if the sanction
served simply to vindicate the Court's authority, then the Court might have the discretion to, in
effect, "waive" the sanction.  However, the 1999 Order prohibited cramming in an (ultimately
unsuccessful) effort to protect precisely the class of people whom Defendants' order violations
injured.  The Court cannot "waive" their right to redress, which is why lower courts have
interpreted *Jacksonville Paper*'s measure of the Court's power as "a demand upon its power."

[84] Defendants' only attempt to present alternative calculations was through Cathy
Coleman, who sought to testify regarding her purported summary of Defendants' alleged "write
offs."  The FTC disputes that Defendants' internal "write offs" necessarily mean that consumers
lost less than what PX-383 indicates.  In any event, the Court properly excluded Coleman's
purported "write off" estimate.  *See* C. Coleman, Tr. Tr. v.6 (Nov. 13, 2013), 1464:9-1466:9
(colloquy regarding proposed "write off" summary testimony).

satisfy the requirement that the FTC establish a "reasonable approximation"[85] of consumer injury by a preponderance of the evidence.[86]

### C. The Court Should Issue an Appropriate Order Ensuring that No "Double Recovery" Occurs.

As the FTC previously has stated, it does not seek double recovery.  To avoid any risk of double recovery, the FTC asks the Court to order (1) that Defendants provide the FTC with information sufficient to identify consumers, if any, who have recovered for Landeen Voicemail Service charges through the class actions; and (2) further order that the FTC administer redress in a manner that avoids double recovery.[87]

## VI. CONCLUSION

For the aforementioned reasons, the FTC asks the Court to find Defendants in contempt.

---

[85] *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997) ("The Commission must show that its calculations reasonably approximated the amount of customers' net losses, and then the burden shifts to the defendants to show that those figures were inaccurate.") (citations omitted); *see also FTC v. Trudeau*, 579 F.3d 754, 773 (7th Cir. 2009) (applying *Febre* in contempt case); *Kuykendall*, 371 F.3d at 766 (same); *FTC v. EDebitPay, LLC*, No. 07-4880, 2011 WL 486260, *13 (C.D. Cal. Feb. 3, 2011) (same), *aff'd*, 695 F.3d 938 (9th Cir. 2012).

[86] Every circuit to have addressed the standard for proof of compensatory sanctions has held that the amount need only be established by a preponderance of the evidence.  *See Kuykendall*, 371 F.3d at 753; *McGregor*, 206 F.3d at 1387; *In re Gen. Motors Corp.*, 110 F.3d 1003, 1018 (4th Cir. 1997); *Graves v. Kemsco Grp., Inc.*, 864 F.2d 754, 755 (Fed. Cir. 1988) (applying Seventh Circuit law); *see also Ahearn ex rel. NLRB v. International Longshore & Warehouse Union*, 721 F.3d 1122, 1129 n.3 (9th Cir. 2013) (noting that every circuit to have considered the standard of proof for compensatory contempt sanctions has adopted a preponderance standard).

[87] Alternatively, the Court could require the FTC to provide Defendants with information sufficient to enable them to challenge any consumer seeking double recovery during the class action challenge process.  In all events, Defendants can seek to modify the class action orders if they contend that a risk of double recovery remains.

Dated:     December 2, 2013                Respectfully Submitted,

                                           FEDERAL TRADE COMMISSION

                                   By:     ____*Robin L. Moore*_____

                                           Robin L. Moore (DC Bar #987108)
                                           Sarah Waldrop (MD Bar) (numbers not issued)
                                           Jonathan Cohen (DC Bar #483454)
                                           Admitted *Pro Hac Vice*

600 Pennsylvania Ave., NW M-8102B
Washington, D.C. 20580
(202) 326-2167 (Moore);
-3444 (Waldrop); -2551 (Cohen);
(202) 326-2558 (facsimile)
rmoore@ftc.gov; swaldrop@ftc.gov;
jcohen2@ftc.gov

- 41 -

## APPENDIX A

**Underlying Facts**

- NXT provided voicemail services to Landeen for <u>15 months</u>[1]
- NXT allotted <u>5,000 minutes</u> per month[2]
- There were <u>400,000</u> voicemail accounts created during the 15 months[3]
- <u>2,000</u> consumers per month (the maximum number of consumers consistent with Zoch's testimony)[4]
- <u>100%</u> turnover (2,000 new, unique consumers each month)[5]

**Calculation**

- (2,000 consumers per month) x (15 months) = 30,000 users
- 400,000 accounts created
- 30,000/400,000 = **7.5%**

---

[1] Specifically, January 2009 through March 2010. As Zoch testified, the NXT platform was "up and running" for ABC by "January or February 2009." R. Zoch, Tr. v.2, 307:15 (Nov. 5, 2013). Both DigitalVMail and 800VMail began charging consumers in January 2009. *See* LEC Dilution Report (Sept. 28, 2011), PX-324 at 3-4. Zoch also testified that NXT's relationship with Landeen concluded in March 2010, when Landeen cancelled the service. R. Zoch, at 314:13-15 (Nov.5, 2013).

[2] R. Zoch, Tr. v.2, 304:25-305:3 (Nov. 5, 2013); NXT Contract, PX-353.

[3] R. Zoch, Tr. v.2, 312:9-12 (Nov. 5, 2013) ("Q: During the time that NXT was providing voice mail services to MyiProducts, approximately how many voicemail accounts were created? A: A little over 400,000.").

[4] *Id.* at 306:19-22 (agreeing that the "upper end" that 5000 minutes per month could support "would be one to two thousand consumers"). The 5000 minutes per month includes both inbound calls (someone calling to leave a message, or to check messages) and outbound calls (for instance, calls made by the accountholder through the account, or calls forwarded automatically to multiple numbers the user set). *See id.* at 305:11-306:2. As an aside, 2000 consumers sharing 5000 minutes per month works out to only 5 seconds per day per consumer (2.5 minutes per consumer per month = 150 seconds per consumer per month; 150 seconds/30 days = 5 seconds per day). This is both spectacularly unrealistic and incredibly favorable to Defendants.

[5] This is a wildly implausible assumption because it assumes that **every** consumer used Landeen's voicemail service for only a month before moving to a new service or electing not to use voicemail. It is vastly more likely that, to the extent the Landeen Voicemail Services had any users at all, most of those users continued with the service for more than one month.

## APPENDIX B

### Underlying Facts

- NXT provided voicemail services to Landeen for <u>15 months</u>[1]
- NXT allotted <u>5,000 minutes</u> per month[2]
- There were <u>400,000</u> voicemail accounts created during the 15 months[3]

### Assumptions

- 500 consumers per month[4]
- 50% turnover (50% new, unique users each month)

### Calculation

- 4,000 consumers
  - 500 users in the first month
  - 250 new users (50% turnover) in each of the next 14 months = 3,500 consumers (14 x 250)
  - 3,500 + 500 = 4,000
- 400,000 accounts created
- 4,000/400,000 = **1%**

---

[1] Specifically, January 2009 through March 2010. As Zoch testified, the NXT platform was "up and running" for ABC by "January or February 2009." R. Zoch, Tr. v.2, 307:15 (Nov. 5, 2013). Both DigitalVMail and 800VMail began charging consumers in January 2009. *See* LEC Dilution Report (Sept. 28, 2011), PX-324 at 3-4. Zoch also testified that NXT's relationship with Landeen concluded in March 2010, when Landeen cancelled the service. R. Zoch, Tr. v.2, at 314:13-15 (Nov. 5, 2013).

[2] R. Zoch, Tr. v.2, 304:25-305:3 (Nov. 5, 2013); NXT Contract, PX-353.

[3] R. Zoch, Tr. v.2, 312:9-12 (Nov. 5, 2013) ("Q: During the time that NXT was providing voice mail services to MyiProducts, approximately how many voicemail accounts were created? A: A little over 400,000.").

[4] 500 consumers per month is a favorable assumption for Defendants because it assumes that each consumer uses only twenty seconds of voicemail time per day (5000 minutes per month and 500 consumers per month = 10 minutes per consumer (5,000/500 = 10); ten minutes per consumer per month = 600 seconds per consumer per month; 600 seconds/30 days = 20 seconds per day)). As the Court may recall, NXT's "unified messaging platform" had multiple features, *see id.* at 300:14-301:1, 303:5-12, and was primarily designed for "road warriors" (travelling businesspeople), *see id.* at 301:2-4, 325:19-326:4—who could use 3000 minutes per month **each**, *see id.* at 306:6-11 (stating that a "typical road warrior" could use "as many as 3,000" minutes per month on the unified messaging platform"). Additionally, the number of minutes consumed includes both inbound calls (someone calling to leave a message or to check messages) and outbound calls (for instance, calls made by the accountholder through the account, or calls forwarded automatically to multiple numbers the user set). *See id.* at 305:11-306:2. In fact, based on the more detailed data available from the second half of the year, *see supra* at III(A)(2), ten minutes per consumer per month almost certainly underestimates actual voicemail use per consumer— and by a substantial amount. FTC data analyst Anne Miles counted 209 total unique users during the nine-month period from July 2009 through March 2010, A. Miles, Tr. v.2 (Nov. 5, 2013), 336:22-337:12, 342:13-343:5, or approximately 27 per month. Additionally, 63 Landeen employees used accounts. *See supra* at 10. Estimating ninety users per month would allocate NXT's 5000 minutes at roughly 56 per consumer per month, or around two minutes per person per day.

## APPENDIX C

**Underlying Facts**

- 200,000 voicemail accounts created[1]
- 1,000 email accounts created[2]
- 209 voicemail accounts were used by consumers[3]
- 63 voicemail accounts were used by Landeen employees[4]
- The FTC received 222 unidentified voicemail account records[5]

**Assumptions**

- Each of the 1000 email accounts created was used by a unique consumer between July 2009 through March 2010[6]
- Landeen's 63 employee-users count as consumers
- The 222 unidentified account records each reflect separate users
- Every user is a unique user (*i.e.*, there is no overlap between users in any of the three prior categories or the 209 voicemail accounts consumers used)

**Calculation**

- 1494 possible consumers
    - 209 voicemail accounts used +
    - 1000 email accounts used +
    - 63 Landeen employee users +
    - 222 unidentified users = 1494
- 200,000 accounts created
- 1494/200,000 = **.747%**

---

[1] NXT hosted "around 200,000" accounts for the Landeen Voicemail Services from July 2009 through March 2010.  *See* R. Zoch, Tr. v.2 (Nov. 5, 2013), 319:12-17.

[2] *Id.* at 328:21-25 (testifying that the number of email accounts created on NXT's server was "[r]ight at 1000").

[3] A. Miles, Tr. v.2 (Nov. 5, 2013), 336:22-337:12, 342:13-343:5.

[4] R. Zoch, Tr. v.2 (Nov. 5, 2013), 313:25-314:12.

[5] *See* A. Miles, Tr. v.2 (Nov. 5, 2013), 348:19-350:25.

[6] Zoch did not specify whether the 1000 accounts were created during the period at issue, or whether they were used at all; we assume that they were both created and used between July 2009 and March 2010.

**APPENDIX D**
**Consumer Complaints Admitted for Their Truth**

| PX # | Pincite | Consumer | Service | Details | Basis for Admission |
|---|---|---|---|---|---|
| 1 | BSG00000067 | Howard Hayes | MyIproducts | Consumer complained to Indiana Office of Utility Consumer Counselor on 1/30/2006; denied all knowledge of service | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 1 | BSG00000071 | Marilyn Liggett | MyIproducts | Consumer complained to Better Business Bureau on 1/30/2006; denied all knowledge of service | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 1 | BSG00000077 | Carol Calabro | MyIproducts | Consumer complained to Florida Public Service Commission on 1/26/2006; denied all knowledge of service | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 1 | BSG00000084 | Angelina Hatfield | MyIproducts | Consumer complained to Better Business Bureau on 1/24/2006; denied all knowledge of service | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 1 | BSG00000090 | David Hinsdale | MyIproducts | Consumer complained to Ohio Attorney General on 2/3/2006; denied all knowledge of service | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 1 | BSG00000096 | Lou Emery | MyIproducts | Consumer complained to Idaho Public Utilities Commission on 2/3/2006; denied all knowledge of service | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 13 | BSG00002847-49 | Robert M. Sanow | MyIproducts | Consumer complained to New York Attorney General on 8/20/2009; stated he was charged without authorization; | Complaint signed with understanding that false statements in complaint punishable as misdemeanor, |

1

| PX # | Pincite | Consumer | Service | Details | Basis for Admission |
|---|---|---|---|---|---|
| | | | | MyIproducts sent him LOA as proof he had ordered the service, but he had never seen the LOA before | Tr. v.3, 682:10-683:24 (Nov. 6, 2013) |
| 14 | BSG00003827-28 | Belinda Scollard | MyIproducts | Consumer complained to Illinois Attorney General on 9/16/2009; stated she was charged without authorization | Complaint signed with affirmation that statements are true and accurate to the best of complainant's knowledge, Tr. v.3, 682:10-683:24 (Nov. 6, 2013) |
| 20 | BSG00001667, 72-74 | Antonia Labra | 800 Vmailbox | Consumer complained to California Public Utilities Commission on 4/28/2009; stated she did not understand how she was billed | Complaint filed on FCC slamming form, including notice that complaint may be referred for prosecution, Tr. v.3, 682:10-683:24 (Nov. 6, 2013) |
| 29 | BSG00001043, 47 | David Ridings | Instant 411 | Consumer complained to Arkansas Attorney General on 2/7/2009; stated he was charged without authorization | Complaint signed with affirmation that statements are true and accurate to the best of complainant's knowledge, with permission to refer the complaint if appropriate, Tr. v.3, 682:10-683:24 (Nov. 6, 2013) |
| 32 | BSG00006390-91, 93-95 | Margaret Macdonald | Instant 411 | Consumer complained to Illinois Attorney General on 1/13/2009; stated she was charged without authorization; Instant 411 sent her LOA as " a copy of [her] supposed transaction" to prove she ordered the service, but she | Complaint signed with affirmation that statements are true and accurate to the best of complainant's knowledge, Tr. v.3, 682:10-683:24 (Nov. 6, 2013) |

| PX # | Pincite | Consumer | Service | Details | Basis for Admission |
|---|---|---|---|---|---|
| | | | | had not filled out the LOA | |
| 39 | BSG00008297, 299-302 | David Porter | eSafeID | Consumer complained to Federal Communications Commission on 8/18/2010; stated he was charged without his permission for service he did not request | Complaint filed on FCC form with notice that complaint may be referred for prosecution, Tr. v.3, 682:10-683:24 (Nov. 6, 2013) |
| 47 | BSG00049379, call #10 | Ethel Whistler | MyIproducts | Charge was in name of Leslie Yearling, which caller did not recognize; CSR canceled account since information did not match | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013), Tr. v.3, 679:13-16 |
| 48 | BSG00049389, call #9 | Deborah Tomasco | MyIproducts | Charge was in name of Anita Serback; CSR canceled account and stated the phone number must have been mis-keyed | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013), Tr. v.3, 679:13-16 |
| 49 | BSG00049413, call #7 | Angela Strickler | MyIproducts | Charge was in name of Huge Lee; caller did not recognize; CSR canceled account | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013), Tr. v.3, 679:13-16 |
| 50 | BSG00035946, call #3 | Jose Perez | MyIproducts | CSR volunteered that charge was under a different name and address, explained that person who registered for service may have typed incorrect number | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013), Tr. v.3, 679:13-16 |
| 58 | BSG00019528, call #1 | Michael Santoro | MyIproducts | Charge was in name of Wendy, which caller did not recognize; CSR stated Wendy must have entered an incorrect phone number upon signing up for voicemail | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013), Tr. v.3, 679:13-16 |
| 127 | BSG00016522 | Christina St. Alla | Instant 411 | Caller inquired what charge was for; LOA provided in name of | Business record (Defendants' case worksheet), Tr. v.3, |

3

| PX # | Pincite | Consumer | Service | Details | Basis for Admission |
|------|---------|----------|---------|---------|---------------------|
| | | | | Diego St. Alla; consumer continued to dispute the charge; credit issued, account canceled | 680:23-681:13 (Nov. 6, 2013) |
| 127 | BSG00016523 | Pearl Evon | Instant 411 | Caller inquired what charge was for; LOA provided in name of Warren McClain; credit issued, account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 127-B | 2:18 – 3:7 | Jennifer Gammon | Instant 411 | Charge was in name of Vontress Lambert; consumer did not recognize, CSR stated that "it's not your charge" and canceled | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013) |
| 127-C | 2:19 – 3:12 | Doris Hamilton | Instant 411 | Charge was in name of Casper and Thelma Hawkins; consumer did not recognize, CSR stated that the person who ordered service "mis-keyed" phone number | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013) |
| 129 | BSG00016494 | Mary Walker | Digital Vmail | LOA provided in name of caller's son; account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 129 | BSG00016495 | Vicky Panal | Digital Vmail | LOA provided in name of Mike Panal; credit issued and account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 129 | BSG00016496 | Madie Sanders | Digital Vmail | LOA provided in name of caller's son; account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 129-A | 2:18 – 3:3 | Scott Dennis | Digital Vmail | Charge was in name of Chris Lidguard; consumer did not recognize, CSR stated person | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013) |

| PX # | Pincite | Consumer | Service | Details | Basis for Admission |
|---|---|---|---|---|---|
| | | | | who signed up for service "keyed in your telephone number incorrectly" | |
| 129-B | 2:19 – 3:12 | Harvey Sales | Digital Vmail | Charge was in name of Kelly Rosser; consumer did not recognize, CSR stated charge was in error because person signed up for services and "mis-keyed" telephone number | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013) |
| 132 | BSG00016530 | Andrea Buchannan | InfoCall | Consumer inquired what charge was for; LOA provided, consumer continued to dispute charge; account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 132 | BSG00016531 | Stacey Holt | InfoCall | LOA provided in name of Sandra Kowsi; caller did not allege to know that person; credit issued, account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 132 | BSG00016532 | Donna Gamble | InfoCall | LOA provided in name of Billy Ramirez; caller did not allege to know that person; credit issued, account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 132 | BSG00016533 | Dorris Wilderman | InfoCall | LOA not provided; credit issued, account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 132 | BSG00016534 | Renee Thompson | InfoCall | LOA provided in name of Lucy Grey; caller did not allege to know that person; credit issued, account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 150 | BSG00016588 | Mrs. Walks | InfoCall | LOA provided in name of caller's son; account canceled | Business record (Defendants' case worksheet), Tr. v.3, |

5

| PX # | Pincite | Consumer | Service | Details | Basis for Admission |
|---|---|---|---|---|---|
| | | | | | 680:23-681:13 (Nov. 6, 2013) |
| 150 | BSG00016589 | Cathline Dunkin | InfoCall | LOA provided; caller continued to dispute the charge; credit issued, account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 150-A | 4:6 – 6:25 | Yvette Adams | InfoCall | Charge was in name of Brittany Adams; consumer did not know that person; CSR told consumer Brittany Adams "used your address and phone number" to sign up for service | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013) |
| 150-B | 3:1 – 3:17 | Linda Sigmund | InfoCall | Charge was in name of Darlene Wilkinson; consumer did not know that person; CSR stated that person who signed up for service gave consumer's phone number and account was "approved with the wrong information on it" | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013) |
| 155-A | 5:2 – 7:7 | Ebelina Kohler | Instant 411 | Charge was in name of Sanathia Cruitt, which consumer did not recognize; CSR checked billing address and stated correct information had not been verified, issued credit | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013) |
| 155-B | 3:9 – 5:9 | Lucy Highfill | Instant 411 | Charge was in name of Joyce Highfill, which caller did not recognize (CSR: "what is the relation?"  Caller: "Well, I don't know.  It's real distant if there is any relation at all.") | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013) |

| PX # | Pincite | Consumer | Service | Details | Basis for Admission |
|---|---|---|---|---|---|
| 155-C | 3:20 – 4:6, 4:21 – 4:24 | Linda Lewis (Boston Scientific) | Instant 411 | Charge was in name of Kevin Pacarian; line subscriber was Boston Scientific, and caller did not recognize name; CSR stated it was an instance of wrong information | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013) |
| 173 | BSG00016721 | Nelda Perez | eSafeID | Caller denied all knowledge of service; LOA provided, customer continued to dispute charge; credit issued and account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 173 | BSG00016722 | Megan Richards | eSafeID | Caller denied all knowledge of service; LOA provided in name of caller's son; credit issued and account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 176 | BSG00016674 | Jerry Hacupp | Streaming Flix | Caller denies all knowledge of service; LOA provided in name of caller's wife; credit issued and service canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 176 | BSG00016675 | Lanore Woodhouse | Streaming Flix | Caller denies all knowledge of service; LOA provided and caller continues to dispute charge; account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 219 | BSG00049391, call #3 | Ella Johnson | MyIproducts | Charge was in name of Louis Butler; CSR stated the phone company should verify that the name and address match because the vendor just provides the service and ESBI bills it; billing supervisor issues credit because number was likely mis-keyed | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013), Tr. v.3, 679:13-16 |

| PX # | Pincite | Consumer | Service | Details | Basis for Admission |
|------|---------|----------|---------|---------|---------------------|
| 220 | BSG00035933-34, call #2 | Muriel Drake | MyIproducts | CSR volunteers that account is under different name and address and thus likely "mis-keyed error," in which person who signed up input incorrect number | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013), Tr. v.3, 679:13-16 |
| 220 | BSG00035937 | Bob Farrell | MyIproducts | Charge is in name of Susan Walker; CSR states that the individual may have mis-keyed number upon signing up; credit issued and canceled account | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013), Tr. v.3, 679:13-16 |
| 243 | BSG00016501-502, call #1 | Karen Davis | MyIproducts | Caller denies all knowledge of service; LOA provided and caller continues to dispute charge; service canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 243-A | 2:17 – 4:5 | Todd Stevens | MyIproducts | Consumer denied ordering service; charge was in name of David Jones; consumer, who owned law firm, had no Davids or Joneses as employees; CSR responds that address also does not match so person who signed up may have mis-keyed telephone number | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013) |
| 244 | BSG00018436, call #5 | Patrick McCrohan | MyIproducts | Consumer inquired what charge was for; LOA provided in name of consumer's girlfriend; account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 318 | BSGRESPXIII00000033 | Opal K | Streaming Flix | Caller denied all knowledge of service; LOA in name of Victor Wallace; caller did not allege to know that person; credit issued | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |

8

| PX # | Pincite | Consumer | Service | Details | Basis for Admission |
|---|---|---|---|---|---|
| | | | | and account canceled | |
| 318 | BSGRESPXIII00000034 | Bruce Gatson | Streaming Flix | Caller denied all knowledge of service; LOA provided in name of Herbert Hicks; credit issued and account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 318 | BSGRESPXIII00000036 | Amy Ring | Streaming Flix | Caller denied all knowledge of service; LOA provided and consumer continued to dispute charge; account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 318 | BSGRESPXIII00000037 | Letty Banner | Streaming Flix | Caller denied all knowledge of service; LOA provided in name of Sharon Banner; account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 319 | BSGRESPXII00000038 | Don Miller | Streaming Flix | Consumer denied all knowledge of service; LOA provided and consumer continued to dispute charge; account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 319 | BSGRESPXIII00000039 | Paul Smith | Streaming Flix | Consumer denied all knowledge of service; LOA provided and consumer continued to dispute charge; credit issued and account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 319 | BSGRESPXIII00000040 | Louis Cirillo | Streaming Flix | Consumer inquired what charge is for; LOA provided in name of consumer's daughter | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 320 | BSGRESPXIII00000223 | Jose Anthony Tapia | InfoCall | Consumer inquired what charge is for; no LOA provided; account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 320 | BSGRESPXIII00000224 | Richard | InfoCall | Consumer inquired what charge is | Business record (Defendants' |

| PX # | Pincite | Consumer | Service | Details | Basis for Admission |
|------|---------|----------|---------|---------|---------------------|
| | | Giammona | | for; LOA provided and consumer continued to dispute charge; account canceled | case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 320 | BSGRESPXIII00000225 | Francesca Waterhouse | InfoCall | Consumer denied all knowledge of service; LOA provided and consumer continued to dispute charge; credit issued and account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 320 | BSGRESPXIII00000227 | Rosa Aguilar | InfoCall | Consumer inquired what charge is for; LOA provided in name of Lorina Bargoa; credit issued and account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 321 | BSGRESPXIII00000290 | Cheryl Carter | eSafeID | Consumer denied all knowledge of service; LOA provided in name of K--- B--- (minor); credit issued and account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 321 | BSGRESPXIII00000291 | Georgia Yrbeery | eSafeID | Consumer called to cancel; LOA provided in name of Bobby Bell; account canceled | Business record (Defendants' case worksheet), Tr. v.3, 680:23-681:13 (Nov. 6, 2013) |
| 322 | BSGRESPXIII00000563, call #4 | Chad Keller | MyIproducts | Charge was in name of Cara; consumer did not recognize; CSR stated address also did not match and person who signed up may have mis-keyed number | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013), Tr. v.3, 679:13-16 |
| 322 | BSGRESPXIII00000564, call #2 | Harvey Hall | MyIproducts | Charge was in name of Marquita Finks; consumer did not recognize; CSR stated the person who ordered service may have input incorrect number | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013), Tr. v.3, 679:13-16 |
| 322 | BSGRESPXIII00000565, | Alberto Garza | MyIproducts | Charge was in name of Eva; | Information does not match, |

| PX # | Pincite | Consumer | Service | Details | Basis for Admission |
|---|---|---|---|---|---|
| | call #4 | | | consumer did not recognize; CSR stated the charge belonged to someone else and was billed to consumer's number in error | Tr. v.2, 505:15-506:25 (Nov. 5, 2013), Tr. v.3, 679:13-16 |
| 322 | BSGRESPXIII00000565, call #5 | Charles Ziegfried | MyIproducts | CSR stated information on account was "completely different" and person who signed up for account may have mis-keyed phone number | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013), Tr. v.3, 679:13-16 |
| 341 | Page 000178, call #1 | Anna Flesburg | MyIproducts | Charge was in name of Bobby; name and address did not match, so CSR canceled and credited account; CSR stated the person who signed up for the service may have had a similar phone number and mis-keyed it | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013), Tr. v.3, 679:13-16 |
| 341 | Page 000179, call #4 | Beverly Hahn | MyIproducts | Consumer did not know what charge was for; account was in name of Jason Teal, which consumer did not recognize; CSR stated "they have had a lot of error billing either someone entered the wrong phone number or they purposely entered someone else's number to be billed" | Information does not match, Tr. v.2, 505:15-506:25 (Nov. 5, 2013), Tr. v.3, 679:13-16 |

11

# APPENDIX E
## Additional Consumer Complaints Reflecting Unauthorized Billing

| PX-# | Pincite | Service | Consumer Name |
|---|---|---|---|
| 2 | entire document | MyIproducts | Paula Garretson |
| 3 | entire document | MyIproducts | John Harding |
| 4 | entire document | MyIproducts | redacted |
| 5 | entire document | MyIproducts | Teresa Perez |
| 6 | entire document | MyIproducts | David Bersie |
| 7 | entire document | MyIproducts | Gary Johnson |
| 8 | entire document | MyIproducts | Travis Bowman |
| 9 | entire document | MyIproducts | Marc Duchesneau |
| 10 | BSG00001947-51 | MyIproducts | Lee Namco |
| 11 | entire document | MyIproducts | John Brown |
| 12 | BSG00002144-49 | MyIproducts | Carter Corbitt |
| 15 | entire document | MyIproducts | Russell Dieterlen |
| 16 | BSG00005026-31 | MyIproducts | Donald Hallinger |
| 17 | BSG00001235-39 | MyIproducts | Maria Pytlak |
| 18 | BSG00001460-66 | 800 Vmailbox | Tony D'Alessio |
| 19 | entire document | 800 Vmailbox | Dorothy Donner |
| 21 | BSG00001725-30 | 800 Vmailbox | Lucinda and Yoao Cruz |
| 22 | entire document | 800 Vmailbox | Janice Bryant |
| 23 | BSG00001836-43, 46 | 800 Vmailbox | Vincenzo Modugno |
| 24 | BSG00005654-55, 57 | Digital Vmail | Earl Miller |
| 25 | entire document | Digital Vmail | CyberNet Consulting, Inc. |
| 26 | entire document | Digital Vmail | Angela Koster |
| 27 | entire document | Digital Vmail | Rodney Birkett |
| 30 | BSG00001593-600, 602-603 | Instant 411 | Ruby Royall |
| 31 | BSG00001848-56 | Instant 411 | Dan Taylor |
| 33 | entire document | Info Call | Gale Hercula |
| 34 | BSG00001938-43 | Info Call | Edwin Borrero |
| 35 | BSG00003999-4003 | Streaming Flix | Hester Jones |
| 36 | BSG00003979-85 | Streaming Flix | Alain Lopez |
| 37 | entire document | Streaming Flix | Joellen Howell-Schmidt |
| 38 | BSG00008185-88, 92-93 | Uvolve | Nedra Blankinship |
| 44 | BSG00049494, Call #1 | MyIproducts | identified by BTN[1] |
| 44 | BSG00049494, Call #2 | MyIproducts | identified by BTN |
| 44 | BSG00049495, Call #3 | MyIproducts | identified by BTN |
| 44 | BSG00049495, Call #4 | MyIproducts | identified by BTN |
| 44 | BSG00049495, Call #5 | MyIproducts | identified by BTN |
| 44 | BSG00049495, Call #6 | MyIproducts | identified by BTN |
| 47 | BSG00049377, Call #1 | MyIproducts | Sylvia Oten |

[1] Defendants produced some complaints that identified the complainant only by BTN. Defendants possess the BTN and information associated with that BTN.

| 47 | BSG00049377, Call #2 | MyIproducts | Tina Davort |
|----|----------------------|-------------|-------------|
| 47 | BSG00049377, Call #3 | MyIproducts | John Tuff |
| 47 | BSG00049377-78, Call #4 | MyIproducts | Philip Holloman |
| 47 | BSG00049378, Call #5 | MyIproducts | George Brand |
| 47 | BSG00049378, Call #6 | MyIproducts | Kathy Henrich |
| 47 | BSG00049378-79, Call #7 | MyIproducts | Rhonda White |
| 47 | BSG00049379, Call #8 | MyIproducts | Betty Allen |
| 47 | BSG00049379, Call #9 | MyIproducts | Shirley Fritchet |
| 47 | BSG00049380, Call #1 | MyIproducts | Jerry Friedman |
| 47 | BSG00049380-81, Call #2 | MyIproducts | Ellen Hunley |
| 47 | BSG00049381, Call #3 | MyIproducts | identified by BTN |
| 47 | BSG00049381, Call #4 | MyIproducts | identified by BTN |
| 47 | BSG00049381-82, Call #5 | MyIproducts | Edward Rose |
| 47 | BSG00049382, Call #6 | MyIproducts | Ted |
| 47 | BSG00049382, Call #7 | MyIproducts | Janice |
| 47 | BSG00049382-83, Call #8 | MyIproducts | Della Hicks |
| 47 | BSG00049383, Call #9 | MyIproducts | Carolyn Powel |
| 47 | BSG00049383, Call #10 | MyIproducts | Sherry Panzel |
| 48 | BSG00049387, Call #1 | MyIproducts | Cybelle Mandigo |
| 48 | BSG00049387, Call #2 | MyIproducts | John Bruno |
| 48 | BSG00049387-88, Call #3 | MyIproducts | Ila Jean Strand |
| 48 | BSG00049388, Call #4 | MyIproducts | Sonya Hannibel |
| 48 | BSG00049388, Call #5 | MyIproducts | Robert Sembach |
| 48 | BSG00049388-89, Call #6 | MyIproducts | Kenneth Hynson |
| 48 | BSG00049389, Call #7 | MyIproducts | Ruth Higgins |
| 48 | BSG00049389, Call #8 | MyIproducts | Rhonda Rodrigue |
| 48 | BSG00049390, Call #10 | MyIproducts | Yvette Avellanet |
| 49 | BSG00049410, Call #1 | MyIproducts | David |
| 49 | BSG00049411, Call #2 | MyIproducts | Robert Harper |
| 49 | BSG00049411-12, Call #3 | MyIproducts | Bobbie Jo Bartlett |
| 49 | BSG00049412, Call #4 | MyIproducts | Mary Cisneros |
| 49 | BSG00049412, Call #5 | MyIproducts | Cynthia Peters |
| 49 | BSG00049413, Call #6 | MyIproducts | Jean Soutter |
| 49 | BSG00049413-14, Call #8 | MyIproducts | Jill Winter |
| 49 | BSG00049414-15, Call #10 | MyIproducts | Karen Syboder |
| 50 | BSG00035945-46, Call #1 | MyIproducts | Mark Mancini |
| 50 | BSG00035946, Call #2 | MyIproducts | Kim (Navarro College) |
| 50 | BSG00035946-47, Call #4 | MyIproducts | Kimberly Chrzanowski |
| 50 | BSG00035947-48, Call #5 | MyIproducts | Mike Camporeale |
| 50 | BSG00035948, Call #6 | MyIproducts | George Maracelino |
| 50 | BSG00035948, Call #7 | MyIproducts | Billie Swim |
| 50 | BSG00035948-49, Call #8 | MyIproducts | Virginia Levine |
| 50 | BSG00035949, Call #9 | MyIproducts | Kathy Oster |
| 50 | BSG00035949, Call #10 | MyIproducts | Robert Clark |
| 56 | BSG00035904, Call #1 | MyIproducts | identified by BTN |

| 56 | BSG00035904-905, Call #2 | MyIproducts | Audrey Manuel |
|---|---|---|---|
| 56 | BSG00035905, Call #3 | MyIproducts | Emily Crum |
| 56 | BSG00035905, Call #4 | MyIproducts | Barbara Brooks |
| 58 | BSG00019528, Call #2 | MyIproducts | Shirley |
| 58 | BSG00019528, Call #3 | MyIproducts | David Grace |
| 127-A | entire document | Instant 411 | Cindy Dickmire |
| 150-C | entire document | Info Call | Vivian Edwards |
| 160-A | entire document | eSafeID | Pamela Grove |
| 168-A | entire document | eProtectID | Kim Johnson |
| 171-A | entire document | Digital Vmail | Sandra Wygull |
| 171-B | entire document | Digital Vmail | Ernie Ferguson |
| 171-C | entire document | Digital Vmail | Henry Andrews |
| 173-A | entire document | eSafeID | Gertie James |
| 173-B | entire document | eSafeID | Sandra Levine |
| 176-A | entire document | Streaming Flix | Theresa Bryan |
| 180-A | entire document | Streaming Flix | Vicki Collins |
| 180-B | entire document | Streaming Flix | Melvin Leonard |
| 180-C | entire document | Streaming Flix | Jose Creel |
| 219 | BSG00049392, Call #1 | MyIproducts | Robert Tracey |
| 219 | BSG00049392, Call #2 | MyIproducts | Kimberly Fritch |
| 219 | BSG00049393-94, Call #4 | MyIproducts | Kathy |
| 219 | BSG00049394, Call #5 | MyIproducts | Connie Rockwell |
| 219 | BSG00049394-95, Call #6 | MyIproducts | Marlena Arcott |
| 219 | BSG00049395, Call #7 | MyIproducts | William Berry |
| 219 | BSG00049395, Call #8 | MyIproducts | Robert Wood |
| 219 | BSG00049395-96, Call #9 | MyIproducts | Colleen Letti |
| 219 | BSG00049396, Call #10 | MyIproducts | Judy |
| 220 | BSG00035933, Call #1 | MyIproducts | Berneda |
| 220 | BSG00035934, Call #3 | MyIproducts | Fran/Brock Davis |
| 220 | BSG00035934, Call #4 | MyIproducts | Michael Fabro |
| 220 | BSG00035934-35, Call #5 | MyIproducts | S. Lin |
| 220 | BSG00035935, Call #6 | MyIproducts | Susan Brown |
| 220 | BSG00035935, Call #7 | MyIproducts | Randall |
| 220 | BSG00035935-36, Call #8 | MyIproducts | Robert Simpson |
| 220 | BSG00035936-37, Call #9 | MyIproducts | Bessie Heller |
| 244-A | entire document | MyIproducts | Richard Renot |
| 244-B | entire document | MyIproducts | Mary Jones |
| 244-C | entire document | MyIproducts | Tim Melman |
| 322 | BSGRESPXIII00000562, Call #1 | MyIproducts | Craig Daniels |
| 322 | BSGRESPXIII00000562, Call #2 | MyIproducts | Mrs. Freeman |
| 322 | BSGRESPXIII00000562-63, Call #3 | MyIproducts | Sylvia Tarin |
| 322 | BSGRESPXIII00000563, Call #5 | MyIproducts | Berta Hernandez |
| 322 | BSGRESPXIII00000564-65, Call #3 | MyIproducts | Oscar Davis |
| 323 | BSGRESPXIII00000566, Call #1 | MyIproducts | Deana Schneider |
| 323 | BSGRESPXIII00000566-67, Call #3 | MyIproducts | Margo Johansson |

3

| 323 | BSGRESPXIII00000567, Call #4 | MyIproducts | Dennis |
|-----|------------------------------|-------------|--------|
| 341 | P. 000178, Call #2 | MyIproducts | Paulette Snoozy |
| 341 | P. 000178-79, Call #3 | MyIproducts | Forest Parr |
| 341 | P. 000179-80, Call #5 | MyIproducts | George Coldfield |
| 341 | P. 000180, Call #6 | MyIproducts | Brenda Trustle |
| 341 | P. 000180-81, Call #7 | MyIproducts | Carol White |
| 341 | P. 000181, Call #8 | MyIproducts | Ann |
| 341 | P. 000181, Call #9 | MyIproducts | Bill Atkinson |
| 341 | P. 000181-82, Call #10 | MyIproducts | Mrs. Jones |
| 343 | P. 000002, Call #1 | MyIproducts | identified by BTN |
| 343 | P. 000002, Call #2 | MyIproducts | identified by BTN |
| 343 | P. 000002-3, Call #3 | MyIproducts | identified by BTN |
| 343 | P. 000003, Call #4 | MyIproducts | identified by BTN |
| 343 | P. 000003, Call #5 | MyIproducts | identified by BTN |
| 359 | BCI_026029, Call #1 | MyIproducts | identified by BTN |
| 359 | BCI_026029, Call #2 | MyIproducts | identified by BTN |
| 359 | BCI_026029, Call #3 | MyIproducts | identified by BTN |
| 359 | BCI_026029, Call #4 | MyIproducts | identified by BTN |

## CERTIFICATE OF SERVICE

       I hereby certify that on the 2nd day of December, 2013, I electronically filed the foregoing POST-TRIAL BRIEF with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Dina M. Cox
Robert Baker
Lewis Wagner, LLP
501 Indiana Avenue, Suite 200
Indianapolis, Indiana 46202

Ricardo G. Cedillo
Derick J. Rodgers
Mark W. Kiehne
Davis, Cedillo & Mendoza, Inc.
McCombs Plaza
755 E. Mulberry Ave., Suite 500
San Antonio, Texas 78212-3149


                     By:     *Robin L. Moore*_____

                      Robin L. Moore (DC Bar #987108)
                      Sarah Waldrop (MD Bar) (numbers not issued)
                      Jonathan Cohen (DC Bar #483454)
                      Admitted *Pro Hac Vice*

600 Pennsylvania Ave., NW M-8102B
Washington, D.C. 20580
(202) 326-2167 (Moore);
-3444 (Waldrop); -2551 (Cohen);
(202) 326-2558 (facsimile)
rmoore@ftc.gov; swaldrop@ftc.gov;
jcohen2@ftc.gov