UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

_____

FEDERAL TRADE COMMISSION,        )
                                         )
        Plaintiff,                   )
                                         )
vs.                                     )     Case No. 5:98-cv-00629-FB-HJB
                                       )
HOLD BILLING SERVICES, Ltd.; et al.,   )
                                       )
        Defendants.          )
_____  )

## RESPONDENTS' POST-TRIAL BRIEF

      The FTC's case for contempt is built on inferences drawn from unreliable, out-of-court statements and incomplete, anecdotal evidence. The FTC asks this Court to stack inference upon inference to establish a "pattern and practice" of contemptuous conduct, but the inferential leaps the FTC is asking this Court to make fly in the face of the Fifth Circuit's "clear and convincing" evidentiary standard. To prove contempt, the Fifth Circuit requires evidence so clear, direct, weighty, and convincing so as to persuade a clear conviction, without hesitancy, of the truth of the precise facts. Each piece of evidence cited by the FTC is *at best* circumstantial – *not* direct and weighty.

      Recognizing the problems with its circumstantial proofs, the FTC has now abandoned its claims against the majority of the Landeen Entities, focusing post-trial on only three Landeen voicemail products. But the FTC's concessions do not save its case; they only highlight the degree to which the Commission overreached in the first place. Indeed, the charges for the three voicemail services were cleared by ESBI, which was not bound by the 1999 Order, but rather agreed to its own Order with the FTC in 2001. Even if the Court were to accept the FTC's argument that ESBI is bound by the 1999 Order as a non-party because the "BSG enterprise" is one and the same for

purposes of Federal Rule Procedure 65 (an argument unsupported by any case law), the FTC cannot articulate any reason why the supposed single "BSG enterprise" should not be governed by the latest order – the 2008 Order.  Nor does the FTC articulate why the 2001 Order which was issued directly to ESBI does not govern ESBI's conduct.

Even if there was a violation of the 1999 Order, any such violation was isolated and cannot support a $52 million award (or even a $30 million award)[1] under the guise of "full consumer redress."  The FTC's position that this Court "must" award the full amount paid by consumers turns equity on its head and inappropriately asks this Court to assume that each of the million-plus consumers has been crammed.  Nothing *requires* a court sitting in equity to interpret "full consumer redress" as the total amount paid by consumers.  To the contrary, the principles of equity, including proportionality, govern this Court's award; and, under such principles, the Court should limit any award to the processing fees retained by Respondents.

But here, no award should be entered at all because Respondents substantially complied with the 1999 Order.  Respondents' compliance with the FTC's expectations as articulated in the 2008 Order coupled with their proactive approach in developing anti-cramming measures warrants application of the doctrine of substantial compliance.  On their own initiative, Respondents diligently and aggressively took all measures reasonably available to them to prevent processing unauthorized charges.  These efforts included development and implementation of the industry leading Best Practices Program in 2006.  The Best Practices were by and large accepted by the FTC when the 2008 Order was negotiated and entered.  Respondents went above and beyond that

---

[1]  Given its proof problems, the FTC has reduced its request for "consumer redress" to $30,115,928.32.  Doc. 204, p. 39.  Regardless of what figure is proposed by the FTC as "full consumer redress," the calculation is flawed as it uses the wrong baseline from which to analyze damages.  *See* § III. B-D, *infra*.

Order's requirements by applying the Best Practices to *all* service providers regardless of whether they offered telecommunication or enhanced services and by augmenting their due diligence, performance monitoring, and authorization testing practices to further prevent unauthorized billings. Any contempt award would ignore that the FTC told Respondents precisely what to do to detect and prevent cramming, and they did precisely what the FTC told them to do and more.

## ARGUMENT

## I.     The FTC Did Not Carry Its Burden Of Proving Contempt By Clear And Convincing Evidence

The FTC claims it is entitled to rely on pattern and practice evidence, rather than direct proof of contempt. This is not the standard in the Fifth Circuit. Regardless, the FTC has not proven clearly and convincingly that Respondents engaged in a pattern or practice of contemptuous conduct.

### A.     The FTC Cannot Avail Itself Of A Relaxed Standard Of Proving Violation By Pattern Or Practice

With clear, direct, weighty, precise, and convincing evidence, the FTC must prove individualized harm on the part of the consumer in order to demonstrate contempt. The FTC, however, advocates for a lesser standard that has not been adopted in the Fifth Circuit. Doc. 204, p. 28. The FTC claims it need only show Respondents "engaged in a pattern of widespread cramming" but cites to no Fifth Circuit cases endorsing this relaxed standard. The one case within the Fifth Circuit to which the FTC cites – *F.T.C. v. National Business Consultants, Inc.*, 781 F. Supp. 1136 (E.D. La. 1991) – is not a contempt action and therefore does not establish that the Fifth Circuit would relax its high standards in proving contempt by allowing pattern and practice evidence. In fact, the majority of the cases cited by the FTC as authority for using pattern and

practice evidence are not contempt cases either.[2] Allowing pattern and practice evidence to prove contempt would eviscerate the Fifth Circuit's strict clear and convincing burden of proof standard. *See, e.g.*, *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995); *Shafer v. Army & Air Force Exchange Service*, 376 F.3d 386 (5th Cir. 2004).

More importantly, all of the cases cited by the FTC involve situations where the complained-of conduct is susceptible to being proven as a pattern or practice. These cases uniformly involve a common scheme or a single deceptive marketing statement disseminated widely among all consumers, such that all consumers report the same or very similar experiences.[3] The FTC has not pointed to a singular scheme or deceptive marketing statement made by Respondents like those in *National Business Consultants*, *Figgie,* or the other cases cited by the FTC. Here, the consumer experience at issue is anything but consistent. This case involves more than one alleged wrongdoer, more than one product or service, and more than one means of signing up for any particular product or service. Without proof of a "strikingly similar consumer

---

[2] *See, e.g.*, *F.T.C. v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312 (8th Cir. 1991) (action for violation of Section 5(a) of FTC Act); *F.T.C. v. Figgie Int'l*, 994 F.2d 595 (9th Cir. 1993) (same); *F.T.C. v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282 (D. Minn. 1985) (same); *F.T.C. v. International Diamond Corp.*, 1983 U.S. Dist. LEXIS 15504 (N.D. Cal. 1983) (same).

[3] For example, in *National Business Consultants*, the defendant franchisors all made the same deceptive statement that they had established leads for business opportunities which persuaded their target consumers to pay $7,500. The court permitted the use of pattern and practice evidence because all of the consumers were victims of a common scheme and all reported strikingly similar experiences. In *FTC v. Figgie Int'l, Inc.*, the practice complained of involved a single product – a heat detector. 994 F.2d 595 (9th Cir.1993). Sales materials recommended the purchase of four or five heat detectors per smoke detector, and this matched Figgie's actual sales ratio. The Commission found, however, "the fact that smoke detectors almost always provide earlier warning than heat detectors would seem to be the single most useful piece of information that could be provided to potential purchasers of residential fire systems." *Id*. at 604 (quoting from *Figgie International, Inc.*, 107 F.T.C. 313 (1986)). Due to the Commission's finding, the court found that "it is reasonable to conclude from the record evidence that consumers purchased the heat detectors in reliance upon respondent's express and implied claim that heat detectors will provide necessary warning to allow a safe escape in most residential fires." *Id*. at 605.

experience," as is required for a court to infer violations through a pattern and practice, the FTC cannot prove its case under this relaxed standard.

Moreover, no authority finds pattern and practice evidence sufficient to hold a "middleman" like Respondents in contempt. The cases cited by the FTC allowing for pattern and practice evidence involved the actual wrongdoer answering for its own conduct. *See, e.g., F.T.C. v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312 (8th Cir. 1990) (direct suit against party alleged to have committed violations); *F.T.C. v. Trudeau*, 579 F.3d 754 (7th Cir. 2009) (same); *McGregor v. Chierico*, 206 F.3d 1378 (11th Cir. 2000) (same); *Figgie*, 994 F.2d at 605 (same). Here, the Landeen Entities and their affiliated marketing partners are the entities who engaged in the complained-of conduct. The FTC had every opportunity to bring these entities into the case and chose not to. The FTC should not be allowed the advantage of a relaxed evidentiary burden to place all of the "blame" upon Respondents – the mere "middleman" payment processors.

**B.     The FTC Has Not Proven A Contemptuous Pattern And Practice**

Even if the Fifth Circuit allowed pattern and practice evidence to prove contempt, the alleged pattern and practice would have to be proven by clear and convincing evidence. The FTC has attempted to demonstrate a pattern and practice in several ways, but each fell far short of meeting the Fifth Circuit's demanding clear and convincing evidence standard.

**1.     *The alleged "mismatched" billings do not serve as evidence of unauthorized billing.***

The FTC asks the Court to infer unauthorized billing from a scrubbing spreadsheet, PX-235, which it claims shows records that were rejected during a "scrub" for "mismatched" consumer information. Evidence that a record was "rejected" in this scrub, however, does not demonstrate

unauthorized billing:  There are a multitude of reasons why a record may fail a "scrub" aside from lack of authorization on the part of the consumer.[4]

As Respondents' general counsel Kelli Cubeta explained, the information that can be inferred from a "scrub" is inherently unreliable because a "scrub" is only as good as the database used for the "scrub."  11/8/13 Tr., pp. 1210-11.  Compounding this problem is the timing of the "scrub" and issues as to whether the consumer's information in the database is up-to-date:

> You could have timing issues or timeouts. It was a matter of – we tried to select vendors that were very well-known, like LexisNexis and others, but there could be discrepancies in the information based on the time that their system was updated, a customer could move, so that there could be, you know, a period of time where it didn't sync up because of just the mobility of the consumer.

*Sally Welge Testimony,* 11/6/13 Tr., p. 833. *See also Kelli Cubeta Testimony,* 11/8/13 Tr., p. 1267 (discussing lack of up-to-date or accurate information in the database); *Melissa Mitchell Testimony,* 11/7/13 Tr., p. 874 (same).

Consistent with these reliability and timing issues, Melissa Mitchell explained there are many legitimate reasons a consumer's data may not pass some name or address lookup at the time the consumer's information is compared to the information in some database including:

- Marriages (11/7/13 Tr., pp. 978-980, 995);
- Divorces (11/7/13 Tr., p. 994);
- Name Changes (11/7/13 Tr., p. 875);
- The consumer moves  (11/7/13 Tr., p. 995);[5] and/or,
- The telephone number was disconnected or reassigned (11/7/13 Tr., p. 995).

---

[4] Respondents' scrubbing process consisted of obtaining the consumer's information – such as last name, address, and phone number – and comparing it to information in certain databases. *Mitchell Testimony,* 11/7/13 Tr., p. 972.  If the information was not a match, the BTN would be removed from billing or "scrubbed."  *Id.*, pp. 972-73.

[5] Ms. Welge also testified that, "You could have multiple parties within households… You can have somebody at an address that may not have the same name, so it may not match up. Or they may not have the right information, as far as birthdate and/or – depending on the private data that was provided, whether it was birthdate or last four – so you could have a reason for something not matching up."  11/6/13 Tr., pp. 832-33.

Witness after witness testified that you can have a valid on-line sale without matching data for several reasons:

- Another household member signed up (*Cubeta Testimony,* 11/8/13 Tr., p. 1202, 1267);[6]
- Roommate situation (*Mitchell Testimony*, 11/7/13 Tr., p. 875);
- Information was mis-keyed by the consumer (*Welge Testimony,* 11/6/13 Tr., p. 832-33);
- Timing issues or timeouts with the database (*Welge Testimony,* 11/6/13 Tr., p. 833).

A close examination of PX-235 demonstrates these legitimate discrepancies and why unauthorized billing cannot be inferred from scrubbing.  PX-235 shows that a large number of records were rejected merely because one data point could not be verified.  Of the 1,806 records at issue, 1,552 (or 86%) matched at least one of the criteria – i.e., first name, last name, address or phone number.  One Thousand Ninety Four (1,094) records (more than 60%) matched the address.  Eight Hundred (800) records (nearly 50%) matched the consumer's last name.   But the fact that one or more data points is mismatched does not demonstrate a consumer has not authorized a charge, particularly where other data points match.  *See, e.g.,* 11/5/13 Tr., p. 509 (In considering consumer complaints, the Court held that, before transcripts or recordings of consumer complaints could be admitted, the LOA information ***must not "match at all….*** Only the ones that say, we got no Davids here, we got no Joneses here.  It doesn't match at all.") (emphasis added).  The only thing PX-235 actually proves is that a BTN can fail a "scrub" despite the fact that multiple data points match.  For these reasons, the scrubbing data in PX-235 cannot serve as clear and convincing evidence that consumers did not authorize charges.

---

[6] Ms. Mitchell also testified, "Another situation would be if the phone bill was in my husband's name, and only my husband's name, and if I had signed up for the service, then the information won't match."  11/7/13 Tr., p. 995.

**2. The FTC's evidence of consumer complaints falls short of demonstrating a violation of the 1999 Order, let alone a pattern of contemptuous conduct.**

Of the nearly 1.2 million consumers of the Landeen Entity products/services, the FTC failed to present one of them to testify under oath.  Instead, the FTC attempted to offer 215 hearsay statements and were successful in admitting only 16 that reveal the consumers' own words (transcript of consumer calling to report mismatched information, slamming form, or signed FCC/Attorney General form).  But the out-of-court statements of 16 consumers – when compared to the 1.2 million Landeen consumers – are probative of nothing.

The purported experience of a handful of consumers cannot be extrapolated to be reflective of the experience of 1.2 million consumers, particularly where there is no "typical" consumer experience in reviewing, selecting and signing up for the multiple products and services at issue. The cherry-picked complaints do not involve consumers reporting identical consumer experiences or consistently reporting a particular misrepresentation.  To the contrary, the complaints that have been introduced demonstrate extremely varying consumer experiences.

Even if this were a case involving a common scheme or single deceptive marketing statement disseminated to all 1.2 million consumers, the alleged experience or perception of 0.00006% (slightly more than five one-thousandths of one percent) of consumers who encountered that scheme or marketing practice is not even remotely significant enough to justify a finding as to consumers generally or to conclude that a practice or conduct rises to the level of concern.[7]  A

---

[7] The FTC's Policy Statement on Deception recognizes that "some people, because of ignorance or incomprehension, may be misled by even a scrupulously honest claim" and that at least a "significant minority" of "reasonable consumers" must be affected before a practice raises concerns.  *See In re Cliffdale Assocs., Inc.* 103 F.T.C. 110, 176-84 (1984).  The FTC has never found that a practice affecting anything remotely close to 0.00006% of consumers was "significant."  While federal courts have reached different conclusions as to what constitutes a significant percentage of consumers in the context of false advertising cases, they have generally looked to percentages in the range of 15 to 20%, and at least one court rejected a finding of

handful of complaints do not prove a pattern or practice of Respondents clearing unauthorized charges in order to support a finding of contempt in this case.

Furthermore, the statements of 16 declarants do not even show 16 violations of the 1999 Order.  To prove a violation of the Order, the FTC must prove that a charge was billed to a phone bill without authorization *from the "Line Subscriber*."[8]  An out-of-court statement that the charge was not authorized is not direct evidence of such a violation because, without the declarant present to be examined, the Court has no way of knowing the identity of the Line Subscriber.[9]  Because the vast majority of statements are silent as to the identity of the Line Subscriber, including whether the person who authorized the charge is a Line Subscriber, even taking these statements as true, the Court still must infer facts to find a violation of the Order.  Such inference is not allowed under the Fifth Circuit's clear and convincing evidence standard.

### 3. The FTC's usage evidence does not demonstrate a lack of authorization by the consumer.

The FTC's usage evidence cannot support a finding of contempt because, at best, it is circumstantial as to whether a consumer authorized a charge when signing up for the product.  The FTC has not pointed to a single case where a court entered a finding of contempt based upon

consumer harm where the evidence showed that only 7.5% of consumers were affected.  *Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.*, 19 F.3d 125, 133-34 (3rd Cir. 1994).

[8] The 1999 Order defines "Line Subscriber" as "an individual or entity who has arranged with a LEC to obtain local telephone service provided through an assigned telephone number, and to be billed for such service on a monthly or other periodic basis."  It would be contrary to the terms of this definition and common sense to suggest there cannot be more than one "Line Subscriber" in a household.

[9] The FTC's failure in this regard is not technical.  Indeed, the issue of other household members authorizing charges is evident from the consumer complaints the FTC sought to introduce. For example, of the 8 audio recordings the FTC presented to the Court during the evidentiary hearing, half of these recordings involved another member of the household authorizing the charge.

circumstantial usage evidence.  The cases cited by the FTC in support of its argument that usage is significant are Section 5 cases, not contempt cases.[10]

Furthermore, usage data is inapposite to whether a consumer authorized a charge; this fact is supported by witness testimony.  For example, Kelli Cubeta explained that both Respondents and AT&T considered tracking usage but ultimately determined that usage could not be tracked as an effective indicator of consumer authorization because the billing aggregator and the LEC would have to rely upon a third-party's subjective assessment of what it means to "use" a product or service.  11/8/13 Tr., pp. 1139-40, 1160-61, 1173-77.  Expert Ian Ratner explained that usage data was unreliable in assessing a third-party service provider's performance because there is an inherent subjectivity with usage, and there is no standard in the industry as to what constitutes an appropriate level of usage.  11/14/13 Tr., pp. 1588-93.  Indeed, not one of the three Orders issued to the various clearinghouse Respondents required the tracking or monitoring of usage data as a cramming detection or prevention method.

Even if usage evidence could support a finding of contempt where the question is consumer authorization, the FTC's evidence is insufficient to prove clearly and convincingly that consumers were not using the Landeen Entity services.  Significantly, the FTC admitted no usage evidence for eight of the nine services sold by Landeen.[11]  This fact alone destroys the FTC's "pattern and

---

[10] *See FTC v. Cyberspace.com*, LLC, 453 F.3d 1196, 1201 (9th Cir. 2006) (Section 5 case); *FTC v. Inc21.com Corp.*, 745 F.Supp.2d 975, 1000-01 (N.D. Cal. 2010) (same); *FTC v. Grant Connect*, LLC, 827 F.Supp.2d 1199 (D. Nev. 2011) (same).

[11] Based upon a reference to NXT's 800 number in the thousands of pages submitted to ESBI during the due diligence process, the FTC claims NXT provided the voicemail platform for 800 Vmailbox and Digital Vmail.  Such an inference is unsupportable.  There is no direct, clear and convincing evidence that NXT provided voicemail services for any entity other than MyiProducts.  The only direct evidence on the issue is Mr. Zoch's testimony that: (1) NXT only provided voicemail services for one Landeen Entity – MyiProducts; and, (2) NXT did not provide voicemail services for 800 Vmailbox or Digital Vmail.  11/5/13 Tr., pp. 320-21, 327-28.  Mr. Zoch also admitted that he provided branding for resellers like MyiProducts, but had never even heard of 800

practice" theory.  Indeed, even if the Court were to accept the FTC's argument that consumers were deceived through some pattern and practice by Landeen, then there would be some evidence on lack of usage for **all** Landeen products.  But that is not the case.[12]  And, the usage data for the single Landeen service offered by the FTC is woefully incomplete and does not establish any precise facts as to whether consumers were using the service over the fifty-one-month period is was on the market.[13]

---

Vmailbox or Digital Vmail.  *Id.* at 320.  The only reasonable inference that can be drawn is that 800 Vmailbox and Digital Vmail had a different platform provider, which is consistent with the fact that ABC used other platform providers (*e.g.*, Meriplix) and that NXT did not have an exclusive contract with ABC.  *Id.* at 320-22.

[12] In filing its Motion for Show Cause, the FTC claimed that only 23 people "streamed" movies from StreamingFlix. The FTC has now abandoned this outlandish claim, introducing no evidence in support thereof, because the statement is blatantly false.  The "evidence" the FTC originally cited in its Motion to Show Cause in support of this claim was evidence relating to the number of movies purchased from a company that provided movies for download on the StreamingFlix website.  From that "evidence," the FTC blindly jumped to the conclusion that this represented the number of consumer who **streamed** movies from the website. The FTC completely misunderstood StreamingFlix.   As  Melissa  Mitchell  (a  satisfied  consumer  of  StreamingFlix)  testified, StreamingFlix had two parts – one part allowed members who paid a monthly subscription to stream unlimited movies for free; the other part allowed them to purchase and download movies provided by other companies.  11/7/13 Tr., pp. 997-99.  The evidence to which the FTC originally cited was the number of consumers who purchased movies for download (outside the streaming subscription).

[13] The usage evidence for MyiProducts is not clear, direct, weighty or convincing.  The FTC completely ignores that there is absolutely no usage data for MyiProducts from December 2005 through June 2009.  *Zoch Testimony*, 11/5/13 Tr., p. 323.  As such, the FTC's sole usage evidence constitutes only nine months of data out of 51 months that MyiProducts' provided voicemail services.  That is, the FTC urges the Court to reach a firm conviction (without hesitation) that no one was using MyiProducts even though the government failed to provide usage data for 80% of the time MyiProducts was on the market.  Even if usage data could constitute circumstantial evidence probative of authorization (which it cannot), the FTC's paltry usage evidence does not establish any precise facts as to whether consumers were using the voicemail product.

**4. The FTC's evidence of refund rates does not demonstrate a lack of authorization by the consumer.**

The FTC erroneously argues that refunds "measure consumer dissatisfaction" which is evidence of cramming.[14]  To fully buy the FTC's argument, one must make a significant leap in logic that "consumer dissatisfaction" equates to a lack of authorization.  The evidence presented by Respondents demonstrates that this is simply not the case.  A dissatisfied consumer means exactly that – the consumer is dissatisfied.  And, a high refund rate exists because Respondents instructed their call centers and their service providers to institute a liberal refund policy to ensure customer satisfaction regardless of the reason for the refund request.  Thus, the provision of a refund does not necessarily mean that the consumer did not authorize the purchase of the product or service in the first place.[15]

There are many reasons why a consumer might request a refund unrelated to unauthorized billing.  *Cubeta Testimony,* 11/8/13 Tr., pp. 1178-79 ("[I]t could be that the product was not working and the consumers were frustrated with it.  It could have been that the service provider's

---

[14] The FTC also attempts to analogize credit card chargebacks with LEC refunds because both "measure consumer dissatisfaction."  According to the FTC, Visa's Andrew Chen testified that credit card chargebacks greater than 1% are an indicator of fraud.  In reality, Chen testified that "the thresholds that Visa set for [chargeback monitoring] were appropriate for Visa acceptance in the US market.  For this third-party billing aggregator model in the telecommunications industry, if there was such a monitoring of inquiries, [it] would have to be based off of whatever the key metrics are for that particular industry.  And I could not opine on what those might be."  *Chen Dep.,* p. 135.  Furthermore, Visa monitors chargebacks, not refunds. When discussing the differences, Chen stated "we don't monitor [the refunds, which] are something different than a chargeback."  *Id.* at 135.  Thus, the FTC's use of chargeback ratios inapplicable and should not be considered evidence of "consumer dissatisfaction" or anything at all relevant to this case.

[15] Contrary to the position it is taking in this lawsuit, the FTC clearly did not believe refund levels were a viable indicator of unauthorized billing in 2008, having agreed with Respondents that refund rates did not need to be monitored.  R-72 (2008 Order); *Cubeta Testimony,* 11/8/13 Tr., p. 1124 ("Q: Did [the] 2008 Order include any requirement that refunds or LEC adjustments be monitored?  A:  No.").  Not one of the 3 Orders issued to the various clearinghouse Respondents required the tracking or monitoring of refund levels as a cramming detection or prevention method.

customer service reps were not treating consumers appropriately.  It is a number of different issues.").  To address these various types of inquiries, Respondents employed an extremely liberal refund policy – when a consumer asked for a refund, they got one.  *Id.* ("We require our service providers to have a very generous and liberal refund policy to make sure that the customer is satisfied."). Given the various reasons a refund is given, refund rates are not indicative of anything but a liberal refund policy.[16]

Expert Ian Ratner's testimony confirms that refund rates are not indicative of unauthorized billing.  Based upon his substantial experience in the industry, he testified that a refund rate is not helpful in detecting cramming because "the industry has a very liberal refund policy" whereby "anybody that calls up that wants a refund, whether they're calling LEC or they're calling the customer service department, is going to get a refund."  11/14/13 Tr., pp. 1592-93.  Mr. Ratner also explained that, because of this liberal policy, a refund rate is duplicative of an inquiry rate and equally unhelpful in detecting unauthorized billing.  *Id.,* p. 1654.  Mr. Ratner testified that a refund may be given when a consumer calls about the service, seeks to cancel the service, or denies knowledge of the service.  *Id.*, pp. 1654-59.  As the Court aptly noted during Mr. Ratner's

---

[16] Refunds are not even an accurate "measure of consumer dissatisfaction" because consumers calling in for refunds are not always honest about their reasons for seeking credit.  Respondents' Call Center Manager Blanca DeLeon testified that she often encountered callers who were less than truthful:

> Oh, customer calls in and questions the charges, and we play a TPV back to them, and it's their voice, it's their information, and they still deny that it's them, and they're just requesting a credit.  So that would be an example, or they say that they didn't authorize or order the service, but the recording is played back to them.

11/5/13 Tr., p. 482.  *See also Mitchell Testimony*, 11/7/13 Tr., p. 989 ("Q: Did you have any experience as a customer service representative that led you to believe that consumers were not always truthful in claiming they had not authorized the service or the product? A: Yes.").  Regardless of the reason for the requested refund, the policy was to give refunds liberally.  Ms. DeLeon testified that "a refund would be given if the customer is requesting a refund."  11/5/13 Tr., p. 482.

testimony, the various reasons a consumer may obtain a refund makes it virtually impossible to conclude with any reliability that a particular refund rate is demonstrative of unauthorized billing.  *Id.* ("His answers were 'may' answers, possible answers based on his experience in the industry.  That would not then lead to a reliable conclusion that any number would show – that I could see, would show unauthorized usage.").  This is exactly why Respondents did not monitor refund (or usage) rates and exactly why a particular refund rate is not clear and convincing evidence of unauthorized billing.  The FTC's attempt to use allegedly high refund rates as evidence of a pattern or practice of cramming must fail.

### 5.   *The FTC's marketing evidence showed that the disclosures provided to consumers were clear and conspicuous.*

The FTC falsely promised the evidence would show that the marketing path consumers supposedly encountered was "inherently deceptive."  Yet, the FTC did not call a single consumer or expert to testify that the marketing used by the Landeen Entities was deceptive.  In fact, the FTC presented no evidence of deception.  Moreover, the evidence demonstrated that the terms and conditions of the Landeen Entity offers were clear and conspicuous, which was the mandate of the 1999 Order.

The FTC's sole marketing evidence consisted of a single "mock-up" created by one of several affiliated marketers utilized by Landeen, Smiley Media.  The FTC presumably used Smiley's mock-up as its most egregious example of deceptive marketing.  But, according to Smiley's CEO, Stephen Oskoui, Smiley was never told by any government agency that the ads it placed for CPA Market/Studio 127 were "inherently deceptive."  11/4/13 Tr., pp. 262-63.

Furthermore, when Smiley's marketing was evaluated by an expert for signs of deception (both heuristically against the FTC's own disclosure guidelines and through the use of user testing and eye-tracking studies), Dr. Robert Rauschenberger found the disclosures to be clear and

conspicuous.  To test the effectiveness of the disclosures, Dr. Rauschenberger did both an expert evaluation of the subject web pages – "to see whether the principles of design that were applied were conducive toward making the disclosures conspicuous" – and a usability study, including an eye-tracking study.  11/13/13 Tr., p. 1311. When evaluating the web pages, Dr. Rauschenberger referred to the FTC's publication .com Disclosures.  *Id*. at 1312-13.  Based on his expert evaluation, Dr. Rauschenberger concluded that, in his opinion and with a reasonable degree of scientific certainty, "the subject websites are designed in such a way to render the disclosures conspicuous and clear if they are read."  *Id*. at 1356.  Based on his usability and eye-tracking study, Dr. Rauschenberger concluded:  "[T]he disclosures were conspicuous based on the eye-tracking data, and … the disclosures were clear based on the fact that participants who actually read them, and didn't ignore them, understood what they were trying to communicate."  *Id*. at 1388.[17]

Even more problematic to the FTC's "pattern and practice" theory, the Smiley mock-up – the FTC's only evidence that Landeen's marketing was deceptive – was not the only way to sign up for a Landeen Entity product or service.  A consumer could encounter Landeen Entity ads and sign up in a multitude of ways, including the service provider's own website, a banner ad, or countless affiliated marketing ads **other than** those offered by Smiley, such as Tag and Clash Media. *Stephen Oskoui Testimony,* 11/4/13 Tr., p. 251-52; *Welge Testimony,* 11/6/13 Tr., p. 837; *Mitchell Testimony,* 11/7/13 Tr., pp. 918-19; *Cubeta Testimony,* 11/8/13 Tr., p. 1188.[18]  Only a

---

[17] The fact that the disclosures are clear and conspicuous is supported by Dr. Rauschenberger's review of the Smiley sign-up data. While Dr. Rauschenberger could not quantify precisely how many people read and understood the disclosures, he could conclude from his review of this data that consumers who encountered these advertisements were exercising discriminating behavior in deciding whether to accept or reject an offer.  11/13/13 Tr., p. 1385.

[18] Mr. Oskoui admitted that Smiley Media did not have "any exclusive relationship" with the Landeen Entities.  11/4/13 Tr., p. 252.  In fact, when asked whether the Landeen Entities used other competitor affiliated marketing partners besides Smiley Media, Mr. Oskoui testified:  "I don't know specifically who else they worked with, but I would assume that they did work with

small fraction of the allegedly aggrieved consumers ever experienced Smiley's marketing campaign.[19]  Thus, the FTC's marketing proof falls fall short of establishing a pattern or practice of deceptive marketing resulting in widespread cramming.

### 6.  The FTC's evidence of inquiry rates does not demonstrate a lack of authorization by the consumer.

The FTC seeks to infer unauthorized billing from inquiry rates, but inquiry rates prove nothing other than there **may** be some performance issue with a service provider client.  But, the issue could relate to customer service, pricing questions, or an issue with the product.  When a third-party exceeds an inquiry threshold, it is tested to identify what the problem is and to confirm that express authorization is being obtained.  The FTC's evidence of "high" inquiry rates, therefore, does not constitute clear or convincing evidence of a pattern or practice of cramming.  Significantly, not every consumer "inquiry" is a complaint.  *Welge Testimony,* 11/6/13 Tr., p. 747; *Ian Ratner Testimony,* 11/14/13 Tr., p. 1580.  And while Respondents log an "inquiry" every single time a consumer calls in to customer service, consumers make inquiries for a variety of reasons unrelated to whether they authorized the charge.  *Mitchell Testimony,* 11/7/13 Tr., pp. 856, 876-77.[20]  Because the FTC has not presented any evidence that quantifies the percentage of inquiries

---

other companies."  11/4/13 Tr., p. 252.  Further, he stated that most of his clients were not working solely with Smiley but also worked with other affiliated marketing partners.  11/4/13 Tr., p. 253.

[19] Moreover, the FTC has not even introduced evidence that all Landeen Entities used Smiley to market their services.  Mr. Oskoui could not (despite multiple attempts to refresh his recollection) identify any specific Landeen Entities except StreamingFlix, eSafeID, and eProtectID. 11/4/13 Tr., pp. 214-16.  He was not able to link Smiley to **any** of the voicemail products other than to state one Landeen Entity was "I-Mail."  *Id.*

[20] And Melissa Mitchell testified:

> [I]t could have been a variety of things.  It could be a situation to where the consumer was calling in because they were trying to get a hold of the client because they needed help with a service, needed a password, they didn't remember their password, or they had buyer's remorse.  They related they no longer … need[ed] the service, and they weren't using it, so they wanted to cancel.  There were situations where the husband signed up for the account, but the wife was the person in charge of the bill, and she didn't want to pay for it,

related to authorization versus the percentage of inquiries related to other matters,[21] the FTC's evidence about inquiry rates fails to prove contempt.

More fundamentally, it is Respondents' testing program – not its monitoring of inquiry rates – that is designed to confirm a service provider is obtaining authorization.  The FTC knows this; otherwise, adopting a two-part monitoring and testing system as part of the 2008 Order is pointless.   Under Respondents' testing program, if one of the three inquiry thresholds was exceeded, the service provider was put into testing.  *Cubeta Testimony,* 11/8/13 Tr., pp. 1118, 1133.  The testing was designed to check for authorization and consisted of identifying a sample of the 20 most recently credited BTNs and demanding proof of express authorization from the third party service provider.  *Id*. at 1133-34.  The quality assurance department then analyzed and verified the proof or documentation of express authorization.  *Id.*  The more a service provider tripped an inquiry threshold, the more they were tested.  *Id*. at 1136.  This process was exactly what was required of Respondents by the 2008 Order.  *Id*. at 1133, 1137.

Here, the evidence shows that, anytime a Landeen Entity breached an inquiry threshold, they were tested; and, every time the Landeen Entities went into testing, they passed.  *Cubeta Id*.

---

so we cancelled – we were asked to cancel – or the client was asked to cancel.  So it was just – I mean it was a variety of – of different reasons why they called in.
11/7/13 Tr., p. 856.

[21] Blanca DeLeon testified that there was no way to quantify how frequently consumers would call in "denying all knowledge" versus calling in to merely cancel the service.  11/5/13 Tr., p. 472.  She further testified that, among millions of customer service calls per year, she could not say what proportion of the calls were actual complaints versus questions about the products or services.  *Id*. at 479.  Finally, she testified that there was no way to say what proportion of the millions of customer service calls were positive or neutral; what proportion of them related to the Landeen Entities; or, what proportion of them related to long distance services, collect call services, or enhanced services.  *Id*. at 480-81.

at 1141.   Thus, the FTC's evidence of "high" inquiry rates cannot establish clearly and convincingly that Respondents were engaged in a pattern of contemptuous conduct.

### 7.   *The FTC's evidence of LEC terminations does not demonstrate a lack of authorization by the consumer.*

The FTC erroneously claims unauthorized billing can be inferred from a LEC's termination of billing for a service provider and points to Verizon's termination of MyiProducts in September 2007 to support its argument.   Doc. 204, pp. 19-23.   The inference should be rejected because, in order to make such a leap, the Commission would first need to establish that Verizon only terminated service providers for unauthorized billing or that Verizon's decision to terminate MyiProducts in 2007 was premised on Verizon learning that MyiProducts was failing to obtain valid authorization.   There is no evidence of either fact.

To the contrary, multiple witnesses testified that there are many reasons (and sometimes no reason) a LEC may terminate a service provider. *Id.* at 1154, 1222; *Welge Testimony* 11/6/13 Tr., p. 827.   More importantly, Verizon clearly did not terminate MyiProducts for unauthorized billing given its decision to bill for StreamingFlix, another Landeen Entity, in 2009.   *Welge Testimony,* 11/6/13 Tr., pp. 810-11.[22]   Furthermore, MyiProducts continued to bill through AT&T years after Verizon's decision to terminate.   *Mitchell Testimony,* 11/7/13 Tr., pp. 880, 969.[23]

Little can be inferred from Verizon's decision because there is no evidence that the decision was based upon any investigation of a consumer "complaint" or testing of the authorizations being

---

[22] Around the same time, AT&T approved StreamingFlix. *Welge Testimony*, 11/6/13 Tr., pp. 811.
[23] Each of the LECs independently considered and decided whether to approve billing for the various Landeen Entities.   For example, despite Verizon's refusal in late 2008 to bill for eProtectID and InfoCall, both AT&T and Embarq approved billing for these entities. *DeSilva Testimony*, 11/6/13 Tr., pp. 719-21, 723-26.   In early 2009, less than six months after rejecting NeedTheInfo, eProtect, and InfoCall due to their associations with Tim Durham, Verizon decided to approve billing for StreamingFlix, despite it also being associated with Tim Durham. *Welge Testimony*, 11/6/13 Tr., pp. 810-11.

obtained by MyiProducts.  In fact, the only evidence relating to what Verizon might have done is the fact that Verizon generally did not investigate consumer allegations to determine their validity. *Welge Testimony,* 11/6/13 Tr., p. 835.

Because a LEC had the ability to terminate a service provider for any reason and several LECs elected to continue billing for MyiProducts long after Verizon's decision to terminate, Verizon's termination of MyiProducts cannot serve as clear and convincing evidence of a pattern and practice of cramming necessary to hold Respondents in contempt.

## II.   The FTC's Focus On Voicemail Products Does Not Support A Finding Of Contempt

Having essentially conceded that it cannot make a showing of contempt with respect to the majority of Landeen Entities, the FTC argues instead for a contempt award relating to Landeen's three voicemail products – MyiProducts, 800 Vmailbox and Digital Vmail.  Doc. 204.  The FTC's focus on these products does not warrant a finding of contempt because the only clearinghouse to process records for them is ESBI, *see* R-1 (1999 Order) and 11/6/13 Tr., pp. 648, 728-29; and, ESBI is a non-party to the 1999 Order.   ESBI is not bound by the 1999 Order;[24] and, if the 2008 Order is not found to apply across the board or to supersede the earlier Orders, then ESBI's conduct should be governed by the 2001 Order that was issued directly to it.   Under the 2001 Order, the FTC cannot show ESBI knew or should have known MyiProducts, 800 Vmailbox or Digital Vmail were not obtaining authorization.   Indeed, ESBI's compliance with the 2008 Order is the quintessential proof that it substantially complied with the "knew or should have known" standard embodied in the 2001 Order.

---

[24] Respondents incorporate herein their entire prior briefing and argument in support of their Motion to Modify or Interpret 1999 Order.  *See* Doc. 93.

While the FTC argues ESBI (and the other non-parties) are bound by the 1999 Order given they "shared employees" and had "consolidated operations," 11/14/13 Tr., pp. 1770-71, this argument should be rejected because it is not supported by any legal authority; and, to bind a non-party under these circumstances would nullify the "legal identification" standard and eviscerate the concept of corporate separateness.[25]  The FTC claims that in *Teas* and *Ocala* a non-party was found in contempt because it "shared employees" and "consolidated operations" with a bound party.[26]  The FTC is wrong.

*Teas* dealt with issue of whether the issuance of an injunction to a parent corporation could be written in a manner that would prohibit activities of the parent.  The *Teas* court was very clear that its holding did not reach whether a subsidiary could be bound by an order issued to its parent. *Teas* expressly declined to rule on whether privity existed to bind the non-party subsidiary.[27] Likewise, *Ocala* had nothing to do with binding a non-party that shared employees and consolidated operations; that case dealt with the circumstances under which a successor could be bound by an order issued to its corporate predecessor. 336 F.2d 236 (5th Cir. 1964).  In *Ocala,* the

---

[25] The FTC erroneously argues that *Regal* supports binding a non-party based upon corporate affiliation.  This is incorrect.  *Regal* did not address whether sharing employees or consolidating operations means parties are "legally identified."  *See Regal Knitwear Co. v. NLRB,* 324 U.S. 9 (1945).  *Regal* focused on whether nonparties were legally identified with a party as "successors" or "assigns."  *Id.* at 14-16.  The *Regal* court's reference to "control" in discussing the common law concept of privity was clear *dicta.  Id.* at 14.  And, the courts that have interpreted *Regal* have consistently applied a "legally identified" standard, which is not satisfied by corporate affiliation, control, or a shared operations.

[26] 11/14/13 Tr., pp. 1770-71 ("Both of those courts, you know, applied 65(d) to all the corporate entities involved in a case similar to this where there was consolidated operations, where there were shared employees, and the like.").

[27] *Teas v. Twentieth Century-Fox Film Corp.*, 413 F.2d 1263, 1268 n.6  (5th Cir. 1969) ("Any intimation in the district court's opinion that the injunction operates directly upon Fox Realty can be disregarded … [b]ecause we understand the injunction to operate solely upon Twentieth Century in personam, we need not discuss the doctrines of privity or alter ego.").

named party to the Order merged into Gulf (its subsidiary); and, based upon that merger (by which Gulf was a successor), Gulf was found to be bound by the Order.  *Id.* at 241-242.

Even if the Court were persuaded that sharing employees and consolidating operations means ESBI (and the other non-parties) are one in the same with BSGNA (which is arguably bound by the 1999 Order), then the 2001 Order should govern and provide the standard by which the operations of ESBI (and the "BSG enterprise") are judged.  The 2001 Order was issued directly to ESBI and its "affiliates"[28] ***after*** the 1999 Order, and it expressly governs "enhanced" charges.  The FTC cannot articulate any reason why the 2001 Order should not govern ESBI's conduct; and, it would be nonsensical that a later order issued directly to ESBI and its "affiliates" would not govern, particularly when ESBI is a non-party to the 1999 Order.

The 2001 Order reflects an evolution of the FTC's position as to the circumstances under which a clearinghouse is liable – i.e., when it knew or should have known a particular charge was not authorized.  Thus, even under the FTC's new post-trial focus on the three voicemail services, ESBI can only be found in contempt upon a showing by clear and convincing evidence that it knew or should have known that the Landeen voicemail providers were not obtaining authorization.  But, there is no clear and convincing evidence that ESBI knew (or should have known) that these voicemail charges were not authorized.  The complaints with respect to these products were isolated at best; and, there is no evidence that ESBI was aware of the alleged lack of usage, which does not demonstrate a lack of authorization in any event.  Furthermore, ESBI's undeniable compliance with the 2008 Order is compelling evidence that it substantially complied with the "knew or should have known standard" because the 2008 Order articulates the specific monitoring

---

[28] The named parties in the 2001 Order are ESBI and BCI, and the order provides that it applies to these entities and their "affiliates."  *See* R-3, p. 3.

and testing practices that should be employed to detect when a service provider is not obtaining authorization.

## III.    The Relief That Can Be Awarded Is Governed By The Principles Of Equity

### A.   Restitution Should Not Be Awarded For Class Members In *Moore* And *Nwabueze*

While the FTC can obtain equitable restitution on behalf of consumers under Section 13(b) of the FTC Act, any restitution the Commission receives "must be distributed to injured consumers and cannot be retained." *FTC v. Kuykendall*, 371 F.3d 745, 756 n.6 (10th Cir. 2004). And, restitution should not be awarded to consumers who are "satisfied" with the services they purchased. *Id.* at 766-67. These limitations on the FTC's ability to obtain restitution are significant here because the FTC has argued that the Court should award "full consumer redress" despite the fact that over 86% of the consumers on behalf of whom the FTC purports to seek redress are class members in nationwide class actions where the consumers have the opportunity to obtain 100% refunds or "full redress." 11/13/13 Tr., p. 1471. The FTC's request for an award of restitution for the class members in *Moore* and *Nwabueze* should be denied.[29]

With respect to the consumers who have made claims in *Moore* (or who will make claims in *Nwabueze*), the FTC offers no reason why restitution for these consumers should be awarded to the Commission in this case. The FTC apparently believes the government is in a better position than the class action settlement administrators to distribute funds to these consumers. This approach is nonsensical and would result in a tremendous waste of resources. Indeed, this approach makes the effort undertaken at great cost in *Moore* and *Nwabueze* by the Northern District of California, class counsel, defense counsel, the settlement administrators, and consumer

---

[29] Respondents reiterate, and incorporate fully their prior arguments, that the FTC's claims for restitution on behalf of consumers who have already resolved their claims in *Moore* and *Nwabueze* are barred by the doctrine of *res judicata*. Doc. No. 189; 11/4/13 Tr., pp. 88-96.

class members who have made claims a complete waste of time.  Consumers who have filed (or will file) claims will be told, "I'm sorry, but the government has your refund money."  This approach will result in needless costs in having the settlement administrator deal with the issue; will place an undue burden on Respondents to challenge claims in the class action context; and, most importantly, will require additional action by consumers to obtain redress after they have taken the time to file a claim.  With respect to the consumers who are members of *Moore* and *Nwabueze*, but who chose not to file a claim after receiving notice of their opportunity to do so, the FTC proposes no plan for distribution of the restitution to these consumers, who were sufficiently satisfied with the service such that they did not make a claim as class members.  How does the FTC intend to locate these consumers who it could not locate to bring to testify in this case?  And if it does locate them, does the Commission intend to send a portion of the restitution to these consumers who have already indicated they did not want restitution in *Moore* and *Nwabueze*?  Does the FTC intend to establish a "claims process" (at great cost no doubt) with the hope that the individuals who did not make a claim after receiving notice in the class action context will now make a claim for monies held by the government?

The FTC has no proposal to distribute restitution to these class members because there is no principled reason why claims for restitution should be resolved through a contempt award paid to the FTC when these same consumers have received notice and the opportunity for full redress in *Moore* and *Nwabueze*.  Moreover, the FTC cannot explain why it should be awarded restitution for consumers who were satisfied with their service such that they have spurned prior opportunities for restitution.  As such, the FTC's restitution award (if any) should not include consumer class members in *Moore* and *Nwabueze*.

**B.  A Restitution Award (If Any) Should Be Based On Individualized Harm Or On The Processing Fees Retained By Respondents**

Because the FTC has failed to show by clear and convincing evidence that the Respondents engaged in a pattern or practice of contemptuous conduct that harmed each and every consumer at issue, this Court should not apply a gross receipts "baseline" as its starting point for determining the amount of any restitution award.  *See Kuykendall*, 371 F.3d at 764-765 (sanctioning use of defendants' gross receipts as starting point for assessing sanctions, but only in cases of "pervasive, persistent contempt" where it has been shown "through clear and convincing evidence that defendants were engaged in a pattern or practice of contemptuous conduct"); *Figgie*, 994 F.2d at 605-606 (allowing use of gross receipts as "baseline" where FTC proved that the defendant made misrepresentations "that … were widely disseminated").  Moreover, any remedy awarded must be limited by traditional principles of equity.  *See* Doc. 1, Complaint, ¶1 (seeking equitable relief under Section 13(b) of FTC Act); *FTC v. Think All Publ'g, L.L.C.,* 564 F. Supp. 2d 663, (E.D. Tex. 2008) (equitable relief is the only relief available under Section 13(b)).  Because this is an equity proceeding, and the availability of any restitution under Section 13(b) of the FTC Act derives from equitable jurisdiction, the Court "may award only equitable restitution" in this case.  *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 67 (2d Cir. 2006).[30]

Here, equitable restitution would be limited to the amount of processing fees retained by Respondents for processing the third-party billing transactions at issue.  *See* § III. D, *infra*. According to *Verity,* "[t]he appropriate measure for restitution is the benefit unjustly received by

---

[30] Restitution is a remedy available in law and equity proceedings, but it is equitable in nature where (as here) it is sought in an equity proceeding.  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (U.S. 2002) ("[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.").

the defendants." 443 F.3d at 67. The facts in *Verity* are strikingly similar to those in this case. In *Verity*, the defendant processed billing records for underlying transactions that were alleged to have been made without a line-subscriber's authorization. The defendants in *Verity* – like Respondents here – received only a portion of the amount consumers paid to the underlying service providers. *Verity* reversed the district court's order requiring the defendants to repay the total amount paid by consumers because the order was based upon the "fallacy" that equitable restitution is measured by the consumer's loss:

> Undeniably, in many cases in which the FTC seeks restitution, the defendant's gain will be equal to the consumer's loss because the consumer buys goods or services directly from the defendant. Thus, in these cases it is not inaccurate to say that restitution is measured by the consumer's loss. But it is incorrect to generalize this shorthand and apply it as a principle in cases where the two amounts differ - for example, when some middleman not party to the lawsuit takes some of the consumer's money before it reaches a defendant's hands.

*Id.* at 68.

Despite the equitable nature of this action and the Court's limited jurisdiction, the FTC erroneously claims the "law requires" the Court to award "full consumer redress" in an amount that is ***thirty four times greater*** than the processing fees retained by Respondents.[31] This position is contrary to the sound reasoning in *Verity* which is directly on point and should guide this Court in fashioning an award,[32] if the Court finds an award of restitution is warranted. It is also

---

[31] With respect to the Landeen voicemail services that are the focus of the FTC's post-trial briefing, the FTC advocates for a restitution award of $30,115,928. The processing fees retained by ESBI for processing billing records for these services was $886,288.

[32] In arguing that *Verity* is inapplicable, the FTC ignores that it too relies upon cases in which "only one who sold directly to consumers was sued." *See FTC v. EdebitPay, LLC*, 695 F.3d 938 (9th Cir. 2012) (FTC sued the direct sellers of online marketing of prepaid debit cards and short-term loans to consumers); *FTC v. Trudeau*, 662 F.3d 947 (7th Cir. 2010) (FTC sued the specific individual who misrepresented the contents of his own book); *Kuykendall*, 371 F.3d 745 (FTC directly sued the defendants that were telemarketing magazine subscriptions which were allegedly deceptive); *McGregor v. Chierico*, 206 F.3d 1378 (same).

unsupported by the FTC's case law. Neither *EdebitPay* nor *Trudeau* stands for the proposition that "full consumer redress" is the exclusive measure of damages under these circumstances.

First, *EdebitPay* does not discuss *Verity* or hold that unjust gain is an inappropriate baseline in a case involving a middleman. To the contrary, *EdebitPay* holds that a court "may" base an award of restitution on consumer loss, but only if the court "explain[s] why the use of consumer loss is appropriate and why the remedy is commensurate with the harm." *Id.* at 945. *EdebitPay* is in accord with *Verity*, which holds that consumer loss is not an appropriate baseline where (as is the case here) the FTC seeks equitable restitution from a middleman, which retained only a fraction of the consumer payments. Second, *Trudeau* does not hold that *Verity* is inapplicable to contempt proceedings. Rather, *Trudeau* holds that *Verity* did not apply to ***that*** contempt proceeding because "Trudeau's situation bears no resemblance to the defendants' situation in *Verity*...." *Id.* at 951. Finally, the FTC's citation to the unpublished order in *BlueHippo* is inapposite to the question of an appropriate restitution "baseline." The question presented in *BlueHippo* was whether the owner of the contempt defendant could be jointly and severally liable. *FTC v. BlueHippo Funding, LLC*, 1:08-CV-1819, pp. 11-12 (S.D. N.Y. July 27, 2010). The court found the owner could be found liable because he was "legally identifiable" with *BlueHippo*. In *dicta*, the court distinguished *Verity* because *Verity* involved a direct FTC action. This fact, however, does not make the holding of *Verity* inapplicable here. Indeed, *Verity* was premised on the principles of equity, which apply with equal force to contempt proceedings. *Spallone v. United States*, 493 U.S. 265, 274 (1990) (applying "traditional equitable principles" to contempt proceeding). *Verity* soundly teaches that equitable restitution would be limited to the amount of processing fees retained by Respondents.

**C.  *Jacksonville Paper* Does Not Preclude The Court From Properly Calculating The Baseline To Be Equal To Gross Revenue Retained By Respondents**

Unable to avoid *Verity*, the FTC persists with its argument that *Jacksonville Paper* demands that this Court award "full consumer redress."  Doc. 204, p. 38, n.83.  As this Court has correctly stated, *Jacksonville Paper* does not mandate that the Court fashion a particular award.[33] 11/4/2013 Tr. pp. 104-105.  The issue in *Jacksonville Paper* was whether the District Court had the authority to order "back pay" (which is a form of equitable restitution) under the Fair Labor Standards Act.  *Jacksonville Paper* should properly be read for the limited proposition that a Court has wide discretion to fashion an award when sitting in equity.  This recognition of the Court's wide discretion, however, cannot support the position that an equity court ***must*** mandate an award based upon the alleged consumer loss.  Such an argument misconstrues *Jacksonville Paper* and turns equity on its head.[34]

---

[33] The FTC also cites several cases for the proposition that, once a finding of contempt has been made, the Court has no discretion to reduce the award below the "actual loss."  The FTC grossly misstates the holdings from these cases, which is that a district court has no discretion to "withhold an order in civil contempt awarding damages, to the extent they are established."  *See Vuitton et. Fils S. A. v. Carousel Handbags*, 592 F.2d 126, 130 (2nd Cir. 1979) (remanding to district court because "Vuitton should be afforded an opportunity to prove its damages"); *In re Grand Jury Subpoena*, 690 F. Supp. 1451, 1453 (D. Md. 1988) ("Once the complainant demonstrates actual losses stemming from the contumacious behavior, the Court is not free to exercise its discretion and withhold an order awarding compensatory damages."); *Thompson v. Cleland*, 782 F.2d 719, 722 (7th Cir. 1986) (remanding because district court refused to allow petitioner to present damages caused by contemptuous conduct).  Finding that a party should be entitled to present evidence of damage upon a showing of contempt is a far cry for mandating that a district court has no discretion in fashioning an award under the principles of equity.

[34] The FTC's reliance on *United States v. United Mine Workers* for the proposition that restitution must be based upon consumer loss is equally misplaced.  330 U.S. 258 (1947).  *United Mine Workers* did not limit such an award to only consumer loss.  *United Mine Workers* cites to *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 456-457 (U.S. 1932), in which the Supreme Court held "[p]rofits are … allowed as an equitable measure of compensation."  And, courts have recognized that *United Mine Workers* did not overrule *Leman*; and, gain is a proper, equitable measure of compensation.  *Connolly v. J.T. Ventures*, 851 F.2d 930, 933-934 (7th Cir. 1988) (holding that *United Mine Workers* did not overrule *Leman* or limit contempt sanctions to only consumer loss).

The FTC chose to sue only the "middleman" – not the Landeen Entities, which engaged directly in the alleged wrongful conduct and received the overwhelming majority of purported consumer loss; not the LECs, which controlled the consumer phone bill and retained more of the purported consumer loss than Respondents; and not Smiley Media, the marketing company that was responsible for the marketing the FTC contends was misleading.  While the FTC is not required to sue every wrongdoer, it cannot rely upon the equitable relief available under the FTC Act without being subject to traditional principles of equity including proportionality, which limits the amount it can obtain from a single wrongdoer.  The most the FTC can be awarded under the specific facts of this case (if anything) is the portion of consumer payments that were retained by Respondents as processing fees.

### D.   Respondents' "Gain" For The Disputed Transactions Is Significantly Less Than That Of The Parties The FTC Chose Not To Sue

*Verity* teaches the defendant's gain – not consumer loss – often sets the appropriate baseline for restitution.  Here, as in *Verity*, there are others who received consumer payment but are not parties to this lawsuit – *i.e.*, the LECs and the Landeen Entities.  These entities have taken the overwhelming majority of the consumer payments.  Under this framework, Cathy Coleman's testimony regarding the processing fees earned by Respondents establishes any potential baseline. Ms. Coleman testified that consumers made payment for the Landeen products directly to the LECs.  11/13/13 Tr., pp. 1454-56.  The LECs retained a portion of each consumer's payment as a "LEC fee" and the remaining consumer dollars were passed on to the appropriate clearinghouse, which retained its processing fee.  The balance was then passed to the Landeen Entity.  *Id.*

Under this billing process, the LECs retained approximately $1.50 for each $14.95 payment made for a Landeen Entity product or service.  *Id.*  The Respondent clearinghouse would retain

2.7 percent of the payment – or 41 cents – for its processing fee.  The Landeen Entity would receive the remaining approximately $13.00.  *Id.*

Ms. Coleman further testified that, under this billing process, the Respondent clearinghouses retained only $2,211,133 in processing fees of the total amount of consumer payments made for the Landeen Entity products and services. 11/13/13 Tr., p. 1460.  For the three voicemail products that have become the post-trial focus of the FTC, the processing fee amount retained by ESBI (the clearinghouse that processed all the charges for the three voicemail products) and whose conduct is governed by the 2001 Order) is only $886,288.  *Id.*  Respondents' "gain" can be further broken down as follows: (1) HBS – the only entity that is even arguably bound by the 1999 Order – retained only $1,060,450 in processing fees;[35] and, (2) the named parties to the 2008 Order (ACI and BCI) retained only $264,396 in processing fees.[36]  *Id.* at 1460.  But because Respondents substantially complied with the 1999 Order, no contempt award should be entered.

## IV.   Respondents Substantially Complied With The 1999 Order

Not only did Respondents comply with the 1999 Order, but Respondents went even further than what was required in working to detect and prevent cramming.  The evidence consistently and unequivocally demonstrates that Respondents were continuously reacting to changes within the third-party billing industry and implementing protocols to detect and prevent cramming.  The Court heard from an impressive number of current and former employees, each with 10+ year tenure with the company.  With sincerity and conviction, each of these witnesses told Respondents' story in their own way, in their own words demonstrating Respondents' commitment and effort to detect and prevent cramming.  *See, e.g., Mitchell, DeSilva, Welge, Wardashki, Cubeta* Testimony.

---

[35] HBS did not process any transactions for the three voicemail products.
[36] BCI retained none.  ACI retained $264,396.

**A. Respondents' Best Practices Program Was Designed Specifically To Prevent Unauthorized Charges For All Respondents' Service Providers**

All of the witnesses were consistent in their explanation that Respondents' business practices evolved over time.  *See, e.g.*, *Cubeta Testimony,* 11/8/13 Tr., p. 1112.  By the time Ms. Cubeta joined BCI in 2003, Respondents already had their Consumer Protection Standards of Practice in place.[37]  *Id*. at 1107.  By 2006, Respondents had further refined these practices and formalized them into the Best Practices Program.  *Id*. at 1112.

The purpose of the Best Practices Program was to ensure that Respondents were monitoring client performance and performing due diligence when on-boarding new clients.  *Id*. at 1112, 1123. The Program was designed to detect and prevent unauthorized billing and was applied across the board to all of Respondents' service providers, including enhanced.  *Id*. at 1126.

Respondents' Best Practices Program consists of three key features:  due diligence, monitoring, and testing.  *Id*. at 1123.  In the due diligence component, additional background checks on service providers were incorporated into the Best Practices Program. *Id*. at 1128.  Also, a "first file" procedure was added that entailed "randomly selecting 30 BTNs out of the first file of records that the service provider submits… before they have submitted any records whatsoever to the local exchange carrier."  *Id*. at 1129.  Then, "after identifying the 30-record sample," the service provider provides "express authorization for each and every single one of those charges."

---

[37] Respondents' Consumer Protection Standards of Practice appeared in every contract from at least 2003 until 2010 and were intended to ensure that the service providers were "capable of providing the service and that there's investigation, as necessary, and information is being provided at the outset as well as ongoing" to ensure that Respondents were able to detect and prevent cramming if any of its service providers engaged in such activity.  *Id*. at 1107, 1113-14 (testifying that Respondents' Consumer Protection Standards of Practice appeared in contracts that pre-dated her joining BCI in 2003).

*Id*. If the express authorization is not present for every single one of those 30 BTNs, the service provider is not permitted to bill. *Id.*

The testing procedures were also further developed in the Best Practice Program. Respondents created the Variable Reporting System (VRS) that enabled them to electronically calculate inquiry ratios and generate reports on a monthly basis for all service providers. *Id*. at 1122. Through VRS, service providers were monitored on a monthly basis; and, if they exceeded any one of three inquiry thresholds, testing of express authorization was performed. *Id*. at 1129-1131, 1133. If express authorization could not be verified by Respondents' quality assurance department on a 95% basis, Respondents would either terminate/suspend the client or proceed to a larger 100-most-recently-credited-charges sample, and check it against a 95% pass rate. *Id*. at 1135. An additional tier of testing – the third review test – was also incorporated into the Best Practices Program. If the client was in testing for the third time in a twelve-month period, 40 BTNs were tested, but without the assistance of the service provider (*e.g.*, Respondents may travel to provider's location and manually or directly retrieve or supervise retrieval of the switch record, LOA, or TPV information). *Id*. at 1136-37.

## B. The 2008 Order Memorialized Respondents' Best Practices Program, Which Provided Specific Guidelines For Respondents To Follow

Respondents' Best Practices Program served as a starting point for negotiations with the FTC in developing the compliance terms embedded in the 2008 Order. *Id*. at 1125-26. Essentially, the 2008 Order memorialized the Best Practices Program along with some additional techniques the FTC wanted to have included. *Id*. Once the FTC make clear what it wanted in the 2008 Order, Respondents listened and did everything that it took – at great expense, time, and human capital – to engineer their entire business operations to be compliant with the Order. The Best Practices

Program "was adjusted to fit with the 2008 Order." *Id*. at 1228.[38]  Respondents' aim was to follow the FTC's "written, documented policies."  *Id*. at 1222.  The 2008 Order was viewed by Respondents as their Bible.  *Id.*

After the FTC gave its blessing to the Respondents' Best Practices Program by incorporating it into the 2008 Order with some additional requirements, Respondents reasonably believed that the 2008 Order told them precisely what they needed to do to be in compliance; and, Respondents believed they were meeting "the expectations of the Federal Trade Commission" if they followed the mandates of the 2008 Order. *Id*. at 1148.  Respondents believed the 2008 Order clarified the 1999 Order in that it mandated "due diligence monitoring and testing in order to be in compliance." *Id*. at 1148.  The "beauty of the 2008 Order" was that it told Respondents "exactly what we need to do." *Id*. at 1149.

Respondents were pro-active in their efforts to prevent cramming through their Best Practices Program and in their application of the 2008 Order.  Respondents were "constantly looking to improve" and were "not complacent."  *Id*. at 1161.  "[D]espite what the expectation is in the 2008 Order, we were always looking to identify if there's a better means of performance monitoring." *Id.*

Respondents were unquestionably committed to "taking all preventative measures." *Id*. at 1121.  Respondents were continually engaging the LECs to ascertain whether they "had any additional ideas or pieces of information that they thought would be more helpful to make the transaction stronger." *Welge Testimony,* 11/6/13 Tr., p. 830 ("If there were ideas that were brought

---

[38] For example, Respondents developed a due diligence checklist to follow the requirements of the 2008 Order.  *Id*. at 1228.  Respondents implemented additional measures for due diligence, including background checks, a first file process, and a reduction of the customer service inquiry ratio for telecommunications services.  *Id.*

forth, we would definitely try to vet them out and see if it was something that could be added to our system."). Respondents also monitored calls to service providers' call centers to ensure that they were timely answering consumer calls and treating end users politely when they called in for any reason. *DeSilva Testimony,* 11/6/13 Tr., p. 710. When a service provider was experiencing high inquiry rates, Respondents would suggest to them that they improve the process of verifying that the person ordering the service was, indeed, the appropriate authorized party. *Welge Testimony,* 11/6/13 Tr., p. 766. Respondents also attempted to head off the LECs' requests for action plans by monitoring service providers and sending out alerts when a service provider reached 75% of the LEC threshold. *Id*. at 798-99. Respondents wanted to "be proactive and be able to highlight or determine if there was an issue prior to [a service provider] exceeding a LEC threshold." *Cubeta Testimony,* 11/8/13 Tr., p. 1119.

Respondents served as an industry leader with respect to their cramming detection and prevention efforts. Respondents heavily promoted their Best Practices Program to various government entities to inform them of their efforts to prevent cramming. *Id*. at 1120. "Prior to 2006, the industry had never seen anything like [the Program]. So this was very new." *Id*. at 1115. Ms. Cubeta met with various state agencies, public utility commissions, and states' Attorney Generals to promote the Best Practices program, "just getting the message out there how we have this … best practices program in place and to let them know that we are here to assist the consumer." *Id*. at 1121. Respondents wanted other clearinghouses to adopt similar programs to ensure measures were being taken industry wide to prevent cramming. *Id.*

### C. Respondents Applied The Requirements Of The 2008 Order Across The Board To All Service Providers

The mandates of the 2008 Order were applied across the board to all of Respondents' service providers, regardless of whether they were basic or enhanced providers. *Id*. at 1126. *See*

*also Mitchell Testimony*, 11/7/13 Tr., p. 987.  "[T]o not apply [the Order] to all service providers would be like taking a step back, and we are not going to regress."  *Cubeta Testimony,* 11/8/13 Tr., pp. 1126-27.  The FTC knew that the standards embodied in the 2008 Order were going to be applied to all service providers across the board, regardless of service type.  *Id.* at 1126-27.

There can be no question that Respondents endeavored to meet and exceed the FTC's expectations of them.  Now, the FTC is trying to change the rules by advocating for a more stringent "all reasonable efforts" standard for substantial compliance.  Doc. 204, p. 37.  This standard is neither supported in the Fifth Circuit law nor is it fair under basic principles of equity.  During cross-examination of Ms. Cubeta, the FTC strategy was to take a requirement of the 2008 Order and ask Ms. Cubeta questions to try to elicit testimony as to why a particular practice required by the 2008 Order would not really work to detect or prevent cramming.  For example, the FTC asked, "[e]ven if a potential vendor is a crammer, there is no requirement that the vendor, during the initial review process, submit information under penalty of perjury?"  11/8/13 Tr., pp. 1238-39.  Ms. Cubeta replied, "No.  I just checked the 2008 order, and that does not require it."  *Id.*  By asking questions implying Respondents' efforts to comply with the 2008 Order were insufficient, the FTC is expecting more of Respondents in this contempt action than what they expected from them in the 2008 Order.  This is unfair and is not called for under Fifth Circuit law.

The Fifth Circuit has held that "[c]ontempt represents more than a delay in performance or a lack of perfection; it is, instead, the failure to accomplish what was ordered in meaningful respects."  *Ruiz v. McCotter,* 661 F. Supp. 112 (S.D. Tex. 1986).  *See also Palmigiano v. Di Prete*, 700 F. Supp. 1180 (D.R.I. 1988) (citing *Ruiz* and holding a finding of contempt "must be based not on a mere violation of a court order but on a party's failure to achieve substantial and diligent compliance in meaningful respects with what the court has ordered.").  A party may defeat a

finding of contempt "by demonstrating that they employed, in good faith, the utmost diligence in discharging their responsibilities." *Id.  See also Go-Video v. Motion Picture Ass'n of Am. (In re Dual-Deck Video Cassette Recorder Antitrust Litigation)*, 10 F.3d 693, 695 (9th Cir. 1993).

The FTC fails to acknowledge that Respondents did exactly what the FTC told them to do in the 2008 Order.  The evidence presented to the Court demonstrates that Respondents made every reasonable effort to meaningfully accomplish what the FTC told them would amount to compliance with the FTC's anti-cramming mandates.  Because the intent of the 1999 Order (and the 2001 and 2008 Orders) was to prevent cramming, and because the 2008 Order is the FTC's latest articulation of what can and should be done to detect and prevent cramming, Respondents' compliance with the 2008 Order equates to substantial compliance with the 1999 Order.

## CONCLUSION

The Court should not find Respondents in contempt of the 1999 Order.  The FTC has failed to present clear and convincing evidence – evidence so clear, direct, weighty, and convincing so as to persuade a clear conviction, without hesitancy, of the truth of the precise facts of the case – that Respondents violated the 1999 Order.  Instead, the evidence at trial thoroughly established Respondents' development and implementation of the utmost diligence in discharging their responsibilities under the 1999 Order with the Best Practices Program, which the FTC accepted and adopted when the 2008 Order was entered.

From the limited instances for which there is admissible evidence of arguably unauthorized charges, the FTC's evidence is insufficient for the Court to extrapolate a "pattern and practice" that Respondents knowingly processed unauthorized charges via ESBI.  The only pattern that has been established is Respondents' practice of diligently and aggressively taking all preventative measures reasonably available to them to prevent processing unauthorized charges in good faith.

Consumers who have truly been charged for a service that was not authorized despite Respondents' diligent efforts (and who have not already been refunded) can make a claim for a 100% refund in *Moore* and *Nwabueze*.  No restitution need be entered here for those resolved and settled claims. Any award that may be entered should be limited to the individual consumers for which there is direct evidence, and further limited to Respondents' gain as a middleman for the transactions.

Finally, when fairly considered, the evidence reveals that the 1999 Order must be modified and updated in recognition of the limitations Respondents face as clearinghouses. The restraints the FTC might enforce against the product and service providers who directly interact with consumers cannot, in fairness, be applied to Respondents.  Respondents request that the Motion to Show Cause be denied and that Respondents' Motion to Modify be granted.

Respectfully submitted,

By: __/s/ *Dina M. Cox*_____
Dina M. Cox, Atty No. 18590-49
Robert M. Baker, IV*
Indiana Atty No. 25471-49
**LEWIS WAGNER, LLP**
501 Indiana Avenue, Ste. 200
Indianapolis, Indiana 46202
Telephone:  (317) 237-0500
Facsimile:  (317) 237-6390
*pro hac vice*

Ricardo G. Cedillo
State Bar No. 04043600
rcedillo@lawdcm.com
Derick J. Rodgers
State Bar No. 24002857
drodgers@lawdcm.com
**DAVIS, CEDILLO & MENDOZA, INC.**
McCombs Plaza, Suite 500
755 E. Mulberry Avenue
San Antonio, Texas  78212
Telephone:  (210) 822-6666

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served electronically in compliance with Local Rule CV-5(a). As such, the foregoing document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1). Pursuant to Fed. R. Civ. P. 5(a)-(b) and Local Rule CV-5(b)(2), all other counsel of record not  deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email and/or fax, on December 16, 2013.

**Douglas V. Wolfe**
**Sarah Waldrop**
**Robin L. Moore**
**Jonathan Cohen**
Federal Trade Commission
600 Pennsylvania Ave., NW
Suite M-8102B
Washington, DC 20580

**Robert Shaw-Meadow**
U.S. Attorney's Office
601 N.W. Loop 410
Suite 600
San Antonio, TX 78216

By: __/s/ *Dina M. Cox*_____
Dina M. Cox, Atty No. 18590-49